**Exhibit A: Indictment in Related Case**

WMP:JMK/MK/BDM
F. #2013R00505

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

ROBERT BANDFIELD,
       also known as "Bob Bandfield,"
GREGG MULHOLLAND,
       also known as "Stamps" and "Charlie Wolf,"
PHILIP KUEBER,
       also known as "Phil Thomas,"
BRIAN DE WIT,
PAULA PSYLLAKIS,
KELVIN LEACH,
ROHN KNOWLES,
CEM CAN,
       also known as "Jim Can,"
ANDREW GODFREY,
IPC MANAGEMENT SERVICES, LLC,
IPC CORPORATE SERVICES INC.,
IPC CORPORATE SERVICES LLC,
LEGACY GLOBAL MARKETS S.A.,
TITAN INTERNATIONAL SECURITIES INC. and
UNICORN INTERNATIONAL SECURITIES LLC,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

FILED
CLERK

2015 JUL 31  PM 4: 40

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>14-476 (S-1) (ILG)</u>
(T. 15, U.S.C., §§ 78j(b) and 78ff;
T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 1956(h), 2 and 3551 <u>et</u>
<u>seq</u>.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

## INTRODUCTION

       At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.     <u>Background</u>

       A.     <u>The Corporate Defendants</u>

           1.     The defendant IPC MANAGEMENT SERVICES, LLC was a Nevada

limited liability company with its principal place of business in Belize City, Belize, and a

mailing address in Clackamas, Oregon. The defendant IPC CORPORATE SERVICES INC. was a Belize corporation with its principal place of business in Belize City, Belize, and an office in St. Vincent, West Indies. The defendant IPC CORPORATE SERVICES LLC was a Nevis, West Indies, limited liability company with its principal place of business in Belize City, Belize, and mailing addresses in Clackamas, Oregon, and Nevis, West Indies. IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC. and IPC CORPORATE SERVICES LLC (collectively, "IPC CORP") were offshore management companies that marketed themselves on their website as providing, inter alia, the following services: (a) offshore company formation; (b) nominee services; (c) trust formation; (d) licensed trustee services; (e) full banking services; (f) offshore credit cards; and (g) offshore brokerage (securities) accounts.

2.      The defendant LEGACY GLOBAL MARKETS S.A. ("LEGACY") was an offshore broker-dealer and investment management company with its principal place of business in Panama City, Panama, and an office in Belize City, Belize. LEGACY marketed itself on its website as a fully licensed broker-dealer, regulated by the International Financial Services Commission ("IFSC") of Belize, which provided investors with full access to the major global exchanges worldwide from a single investment account. LEGACY emphasized that its management consisted of seasoned executives who had extensive experience in the offshore financial industry and distinguished backgrounds ranging from top-performing financial advisors to experts in banking, public policy, securities law and regulatory compliance.

3.      The defendant TITAN INTERNATIONAL SECURITIES INC. ("TITAN") was an offshore broker-dealer and investment management company with its principal place of business in Belize City, Belize. TITAN marketed itself on its website as a fully licensed broker-dealer, regulated by the IFSC of Belize, which serviced, inter alia, the

2

Over-the-Counter ("OTC") markets for both corporate and individual clients. TITAN

emphasized that it considered client confidentiality paramount and adhered to Belize's strict

privacy laws.

        4.     The defendant UNICORN INTERNATIONAL SECURITIES LLC

("UNICORN") was an offshore broker-dealer and investment management company with its

principal place of business in Belize City, Belize. UNICORN marketed itself on its website as a

fully licensed broker-dealer, regulated by the IFSC of Belize, which provided investors with full

access to the major global exchanges worldwide from a single investment account. UNICORN

emphasized that its clients could "trade with confidence" because, inter alia: (a) information

about beneficial owners, shareholders, directors and officers is not filed with the Belize

government and not available to the public; (b) Belize does not disclose banking and financial

information to the United States, or any other foreign government, for any reason, including for

cases involving tax-related issues; (c) no government approvals are required for the transfer of

dividends, interest and royalties, and for the repatriation of capital; and (d) it provided online

brokerage features, including order routing to different market makers and 24-hour access to

cash and securities transactions.

    B.    The Individual Defendants

        5.     The defendant ROBERT BANDFIELD, also known as "Bob Bandfield," a

U.S. citizen, founded and controlled IPC CORP. BANDFIELD worked at IPC CORP's office in

Belize City, Belize. BANDFIELD also claimed to have created TITAN, LEGACY and

UNICORN.

        6.     The defendant GREGG MULHOLLAND, also known as "Stamps" and

"Charlie Wolf," a dual citizen of the U.S. and Canada and resident of California, was one of IPC

CORP's largest clients. By June 2011, MULHOLLAND moved cash and a substantial amount of his securities to LEGACY, and in or about February 2012, MULHOLLAND purchased LEGACY for approximately $1 million. From approximately February 2012 through September 2014, MULHOLLAND secretly owned and controlled LEGACY.

7. The defendant PHILIP KUEBER, also known as "Phil Thomas," a Canadian citizen who made illegal payments to obtain Belizean citizenship, was MULHOLLAND's associate. KUEBER resided and worked in California and Belize.

8. The defendant BRIAN DE WIT, a citizen of Canada, was LEGACY's President and primary broker. DE WIT worked at LEGACY's offices in Belize and Panama.

9. The defendant PAULA PSYLLAKIS, a citizen of Canada, was married to the defendant BRIAN DE WIT and managed LEGACY's back office operations. PSYLLAKIS worked at LEGACY's offices in Belize and Panama.

10. The defendant KELVIN LEACH, a citizen of the Bahamas, was TITAN's President. LEACH worked at TITAN's office in Belize City, Belize.

11. The defendant ROHN KNOWLES, a citizen of the Bahamas, was TITAN's Head Securities Trader. KNOWLES worked at TITAN's office in Belize City, Belize.

12. The defendant CEM CAN, also known as "Jim Can," a dual citizen of Canada and Turkey, was UNICORN's President. CAN worked at UNICORN's office in Belize City, Belize.

13. The defendant ANDREW GODFREY, a citizen of Belize, was BANDFIELD's primary associate and worked at IPC CORP's office in Belize City, Belize. GODFREY was the main contact at IPC CORP for its clients.

II.    Relevant Regulatory Principles and Definitions

14.    The Foreign Account Tax Compliance Act ("FATCA") was a federal law enacted in March 2010 that targeted tax non-compliance by U.S. taxpayers with foreign accounts. FATCA required U.S. persons to report their foreign financial accounts and offshore assets. Additionally, FATCA required foreign financial institutions to report to the Internal Revenue Service ("IRS") certain financial information about accounts held by U.S. taxpayers or foreign entities in which U.S. taxpayers held a substantial ownership interest.

15.    An international business corporation ("IBC") was an offshore, untaxed company, formed under the laws of a foreign jurisdiction, which was not permitted to engage in business within the jurisdiction in which it was incorporated. An owner of an IBC could deposit money and transfer stock to an IBC to facilitate banking and securities trading activities while maintaining a level of anonymity for the IBC's true owner because an IBC's ownership records were typically not publicly available.

16.    The term "beneficial owner" was defined under the rules of the U.S. Securities and Exchange Commission ("SEC"). It included any person who directly or indirectly shared voting power or investment power (the power to sell a security). When a person or group of persons acquired beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934, they were required to file a Schedule 13D with the SEC. Schedule 13D reported the acquisition and other information within ten days after the purchase. The schedule was filed with the SEC and was provided to the company that issued the securities and each exchange on which the security was traded. Any material changes in the facts contained in the schedule required a prompt amendment.

5

17.     The term "nominee" in the securities fraud context referred to a person or firm into whose name securities or other properties were transferred in order to facilitate transactions, while concealing the customer as the actual owner.  A "nominee account" was a type of account in which a stockbroker held shares belonging to clients in the name of a sham entity or another individual.  The use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer.

18.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization.  Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges.  Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

19.     Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership.  For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B.  Matched trades were similar to wash trades but involved a related third person or party who placed one side of the trade.  For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker.  Both wash trades and matched trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

6

20.     A "pump and dump" scheme was a scheme where a group of individuals who control the free trading or allegedly unrestricted shares, also referred to as the "float," of a microcap company fraudulently inflated the share price and trading volume of the targeted public company through, inter alia, wash and matched trades, false and misleading press releases and paid stock promotions.  When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

III.    The Fraudulent Scheme

     A.     Overview

21.     In or about and between January 2009 and September 2014, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," PHILIP KUEBER, also known as "Phil Thomas," BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN, also known as "Jim Can," ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL MARKETS S.A., TITAN INTERNATIONAL SECURITIES INC. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, devised and engaged in a scheme whereby they agreed to: (a) defraud investors and potential investors in various U.S. publicly traded companies through, inter alia, the fraudulent concealment of the true beneficial ownership interests in the various U.S. publicly traded companies, and the engineering of artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies; (b) defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment and collection of revenue, specifically federal income

taxes under, <u>inter alia</u>, FATCA; and (c) launder money by facilitating financial transactions to and from the United States, which transactions involved proceeds of fraud in the sale of securities.

22.     In or about and between January 2009 and September 2014, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," PHILIP KUEBER, also known as "Phil Thomas," BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN, also known as "Jim Can," ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL MARKETS S.A., TITAN INTERNATIONAL SECURITIES INC. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, created numerous shell companies and bank accounts through which passed approximately $500 million in fraudulent proceeds connected to more than 100 U.S. citizens and residents.

23.     The defendant GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," controlled a group of approximately a dozen individuals, including the defendant PHILIP KUEBER, also known as "Phil Thomas" (hereinafter collectively referred to as the "Mulholland Group"), which was responsible for fraudulently manipulating the stock of more than forty U.S. publicly traded companies and then transferring, through attorney escrow accounts associated with five offshore law firms, approximately $300 million in fraudulent proceeds into, <u>inter alia</u>, accounts controlled by the Mulholland Group in the U.S. and Canada.

B.     The Undercover Operation

24.     Beginning in approximately November 2012, a law enforcement agent posing as a stock promoter engaged in fraudulent trading activity (the "Undercover Agent") was directed by John Doe 1, an employee for the now-defunct Bahamas-based broker-dealer Gibraltar Global Securities, Inc. whose identity is known to the Grand Jury, to LEGACY and TITAN. John Doe 1 advised the Undercover Agent that LEGACY and TITAN could establish an IBC for the Undercover Agent to facilitate his stock promotion business, and that same day, sent an email to the Undercover Agent providing him with the contact information for the defendant KELVIN LEACH.

25.     In or about January 2013, the Undercover Agent, while located in the Eastern District of New York, placed consensually-recorded telephone calls to the defendants KELVIN LEACH and ANDREW GODFREY. During these telephone calls, the Undercover Agent explicitly stated that he was a U.S. citizen who was interested in opening an offshore brokerage account with TITAN. The Undercover Agent added that he was a stock promoter who wanted to conceal his ownership of stocks and money transfers in order to avoid scrutiny from the SEC and the IRS. LEACH informed the Undercover Agent that TITAN did not open individual accounts in the name of U.S. citizens but explained that TITAN could open a brokerage account for the Undercover Agent through an IBC that could be created by IPC CORP.

26.     Shortly thereafter, the defendant ANDREW GODFREY informed the Undercover Agent that IPC CORP could establish a corporate structure that concealed the Undercover Agent's ownership interest in his brokerage account at TITAN, which would provide the Undercover Agent with the desired protection he sought from the SEC and the IRS.

Specifically, GODFREY explained that IPC CORP would establish a limited liability company ("LLC") and an IBC for the Undercover Agent and designate IPC CORP's employees as the beneficial owners, or more appropriately, the nominees. In this fraudulent structure designed to conceal the Undercover Agent's control and ownership, the IBC, which opened the Undercover Agent's brokerage account at TITAN, would be owned by the LLC and the Undercover Agent's name would not be associated with either entity.

27.    In or about October 2013, after the Undercover Agent had paid $3,300 for the IBC and LLC and the brokerage accounts at LEGACY and TITAN established for him by IPC CORP to conceal his true beneficial ownership, the Undercover Agent made consensually-recorded telephone calls to the defendants BRIAN DE WIT and KELVIN LEACH. During these telephone calls, in furtherance of the Undercover Agent's fraudulent scheme to conceal his true beneficial ownership of his brokerage account, DE WIT and LEACH confirmed to the Undercover Agent that IPC CORP had established brokerage accounts, not in his name, but in the name of the Undercover Agent's designated IBCs.

28.    On or about November 6, 2013, the Undercover Agent met with the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," and ANDREW GODFREY at IPC CORP's office in Belize. The entire meeting was recorded by the Undercover Agent with a recording device. During this meeting, BANDFIELD and GODFREY explained, in great detail, how IPC CORP assisted U.S. citizens, like the Undercover Agent, in evading U.S. laws and regulations, including the IRS's reporting requirements, by establishing sham IBCs and LLCs. To assure the Undercover Agent of IPC CORP's expertise with managing this fraudulent arrangement and BANDFIELD's own experience in dealing with clients seeking to manipulate the markets and effectively transfer money and stock into and out of the United

10

States without leaving a trail, BANDFIELD revealed that he had created TITAN and LEGACY and had incorporated more than 5,000 sham companies. BANDFIELD then suggested means by which the Undercover Agent could circumvent the SEC's reporting requirements by concealing his beneficial ownership of more than five percent of a public company's stock through nominee accounts, and the IRS's reporting requirements by having a nominee sign IRS Forms W-8BEN for the Undercover Agent's IBCs and LLCs. An IRS Form W-8BEN is a form which notifies the IRS that a foreign individual is the beneficial owner of funds that are subject to tax withholding. Finally, BANDFIELD and GODFREY explained that IPC CORP would soon offer its clients prepaid MasterCards that allowed for transfers up to $50,000 per month, adding, "we can make it so it's not attached to you."

29.     That same day, the Undercover Agent also met with the defendant ROHN KNOWLES in the presence of the defendant ANDREW GODFREY. Consistent with the defendant ROBERT BANDFIELD's explanation of IPC CORP's fraudulent coordination with LEGACY and TITAN, KNOWLES acknowledged that TITAN could not open an account for U.S. citizens, like the Undercover Agent, without IPC CORP's IBC and LLC arrangement. When the Undercover Agent explicitly indicated that he wanted to engage in fraudulent market manipulation through wash trades and matched trades between two accounts controlled by him, KNOWLES stated that he could orchestrate those trades through close coordination with the defendant BRIAN DE WIT at LEGACY, and stated that "me and Brian do it all the time for other clients."

30.     A few months later, on or about March 4, 2014, the Undercover Agent met again with the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," and ANDREW GODFREY at IPC CORP's office in Belize. This meeting was also recorded by the

Undercover Agent with a recording device. During this meeting, BANDFIELD and GODFREY touted, <u>inter alia</u>, IPC CORP's success in establishing fraudulent corporate structures, including six IBCs and two LLCs for the Undercover Agent in order to conceal the Undercover Agent's true beneficial ownership of the brokerage accounts at LEGACY, TITAN, UNICORN and two additional broker-dealers. BANDFIELD explained that this "slick" structure was specifically designed to counter U.S. President Barack Obama's new laws, a reference to FATCA. BANDFIELD and GODFREY advised the Undercover Agent that the designated nominees, who included a security guard and courier, would sign any stock purchase agreements on behalf of the IBCs at the Undercover Agent's direction. As payment for IPC CORP's services, the Undercover Agent paid BANDFIELD and GODFREY $9,600 in cash and was informed that IPC CORP would refund the earlier $3,300 paid via PayPal to erase the paper trail.

   31. Following this meeting, the defendant ANDREW GODFREY escorted the Undercover Agent to UNICORN's office where GODFREY introduced the Undercover Agent to the defendant CEM CAN, also known as "Jim Can." GODFREY informed the Undercover Agent that IPC CORP conducted a significant amount of business with UNICORN and that UNICORN expedited the opening of accounts for IPC CORP. After the Undercover Agent explicitly revealed his intentions to manipulate the stock of a publicly traded company, CAN confirmed that IPC CORP's scheme of establishing sham IBCs and LLCs enabled UNICORN to execute trades for U.S. citizens like the Undercover Agent. To further conceal its clients' true beneficial ownership and fraudulent activities, CAN explained that UNICORN provided its clients with unidentifiable debit cards which could be used by UNICORN's clients to pay "consultants" in stock manipulation schemes. CAN also advised the Undercover Agent to keep

his wire transfers to Belize under $50,000, and vary the amounts, because a wire transfer of $50,000 and over caused banks to inquire into the source of funds.

32.     Following his return from Belize, the Undercover Agent continued communicating with the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," BRIAN DE WIT, KELVIN LEACH, ROHN KNOWLES, CEM CAN, also known as "Jim Can," and ANDREW GODFREY, in furtherance of the Undercover Agent's purported scheme to conceal his true beneficial ownership, engage in market manipulation of publicly traded companies, evade reporting requirements and the payment of taxes to the IRS and transfer proceeds of fraud in the sale of securities to and from the United States. For example, on or about April 9, 2014, during a consensually-recorded telephone call between LEACH and the Undercover Agent, LEACH confirmed that any wire transfer requests to TITAN must go through IPC CORP and that IPC CORP's nominee must execute stock transfers. When the Undercover Agent explicitly stated that he wanted to orchestrate trading in the stock of a publicly traded company between LEGACY and TITAN, LEACH responded that TITAN worked well with LEGACY.

C.     The Mulholland Group and Other Corrupt Clients

33.     After the enactment of FATCA in March 2010, the defendants LEGACY, TITAN and UNICORN put disclaimers on their websites that they would not accept U.S. clients. Contrary to these representations, LEGACY, TITAN and UNICORN continued to have U.S. clients, so long as the clients concealed their U.S. ties through the defendant IPC CORP's fraudulent IBC and LLC structure. Shortly after the enactment of FATCA, the Mulholland Group became one of IPC CORP's largest clients.

34.     On or about and between March 21, 2014 and May 22, 2014, law enforcement authorities conducted judicially-authorized wiretaps of two IPC CORP, one TITAN and one LEGACY telephone lines, specifically: 305-671-3493 (IPC), 503-305-3897 (IPC), 305-395-7896 (TIS) and 888-400-5461 (LGM).  Additionally, on or about and between May 1, 2014 and May 30, 2014, law enforcement authorities conducted a judicially-authorized wiretap of TITAN telephone line 305-407-8426.  These five judicially-authorized wiretaps (collectively, the "IPC-TIS-LGM Wiretaps") and emails obtained through judicially-authorized search warrants revealed that the fraudulent IBC and LLC structure devised and controlled by the defendant ROBERT BANDFIELD, also known as "Bob Bandfield," and his co-conspirators, extended far beyond the arrangement with the Undercover Agent.

35.     The results of the email search warrants confirmed that the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN, also known as "Jim Can," ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL MARKETS S.A., TITAN INTERNATIONAL SECURITIES INC. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, were engaged in a scheme with more than 100 U.S. citizens and residents (the "Corrupt Clients"), including the defendants GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," and PHILIP KUEBER, also known as "Phil Thomas," to evade, inter alia, U.S. securities and tax laws and conceal their fraudulent activity and illegal proceeds through IPC CORP's fraudulent IBC and LLC structure.

36.     For example, on or about September 6, 2013, the defendant BRIAN DE WIT sent an email to the defendant ANDREW GODFREY requesting that UNICORN waive its

account opening fee of $1,000 because "we agreed to open accounts at each others['] firms and we don't charge such a fee . . . ." On or about November 6, 2013, the defendant ROBERT BANDFIELD, also known as "Bob Bandfield," sent an email to Corrupt Client 1, an individual whose identity is known to the Grand Jury, forwarding IRS Form W-8BEN signed by GODFREY as the nominee for the IBC in response to a request received by Corrupt Client 1 from a U.S. transfer agent. On or about December 4, 2013, the defendant KELVIN LEACH sent an email to BANDFIELD informing BANDFIELD that a client requested that $75,000 be wire transferred from a brokerage account to a law firm in the United States. On or about December 16, 2013, the defendant ROHN KNOWLES sent an email to BANDFIELD, copying LEACH, in which he forwarded an email from Corrupt Client 2, an individual whose identity is known to the Grand Jury, requesting six wire transfers totaling $1.9 million for various IBCs.

      37.    The IPC-TIS-LGM Wiretaps further confirmed that the defendants, together with others, were engaged in a scheme to evade, inter alia, U.S. securities and tax laws and conceal their fraudulent activity and illegal proceeds through IPC CORP's fraudulent IBC and LLC structure. For example, on or about March 24, 2014, Corrupt Client 3, an individual whose identity is known to the Grand Jury, asked the defendant ANDREW GODFREY, whose name he received from the defendant KELVIN LEACH, to have IPC CORP establish an IBC for him to enable him to trade through TITAN. On or about March 26, 2014, Corrupt Client 4, an individual whose identity is known to the Grand Jury, called GODFREY and stated that his biggest concern was getting his funds wired back into the United States. In response, GODFREY advised Corrupt Client 4 that he/she could use his/her IBC account at UNICORN and UNICORN's unidentifiable debit cards to transfer his funds. On or about March 28, 2014, Corrupt Client 5, an individual whose identity is known to the Grand Jury, called the defendant

ROHN KNOWLES to inquire about his trading order and wire transfers to a third party. In response, KNOWLES stated that TITAN could execute third-party wire transfers but reminded Corrupt Client 5 that he needed to send the wire instructions through GODFREY or "whoever the signatory is on the account." On or about May 19, 2014, GODFREY called Corrupt Client 6, an individual whose identity is known to the Grand Jury, and stated that IPC CORP's fraudulent scheme using sham IBC and LLC structures was created to evade the IRS, specifically FATCA. On or about May 29, 2014, LEACH called a representative at Cayman National Bank to confirm three wire transfers, including one wire transfer that was requested in the name of an IBC.

     D.    The Stock Manipulation Schemes

     38.    The Corrupt Clients, including the defendants GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," and PHILIP KUEBER, also known as "Phil Thomas," utilized IPC CORP's fraudulent IBC and LLC structure and brokerage accounts in the names of the IBCs at offshore brokerage firms such as LEGACY, TITAN and UNICORN to facilitate pump and dump schemes involving hundreds of microcap or penny stocks.

     (i)    Cannabis-Rx, Inc.

     39.    Cannabis-Rx, Inc. ("Cannabis-Rx") was a microcap or penny stock company which traded under the ticker symbol CANA on the OTC markets. Cannabis-Rx's purported business plan consisted of serving the real estate needs of the regulated cannabis industry in states where such business was licensed and permitted. Cannabis-Rx's purported business plan also consisted of purchasing real estate assets and leasing facilities to licensed marijuana growers and dispensary owners for their operations.

     40.    The defendants ROBERT BANDFIELD, also known as "Bob Bandfield," BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN,

also known as "Jim Can," ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC

CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL

MARKETS S.A., TITAN INTERNATIONAL SECURITIES INC. and UNICORN

INTERNATIONAL SECURITIES LLC, together with others, conspired with certain of the

Corrupt Clients to fraudulently manipulate the price and volume of Cannabis-Rx's stock.

Specifically, the true beneficial owners of a significant amount of CANA's free trading or

unrestricted stock had concealed their ownership interest through BANDFIELD and IPC

CORP's fraudulent IBC and LLC structure, and DE WIT and PSYLLAKIS, through LEGACY,

were actively involved in the fraudulent manipulation of CANA's stock price and volume.  For

example, on or about and between March 27, 2014 and April 16, 2014, DE WIT and Corrupt

Client 7, an individual whose identity is known to the Grand Jury, engaged in a series of

orchestrated transactions which resulted in CANA's stock price plummeting from $13.77 per

share on March 27, 2014 to $0.50 per share on April 16, 2014.  On March 28, 2014 alone, DE

WIT received at least five telephone calls from Corrupt Client 7 with specific instructions to

fraudulently orchestrate the trading of CANA's stock.  That day, CANA's stock, which had not

traded since July 2, 2013, had a trading volume of 189,800 shares and the share price plummeted

from the previous day's closing price of $13.77 per share to a closing price of $1.90 per share.

      (ii)    <u>Vision Plasma Systems, Inc.</u>

     41.    Vision Plasma Systems, Inc. ("Vision Plasma"), formerly known as

Bonanza Land Holdings Inc. and vLinx Technology Inc., was a microcap or penny stock

company which traded under the ticker symbol VLNX on the OTC markets.  Vision Plasma

purported to be a technology company that manufactured and sold portable plasma gasification

systems for the remediation of hazardous wastes.

42.     The defendants ROBERT BANDFIELD, also known as "Bob Bandfield,"
BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN,
also known as "Jim Can," ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC
CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL
MARKETS S.A., TITAN INTERNATIONAL SECURITIES INC. and UNICORN
INTERNATIONAL SECURITIES LLC conspired with the defendants GREGG
MULHOLLAND, also known as "Stamps" and "Charlie Wolf," and PHILIP KUEBER, also
known as "Phil Thomas," and others, to fraudulently manipulate the price and volume of Vision
Plasma's stock. Specifically, in or about June 2011, approximately 100 million shares of Vision
Plasma were issued to ten different IBCs created by IPC CORP. MULHOLLAND paid for and
beneficially owned nine of these ten IBCs, which in turn owned approximately 84 million shares
of VLNX stock. Thus, MULHOLLAND, together with the Mulholland Group, beneficially
owned and controlled at least 84 percent of the free trading shares of VLNX, which was
concealed from the investing public in violation of SEC rules and regulations.

43.     On August 16, 2012, AwesomePennyStocks.com and other penny stock
promotional websites sent email blasts to their subscribers that VLNX was their new "pick."
Prior to August 16, 2012, there was no trading activity in VLNX. On August 16, 2012, the daily
trading volume was 308 million shares and the stock price, which opened at $0.14 increased to
an intraday high of $0.39 before closing at $0.30. On August 16, 2012, the nine IBCs
beneficially owned and controlled by the defendant GREGG MULHOLLAND, also known as
"Stamps" and "Charlie Wolf," sold more than 83 million shares of VLNX, primarily through
LEGACY, resulting in approximately $21 million in proceeds.

18

      (iii)   <u>Cynk Technology Corp.</u>

     44.    Cynk Technology Corp. ("CYNK"), formerly known as Introbuzz, was a microcap or penny stock company which traded under the ticker symbol CYNK on the OTC markets. CYNK purported to be developing a web-based social network service in which people would pay for introductions to celebrities, business contacts and "even the right squash player."

     45.    The defendants ROBERT BANDFIELD, also known as "Bob Bandfield," BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN, also known as "Jim Can," ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL MARKETS S.A., TITAN INTERNATIONAL SECURITIES INC. and UNICORN INTERNATIONAL SECURITIES LLC conspired with the defendants GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," and PHILIP KUEBER, also known as "Phil Thomas," and others to fraudulently manipulate the price and volume of CYNK's stock. In or about and between April 2012 and September 2012, the Mulholland Group wire transferred $1,524,000 from an account controlled by the Mulholland Group to an Introbuzz account at Bank of America. In June 2012, approximately 75 percent of Introbuzz's initial public offering of stock was purchased by KUEBER's relatives and close associates. On or about August 29, 2012, PSYLLAKIS sent an email to KUEBER informing him that he needed BANDFIELD's assistance for the placement of KUEBER's "Chinese nationals" as the "nominee shareholders" of various IBCs, including three IBCs that later owned the vast majority of CYNK's free trading shares. MULHOLLAND paid IPC CORP for these IBCs.

     46.    In or about May 2013, the defendant PHILIP KUEBER, also known as "Phil Thomas," reserved the name "Cynk Technology Corp." with the Secretary of State of

Nevada using the name "Phil Keeber." On or about June 21, 2013, Introbuzz announced that it had amended its name to CYNK Technology Corp. and updated its ticker symbol to CYNK. Throughout 2013, KUEBER's relatives and close associates sold their CYNK shares to three IBCs controlled by the Mulholland Group.

47.     On or about May 15, 2014, the defendant GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," placed a telephone call to the defendant BRIAN DE WIT, and in reference to CYNK stock, MULHOLLAND stated that "[KUEBER's] working on the CEO scenario right now, you know, resignation," and that "we have all the free trading [shares]." Prior to this conversation between MULHOLLAND and DE WIT, there had been no trading in CYNK stock since on or about April 9, 2014, or for 24 trading days. On or about May 15, 2014, the stock closed at $0.06 per share following trading of 1,900 shares. Beginning on or about June 17, 2014, trading activity in CYNK increased to 367,400 shares traded on that day, and the stock price increased from an opening price of $0.18 per share to a closing price of $2.25 per share. From approximately June 17, 2014 through July 10, 2014, despite having no revenue or assets, more than 2 million shares were traded, CYNK's share price increased from a closing price of $2.25 per share to a closing price of $13.90 per share, and CYNK was valued at more than $4 billion as a result of the fraudulent manipulation by the Mulholland Group. A number of offshore brokerage firms, including LEGACY and TITAN, traded in CYNK stock. On July 11, 2014, the SEC suspended trading in CYNK.

<u>COUNT ONE</u>
(Conspiracy to Commit Securities Fraud)

48.     The allegations contained in paragraphs one through forty-seven are realleged and incorporated as though fully set forth in this paragraph.

49.     In or about and between June 2011 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," PHILIP KUEBER, also known as "Phil Thomas," BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN, also known as "Jim Can," ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL MARKETS S.A., TITAN INTERNATIONAL SECURITIES INC. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in various publicly traded companies, in connection with the purchase and sale of investments in the various publicly traded companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

50.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," GREGG MULHOLLAND, also known as "Stamps" and "Charlie

21

Wolf," PHILIP KUEBER, also known as "Phil Thomas," BRIAN DE WIT, PAULA

PSYLLAKIS, KELVIN LEACH, ROHN KNOWLES, CEM CAN, also known as "Jim Can,"

ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE

SERVICES INC., IPC CORPORATE SERVICES LLC, LEGACY GLOBAL MARKETS S.A.,

TITAN INTERNATIONAL SECURITIES INC. and UNICORN INTERNATIONAL

SECURITIES LLC, together with others, committed and caused to be committed, among others,

the following:

OVERT ACTS

a.      On or about August 29, 2012, PSYLLAKIS sent an email to

KUEBER in which she stated that KUEBER needed the assistance of BANDFIELD with the

placement of KUEBER's "Chinese nationals" as the "nominee shareholders" of various IBCs

established by IPC CORP.

b.      On or about January 24, 2013, during a telephone call between the

Undercover Agent and LEACH, LEACH stated, in part, that the Undercover Agent should

contact IPC CORP to establish an IBC.

c.      On or about January 25, 2013, during a telephone call between the

Undercover Agent and GODFREY, GODFREY stated, in part, that IPC CORP would set up an

LLC and an IBC for the Undercover Agent because the Undercover Agent was an American.

d.      On or about January 25, 2013, GODFREY sent an email to the

Undercover Agent providing wire transfer instructions for IPC CORP and a list of IBCs and

LLCs from which the Undercover Agent could choose his IBCs and LLCs.

e.      On or about October 31, 2013, LEACH sent an email to the Undercover Agent confirming receipt of $60,000 from the Undercover Agent via wire transfer to fund the Undercover Agent's IBC brokerage account at TITAN.

f.      During a meeting on or about November 6, 2013 at IPC CORP's office in Belize City, Belize, between BANDFIELD, GODFREY and the Undercover Agent, BANDFIELD explained that IPC CORP could create an IBC and LLC corporate structure for the Undercover Agent.

g.      During a meeting on or about November 6, 2013 at TITAN's office in Belize City, Belize, between KNOWLES and the Undercover Agent, KNOWLES confirmed that TITAN and LEGACY executed wash trades and matched trades for clients.

h.      During a meeting on or about March 4, 2014 at UNICORN's office in Belize City, Belize, between CAN, GODFREY and the Undercover Agent, CAN confirmed that IPC CORP's IBC and LLC structure enabled UNICORN to deal with U.S. citizens.

i.      During a telephone call on or about March 31, 2014 between DE WIT and Corrupt Client 7, DE WIT stated, in reference to trading CANA stock, "I thought I could see Kelvin [LEACH] in there too, so maybe he is in there grabbing some, and together we will try to do what we can."

j.      On or about March 31, 2014, KNOWLES confirmed in a telephone call with an unidentified individual that KNOWLES had sold 57,100 shares of CANA stock at $1.476 per share.

k.      During a telephone call on or about April 29, 2014 between BANDFIELD and Corrupt Client 8, an individual whose identity is known to the Grand Jury, BANDFIELD stated, in part, "right now, most of our work is securities, surprisingly enough.

We see a lot of IPOs and lot of penny stock, OTC stock, pink sheets and all that. We trade a lot of it through companies we set up. Probably 99 percent of our business or 98 percent right now is this kind of stock."

        l.      On or about May 6, 2014, KUEBER called a representative of IPC CORP and asked to speak to GODFREY to "get a couple of accounts opened up."

        m.    During a telephone call on or about May 9, 2014 between MULHOLLAND and GODFREY, MULHOLLAND stated, in part, "just chasing down to see if you have any more names for those IBCs that we bought . . . we talked and you had five or so."

        n.     During a telephone call on or about May 15, 2014 between MULHOLLAND and DE WIT, MULHOLLAND stated that his group controlled all the free trading shares of CYNK stock.

      (Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Defraud the United States)

      51.    The allegations contained in paragraphs one through forty-seven are realleged and incorporated as though fully set forth in this paragraph.

      52.    In or about and between November 2012 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," CEM CAN, also known as "Jim Can," and ANDREW GODFREY, together with others, did knowingly and willfully conspire to defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment and collection of revenue, specifically, causing the preparation of fraudulent Forms W-8BEN.

24

53. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY and CEM CAN, also known as "Jim Can," together with others, committed and caused to be committed, among others, the following:

### OVERT ACTS

a. During a meeting on or about November 6, 2013 at IPC CORP's office in Belize City, Belize, between BANDFIELD, GODFREY and the Undercover Agent, BANDFIELD and GODFREY confirmed that the Undercover Agent would not be subject to the IRS's reporting requirements because IPC CORP's designated nominee would sign the stock purchase agreements and the IRS Forms W-8BEN for the Undercover Agent's IBCs and LLCs.

b. During a meeting on or about March 4, 2014 at UNICORN's office in Belize City, Belize, between CAN, GODFREY and the Undercover Agent, CAN advised the Undercover Agent that having a loan agreement with his IBC would allow him to avoid any issues with U.S. tax regulators.

c. On or about November 6, 2013, BANDFIELD sent an email to Corrupt Client 1 forwarding an IRS Form W-8BEN signed by GODFREY as the nominee for Corrupt Client 1's IBC.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT THREE
(Money Laundering Conspiracy)

54. The allegations contained in paragraphs one through forty-seven are realleged and incorporated as though fully set forth in this paragraph.

55. In or about and between January 2009 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ROBERT BANDFIELD, also known as "Bob Bandfield," GREGG

MULHOLLAND, also known as "Stamps" and "Charlie Wolf," PHILIP KUEBER, also known

as "Phil Thomas," BRIAN DE WIT, PAULA PSYLLAKIS, KELVIN LEACH, ROHN

KNOWLES, CEM CAN, also known as "Jim Can," ANDREW GODFREY, IPC

MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE

SERVICES LLC, LEGACY GLOBAL MARKETS S.A., TITAN INTERNATIONAL

SECURITIES INC. and UNICORN INTERNATIONAL SECURITIES LLC, together with

others, did knowingly and willfully conspire:

    a.    to conduct financial transactions affecting interstate commerce,

specifically the interstate wire transfer of money and securities, which transactions involved

property represented by a person at the direction of, and with the approval of, a federal official

authorized to investigate violations of Title 18, United States Code, Section 1956, to be the

proceeds of specified unlawful activity, specifically, fraud in the sale of securities, contrary to

Title 15, United States Code, Sections 78j(b) and 78ff, (i) with the intent to promote the carrying

on of such specified unlawful activities, contrary to Title 18, United States Code, Section

1956(a)(3)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of

property believed to be the proceeds of the specified unlawful activities, contrary to Title 18,

United States Code, Section 1956(a)(3)(B), and (iii) to avoid a transaction reporting requirement

under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(3)(C); and

    b.    to transport, transmit and transfer a monetary instrument and

funds from a place in the United States to and through a place outside the United States and to a

place in the United States from and through a place outside the United States, (i) with the intent

to promote the carrying on of specified unlawful activities, contrary to Title 18, United States

Code, Section 1956(a)(2)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i), and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(ii).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FOUR
(Securities Fraud – VLNX)

56. The allegations contained in paragraphs one through forty-seven are realleged and incorporated as though fully set forth in this paragraph.

57. In or about and between June 2011 and September 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," PHILIP KUEBER, also known as "Phil Thomas," BRIAN DE WIT, PAULA PSYLLAKIS, ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC and LEGACY GLOBAL MARKETS S.A., together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in VLNX,

27

in connection with the purchases and sales of investments in VLNX, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT FIVE
(Securities Fraud – CYNK)

58.    The allegations contained in paragraphs one through forty-seven are realleged and incorporated as though fully set forth in this paragraph.

59.    In or about and between April 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," GREGG MULHOLLAND, also known as "Stamps" and "Charlie Wolf," PHILIP KUEBER, also known as "Phil Thomas," BRIAN DE WIT, PAULA PSYLLAKIS, ANDREW GODFREY, IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC and LEGACY GLOBAL MARKETS S.A., together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in CYNK,

28

in connection with the purchases and sales of investments in CYNK, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## FOR COUNTS ONE, FOUR AND FIVE

60. The United States hereby gives notice to the defendants charged in Counts One, Four and Five that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

61. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

  a.    cannot be located upon the exercise of due diligence;

  b.    has been transferred or sold to, or deposited with, a third party;

  c.    has been placed beyond the jurisdiction of the court;

  d.    has been substantially diminished in value; or

  e.    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
FOR COUNT THREE

62.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

63.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:_____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

F. #2013R00505
FORM DBD-34
JUN. 85

No. 14-476 (S1) (ILG)

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*Robert Bandfield, et al.,*

Defendants.

# SUPERSEDING INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18 U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                        *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                        *Clerk*

*Bail, $* _____

_____

*Jacquelyn M. Kasulis, Assistant U.S. Attorney (718) 254-6103*

# INFORMATION SHEET

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

FILED
CLERK

2015 JUL 31 PM 4:39

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

$14$ CR $476$ (S-1)(ILG)

1.  Title of Case: United States v. Robert Bandfield, et al.

2.  Related Magistrate Docket Number(s):

3.  Arrest Date: September 9, 2014

4.  Nature of offense(s):  X  Felony
                          ☐  Misdemeanor

5.  Related Cases - Title and Docket No(s).  (Pursuant to Rule 50.3.2 of the
    Local E.D.N.Y. Division of Business Rules):  ____No____

6.  Projected Length of Trial:  Less than 6 weeks  ( X )
                                More than 6 weeks  ( )

7.  County in which crime was allegedly committed:  _Kings_____
        (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.  Was any aspect of the investigation, inquiry and prosecution giving rise to the case pending
    or initiated before March 10, 2012.[1]          (X) Yes  ( ) No

9.  Has this indictment/information been ordered sealed?   (X) Yes  (X) No  bol

10. Have arrest warrants been ordered?             ( X) Yes  ( ) No

11. Is there a capital count included in the indictment?   ( ) Yes  (X) No

KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY

By: _____
Winston M. Paes
Assistant U.S. Attorney
718-254-6023

_____
[1]   Judge Brodie will not accept cases that were initiated before March 10, 2012.