**Exhibit B: March 17, 2014 Wiretap**

JPN:JMK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INTERCEPTION OF WIRE
COMMUNICATIONS TO AND FROM                                    AFFIDAVIT
305-671-3493, A TELEPHONE NUMBER
SERVICED BY VONAGE AND SUBSCRIBED TO
BY ROBERT BANDFIELD, 12042 SE SUNNYSIDE
ROAD, APT. 589, CLACKAMAS, OREGON 97015

IN THE MATTER OF AN APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INTERCEPTION OF WIRE
COMMUNICATIONS TO AND FROM
503-305-3897, A TELEPHONE NUMBER
SERVICED BY VONAGE AND SUBSCRIBED TO
BY ROBERT BANDFIELD, 12042 SE SUNNYSIDE
ROAD, APT. 589, CLACKAMAS, OREGON 97015

IN THE MATTER OF AN APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INTERCEPTION OF WIRE
COMMUNICATIONS TO AND FROM
305-395-7896, A TELEPHONE NUMBER
SERVICED BY VONAGE AND SUBSCRIBED TO
BY TITAN INTERNATIONAL SECURITIES, INC.,
12042 SOUTHEAST SUNNYSIDE ROAD,
CLACKMAS, OREGON 97015

1

EDNY-IPC-000007450

IN THE MATTER OF AN APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INTERCEPTION OF WIRE
COMMUNICATIONS TO AND FROM
888-400-5461, A TELEPHONE NUMBER
SERVICED BY PHONE.COM AND SUBSCRIBED TO
BY LEGACY GLOBAL MARKETS OPERATOR,
7 NEW ROAD, SUITE #4, BELIZE CITY, BELIZE
2112
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SOUTHERN DISTRICT OF NEW YORK, SS:

                 , a Special Agent of the Federal Bureau of Investigation

("FBI"), being duly sworn, deposes and says:

      1.     I have been a Special Agent of the FBI for approximately 10 years. I am

responsible for conducting and assisting in white collar fraud investigations into the activities of

individuals and criminal groups responsible for wire fraud and money laundering. These

investigations are conducted both in an undercover and overt capacity. I have participated in

numerous investigations, during the course of which I have conducted physical and electronic

surveillance, executed court-authorized search warrants and arrest warrants, reviewed

consensual recordings of individuals and debriefed cooperating witness and confidential

informants and used other investigative techniques to secure relevant information regarding the

criminal activities of individuals participating in wire fraud and money laundering, among other

crimes. As a result of my training and experience, I am familiar with the techniques and

methods of operation used by individuals involved in criminal activity to conceal their activities

from detection by law enforcement authorities.

      2.     I am an investigative or law enforcement officer of the United States

within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by

2

EDNY-IPC-000007451

law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3.  This affidavit is submitted in support of an application for an order authorizing the interception of wire communications occurring to and from telephone number 305-671-3493, a telephone issued by Vonage and subscribed to by Robert Bandfield, 12042 Southeast Sunnyside Road, Apt. 589, Clackamas, Oregon, 97015 (the "IPC-305 Phone"); telephone number 503-305-3897, a telephone issued by Vonage and subscribed to by Robert Bandfield, 12042 Southeast Sunnyside Road, Apt. 589, Clackamas, Oregon, 97015 (the "IPC-503 Phone"); telephone number 305-395-7896, a telephone issued by Vonage and subscribed to by Titan International Securities, Inc., 12042 Southeast Sunnyside Road, Clackamas, Oregon 97015 (the "TIS-305 Phone"); and telephone number 888-400-5461, a telephone issued by phone.com and subscribed to by Legacy Global Markets Operator, 7 New Road, Suite #4, Belize City, Belize 2112 (the "LGM-888 Phone") (collectively, the "Subject Telephones").

4.  The Subject Telephones utilize Voice over Internet Protocol ("VoIP"), a technology that allows voice calls to be made over computer networks like the internet. Vonage and phone.com have confirmed that the calls on the Subject Telephones route through servers in the United States and can be intercepted within the United States, although the calls on the Subject Telephones are ultimately routed to Belize and elsewhere. Additionally, this Court has jurisdiction pursuant to 18 U.S.C. § 2518(3) to authorize the interception of the Subject Telephones because communications over the Subject Telephones will be first heard and minimized within the Southern District of New York.

5.  Based on information learned in the course of the investigation, the IPC-305 Phone and IPC-503 Phone appear to be the U.S.-based telephone numbers for IPC (defined

3

EDNY-IPC-000007452

below), an investment management company with an office located in Belize. As discussed below, while an IPC receptionist often answers calls placed to the IPC-305 Phone and IPC-503 Phone, ANDREW GODFREY and ROBERT BANDFIELD appear to be the primary users of those phones. Based on information learned in the course of the investigation, the TIS-305 Phone appears to be the U.S.-based telephone number for Titan International Securities (defined below), an offshore brokerage and investment management company. As discussed below, while a Titan receptionist often answers calls placed to the TIS-305 Phone, KELVIN LEACH and ROHN KNOWLES appear to be the primary users of that phone. Based on information learned in the course of the investigation, the primary user of the LGM-888 Phone is BRIAN DE WIT.

6. I have personally participated in the investigation of the offenses described herein. I am familiar with the facts and circumstances of this investigation from, among other sources of information: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement authorities; (c) consensual recordings made by an undercover law enforcement agent ("undercover agent"); (d) the review of toll records and other business records and (e) the review of investigative reports. Based upon my familiarity with the investigation, and upon other information which I have reviewed and deemed to be reliable, I believe that:

a. there is probable cause to believe that ROBERT BANDFIELD, also known as "Bob," ANDREW GODFREY, GLENNA BERGEY, BRIAN DE WIT, KELVIN LEACH, ROHN KNOWLES, LOUIS BUONOCORE, PAUL GIARMOLEO, RANDALL HAMDAN, also known as "Randy," EDWARD MONET, also known as "Edward Moinat," LOUIS NOLFO, TIMOTHY PINCHIN, BRUCE SCHOENGOOD and WILLIAM SHERMAN

4

EDNY-IPC-000007453

(collectively, the "Subject Individuals"), and others as of yet unknown, are variously committing offenses enumerated in Section 2516 of Title 18, United States Code, specifically offenses involving 18 U.S.C. §§ 1343 and 371 (wire fraud and wire fraud conspiracy) and 18 U.S.C. § 1956 (money laundering and money laundering conspiracy) (collectively, the "Subject Offenses").[1]

      b.    there is probable cause to believe that particular wire communications of ROBERT BANDFIELD, also known as "Bob," ANDREW GODFREY, GLENNA BERGEY, BRIAN DE WIT, KELVIN LEACH, ROHN KNOWLES, LOUIS BUONOCORE, PAUL GIARMOLEO, RANDALL HAMDAN, also known as "Randy," EDWARD MONET, also known as "Edward Moinat," LOUIS NOLFO, TIMOTHY PINCHIN, BRUCE SCHOENGOOD and WILLIAM SHERMAN (collectively, the "Subject Interceptees"), and others as of yet unknown, concerning the Subject Offenses will be variously obtained through the interception of such communications to and from the Subject Telephones.

      7.    These communications are expected to concern the specifics of the above offenses, including (i) the nature, extent and methods of the herein described criminal activities of the Subject Individuals and others; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the Subject Offenses; (iii) the distribution and transfer of the money involved in these activities; (iv) the existence and location of relevant records; (v) the location and source of resources used to finance the illegal activities; (vi) the

---

[1]     Furthermore, although not predicate offenses, I believe that probable cause exists that we will additionally receive information concerning the Subject Individuals committing securities fraud and conspiring to commit securities fraud, in violation of 18 U.S.C. §§ 1348 and 1349 and 15 U.S.C. §§ 78j(b) and 78ff, and tax evasion and tax evasion conspiracy, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 371, as well as aiding and abetting all of the offenses described above and herein, in violation of 18 U.S.C. § 2. Fraud in the sale of securities is a "specified unlawful activity" for the purposes of money laundering. 18 U.S.C. § 1956(c)(7)(A) (incorporating the crimes set forth in 18 U.S.C. § 1961(1), including "fraud in the sale of securities").

5

location and disposition of the proceeds from those activities; and (vii) the locations and items used in furtherance of those activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the Subject Offenses.

8. The goals of this investigation include, among others, (i) identifying all the specific wire fraud and money laundering crimes the Subject Individuals are committing or have committed, including gathering additional evidence about the identities of the co-conspirators involved in the crimes described herein; (ii) developing sufficient, admissible evidence to charge the Subject Individuals and their co-conspirators with those crimes; (iii) determining the scope of the wire fraud and money laundering crimes the Subject Individuals and their co-conspirators are committing; and (iv) dismantling the international wire fraud and money laundering scheme established by the Subject Individuals and their co-conspirators to facilitate that scheme.

9. The statements contained in this affidavit are based in part on hearsay, including information provided by special agents of the FBI, other law enforcement personnel, an undercover agent, and also based on my experience and background as a Special Agent. All statements are provided in sum and substance and in part. Summaries of recorded conversations are based upon draft transcripts of these conversations, which are subject to revision. Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation for an order authorizing the interception of wire communications.

6

## FACTS AND CIRCUMSTANCES

I.   Subject Individuals and Relevant Companies

10.   IPC is an offshore management company comprised of IPC Corporate Services, Inc. in Belize City, Belize and IPC Corporate Services, LLC in Clackmas, Oregon (collectively, "IPC").[2] IPC's principal office is located in Belize.

11.   ROBERT BANDFIELD, a U.S. citizen, founded and controls IPC.[3]

BANDFIELD has stated to an undercover agent that he is from Oregon and that he previously spent fifteen years in British Columbia, Canada, ten years in the Cayman Islands, a period of time in Turks and Caicos, and some additional time in Canada. According to BANDFIELD, he has spent the last ten or eleven years in Belize. A criminal history database check shows that BANDFIELD has no prior criminal history.

12.   ANDREW GODFREY, a citizen of Belize, is an employee of IPC who is located in Belize. A criminal history database check has revealed the following: On June 9, 2000, GODFREY was convicted of taking indecent liberties with a child, in violation of North Carolina law. He was sentenced to a term of probation and was ultimately deported to Belize.

13.   GLENNA BERGEY, a U.S. citizen, is another employee of IPC who is located in Belize. Upon information and belief, I believe that BERGEY is BANDFIELD's wife.

---

[2]   Upon information and belief, I believe that "IPC" stands for International Privacy Corporation.

[3]   BANDFIELD was investigated by the FBI in approximately 1999 in connection with an investment fraud scheme. During that investigation, a witness stated to the FBI, in substance and in part, that BANDFIELD made a presentation to him and others (at the behest of the primary target of the investigation) regarding IPC, and that BANDFIELD provided guidance regarding setting up offshore corporate and bank accounts in Belize and the Turks and Caicos Islands. The witness further stated that BANDFIELD charged $1,350 for setting up the accounts. The witness also stated that, after he had utilized IPC's services to set up an offshore company and bank account, he was defrauded by the primary target of a large portion of his investment. BANDFIELD was not charged with a crime in connection with that investigation.

7

An e-mail obtained pursuant to a court-authorized search warrant lists BERGEY as an "IPC Accounts Administrator."[4]  Additionally, in a consensually-recorded telephone conversation between Godfrey and the undercover agent on or about May 17, 2013 on the IPC-305 Phone, GODFREY referred to "Glenna" as "my accountant."  Based on information learned during the course of the investigation, I believe that GODFREY was referring to BERGEY when he referred to "Glenna."  A criminal history database check shows that BERGEY has no prior criminal history.

14.     Titan International Securities, Inc. ("Titan" or "TIS"), located in Belize, is an offshore brokerage and investment management company.  Titan maintains brokerage accounts at Scottsdale Capital Advisors ("Scottsdale"), a brokerage firm located in Arizona.  On or about November 6, 2013, in a consensually-recorded meeting, BANDFIELD told the undercover agent that he created Titan.[5]

15.     KELVIN LEACH, a citizen of the Bahamas, is the President of Titan and is located in Belize.  A criminal history database check shows that LEACH has no prior criminal history.

16.     ROHN KNOWLES, a citizen of the Bahamas, is a Titan employee who is located in Belize.  A criminal history database check reveals the following: On April 26, 2007, KNOWLES was arrested in Raleigh, North Carolina and charged with possession of marijuana with intent to distribute and maintaining a vehicle, dwelling or other place for use, storage or sale

---

[4]     On August 26, 2013, law enforcement obtained search warrants to search two e-mail accounts: an IPC e-mail address for GODFREY and a general IPC e-mail address. See 13 M 743 (VMS) (E.D.N.Y.).  On February 3, 2014, law enforcement obtained search warrants for additional e-mail addresses related to IPC and expanded the timeframe for the search of the first two IPC e-mail addresses. See 14 M 104 (RLM) (E.D.N.Y.).

[5]     The address listed as part of the subscriber information for the TIS-305 Phone is the same address in Clackamas, Oregon that is associated with BANDFIELD and IPC.

8

of a controlled substance, both in violation of North Carolina law. On May 16, 2007, the possession of marijuana charge was dismissed without leave. Additionally, on May 16, 2007, a judge adjudicated that KNOWLES was guilty of the maintaining a vehicle, dwelling or other place for use, storage or sale of a controlled substance charge and sentenced him to 30 days' imprisonment and 18 months' probation.

17.    Legacy Global Markets, S.A. ("Legacy" or "LGM"), also located in Belize, is another offshore brokerage and investment management company. It also maintains brokerage accounts at Scottsdale in Arizona. On or about November 6, 2013, in a consensually-recorded meeting, BANDFIELD told the undercover agent that he created Legacy.

18.    BRIAN DE WIT, a Canadian citizen, is the president of Legacy. He is located in Belize and Panama. A criminal history database check shows that DE WIT has no prior criminal history.[6]

19.    LOUIS BUONOCORE, a U.S. citizen, has had contact with one or more of the Subject Telephones. A criminal history database check has revealed the following: On December 20, 1978, BUONOCORE pleaded guilty to Operating a Motor Vehicle Impaired by Alcohol, in violation of New York Vehicle and Traffic Law § 1192, and was sentenced to conditional discharge. On May 24, 1983, BUONOCORE pleaded guilty to Resisting Arrest, in violation of New York Penal Law § 205.30 (a misdemeanor), and Disorderly Conduct, in violation of New York Penal Law § 240.20, and was sentenced to a \$250 fine. On October 10, 1984, BUONOCORE pleaded guilty to Disorderly Conduct: Unreasonable Noise, in violation of New York Penal Law § 240.20, and Operating a Motor Vehicle with .10 of 1% Alcohol (blood level), in violation of New York Vehicle and Traffic Law § 1192, and was sentenced to 30 days

---

[6]    Subscriber information for the LGM-888 Phone lists the e-mail address for the account as brian@lgm.bz. Based on information learned in the course of the investigation, I believe that the e-mail address associated with the LGM-888 Phone is DE WIT's e-mail address.

9

in custody and a $350 fine. On February 3, 1992, BUONOCORE was convicted of a traffic/motor vehicle offense in the state of Georgia and was sentenced to a $132 fine. On June 28, 1992, BUONOCORE was convicted of a Driving under the Influence of Alcohol offense (a misdemeanor) in the state of Georgia and was sentenced to a $1,000 fine. On August 26, 1993, BUONOCORE was convicted of another Driving under the Influence of Alcohol offense (a misdemeanor) in the state of Georgia and was sentenced to a $1,000 fine. On January 7, 2000, BUONOCORE pleaded guilty to Criminal Possession of a Controlled Substance in the 7th Degree, in violation of New York Penal Law § 220.03 (a misdemeanor), and was sentenced to conditional discharge. On March 12, 2000, BUONOCORE was resentenced for violating the terms of his conditional discharge sentence to an additional term of conditional discharge and two days of community service. In May 2000, BUONOCORE was convicted of one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff. BUONOCORE was ultimately sentenced to 18 months' imprisonment, three years' supervised release and $147,750 in restitution.

20. PAUL GIARMOLEO, a U.S. citizen, has had contact with one or more of the Subject Telephones. A criminal history database check shows that GIARMOLEO has no prior criminal history.

21. RANDALL HAMDAN, a U.S. citizen, has had contact with one or more of the Subject Telephones. A criminal history database check shows that HAMDAN has no prior criminal history.

22. EDWARD MONET, a U.S. citizen, has had contact with one or more of the Subject Telephones. A criminal history database check reveals the following: On May 24,

10

1991, MONET was arrested for Driving with a Suspended License and a Hit and Run, both in violation of California state law, and was sentenced to three years' probation. On September 16, 1993, MONET was convicted of providing a False ID to Specific Peace Officers, in violation of California state law, and was sentenced to two years' probation. On February 27, 1997, MONET was convicted of providing a False ID to Specific Peace Officers and Obstructing/Resisting a Public Officer, both in violation of California state law, and was sentenced to three years' probation, a fine and participation in a work program.

23. LOUIS NOLFO, a U.S. citizen, has had contact with one or more the Subject Telephones. A criminal history check shows that NOLFO has no prior criminal history.

24. TIMOTHY PINCHIN, a Canadian citizen, has had contact with one or more of the Subject Telephones. A criminal history database check shows that PINCHIN has no prior criminal history.

25. BRUCE SCHOENGOOD, a U.S. citizen, has had contact with one or more of the Subject Telephones. A criminal history database check shows that SCHOENGOOD has no prior criminal history.

26. WILLIAM SHERMAN, a U.S. citizen, has had contact with one or more of the Subject Telephones. A criminal history database check shows that SHERMAN has no prior criminal history.

II. The Investigation

27. In my training and experience, offshore management companies have historically been used by individuals to facilitate securities fraud, money laundering and tax evasion. Specifically, individuals committing securities fraud often use offshore management companies to set up and manage offshore entities. Through these entities, individuals launder

11

EDNY-IPC-000007460

illegal stock proceeds (usually derived by stock manipulation schemes or false disclosure schemes), conceal their ownership of large percentages of stock of public companies in violation of federal securities laws, and manipulate the trading of public companies by trading in an illicit fashion through accounts maintained in the names of the entities. Stock fraudsters have traditionally used offshore entities to trade securities on their behalf in the public market, allowing fraudsters to conceal their involvement in the trading and manipulation of the securities for their benefit. Additionally, offshore management companies facilitate these individuals' evasion of U.S. Internal Revenue Service ("IRS") reporting requirements, tax payments associated with their gains, and control and transfer of illicit proceeds of the fraudulent schemes.

28. Beginning in approximately July 2011, based on information learned in the course of another investigation, the government began investigating Gibraltar Global Securities, Inc. ("Gibraltar" or "GGSI"), a Bahamas-based broker-dealer, for potential violations of U.S. law, including securities fraud, money laundering and tax evasion.[7] On or about November 9, 2012, an undercover agent contacted Christopher Lunn of Gibraltar, posing as a potential account holder who was in the stock promotion business. During that call, Lunn explained that, due to recent regulatory scrutiny, Gibraltar was no longer opening new accounts.[8]

---

[7] During another investigation into a market manipulation scheme, law enforcement agents tracked international wire transfers in an attempt to identify additional co-conspirators. The analysis revealed that several wires from GGSI were used to purchase discounted stock. Upon further investigation, law enforcement agents learned of hundreds of suspicious money and stock transfers associated with GGSI, including aggressive depositing, selling (dumping), and transferring of proceeds of at least 100 different penny stocks.

[8] On or about March 15, 2013, the U.S. Securities and Exchange Commission ("SEC") filed a complaint against Gibraltar, among other parties, for participating in a "pump and dump" scheme involving two publicly-traded U.S. companies. Securities and Exchange Commission v. Gibraltar Global Securities, et al., Civ. No. 13-1735 (S.D.N.Y.). On or about April 18, 2013, the SEC filed a second complaint charging Gibraltar and Warren Davis, Gibraltar's owner and president, with unlawfully operating as a broker-dealer in the United States and participating in an illegal unregistered offering and sale of shares of Magnum d'Or, a micro-cap company.

12

Lunn explained that a number of clients were setting up similar accounts at Belize-based

brokerage firms with which Gibraltar had relationships. Lunn noted that such an arrangement is

"under the radar," and recommended the usage of Titan and Legacy.

29.     Lunn also stated that these Belize-based brokerage firms can set up an

"IBC" for the undercover agent, which, in my training and experience, refers to an international

business corporation ("IBC"). It is my understanding that an IBC is an offshore, untaxed

company, formed under the laws of a foreign jurisdiction, which is not permitted to engage in

business within the jurisdiction in which it was incorporated. IBCs are commonly used for

offshore banking, investment activities and asset protection. Owners of IBCs can deposit money

and transfer stock to an IBC to facilitate banking and securities trading activities while

maintaining a level of anonymity for the IBC's owner. IBC ownership records are typically not

publicly available.

30.     At the conclusion of the call, Lunn offered to send an e-mail to the

undercover agent that included contact information for the Belize-based brokerage firms, among

others, that Lunn and the undercover agent had discussed. On or about November 9, 2012, Lunn

Securities and Exchange Commission v. Gibraltar Global Securities, Inc. and Warren A. Davis,
Civ. No. 13-2575 (S.D.N.Y.). According to the second SEC complaint, beginning in 2008 and
continuing through August 2012, Gibraltar, through its website, solicited U.S. customers, who
were looking to sell shares of low-priced, thinly-traded stock, by advertising brokerage services,
including the formation of offshore business corporations with nominee officers and directors
that would enable U.S. customers to trade anonymously. The complaint alleges that Gibraltar
routinely accepted deposits of stock and arranged to have the stock transferred into Gibraltar's
name. Gibraltar then followed its customers' orders and sold the shares through various
securities accounts maintained by Gibraltar at U.S. broker-dealers. In exchange, Gibraltar
charged the account holders a two to three percent commission. Additionally, the complaint
alleged that Gibraltar and Davis participated in the unregistered offering and sale of over 10
million shares of Magnum d'Or on behalf of U.S. customers, resulting in proceeds of over $11
million. The SEC has obtained documents during the course of its investigation of Gibraltar
indicating that, as of February 2010, a Gibraltar internal handbook stated that Gibraltar used IPC
to establish international business corporations and Belize-based bank accounts on behalf of its
clients.

13

sent an e-mail to the undercover agent in which he provided contact information for firms that could assist the undercover agent with opening an account. Specifically, Lunn provided the contact information for KELVIN LEACH at Titan and telephone numbers, including the LGM-888 Phone, and an e-mail address for Legacy.[9]  The telephone number for Titan that Lunn provided to the undercover agent is a Belize-based telephone number for Titan (a different telephone number than the TIS-305 Phone).[10]

A.  The Undercover Agent Contacts Titan

31.  On or about January 24, 2013, the undercover agent placed a telephone call to LEACH at Titan using the telephone number provided by Lunn. During that call, the undercover agent explained that he was interested in opening an account into which he could transfer money and with which he could buy and sell stock. LEACH explained that, because the undercover agent was a U.S. citizen, Titan could not open an individual account in the name of the undercover agent. LEACH instructed the undercover agent to contact "IPC Corporate Services" to set up a foreign corporation first (referred to by the undercover agent as an "IBC"), and then Titan could open a brokerage account for that foreign corporation. LEACH agreed to provide IPC's contact information to the undercover agent in an e-mail. At the conclusion of the call, the undercover agent confirmed that, once he set up the IBC and brokerage account at Titan in the IBC's name, "everything" would be "confidential," and that there would be "no communication with the IRS, SEC in, in the United States." LEACH replied, "correct," and confirmed that everything would then be "completely offshore." He also stated that all correspondence related to the account would go to the IBC and IPC only. The undercover agent

---

9       Lunn also provided contact information for two Bahamas-based brokerage firms.

10      Subscriber records confirm that the TIS-305 Phone is the U.S.-based telephone number for Titan.

14

concluded the call by stating that he was looking for "asset protection and privacy." In response, LEACH stated, "yep."

32. Later that day, LEACH sent an e-mail to the undercover agent in which he copied GODFREY and provided the telephone number associated with the IPC-305 Phone for GODFREY at "IPC Corporate Services." The undercover agent then e-mailed GODFREY and asked him to call the undercover agent to discuss establishing an IBC. The undercover agent also requested that GODFREY e-mail to him the documentation needed to establish an IBC and a brokerage account at IPC.

B. The Undercover Agent Contacts IPC

33. On or about January 24, 2013 at approximately 4:51 p.m., the undercover agent attempted to call GODFREY on the IPC-305 Phone. During that call, the undercover agent heard a pre-recorded message stating that he had reached "IPC" and instructing him to leave a voicemail message. The undercover agent then left a voicemail message in which he asked GODFREY to call him about setting up an IBC and then establishing a brokerage account at Titan. On or about January 25, 2013 at approximately 1:27 p.m., the undercover agent placed another call to GODFREY using the IPC-305 Phone. During that call, a woman answered the phone and stated "IPC. How may I help you?" After the undercover agent asked for GODFREY and stated that he was returning GODFREY's call, the woman who answered the phone stated, in sum and substance, that GODFREY was unavailable at that time and that she would tell GODFREY that the undercover agent had called. Approximately 10 minutes later, at approximately 1:37 p.m., the undercover agent placed another telephone call to GODFREY using the IPC-503 Phone.

15

34.    At the beginning of the call, GODFREY explained that the undercover

agent needed to set up an "LLC" and an IBC.[11]  GODFREY and the undercover agent discussed

the following:

GODFREY:    Okay.  Now the thing is, you are an American,
            right?

UC:         Unfortunately, I have that curse.

GODFREY:    [Laughs].

UC:         [Laughs].  That is why I am calling you.

GODFREY:    Okay.  So we have to get you set up with a
            structure that we create.  You need an LLC as
            well as the IBC.

UC:         Okay.

GODFREY:    Okay.  Let me explain that to you.  The LLC is
            going to own the local IBC.  Okay?  And we're
            going to put a beneficial owner on that LLC.

UC:         Mm hmm.

GODFREY:    It's going to be somebody from my office.

UC:         Mm hmm.

GODFREY:    Okay?  So that your name is not on it, out there.

UC:         Perfect.

GODFREY:    Once we open the account, we will give you
            your password and your account number.  You
            can go online, you can do your trading, you can
            give all your directions, directives to, to Titan.
            We will not do any of that for you.  Okay?  So,
            you'll control that part.

UC:         Okay, okay.

[11]    Based on my training and experience, I believe that an "LLC" is a limited liability
company.

16

GODFREY:     Alright. So, um, what I'm going to do is, if you
             give me an e-mail address, I could send you a
             list that I have of some names that's readily
             available, um, for use right now that I keep
             some shelf companies for purpose like this.

UC:          Mm hmm, mm hmm.

GODFREY:     Alright. And, um, you could choose one of the
             Belize, um, IBCs and one of the Nevis LLC
             names and, um, immediately I'm going to go
             ahead and start to get that thing set up for you.

UC:          Okay, great. Do you, do you have the St. Kitz
             as well? Or is it, uh . . .

GODFREY:     No, uh, the, we use Nevis is because of the, the
             laws there, it's much better, for safer protection
             part of this aspect.

UC:          Oh, okay.

GODFREY:     When, if anybody go and ask anything, or if
             they ask if who owns the local company, and
             we say it's a Nevis company, the first thing
             they have to do is go down there. Then they
             have to put up 25,000 U.S. dollars
             nonrefundable.

UC:          Mm hmm. Mm hmm.

GODFREY:     Then they have to hire a local lawyer.

UC:          Mm hmm.

GODFREY:     Then they have to prove that you did some
             criminally wrong, why they investigating or do
             all this.

UC:          Mm hmm.

GODFREY:     Then they have to take it the court system. So
             they have to wait for a slot for it to be available
             to come to the . . . So, this is all looking about 8
             years.

17

EDNY-IPC-000007466

| | |
|---|---|
| UC: | Oh, oh! That would be the process, of, of, of somebody, digging down – |
| GODFREY: | Investigating or trying to looking into this, and all that, and all that. |
| UC: | That's great. |
| GODFREY: | Will take a number of time. That's why we use that, you know – |
| UC: | That's, that's great. That's great. Because, my, obviously, um, you know, as I'm sure you've heard, uh, you know, things are changing drastically here in the U.S. And, the uh – |
| GODFREY: | Yeah. |
| UC: | You know, the Obama administration just appoint – |
| GODFREY: | Mm hmm. |
| UC: | Appointed Mary Jo White, to the SEC here – |
| GODFREY: | Oh, boy. |
| UC: | -- who was a very aggressive former prosecutor and things like that, and uh – |
| GODFREY: | Mm hmm. |
| UC: | You're going to be seeing . . . a big outflow, uh, from the U.S. . . . I would say. |
| GODFREY: | Yeah, we have a lot of clients that are telling us that they're moving from the U.S. to go to different jurisdictions, you know? |

35.    In the excerpt of the call set forth above, in context, and based on

information learned in the course of this investigation, I believe that GODFREY is explaining to

the undercover agent that the LLC established by the undercover agent would own the agent's

18

IBC, and that the "beneficial owner" of the LLC would be an individual working at IPC's office, ensuring that the undercover agent's name would not be associated with either entity, despite the fact that the undercover agent controls both entities.[12]  I believe that GODFREY further explains to the undercover agent that the LLC would be based in Nevis and that the IBC would be based in Belize. In the excerpt above, GODFREY also appears to be explaining that, because of Nevis's favorable laws, if anyone wanted to investigate the undercover agent's LLC for possible illegal criminal activity, it could take approximately eight years for any legal proceedings to occur in Nevis. I believe that GODFREY also states that IPC had many American clients looking to move to "different jurisdictions" because of recent increased regulatory scrutiny in the United States.

36.     During the call, the undercover agent also stated that he wanted to ensure the confidentiality of his dealings with IPC. GODFREY responded: "Yeah, um, even after we set this up, and um, what I do, if I need – I don't send anything sensitive on the internet. It's not safe." He further stated: "I might send you an e-mail says 'call me,' or 'I need to speak to you,' or you know, that type of stuff." GODFREY further stated that he was speaking to the undercover agent on the phone instead of explaining the set up to the undercover agent via the internet because he "[didn't] want anybody to get it to know what structure we're doing."

37.     The undercover agent then sought an assurance from GODFREY that the IRS and the SEC could not obtain information about his transactions through the offshore brokerage accounts, and in response, GODFREY stated, "They can't get it. You don't, you don't

___
12     In my training and experience, the term "beneficial owner" in this context refers to an individual who is employed or associated with an offshore management company and who acts on behalf of an IBC as if he/she has discretionary control and authority over the assets of the IBC, but who in reality takes direction from another with respect to the acquisition or disposition of assets.

19

own this." He further stated: "You don't own it [laughing]. So how can they link it to you?" In context, GODFREY appears to be referring to the fact that the undercover agent's IBC would own the brokerage accounts at issue, and the undercover agent's name would not be associated with the brokerage accounts, the IBC or the undercover agent's LLC (which owns the IBC). Later in the call, GODFREY also explained that the LLC could also own multiple IBCs, and that for further security, the undercover agent could set up a trust in which the LLC and IBCs could be shielded.

38.     As GODFREY explained the documentation he would need from the undercover agent to start the process of setting up an IBC and LLC, GODFREY and the undercover agent got disconnected. The undercover agent called GODFREY back on the IPC-503 Phone at approximately 1:45 p.m. During that call, GODFREY finished explaining the documentation he needed from the undercover agent, and assured the undercover agent that the documentation would be kept in GODFREY's files only. The undercover agent then explained that he expected to "buy and sell securities," and that he is a "stock promoter" who "bring[s] market awareness to certain micro-cap stocks."[13] The undercover agent also stated that he wanted to receive fees via wire transfers from his clients into the offshore brokerage accounts, and that he wanted to do a "significant amount of trades," in reference to stocks. GODFREY and the UC then stated the following:

> GODFREY:          They will wire the monies, they will send it
>                   wherever you want. You can also use that as a
>                   bank account.

---

[13]     In my training and experience, "micro-cap stocks" refer to stocks of publicly-traded U.S. companies which have a low market capitalization. Micro-cap stocks are often subject to price manipulation because they are thinly-traded and subject to less regulatory scrutiny than stocks that trade on notable exchanges, and large blocks of their stock are often controlled by a small group of individuals, which enables those in the group to control or orchestrate trading in those stocks.

20

EDNY-IPC-000007469

UC:               Perfect. Well, then, as long as I can receive
                  large wires, and then I'll –

GODFREY:          You could receive large wires, because they
                  trade on this omnibus account.

UC:               Mm hmm.

GODFREY;          You see? So, everything – they can move large
                  amount of monies.

UC:               Okay, good. That's, that's all --

GODFREY:          You see it's not, it's not, it's not like with the
                  bank. By the time you hit $50,000, they want a
                  source of funds, and where it's coming from.
                  And, you know, the whole life history.

UC:               Right. Now, the other thing is, do, do you have
                  in Belize, like we have in the U.S., like, uh –
                  the banks will, you know transactions over a
                  certain amount, do they get reported to some
                  reg, regulatory agency, in Belize? Or is that –

GODFREY:          The banks will, if it, if it looks funny, like say,
                  if I send in, uh, $30,000, uh, today, tomorrow I
                  send in $49,000, the next day, I put in – they're
                  going to look at that as layering, and they're
                  going to try to say okay, we're going to put all
                  this as one.

UC:               Mm hmm.

GODFREY:          You see?

UC:               Mm hmm.

GODFREY:          And they would start looking at that. They
                  probably would report that to the FIU, which is
                  financial internal unit, uh, unit. They do like,
                  look for money laundering and stuff like this.

UC:               Mm hmm.

21

EDNY-IPC-000007470

GODFREY:        You see? Titan, because they can trade their
                stock brokerage account, they do large monies
                as uh, they don't do that.

UC:             Good, so, so the – my transactions would just
                blend into all the other transactions and –

GODFREY:        Exactly, exactly.

39.     In context, and based on information learned in the course of this
investigation, I believe that, in the excerpt above, GODFREY is explaining to the undercover
agent that, because Titan has one "omnibus" brokerage account from which it conducts financial
transactions, and all the money wired into the account by Titan's clients is pooled together, there
is less concern that any law enforcement suspicions regarding money laundering will be raised
by wiring large sums of money into the brokerage account.

40.     At the conclusion of the call, GODFREY explained that IPC works very
closely with two brokerage firms in Belize – "Titan International Securities" and "Legacy Global
Markets." GODFREY further explained that Titan is located right next to IPC, and that Legacy
is in "San Pedro, in the islands" in Belize. GODFREY explained that "we" (which I believe is a
reference to IPC) had helped both firms obtain their licenses. GODFREY also stated that
BRIAN DE WIT is the main point of contact at Legacy. GODFREY warned the undercover
agent to be careful about setting up brokerage accounts in the Bahamas because of "what
happened with GGSI." In context, I believe that GODFREY was referring to Gibraltar when he
referred to "GGSI" and the SEC civil actions that were initiated against Gibraltar in March and
April 2013. At the conclusion of the call, GODFREY obtained the undercover agent's e-mail
address and stated that he would send an e-mail to the undercover agent containing a list of
already-established LLC and IBC names from which the undercover agent could choose.

22

41.     On or about January 25, 2013, GODFREY sent an e-mail to the

undercover agent attaching three documents. The first document explained the wire instructions

to IPC in Belize. The second document, containing the title "Belize Shelf Companies," included

a list of approximately nine existing shelf companies from which the undercover could choose.

The third document, containing the title "Nevis Shelf Companies," included a list of

approximately 14 existing shelf companies from which the undercover agent could choose.

42.     On or about March 27, 2013 at approximately 1:35 p.m., the undercover

agent called GODFREY on the IPC-305 Phone. During that call, Godfrey confirmed that he had

sent an e-mail to the undercover agent containing lists of Belize and Nevis shelf companies.

GODFREY then explained that the undercover agent needed to choose an LLC and an IBC from

those lists, and then IPC would set up brokerage accounts at Titan and Legacy for the undercover

agent using his chosen IBC (which the undercover agent's LLC would own). GODFREY further

explained that IPC's fee for the described service was $3,300, which the undercover agent could

pay via a wire transfer, a bank draft made out to IPC or through Paypal on the internet. When

the undercover agent asked GODFREY about setting up a brokerage account at Legacy,

GODFREY responded that the undercover agent should contact DE WIT, and provided the

undercover agent with the LGM-888 Phone. GODFREY, who appeared to actually be talking to

someone at Legacy while on the phone with the undercover agent stated the following: "Brian,

give me your international U.S. number – give me your toll free – 8-8-8-4-0-0-5-4-6-1 -- no, no,

no, this is, um, a person that, um, wants to – wants an account with you, we're getting ready to

set it up with him and apparently it's some large numbers that he wants to move with you, so um,

he's getting one at Titan, he's getting one with you, he's getting one at Seven Miles, you know,

so um, I want him -- he wants to know who to speak to there and discuss some things with you.

23

Not right at this moment, I know you – but everything is down, so he's uh [inaudible] -- wants to do some big things with you."[14]

43. On or about May 17, 2013 at approximately 2:57 p.m., the undercover agent called GODFREY on the IPC-305 Phone. During that call, the undercover agent explained to GODFREY that he was prepared to choose an LLC and an IBC and that he wanted to choose Crystal Capital, LLC as his LLC in Nevis, and Aladdin Assets Managements as his IBC in Belize. When the undercover agent then asked GODFREY about paying IPC's fee through its website, GODFREY transferred the undercover agent to a woman named "Glenna," who GODFREY referred to as "my accountant." Based on information learned in the course of the investigation, I believe that "Glenna" is GLENNA BERGEY. BERGEY then assisted the undercover agent in paying IPC's fee of $3,300 to set up an LLC and IBC and set up brokerage accounts for him.

44. GODFREY then rejoined the telephone conversation on the IPC-305 Phone and told the undercover agent that, while Aladdin Assets Managements was still available for the undercover agent to use, someone else was already "cooking" with Crystal Capital, LLC. GODFREY then suggested that the undercover agent use Lion Mercantile as his IBC and Cavern Capital, LLC as his LLC. The undercover agent agreed to use GODFREY 's suggestions. GODFREY confirmed that the undercover agent wanted to set up brokerage accounts at both Titan and Legacy, and told the undercover agent that he could use his Titan and Legacy brokerage accounts as bank accounts as well, as long as he traded stocks using the brokerage accounts in addition to transferring money in and out of the account. Otherwise, GODFREY warned, the undercover agent could raise "red flags." GODFREY further explained that, for

---

14   Based on information learned during the course of the investigation, Seven Mile Securities, located in the Cayman Islands, is another brokerage firm with which IPC works.

EDNY-IPC-000007473

example, the undercover agent should not wire $50,000 into the brokerage accounts and then wire $35,000 out of the accounts "the next day." GODFREY cautioned that if the undercover agent deposited a large sum of money into the brokerage accounts, he would need to "let it [i.e., the money] sit for a while," and then transfer $5,000 out of the accounts while continuing to trade stocks using the accounts. In context, it appears that GODFREY is explaining to the undercover agent how to trade stock and wire money in and out of the brokerage account in a manner that shields activities involving securities fraud, money laundering and wire fraud from law enforcement authorities.

45. Following that call, the undercover agent sent an e-mail to GODFREY in which he confirmed the completion of his "order," in reference to having paid for IPC's services. In response, GODFREY e-mailed the undercover agent and stated, "received the payment. had to change from Cavern Capital llc, to Crystal Securities LLC as the other one was reserved and i was not aware of it."

46. On or about May 20, 2013, the undercover agent received an e-mail from Clodine Anderson, an employee of IPC who referred to herself as "Banking & Securities Personnel." In that e-mail, Clodine stated that the "LGM" account for Lion Mercantile, Inc. had been opened and included account number information for that account. In context, I believe that "LGM" is a reference to Legacy. In response, the undercover agent e-mailed GODFREY and Anderson asking for instructions for use of the Legacy brokerage account. Anderson then instructed the undercover agent to contact Legacy directly at 501-226-2889 (Legacy's direct telephone number in Belize) and "ask for Brian" regarding his questions. In context, I believe that "Brian" is a reference to DE WIT.

25

EDNY-IPC-000007474

47.    On September 25, 2013 at approximately 2:02 p.m., the undercover agent

called GODFREY on the IPC-305 Phone. During that call, the undercover agent confirmed that

he had received an e-mail stating that a brokerage account had been set up for him at Titan, and

asked GODFREY about how he could obtain his user name and password for his Legacy

brokerage account. GODFREY instructed the undercover agent to contact DE WIT on the

LGM-888 Phone regarding his Legacy brokerage account. Additionally, GODFREY instructed

the undercover agent to contact LEACH on the TIS-305 Phone regarding any questions he had

about his Titan brokerage account.

48.    The undercover agent then asked GODFREY about using a trust to

provide further "security" and then asked about the need for an LLC:

UC:                         ...I'm getting ready at this point to actually
                            move some – you know significant funds into
                            there ... and some securities. And start doing
                            my magic, basically. Um, what I wanted to
                            follow up with you about is – we had discussed
                            the initial structure that you have set up for me
                            right now – the LLC and the IBC. Um ... I'm
                            not quite clear exactly how the ... um ... the
                            LLC is Crystal Securities fits into it, but I don't
                            really care about that right now because I know
                            everything is under Lion Mercantile. What I
                            would like to discuss with you is how we can
                            set this up to have the greatest ... um ...
                            privacy, the greatest security – you had spoken
                            to me about another structure that would be
                            even more safe and secure – I think it would be
                            ... uh ... putting it within a trust or something
                            like that. So basically, I'm gonna want to
                            discuss that with you and figure out – you know
                            – how we can ... we can set this up so that –
                            you know – things are – things are really tight.
                            Umm...

GODFREY:                    The trust would be a double shell security for
                            you. The trust would be a shell security,
                            because of the way we have it structured. What

26

I will do with you with that is …I will sit in and let you have that conversation with my boss Mr. Bandfield. He is a … he is the aged guru on that.

\*\*\*

GODFREY: The thing – the -- you said, you said you really don't know how the LLC fit into play – you are an American, right?

UC: Correct.

GODFREY: That's the reason why the trust at the … uh … LLC fits into play because you can't get an account anywhere, because nobody wants to deal with Americans, because you guys have this HIRE act stuff stamped on your forehead thanks to Mr. Obama.

\*\*\*

GODFREY: … that's the biggest reason why your LLC is in place, so that we can do business.

49. In context, and based on information learned during the course of the investigation, I believe that the undercover agent's reference to moving "significant funds" and "some securities" through his account and his expressed intent to "start doing [his] magic," along with the UC's concern about maximizing the "security" of his account, makes clear to GODFREY that the undercover agent intends to use the brokerage account for various illegal purposes, including money laundering (with securities fraud and/or wire fraud as the "specified unlawful activity") and wire fraud, among other offenses. Additionally, I believe that when GODFREY refers to BANDFIELD as the "guru" of establishing trusts, he means that BANDFIELD has the most knowledge at IPC about utilizing trusts in order to further insulate the undercover agent from law enforcement detection. I also believe that GODFREY's

27

EDNY-IPC-000007476

explanation for the undercover agent's need for an LLC as an American shows that GODFREY is aware that other individuals, including U.S. citizens, are using IPC for similar purposes.[15]

50. At the conclusion of the call, the undercover agent stated to GODFREY that he planned to travel to Belize sometime in November for a global asset protection conference and hoped that they could meet to talk about "future business." GODFREY responded, in sum and substance, that he would be available to meet. GODFREY also stated that he would arrange for the undercover agent to speak to BANDFIELD.

C. The Undercover Agent Contacts Legacy and Titan about Funding His Accounts

51. On or about October 18, 2013 at approximately 2:30 p.m., the undercover agent called DE WIT on the LGM-888 Phone and stated that he was from "Lion Mercantile," his IBC. During that call, the undercover agent asked DE WIT about how he could obtain a user name and password to access Lion Mercantile's brokerage account. DE WIT asked, "Do you know if it's been funded?" In response, the undercover agent stated that he was trying to access the account in order to transfer money into it. DE WIT then stated, "Okay, um, why don't you do me a favor and e-mail me, and I'll give you all that information." He then instructed the undercover agent to e-mail him at brian@lgm.bz. The undercover agent then stated that, once he received the instructions, he would "fund the account." The undercover agent concluded the call by stating to DE WIT that he would like to "have a follow up conversation and just chat with you about some of the things I'm looking to accomplish," in reference to his IBC's brokerage

---

[15] I believe that Godfrey's reference to the HIRE Act is in reference to the Hiring Incentives to Restore Employment (HIRE) Act of 2010, a law that provides payroll tax breaks and other incentives for businesses to hire unemployed workers. To offset the costs of the HIRE Act, Congress enacted the Foreign Account Tax Compliance Act (FATCA), which requires foreign banks to find American account holders and disclose their balances, receipts, and withdrawals to the IRS, or be subject to a 30 percent withholding tax on income from U.S. financial assets held by the banks. The FATCA also requires the owners of foreign-held assets to report those assets on their U.S. tax returns if they are worth more than $50,000. Those individuals who fail to do so are subject to a 30 percent penalty on the balance of the accounts in question.

28

account at Legacy. DE WIT responded, "Sure. No problem." Based on my training and experience and information learned in the course of this investigation, including discussions the undercover agent has had with BANDFIELD, GODFREY, KNOWLES, LEACH and DE WIT, as described herein, I believe this call is in furtherance of fraud in the sale of securities, money laundering, wire fraud and tax evasion because DE WIT is assisting the undercover agent in funding and obtaining access to a brokerage account at Legacy in the name of his IBC – Lion Mercantile – so that the undercover agent can participate in such illegal activities as matched stock trading, money laundering, the use of wires to facilitate securities fraud schemes and false ownership disclosures, and tax evasion.

52.     Later that day, the undercover agent e-mailed DE WIT and requested instructions about obtaining the user name and password for his brokerage account at Legacy. DE WIT responded that day that he was trying to send instructions directly from Caledonian Bank (where Legacy has an omnibus account) to the undercover agent to fund his brokerage account at Legacy. DE WIT further stated: "Once the account has been funded with cash &/or stock, we will set up online viewing in our system." On October 18, 2013, Caledonian Bank, at the request of DE WIT, e-mailed the undercover agent with instructions for wiring money into Legacy's account.

53.     On or about October 18, 2013 at approximately 4:31 p.m., the undercover agent called LEACH at Titan on the TIS-305 Phone. During that call, the undercover agent requested instructions for funding his brokerage account at Titan. LEACH responded by stating, "Not a problem. What's, what's your e-mail address again?" Once the undercover agent had provided his e-mail address to LEACH, LEACH said: "So I'll send you over those, uh, wire details, and – um – you just fund the account from there. If you, if you have any other questions,

29

just give me a shout." The undercover agent also requested the "forms I need to – you know, if I want to get some stock over there as well. Whatever I'm going to need for that." LEACH responded, "I can do that." The undercover agent then explained that he was "looking to get things organized now on my end, and start getting some things kicked off." He further explained that he planned to send $50,000 -- "a small little piece to get started" -- to the account early next week. The undercover agent then stated that, once he funded the account, he would like to talk to LEACH "about, you know, a lot of different things that I'm looking to do, things I'm looking to accomplish, and, and, you know, make sure that we're able to, uh, you know, get it done through you." LEACH responded, "that's not a problem."

54.      The undercover agent then told LEACH that he planned to be in Belize at the beginning of November and would like to meet with LEACH to "kick some things around." LEACH responded that he was not going to be in Belize at the end of October or beginning of November and hoped to return in time to meet up with the undercover agent. Based on my training and experience and information learned in the course of this investigation, including discussions the undercover agent has had with BANDFIELD, GODFREY, KNOWLES, LEACH and DE WIT, as described herein, I believe this call is in furtherance of fraud in the sale of securities, money laundering, wire fraud and tax evasion because LEACH is assisting the undercover agent in funding and obtaining access to a brokerage account at Titan in the name of his IBC – Lion Mercantile – so that the undercover agent can participate in such illegal activities as matched stock trading, money laundering, the use of wires to facilitate securities fraud schemes and false ownership disclosures, and tax evasion. On October 18, 2013, the undercover agent received an e-mail from an employee of Titan with wire instructions to Caledonian Bank, the bank at which Titan has an account.

30

55.    On or about October 29, 2013, approximately $60,000 was transferred into Titan's account at Caledonian Bank on behalf of the undercover agent, and approximately $30,000 was transferred into Legacy's account at Caledonian Bank on behalf of the undercover agent.

D.    Meetings in Belize

a.    Meeting with BANDFIELD and GODFREY

56.    On or about November 6, 2013, the undercover agent met with GODFREY and BANDFIELD at IPC's office in Belize.[16]  The meeting took place in a conference room and lasted approximately one and one quarter hours.  The entire meeting was recorded by the undercover agent with an audio and video recording device.

57.    At the beginning of the meeting, GODFREY opened a manila folder and indicated that he had a file pertaining to the undercover agent's account with IPC.  GODFREY stated that there was no copy of the undercover agent's passport in the file, and requested that the undercover agent submit a copy of his passport to IPC for his file.  GODFREY suggested that the undercover agent e-mail a copy of the passport to him.

58.    GODFREY also requested that the undercover agent provide IPC with a utility bill, a bank reference and a professional reference from an attorney or accountant.  During the meeting, BANDFIELD and GODFREY suggested that the reference letters should indicate that the attorney or accountant knew the account holder, in this case the undercover agent, for a period of two years.  At one point during the meeting, BANDFIELD provided the undercover agent with a template professional reference letter for the undercover agent to use.

---

[16]    BANDFIELD, who was not present at the start of the meeting, joined the meeting shortly after GODFREY and the undercover agent began discussing the undercover agent's account with IPC.  Throughout the undercover agent's meeting with BANDFIELD in Belize discussed herein, GODFREY was present.

31

59.    During the meeting, BANDFIELD discussed the benefits of opening an
account with IPC. Specifically, he indicated that a number of securities firms would not do
business with Americans and that banks were closing their operations to Americans because of
recent U.S. legislation. To deal with this situation, BANDFIELD stated that IPC created a
structure whereby it will open an account at a brokerage firm, such as Titan, on behalf of its
client but under the name of an IBC. BANDFIELD further stated that GODFREY or another
nominee would be assigned to the particular IBC. BANDFIELD indicated that a Belizean
citizen could not sit on a Belize IBC as a nominee because of tax reasons; however,
BANDFIELD stated that GODFREY or another Belizean nominee could own a Nevis LLC that,
in turn, could own a Belize IBC.

60.    BANDFIELD stated that, if anyone asked any questions about who owns
the IBC, IPC would indicate that the Belize IBC was owned by a Nevis LLC and that the Nevis
LLC was owned by GODFREY or some other nominee. BANDFIELD stated, "and that's how
we are getting around it." Based on my experience investigating securities fraud, wire fraud and
money laundering cases, as well as my review of the video and other communications in this
investigation, it is my belief that this structure, as articulated by BANDFIELD, is designed to
conceal an IPC client's control of the IBC, its brokerage accounts and its assets. Moreover,
based on my participation in this investigation, as well as my review of documents and recorded
conversations obtained during the investigation, I am not aware of any legitimate business by
IPC, and it is my belief that IPC was established for the sole purpose of facilitating securities
fraud, money laundering and tax evasion.

61.    In a clear attempt to assure the undercover agent that his assets would be
safe, BANDFIELD indicated that while a nominee may own the LLC, IPC and BANDFIELD

32

would have control over the nominee. If the undercover agent would like to have money moved or securities traded, the undercover agent would simply need to contact IPC, and IPC would make sure that money or securities are transferred or moved as directed by the undercover agent.

62. BANDFIELD further stated that, in order to demonstrate that the nominee owns the LLC, a certificate would be issued to the nominee reflecting his/her ownership. BANDFIELD told the undercover agent that he should not worry about the issuance of this certificate, because IPC has the ability to replace nominees without delay.

63. To make clear that the undercover agent would have control over assets and money, BANDFIELD told the undercover agent, "we know who ultimately is behind it [the LLC], but legally, [the nominee] owns it." Additionally, BANDFIELD informed the undercover agent that BANDFIELD owned one percent of every one of the LLCs set up by IPC. As a result, BANDFIELD would be able to prevent a nominee from making any changes to the structure of the LLC.

64. BANDFIELD told the undercover agent that if he wanted to own everything and demonstrate outward control over the LLCs and IBCs, IPC will not do business with him because that type of structure "gonna hurt you in the long run." BANDFIELD intimated that if a client wanted to own or outwardly control the entities or assets, then the IRS and creditors could make the client give the money back. The IRS and creditors, however, could not take the money from a nominee, such as GODFREY.[17]

---

[17] During the meeting, BANDFIELD also stated that IPC is able to establish trusts on behalf of its clients. BANDFIELD cautioned that the undercover agent should not be associated with the trust as a beneficiary or creator of the trust. The above-referenced discussion about outward control occurred while BANDFIELD was discussing the trust structure.

33

i. Avoiding the Appearance of Control

65.    During the November 6, 2013 meeting, the undercover agent stated that he was in the stock promotion and investor awareness business and received a significant amount of stock in connection with his activities. He further stated that he did not want to pay taxes and that he did not want the IRS to know about his activities. The undercover stated that the SEC was also looking at different aspects of his business and, thus, he needed to operate in an insulated environment.

66.    In response, BANDFIELD explained to the undercover agent that the brokers (i.e., Titan and Legacy) did not receive due diligence as to the identity of IPC's clients such as the undercover agent; rather, the brokers receive only due diligence as to the nominee of the IBC, LLC or trust.

67.    BANDFIELD also told the undercover agent that if he wanted to trade securities through his accounts at the brokers (i.e., Titan or Legacy), then the LLC or IBC would enable the undercover agent to have limited trading authority. To conceal the undercover agent's control over the accounts, BANDFIELD suggested that the undercover agent arrange for the LLC or IBC to pay the undercover agent a nominal amount as a "fee" for trading services. BANDFIELD suggested these nominal payments because "now we got a reason for you [the undercover agent] to have, you know been, e-mailing them [the brokers] or talking to them, or what have you." BANDFIELD warned that in a few years the government may be asking the undercover agent why the undercover agent was calling or e-mailing Titan. BANDFIELD then instructed the undercover agent that, in response, he should refer the government to the "agreement" to "assist" the IBC and the "fee" which the undercover agent would report on his tax return. BANDFIELD said, "then there is no problem." Based on BANDFIELD's

34

statements, and my experience investigating securities fraud cases, it is clear that BANDFIELD was suggesting that the undercover agent, the LLC and the IBC engage in deceptive acts to conceal the undercover agent's ownership and control over the brokerage accounts, which are nominally held by the LLC and IBC.

68. With respect to trading in the brokerage accounts, BANDFIELD stated that one of the mistakes that people made was that they traded a lot of stocks in one IBC and had the same person appear as the signatory on all of the trading accounts of that IBC. To prevent these mistakes, BANDFIELD suggested that the undercover agent maintain multiple IBCs and trade through accounts associated with the multiple IBCs. As a result, BANDFIELD suggested, the undercover agent would be able to use multiple entities with different signatories to trade the securities without creating suspicion with U.S. brokerage firms.

69. BANDFIELD also explained that he created Titan and Legacy and incorporated more than 5,000 companies. He further stated that he has been setting up IBCs and LLCs for years and has provided these services to many individuals. BANDFIELD did not identify who these individuals are.

ii. Discussion Concerning Stock Ownership Disclosures

70. BANDFIELD also suggested ways in which the undercover agent could conceal the beneficial ownership of more than five percent of a public company's stock.[18]

---

[18] Individuals who own or control more than five percent of a public reporting company's stock are obligated to make disclosures concerning their ownership. I am aware that the disclosure obligations apply regardless of whether the stock is owned by one or more entities under common control of a beneficial owner (i.e., someone with discretionary control to dispose of or transfer the stock). Based on my participation in other securities fraud investigations, it is my understanding that stock fraudsters who beneficially own more than five percent of a public reporting company's stock often conceal their ownership through offshore companies and IBCs. It is my understanding that those stock fraudsters also cause individuals associated with the IBCs or offshore companies to execute false beneficial ownership documents in order to conceal the fraudsters' own beneficial ownership and control of stock. By concealing their ownership, the

35

EDNY-IPC-000007484

Specifically, BANDFIELD told the undercover agent that if, for example, the undercover agent had six percent of a public company's stock, then he should hold four percent of the company's stock in the name of one entity and transfer the remaining two percent to another entity that maintains a brokerage account at a different brokerage firm. BANDFIELD also warned the undercover agent that "we" would run into problems if the undercover agent were to use the same brokerage firm to trade a significant portion of a company's stock (e.g., twenty percent of a company's stock), even if the undercover agent traded the stock through multiple accounts established for the various entities.

71.    BANDFIELD also suggested that the undercover agent create multiple IBCs and transfer a portion of a particular company's stock into the different IBCs. BANDFIELD indicated that such a structure would avoid a situation where one IBC held five or six percent of a company's stock. He also spoke about the possibility of one LLC owning a number of different IBCs with different nominees, to conceal the ownership and control of more than five percent of any one stock. BANDFIELD indicated that it was the responsibility of IPC's clients, including the undercover agent, to make sure that no single IBC account was trading more than five percent of a company's stock.

72.    At one point during the meeting, BANDFIELD stated the undercover agent should not use the word "control" when speaking about his relationship to the IBCs or LLCs. In fact, BANDFIELD said, the word "'control' is a bad word around here."

---

stock fraudsters are able to sell large blocks of stock without alerting the public to their control over the stock. Accordingly, stock fraudsters' failure to disclose their ownership, as well as their false and misleading statements about their ownership, constitutes securities fraud and wire fraud (both of which are predicate acts for money laundering), because they are perpetrating frauds in the buying and selling of stock by misleading the public about the true ownership and control of a company's stock and using wires to do so.

36

### iii. Discussion Concerning The Transfer of Assets

73. BANDFIELD also talked about the process through which the undercover agent would be able to buy and sell securities and transfer money. Specifically, BANDFIELD told the undercover agent that if he wanted to buy or sell a security, he simply would need to direct BANDFIELD or someone at IPC to buy or sell the security.

74. If the undercover agent intends to send funds by wire, BANDFIELD explained, the undercover agent simply would need to contact IPC or BANDFIELD, indicating that a transfer of funds should occur. BANDFIELD cautioned the undercover agent about sending e-mails to IPC regarding the transfer of funds, saying, "you have to be a little careful on how you e-mail this stuff [wire instructions]." Once IPC or BANDFIELD received the request, IPC would contact Titan and make the request to transfer funds from the entity's Titan account. BANDFIELD again cautioned the undercover agent, stating that "Titan doesn't want you, who [is] doing the trading, to play with monies – if you are playing with the monies, it shows control." BANDFIELD further stated that even though the undercover agent might have limited trading authority over an account, only IPC would give the orders to transfer the funds.[19]

75. BANDFIELD indicated that the undercover agent should be concerned about any connection between the undercover agent and the funds that he wired into one of the accounts. As an alternative to using wire transfers, BANDFIELD suggested that the undercover agent transfer stock directly into his account. That way, the undercover agent would be able to cause the issuance of stock for services and then deposit the stock in a Belize account. BANDFIELD indicated that the undercover agent would then be able to sell the stock and

---

[19] As an alternative, BANDFIELD stated that if the undercover agent were to open an offshore brokerage firm, the undercover agent could move as much money as the undercover wanted into and out of the brokerage firm's accounts and "nobody would question it."

37

receive the sale proceeds. As a result, BANDFIELD suggested, the undercover agent effectively would be able to move money out of the United States without there being any "trail" to the undercover agent. In context, and based on my training and experience, it is my belief that BANDFIELD was explaining ways in which the undercover agent could commit securities fraud, wire fraud and money laundering.

76. BANDFIELD suggested that if the undercover agent needed to execute agreements in connection with the issuance of the stock, the undercover agent should send the agreement to IPC so that the nominee associated with the IBC could execute the document. BANDFIELD also suggested that the nominee would sign any Form W-8BEN in connection with any accounts. It is my understanding that Form W-8BEN refers to an IRS form used to disclose beneficial ownership of bank and brokerage accounts by foreign beneficial owners for the purpose of U.S. tax withholding. The form's certification includes a statement that the beneficial owner of the account is not a U.S. citizen. In context, it is my belief that BANDFIELD was explaining to the undercover agent that nominees for the IPC account (i.e., individuals who are also employees of IPC) would be willing to execute false Form W-8BENs indicating that U.S. citizens were not beneficial owners of bank and brokerage accounts.

77. BANDFIELD also cautioned the undercover agent about sending wire transfers to particular parties. Specifically, BANDFIELD stated that Titan and Legacy would not send money transfers to stock promoters because "it looks pretty bad." Rather, Titan and Legacy would wire funds to attorneys who have trust accounts and those attorneys would then forward the wires to the stock promoters. In my experience investigating securities fraud, wire fraud and money laundering cases, individuals intent on manipulating the price of a particular

38

EDNY-IPC-000007487

public company's stock rely on, and compensate, stock promoters who engage in activities to artificially inflate a company's stock price.

### iv. Discussions Concerning the Creation of a Trust

78.      BANDFIELD spoke at length about the possibility of IPC establishing an "irrevocable" trust on behalf of the undercover agent. BANDFIELD explained that the undercover agent could use the trust to hold securities and transfer funds. BANDFIELD further explained to the undercover agent that he should not be the settlor or beneficiary of the trust, because then his relationship would need to be reported to the IRS. Instead, BANDFIELD suggested that the undercover agent provide IPC with a "letter of wishes," which the undercover could change at any time. BANDFIELD stated that any distribution of the trust would occur only after the undercover agent's estate had settled, and the distribution would be in accordance with undercover agent's wishes as set forth in the "letter of wishes."

79.      BANDFIELD also explained that the trust structure would allow the undercover agent to receive funds as a "loan" from the trust. By way of example, BANDFIELD explained that the undercover agent would be able to withdraw $1 million from the trust as a "mortgage" on a condo owned by the undercover agent. BANDFIELD explained that this withdrawal of money as a "loan" would enable the undercover agent to receive cash without paying taxes and that the undercover agent could then spend that money on whatever he wanted. For smaller transfers, BANDFIELD advised that the undercover agent could soon withdraw funds with debit cards that would not leave a "foot print."

### v. Discussion Concerning the Internet and the Undercover Agent's History

80.      BANDFIELD stated that IPC needed updated phone and e-mail contact information for its clients. He cautioned that the internet was not always "safe." As a result,

39

GODFREY stated that he or someone from IPC might e-mail a client, stating, "please call me," because GODFREY wanted to discuss something with the client that he did not "want to put on the net [in an e-mail]."

81. BANDFIELD also asked the undercover agent if he had any SEC violations or if he had any other issues in the past. GODFREY asked whether the undercover agent had committed any murders. BANDFIELD stated that, regardless of the response, it would not be an issue, but that "we would have to do some alterations."

B. Meeting with KNOWLES

82. The same day, after meeting with GODFREY and BANDFIELD, the undercover agent met with ROHN KNOWLES, a securities trader with Titan, in Titan's offices. Titan's offices are located on the same floor and adjacent to IPC's offices. The undercover agent advised KNOWLES that he was in the stock promotion business and had already opened one account each at Titan and Legacy.

83. KNOWLES told the undercover agent that he regularly worked with "Brian" at Legacy and that clients often split stock between the two brokerage firms. He indicated that "we" (Titan and Legacy) might hold twenty or thirty percent of a company's stock within the brokerage firm, but assured the undercover agent that the stock would be maintained "obviously in separate accounts." In context and based on information learned in the course of the investigation, I believe that "Brian" is a reference to DE WIT. Additionally, in context, and based on my experience investigating this case and other cases involving securities fraud, wire fraud and money laundering, KNOWLES appears to be aware of the disclosure requirement regarding ownership of 5% or more of a public reporting company's stock, and appears to be facilitating the evasion of that reporting requirement.

40

84. KNOWLES told the undercover agent that he would take orders to buy or sell securities from the undercover agent after the undercover agent returned to the United States. KNOWLES, however, stated that he preferred to receive such orders by phone rather than online, because it was quicker and also because the undercover agent could let KNOWLES know whether he wanted KNOWLES to "work" a big trade "in a certain way."

85. KNOWLES indicated that he could execute matched trades between two accounts controlled by the undercover agent at prices determined by the undercover agent. To ensure that the trade would "print" (i.e., be visible to the public and other investors), KNOWLES suggested that the undercover agent use KNOWLES and Brian (DE WIT) to execute such trades. Based on my experience investigating this case and other securities fraud cases, I believe that KNOWLES was referring to, and agreeing to engage in, the simultaneous sale and purchase of a security by an individual, or group of individuals, designed to show market activity. Such trades, which are known as matched trades, are most common in manipulation schemes, and do not reflect a bona fide sale of a security but, rather the false appearance of actual, bona fide market activity. Matched trading is designed to artificially inflate the price of a security, inducing unknowing members of the public to buy the security as well. Once individuals engaging in matched trading have sufficiently "pumped" a stock, they then sell or "dump" their stock shares, usually at a significant profit, ultimately causing the price of the shares to plummet. The "dumping" of the stock results in losses to the public who were not aware of the "pump and dump" scheme. The "pumping and dumping" of a company's stock by stock fraudsters using offshore IBCs using various brokerage accounts constitutes securities fraud and wire fraud (the fraudsters use wires to complete the buying and selling of stock), and the use of the brokerage accounts to conceal the illicit proceeds of those crimes constitutes money laundering.

41

86. KNOWLES indicated that if he tried to execute such a trade between two Titan accounts, rather than between a Titan account and a Legacy account, Titan's clearing firm (in other words, the U.S. brokerage firm at which Titan and Legacy have trading accounts) would ask: "What's going on here?" KNOWLES recommended that the undercover use "me and Brian" for such trades and stated, "me and Brian do it all the time for other clients." KNOWLES did not indicate to the undercover agent who his other clients are. KNOWLES then told the undercover agent what instructions to give KNOWLES and Brian (DE WIT) to ensure the execution of such matched trades.

87. The undercover agent also indicated that he wanted to control the trading in particular stocks, that he wanted to move the price of particular stocks to certain levels, and asked KNOWLES whether he was comfortable with such activity. KNOWLES acknowledged that he was comfortable with such trading activity, repeatedly stating that is was "not a problem." KNOWLES also reassured the undercover agent that he frequently coordinated trades with Brian (DE WIT) and that they communicated by Skype or by Blackberry PIN, "which is a little bit more secure." KNOWLES stated that, if the undercover agent wanted to execute coordinated trades in a particular stock, the undercover agent could simply call or "message" KNOWLES, advising KNOWLES to "coordinate with Brian." KNOWLES assured the undercover agent that he would then communicate with Brian (DE WIT) as needed to coordinate trading of the stock as requested by the undercover agent. Based on my experience investigating securities fraud, wire fraud and money laundering cases, the terminology used by KNOWLES when describing his communications with "Brian" (DE WIT) are typical communications between individuals intent on manipulating trading in a particular public security, which constitutes securities and wire fraud.

42

88.     KNOWLES also acknowledged that the undercover agent was the person behind the IBC that had been set up by IPC. This acknowledgement demonstrates that KNOWLES knows that the IPC clients are the true control persons behind the IBCs and LLCs used by IPC. KNOWLES also stated that Titan would not have opened the account directly for the undercover agent because the undercover agent was an American; the account, he explained, could only be set up because the undercover agent used the "structure" provided by BANDFIELD and IPC. As a result, he advised, a regulator looking at Titan's book would not be able to see that IPC's clients, in fact, controlled the accounts.

89.     KNOWLES advised the undercover agent to contact IPC if he intended to transfer money out of the Titan brokerage account. All money transfers had to be signed off on by the nominee working for IPC. KNOWLES cautioned that "we can't have an American signing off on a money movement, because, obviously, that would still mean it's a U.S. person, a U.S. person's cash." He also indicated that Titan could not send money directly to issuers or stock promoters, because such a transfer would raise a red flag with Titan's bank.

E.     Calls to IPC, Titan and Legacy After the Belize Meetings

90.     On or about December 11, 2013 at approximately 3:19 p.m., the undercover agent called BANDFIELD on the IPC-503 Phone. During that call, BANDFIELD explained to the undercover agent that he would like to establish five IBCs, each of which would be owned by one of two Nevis-based LLCs, for the undercover agent, as follows:

| BANDFIELD: | Okay, well – um – let's see, where we left off last time is – umm – I did – um – I go through this and – um – worked – ahh, ahh – came up with more names and companies that we have here which is really not – not very hard. |
| --- | --- |
| UC: | Great. |

43

BANDFIELD:     Uhh – came up with some IBCs and then I
               thought that to, to put up, to do what you want
               to accomplish, I believe, I – uh – put two LLCs
               Nevis behind those so each one would own
               three, because of the present one.

UC:            Mm hmm.

BANDFIELD:     So this, this, puts the ownership in two different
               areas.  Um – regarding the brokerage accounts
               – um – certainly we can do at least four here,
               probably five accounts, not a problem.

UC:            Mm hmm.

BANDFIELD:     And we would, we would, do all of them
               similarly in that they would be opened in the
               name of the company – uh – and the ownership
               would be by the Nevis company, which then
               would be owned by an individual.  We got
               some new individuals, so we would put them
               with it.  Now, I – uhh – let's see, I don't advise
               on any taxes.

UC:            Right.

BANDFIELD:     Uhh – but assuming we're trying to maintain
               some privacy here.  Um –

UC:            We can –

BANDFIELD:     -- this would –

UC:            -- safely assume that [laughs].

BANDFIELD:     Yeah [laughs].  This certainly would, would,
               take care of that because the – uh – legality of
               this is, is that those companies are owned by
               those – by – owned by the LLC and the LLC
               indeed does own the – uh – is owned by an
               individual out here.

UC:            Right.

44

| BANDFIELD: | So that part is firm. And the shares for the LLCs are actually written in the name of that individual. |
|---|---|
| UC: | Mm hmm. |
| BANDFIELD: | So, we have that here. Now – umm, umm – I think, I think you had mentioned umm, ahh – a, percentages that some, some companies may receive percentages of stock for their work – umm – and that's where the use would come in, that they would be receiving stock for some of their work. |
| UC: | Right. |
| BANDFIELD: | And that's fine. Ahh – I think one would be not expecting them to receive a huge portion of every issue, but something reasonable for whatever their services are. |
| UC: | Right, right. |

91. In context, and based on information learned in the course of the investigation and my training and experience in investigating securities fraud, money laundering and wire fraud, I believe that Bandfield, in proposing the two LLC and 5 IBC ownership structure set forth above (which would not show any of the undercover agent's control of those entities on paper), is facilitating securities fraud (a "specified unlawful activity" for money laundering purposes), money laundering and wire fraud, because Bandfield is aiding the undercover agent in disguising the true ownership of stock, helping to disguise payments to the undercover agent for his illegal stock promotion activities, and suggesting the use of wires (through the transfer of money and stock to and from the LLCs and IBCs controlled by the undercover agent) to perpetrate the undercover agent's securities fraud schemes.

92. BANDFIELD also explained that IPC could then set up five different brokerage accounts for the undercover agent's IBCs. He listed the following IBCs as available

45

for the undercover agent to use as part of IPC's services, in addition to Lion Mercantile (the IBC that the undercover agent already controlled): Klondike Kapers, Inc., Keyhole Explorations, Inc., Micalane Management, S.A., and Probe Investments, Inc.[20] In addition to Crystal Capital Securities, the LLC that the undercover agent already controlled, BANDFIELD suggested that the undercover agent also use an LLC called Rustic Partners to own some of the undercover agent's IBCs.

93. During the call, BANDFIELD also emphasized the importance of the dates upon which the LLCs and IBCs were established, so that the undercover agent could use the names of the IBCs and LLCs to "document" past business deals. In context, I believe that BANDFIELD was offering the undercover agent the ability to backdate prior stock deals by offering IBCs and LLCs that were established on earlier dates. Based on my training and experience, and information learned in the course of this investigation, I believe that Bandfield's offering to the undercover agent a means by which to backdate illegal securities deals is additional evidence of securities fraud, money laundering and wire fraud.

94. BANDFIELD also stated that he could establish brokerage accounts for the undercover agent at five different securities firms, including Titan and Legacy.[21] BANDFIELD noted, "we can spread this stuff out pretty good." In context, and based on information learned in the course of the investigation, Bandfield's suggestion that the undercover agent set up brokerage accounts at five different brokerage firms, located in different countries,

---

[20]  BANDFIELD explained during the call that one of the IBCs he listed is based in St. Vincent, and the other IBCs are based in Belize.

[21]  During the call, BANDFIELD stated to the undercover agent that IPC could establish brokerage accounts at the following securities firms: Interworld Securities, Verdmont (located in Panama), Seven Mile Securities (located in the Cayman Islands), and Beaufort Securities (located in London, England). BANDFIELD also stated that "we" set up another brokerage firm – Unicorn Securities – in Belize.

46

EDNY-IPC-000007495

is in furtherance of securities fraud, money laundering and wire fraud, because Bandfield is aiding the undercover agent in facilitating matched trading of stock and disguising the true ownership and control of a company's stock from the public and regulatory authorities. Bandfield is also providing a means by which the undercover agent can spread out the illegal proceeds of his stock promotional activities, which constitutes further evidence of money laundering.

95. BANDFIELD also suggested that the undercover agent use an IBC for a particular stock trade and then "dump" that IBC after a year or two to further evade detection. He noted that a certain client of his, an individual who is "very well off," has had the same IBCs for approximately 10 years. BANDFIELD further stated, "One of these days I've just gotta sit down with him and get rid of a bunch of these. But you know, you kinda get used to the name, and you know, you figure you're trading them. But it's not a good idea."

96. BANDFIELD and the undercover agent also discussed IPC's fees for the services they discussed. As set forth above, the undercover agent had already paid IPC approximately $3,300 via Paypal for an IBC and an LLC. With respect to that payment, BANDFIELD stated the following:

BANDFIELD: Okay, then the next little thing I want to talk about is -- umm -- and, in May – umm -- there was a payment made, by Paypal, for a couple of -- umm -- companies, of thirty-three hundred.

UC: Right.

BANDFIELD: Now that's a permanent record so we cannot erase that thing. But I'm thinking that -- umm, umm -- perhaps, are, are you thinking of coming down here at all in the future again, or?

47

UC:                    I would certainly do so if that was -- uhh --
                       something that -- uhh -- you know, you
                       thought that was -- uhh -- a good option.

BANDFIELD:             I think, I think it would be, not be a bad
                       idea, you know at, at your leisure. Umm --
                       but one of the things -- umm -- I would like
                       to do is send back this payment. [Laughs].
                       And then we've completely taken care of
                       everything.  We have no direct connection at
                       all.  Umm -- you had looked at some things
                       for those if, for that issue in May, but you
                       didn't proceed with it and we just sent the
                       money back. I'd like to do that.

UC:                    Okay.

BANDFIELD:             Umm -- perhaps after the first year or
                       something. And then we'll work on the other
                       ones in some other manner.

UC:                    Okay.

BANDFIELD:             Umm -- does, does that make sense to you
                       here? I'm being a little bit evasive, but I
                       think that the gist of it all is there.

UC:                    No, no, no. I, I, I, I totally get it. Umm -- I
                       totally get it. It -- it would, uh -- it would
                       extinguish our relationship -- uhh -- in one
                       manner, and continue in another.

BANDFIELD:             That's correct yeah and I think it works out
                       really well . . . .

97.    At the end of the call, BANDFIELD suggested that the undercover agent

travel to Belize with cash to pay IPC for its services.  In context and based on information

learned in the course of the investigation, it appears that BANDFIELD, in suggesting that IPC

48

EDNY-IPC-000007497

refund the undercover agent's Paypal payment of $3,300, is attempting to further evade law enforcement detection by eliminating as many connections via a paper trail to the undercover agent as possible.

98.     On or about December 19, 2013 at approximately 3:20 p.m., the undercover agent contacted KNOWLES on the TIS-305 Phone. During that call, the undercover agent stated to KNOWLES that he intended to "get some trading going in the first quarter of next year." The undercover agent asked KNOWLES if he had spoken to DE WIT about the undercover agent's plans for trading securities, and KNOWLES responded as follows: "no, we, never got a chance to speak. But, I mean, as I say, we, we, -- uhh – we do business all the time so, I mean – ahh – it, it's – ah – it shouldn't, it really shouldn't be a problem. It, it probably [unintelligible] speak to him when I actually see him – umm – rather than, over, you know, over the phone about it. But, yeah, I mean, it shouldn't be an issue." KNOWLES concluded the call by stating, "I guess whenever, you know, you're ready to start to – uhh – you, you're ready to start depositing securities and what not, just – uh – let us know and we're, we're, we're, we're here." In context, and based on information learned during the course of the investigation, I believe that KNOWLES is confirming to the undercover agent that he and DE WIT orchestrate matched trading of securities for their clients (which constitutes evidence of securities fraud and wire fraud) and that they are prepared to do the same for the undercover agent. Additionally, the fact that KNOWLES intends to speak to DE WIT in person as opposed to over the phone regarding the undercover agent's planned activities suggests that KNOWLES understands that his actions constitute criminal wrongdoing.

99.     On or about December 19, 2013 at approximately 3:37 p.m., the undercover agent called DE WIT on the LGM-888 Phone. During that call, the undercover

49

agent confirmed that he had transferred $30,000 into his IBC's account at Legacy (as set forth

above). DE WIT responded by giving the undercover agent a user name and passcode for the

account. The undercover agent then stated that he would like to meet with DE WIT in person as

opposed to speaking with him on the phone regarding his plans. The undercover agent then

confirmed with DE WIT that DE WIT and KNOWLES "work well together in the kinds ... of

things" that the undercover agent had planned to do. In context, it is possible to conclude that

DE WIT appeared to be confirming that he and KNOWLES have previously collaborated on

matched trading of securities for clients, which constitutes prior instances of securities fraud,

wire fraud and money laundering, and that he is prepared to do the same for the undercover

agent.[22]

F. Other Investigative Information

100. Records from Paypal for the time period of January 1, 2009 to February 5,

2013 show that approximately 65 individuals who listed a U.S. address on their Paypal accounts

sent payments to IPC's Paypal account in amounts consistent with setting up or renewing

offshore accounts.[23] These payments include such notations as "Belize IBC & Nevis LLC," "3

companies each $1,000[ ]US" and "FIRST COMPANY[ ]SECOND COMPANY[ ]THIRD

COMPANY[ ]ANNUAL." IPC's Paypal account opening documents list a domestic e-mail

---

[22]      Since December 2013, the undercover agent has been in contact with GODFREY,
BANDFIELD, LEACH, KNOWLES and DE WIT through e-mail regarding a visit to Belize that
the undercover agent made in early March 2014. On March 4, 2014, the undercover agent met
with GODFREY and BANDFIELD at IPC's offices in Belize. That meeting was consensually
recorded. During that meeting, the undercover agent paid BANDFIELD $9,600 in cash for
establishing the undercover agent's IBC and LLC structure and for establishing five different
brokerages accounts for him. Additionally, the undercover agent and BANDFIELD discussed
the use of the undercover agent's IBCs and LLCs to further the undercover agent's plans for
illegal stock promotion activity.

[23]      IPC's Paypal account is registered to ROBERT BANDFIELD.

50

EDNY-IPC-000007499

account for IPC as opulence10@yahoo.com. According to information obtained from Yahoo! Inc., the e-mail service provider for that e-mail account, an alternate e-mail contact for opulence10@yahoo.com is glenna@ipc-offshore.com. Moreover, the individual who registered the opulence10@yahoo.com account was BERGEY.

101. Additionally, U.S. tax laws require that individuals report foreign bank accounts containing $10,000 or more. Notably, only four of the 65 individuals with U.S. addresses who sent money to IPC's Paypal account reported having such foreign bank accounts by filing a Report of Foreign Bank and Financial Accounts form with the IRS. Of these four individuals, two individuals reported accounts in China. The other two individuals disclosed accounts in Panama and the Bahamas, two countries in which IPC appears to have the ability to set up accounts.

102. Of the 65 individuals listed in the Paypal records, 33 individuals have been identified through public SEC filings as an officer, director, shareholder or consultant to a publicly-traded penny stock company.

103. Given the nature of the business, the statements made by BANDFIELD and GODFREY during the course of this investigation, my review of e-mails obtained in this case and documents obtained from Paypal, the lack of IRS disclosures by individuals who used the Paypal system, and the histories of individuals who have communicated with IPC (as set forth below), I believe that U.S. citizens are using IPC to conceal their beneficial ownership of accounts and failing to disclose that beneficial ownership of those accounts to the IRS. Additionally, given the fact that more than $364 million was transferred through Titan and Legacy during the period October 2010 through April 2013, and that many of the fees

51

associated with establishing an IPC account are approximately $3,000, I believe that many accounts established by IPC hold in excess of $10,000.

104. Moreover, based on my training and experience, the nature of IPC's business, the statements made by BANDFIELD and GODFREY during the course of this investigation, my review of e-mails obtained in this case and documents obtained from Paypal, the fact that the vast majority of the 65 individuals with U.S. addresses who used the Paypal system have not disclosed foreign bank accounts to the IRS, the fact that approximately half of those individuals are associated with penny stock companies, and the fact that a number of individuals communicating with IPC are under investigation and/or have been subject to a conviction or a sanction by the Financial Industry Regulatory Authority ("FINRA"), I believe that IPC's clients are using IPC's services to facilitate securities fraud, wire fraud, money laundering and tax evasion.

III.    Toll Analysis

105. Analysis of toll records for the Subject Telephones provides further and independent probable cause that the Subject Individuals are using the Subject Telephones to engage in illegal activities, including securities fraud, wire fraud and money laundering.

106. An analysis of toll records between January 1, 2013 and March 14, 2014 (the "Covered Period") shows regular contact between the Subject Telephones and eight telephone numbers believed to be used by the Subject Individuals listed below, who have a history of participating in financial fraud and market manipulation schemes. In my experience, those who engage in market manipulation schemes typically engage in schemes involving several micro-cap stocks over a period of time.

107. Subsection A summarizes the involvement of certain Subject Individuals in market manipulation and financial fraud schemes. Subsections B, C, D and E then detail the

52

number of calls and the date of the most recent call between each Subject Individual and the Subject Telephones.

A. Subject Individuals

a. LOUIS BUONOCORE

108. Toll records show contact between telephone number 781-935-2461 and two of the Subject Telephones on 13 occasions, most recently on December 4, 2013. A public records search has revealed that 781-935-2461 is registered to LOUIS BUONOCORE in Woburn, Massachusetts. Phone records also reveal that that telephone number is subscribed to Dina Buonocore, who, upon information and belief, is LOUIS BUONOCORE's wife. As set forth above, in May 2000, following a three-week jury trial, BUONOCORE was convicted of one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff. BUONOCORE was sentenced to eighteen months' imprisonment, three years' supervised release and $147,750 in restitution. Based upon the facts and circumstances set forth herein, I believe that BUONOCORE is using telephone number 781-935-2461, and that the contact between that phone number and two of the Subject Telephones is likely in furtherance of securities fraud, wire fraud and money laundering, among other offenses

b. PAUL GIARMOLEO

109. Toll records show contact between telephone number 516-816-3288 and three of the Subject Telephones on 125 occasions, most recently on February 28, 2014. A public records search has revealed that 516-816-3288 is registered to PAUL GIARMOLEO in Miller Place, New York. In May 2001, the Massachusetts Securities Division denied GIARMOLEO's application to become a registered agent after being advised of a customer complaint lodged

53

against GIARMOLEO and his failure to appear for an on-the-record interview to provide additional information regarding his past activities in the securities industry. In April 2008, GIARMOLEO was suspended by FINRA for one year and was fined approximately $27,500, based on allegations that he recommended a stock to customers without having a reasonable basis to do so and without having reviewed the current financial statement and material business information about the stock; that GIARMOLEO made price predictions to customers; and that GIARMOLEO, acting intentionally or recklessly, made material misrepresentations or omitted facts in recommending a speculative stock. Additionally, in June 2013, GIARMOLEO became the subject of an FBI investigation for his possible participation as a stock promoter in a "pump-and-dump" market manipulation scheme. That investigation is ongoing. Based upon the facts and circumstances set forth herein, I believe that GIARMOLEO is using telephone number 516-816-3288, and that the contact between that phone number and three of the Subject Telephones is likely in furtherance of securities fraud, wire fraud and money laundering, among other offenses.

c. RANDALL HAMDAN

110.    Toll records show contact between telephone number 313-768-7899 and one of the Subject Telephones on 24 occasions, most recently on June 18, 2013. A public records search has revealed that 313-768-7899 is registered to RANDALL HAMDAN, also known as "Randy," in Dearborn, Michigan. HAMDAN is currently the subject of an FBI investigation into a market manipulation scheme.

111.    In February 2012, HAMDAN had three telephone conversations, which were consensually recorded, with a confidential source. [24] During those calls, HAMDAN discussed in detail various stock manipulation schemes. In one call, HAMDAN relayed to the

---

[24]    The confidential source pleaded guilty to an information charging one count of securities fraud in March 2012. The source has proven reliable in the past, and the information he/she has provided has been corroborated. The confidential source has not been sentenced yet.

54

EDNY-IPC-000007503

source a conversation HADMAN had with another individual about $6 million to $8.5 million worth of "trading back and forth" on a particular day. HAMDAN then explained that an international group of brokers and fund managers "will take the share price to $0.35 and then they're going to take everyone out." In context, and based on my training and experience, I believe that "take everyone out" refers to selling the stock held by the members of the group coordinating the market manipulation. HAMDAN further explained that the group would then "bring up the share price to $0.60 or $0.65" to avoid an immediate decline in the stock price after the positions are sold so "this thing does not look like a roller coaster." HAMDAN explained that this was an opportunity to make $3 to $5 million in profits. When the confidential source asked HAMDAN for assurance that the group could control the share price, HAMDAN replied, "I have no doubt in my mind that the price will be walked up."

112. In the same call, HAMDAN made repeated references to Belize, selling stock out of Belize brokerage accounts, and holding money in Belize bank accounts. HAMDAN explained that he was working with "Frank" and another "guy" and further explained the process of setting up an offshore entity: for a fee of $2,500, the "guy" would provide a customer with a sheet of company names from which to choose, and then would offer to provide the customer with officers and directors for the customer's chosen company. HAMDAN then stated, "of course, you say yes" so that "your name will not be on there." Once the structure was in place, HAMDAN explained that the shares would be deposited "down there." HAMDAN further explained that if shares are issued to "your entity," they will be "cut to another entity in Belize" and "if you sell those shares, you're not in the DTC system."[25] In context and based on my training and experience investigating this case and other cases involving securities fraud, wire

---

[25] Based on my training and experience, I believe that HAMDAN's reference to the "DTC system" is a reference to the Depository Trust Company ("DTC"). The DTC acts as a clearinghouse to process and settle trades in securities.

55

fraud and money laundering, I believe that HAMDAN provided a detailed description to the confidential source of a process similar to the one used by IPC by which a U.S. individual could sell securities through Belize entities in a manner that concealed the U.S. individual's control of the entity and, thus, the true ownership of the shares.

113. During the call described above, HAMDAN further noted that the "guy" would also provide an ATM card that would allow for withdrawals at ATMs, bank and casinos. HAMDAN then explained in detail how large amounts of cash could be withdrawn at casinos without raising any suspicion.

114. Based upon the facts and circumstances set forth herein, I believe that HAMDAN is using the telephone number 313-768-7899 and that the contact between that phone number and one of the Subject Telephones is likely in furtherance of securities fraud, wire fraud and money laundering, among other offenses.

d. EDWARD MONET

115. Toll records show contact between telephone number 619-991-5472 and all four of the Subject Telephones on 156 occasions, most recently on January 7, 2014. A public records search has revealed that 619-991-5472 is registered to EDWARD MONET, also known as "Edward Moinat," in San Diego, California. In October 1993, MONET resigned from a brokerage firm after being the subject of a customer complaint alleging that MONET engaged in unauthorized trades. In January 1998, MONET was sanctioned by the state of Wisconsin based on allegations that MONET offered unregistered stock to at least one person in Wisconsin while MONET was not licensed to do so. In June 2009, the FBI interviewed a stock promoter as part of a market manipulation investigation. The stock promoter alleged that MONET was an "IR person" (stock promoter), that MONET was made aware when an e-mail campaign to promote a

56

stock was going to "kick off," and that MONET then coordinated with others to sell their stock based on the timing of the e-mail campaign.

116. Additionally, in April 2013, David Loflin sent several e-mails to BANDFIELD, GODFREY and another IPC employee requesting that certain corporate documents be signed at the request of MONET.[26] For example, on April 30, 2013, Loflin sent an e-mail to BANDFIELD, GODFREY and others stating: "Per Eddie Money, please have MAFX, Inc., sign the attached letter and return to me." Upon information and belief, I believe that Loflin's reference to "Eddie Money" is a reference to MONET. Additionally, several documents Loflin e-mailed that day relate to the conversion of $1,500 of debt into 150 million shares of a publicly-traded penny stock company and include a "Debt Assignment" document signed by MONET. Based upon the facts and circumstances set forth herein, I believe that MONET is using telephone number 619-991-5472, and that the contact between that phone number and all four of the Subject Telephones is likely in furtherance of securities fraud, wire fraud and money laundering, among other offenses.

e. LOUIS NOLFO

117. Toll records show contact between telephone 561-213-2262 and three of the Subject Telephones on 105 occasions, most recently on March 11, 2014. A public records search has revealed that 561-213-2262 is registered to LOUIS NOLFO in Boca Raton, Florida. NOLFO was a licensed financial consultant and stock broker. In December 2008, FINRA took regulatory action against NOLFO and barred NOLFO from the securities industry based on allegations that NOLFO exercised control over customer accounts, churned those accounts and effected numerous excessive securities transactions in those customer accounts, and thereby

---

[26] These e-mails were obtained pursuant to a court-authorized search warrant dated August 26, 2013.

57

directly or indirectly, knowingly or recklessly, employed devices, schemes or artifices to
defraud, made untrue statements of material facts, failed to state material facts, or effected
transactions by means of manipulative, deceptive or other fraudulent devices or contrivances;
used unsuitable levels of margin in one of the customer accounts in a manner that was reckless
and inconsistent with the customer's objectives; and failed to adequately supervise the trading
activities of a registered representative. Based upon the facts and circumstances set forth herein,
I believe that NOLFO is using telephone number 561-213-2262, and that the contact between
that phone number and three of the Subject Telephones is likely in furtherance of securities
fraud, wire fraud and money laundering, among other offenses.

### f. TIMOTHY PINCHIN

118. Toll records show contact between telephone number 858-869-5296 and
three of the Subject Telephones on 98 occasions, most recently on February 20, 2014. A public
records search has revealed that 858-869-5296 is registered to TIMOTHY PINCHIN in Del Mar,
California. Confidential sources of the FBI alerted agents to PINCHIN in approximately 2000
and 2013. In November and December 2000, a confidential source reported that the source was
introduced to PINCHIN in late 1997 by the CEO of a publicly-traded company, and that
PINCHIN was a high-powered internet promoter.[27] The source further reported that the CEO of
the company was planning a reverse merger of the publicly-traded company, and that PINCHIN
had knowledge that the deal was "rigged." The source reported that PINCHIN was ultimately
the recipient of about 1.3 million shares of the company. In 2013, another confidential source
reported that the source had known PINCHIN since 1997, and that the source had done a deal

---

[27]      Due to the age of this confidential source's information, I have been unable to verify the
reliability of his or her information.

EDNY-IPC-000007507

involving stocks with PINCHIN a long time ago.[28] The source also stated that PINCHIN had

some issues and problems with the SEC, and that PINCHIN was known as a "deal guy" involved

in market manipulation. Additionally, the source reported that PINCHIN found shell companies

to do reverse mergers as part of stock market manipulation schemes, and that PINCHIN just

wanted to "blow paper," meaning that he wanted to pump up the price of a stock and then sell the

stock to make money. Based upon the facts and circumstances set forth herein, I believe that

PINCHIN is using telephone number 858-869-5296, and that the contact between that phone

number and three of the Subject Telephones is likely in furtherance of securities fraud, wire

fraud and money laundering, among other offenses.

### g. BRUCE SCHOENGOOD

119. Toll records show contact between telephone number 732-786-8044 and

three of the Subject Telephones on 66 occasions, most recently on March 13, 2014. A public

records search has revealed that 732-786-8044 is registered to BRUCE SCHOENGOOD in

Manalapan, New Jersey. Phone records also reveal that the subscriber for that telephone number

is King Media, Inc., a business controlled by SCHOENGOOD. In April 2013, FINRA made a

referral to the SEC relating to NanoTech Entertainment Inc. ("NTEK") after identifying

suspicious press releases, promotional material and trading activity, which lead FINRA to

suspect that NTEK may be have been the subject of a "pump-and-dump" market manipulation

scheme. The FINRA referral identified certain suspicious stock trades, including the sale of

approximately 18 million shares of NTEK between November 2012 and March 2013 from an

account controlled by SCHOENGOOD for approximately $132,000. The FINRA referral also

---

[28] The confidential source pleaded guilty to an information charging one count of
conspiracy to commit securities fraud. On October 15, 2013, he or she was sentenced to 18
months' imprisonment and $65,000 in restitution. I believe that the confidential source's
information regarding PINCHIN is reliable.

59

EDNY-IPC-000007508

noted that SCHOENGOOD was an investor relations representative for several Over the Counter
Bulletin Board ("OTCBB") issuers.[29] The FBI also initiated a criminal investigation into the
suspicious trading of NTEK stock.[30] Based upon the facts and circumstances set forth herein, I
believe that SCHOENGOOD is using telephone number 732-786-8044, and that the contact
between that phone number and three of the Subject Telephones is likely in furtherance of
securities fraud, wire fraud and money laundering, among other offenses.

        h.  WILLIAM SHERMAN

        120.    Toll records show contact between telephone number 561-859-6900 and
three of the Subject Telephones on 438 occasions, most recently on March 13, 2014. A public
records search has revealed that 561-859-6900 is registered to SHERMAN of Boca Raton,
Florida. The FINRA referral regarding NTEK, set forth above, also identified suspicious stock
trades from an account controlled by SHERMAN, including the sale of approximately 3.5
million shares of NTEK for approximately $68,000. Prior to that sale, an account controlled by
SHERMAN acquired approximately 5 million shares of NTEK from SHERMAN's wife for
approximately $500.

        121.    Additionally, the FINRA referral identified as suspicious the sale of more
than 12 million shares of NTEK stock between February and March 2013 from a Titan account
at Scottsdale. Documents provided by Titan to Scottsdale state that the stock was owned by
Galaxy Worldwide, a Belize-based corporation owned by Lellia Senticum and that the Titan
account obtained a promissory note from SHERMAN's wife, a previous note holder of NTEK
stock, in November 2012. Senticum, an IPC employee, appears to act regularly as a nominee for

---

29      The OTCBB is an electronic quotation system for many over-the-counter securities that
are not listed on a national securities exchange.

30      The FBI investigation into NTEK includes investigating individuals such as
SCHOENGOOD and SHERMAN.

EDNY-IPC-000007509

other offshore companies. Based on my training and experience, and information obtained in

this investigation, I believe that Senticum was acting as a nominee of Galaxy Worldwide in order

to hide the true ownership of that company and the NTEK shares owned by that company.[31]

122.    Based upon the facts and circumstances set forth herein, I believe that

SHERMAN is using telephone number 561-859-6900, and that the contact between that phone

number and three of the Subject Telephones is likely in furtherance of securities fraud, wire

fraud and money laundering, among other offenses.

B. Toll Analysis for IPC-305 Phone

123.    Toll records show that during the Covered Period, the IPC-305 Phone

made and received 4,101 calls and was in contact with the following Subject Individuals 221

times, most recently on February 27, 2014, as shown in the summary table below:

| Name | Number | Total | First | Last |
|------|--------|-------|-------|------|
| BUONOCORE, LOUIS | 781-935-2461 | 11 | 01/25/13 | 11/25/13 |
| GIARMOLEO, PAUL | 831-842-1962 | 32 | 01/09/13 | 02/27/14 |
| HAMDAN, RANDY | 561-859-6900 | 24 | 01/16/13 | 06/18/13 |
| MONET, EDWARD | 619-991-5472 | 27 | 01/16/13 | 01/07/14 |
| NOLFO, LOUIS | 561-213-2262 | 41 | 01/02/13 | 02/25/14 |
| PINCHIN, TIMOTHY | 858-869-5296 | 14 | 01/22/13 | 12/24/13 |
| SCHOENGOOD, BRUCE | 732-786-8044 | 32 | 01/16/13 | 12/24/13 |
| SHERMAN, WILLIAM | 561-859-6900 | 40 | 01/09/13 | 02/03/14 |

C. Toll Analysis for IPC-503 Phone

124.    Toll records show that during the Covered Period, the IPC-503 Phone

made and received 4,399 calls and was in contact with the following Subject Individuals 171

times, most recently on February 25, 2014, as shown in the summary table below:

[31]    The criminal investigation into NTEK, SCHOENGOOD and SHERMAN is ongoing.
My understanding is that the SEC did not initiate an investigation into NTEK.

61

| Name | Number | Total | First | Last |
|------|--------|-------|-------|------|
| GIARMOLEO, PAUL | 831-842-1962 | 34 | 01/09/13 | 12/19/13 |
| MONET, EDWARD | 619-991-5472 | 79 | 01/02/13 | 12/17/13 |
| PINCHIN, TIMOTHY | 858-869-5296 | 42 | 01/22/13 | 01/23/14 |
| SCHOENGOOD, BRUCE | 732-786-8044 | 7 | 01/08/13 | 11/21/13 |
| SHERMAN, WILLIAM | 561-859-6900 | 7 | 12/27/12 | 07/29/13 |
| NOLFO, LOUIS | 561-213-2262 | 2 | 02/25/14 | 02/25/14 |

### D. Toll Analysis for TIS-305 Phone

125. Toll records show that during the Covered Period, the TIS-305 Phone

made and received 2,463 calls and was in contact with the following Subject Individuals 479

times, most recently on March 13, 2014. As shown in the summary table below:

| Name | Number | Total | First | Last |
|------|--------|-------|-------|------|
| GIARMOLEO, PAUL | 831-842-1962 | 57 | 12/05/13 | 02/28/14 |
| MONET, EDWARD | 619-991-5472 | 4 | 12/02/13 | 01/03/14 |
| SCHOENGOOD, BRUCE | 732-786-8044 | 27 | 12/02/13 | 03/13/14 |
| SHERMAN, WILLIAM | 561-859-6900 | 391 | 05/18/12 | 03/13/14 |

### E. Toll Analysis for the LGM-888 Phone

126. Toll records show that during the Covered Period, the LGM-888 Phone

made and received 3,200 calls and was in contact with the following Subject Individuals 152

times, most recently on March 13, 2014, as shown in the summary table below:

| Name | Number | Total | First | Last |
|------|--------|-------|-------|------|
| BUONOCORE, LOUIS | 781-935-2461 | 2 | 12/04/13 | 12/04/13 |
| MONET, EDWARD | 619-991-5472 | 46 | 08/01/13 | 11/29/13 |
| NOLFO, LOUIS | 561-213-2262 | 62 | 01/02/13 | 03/11/14 |
| PINCHIN, TIMOTHY | 858-869-5296 | 42 | 01/03/13 | 02/20/14 |

EDNY-IPC-000007511

## NEED FOR INTERCEPTION

127.    Based upon my training and experience and based upon all of the facts set forth herein, it is my belief that the interception of wire communications is the only available technique that has a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt that the Subject Individuals, and others as of yet unknown, are engaged in the above-described offenses.   As set forth above, I have learned thus far that the Subject Individuals appear to be utilizing offshore IBC and LLC structures and false beneficial owners, for those entities in order to conceal the true ownership of money and stocks transferred into and out of those accounts.  By concealing the true ownership of those entities, individuals are able to commit fraud in the sale of securities by participating in such market manipulation schemes as matched trading; commit wire fraud by failing to disclose to the trading public and the SEC the true ownership of the company's shares; evade the payment of taxes; and launder the proceeds of their illegal activities, among other crimes.

128.    I believe that the following investigative procedures, which are usually employed in the investigation of this type of criminal case, have been tried and failed, reasonably appear to be unlikely to succeed if they are tried, or are too dangerous to employ.

## ALTERNATIVE INVESTIGATIVE TECHNIQUES

### Undercover Agent

129.    While the use of the undercover agent has provided valuable information in this case, the undercover agent is unlikely to accomplish all of the goals of the investigation. The undercover agent has not had contact with, and does not have any present ability to contact, individuals participating in wire fraud and/or money laundering schemes who have utilized IPC's

63

services or have brokerage accounts at Titan and/or Legacy. In fact, while BANDFIELD and GODFREY have alluded to other clients, they have resisted revealing those identities to the undercover agent. I also believe that it is not feasible for the undercover agent to discuss with BANDFIELD, GODFREY, BERGEY, LEACH, KNOWLES or DE WIT the identities of other clients and the types of criminal activities in which those clients are participating without jeopardizing the investigation. Additionally, considering that IPC's services involve disguising clients' identities and criminal activities, it is highly unlikely that the undercover agent, in his current role as a client, could penetrate the conspiracy in any meaningful way that would in itself achieve the goals of the investigation.

## Confidential Informants

130.    The use of confidential informants cannot accomplish all the goals of the investigation either. As with the undercover agent, confidential informants could potentially pose as clients of IPC, Titan and/or Legacy, but confidential informants would similarly have limited access, if any, to individuals participating in wire fraud and/or money laundering schemes who have utilized IPC's services or have brokerage accounts at Titan and/or Legacy. The confidential sources described in the toll analysis section have provided useful historical information about a few of the Subject Individuals, but they do not have relationships with BANDFIELD, GODFREY, BERGEY, LEACH, KNOWLES or DE WIT that could further the goals of the investigation.

## Surveillance

131.    To date, no surveillance has been performed of the Subject Individuals in this investigation, and considering the fact that BANDFIELD, GODFREY, BERGEY, LEACH, KNOWLES and DE WIT are located primarily in Belize (and that DE WIT travels back and

64

forth between Belize and Panama), regular surveillance of the Subject Individuals would be difficult to perform. Additionally, surveillance would not accomplish all of the goals of the investigation because it would not reveal the substance of any of the Subject Individuals' discussions with their accomplices, which is key to establishing their knowledge of the aforementioned illegal activities. In addition, IPC, Titan and Legacy's clientele are believed to be in different locations and therefore likely discuss their illegal activities over the telephone. Surveillance would not help law enforcement agents gather any evidence concerning the statements made during those conversations.

### Grand Jury Subpoenas

132.    Based upon your affiant's experience and conversations with Assistant United States Attorney Jacquelyn M. Kasulis, who has experience prosecuting violations of criminal law, your deponent believes that subpoenaing persons believed to be involved in this criminal activity and their associates before a Federal Grand Jury would not be successful in achieving the stated goals of this investigation. Such individuals would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. Moreover, it would be unwise to seek any kind of immunity for these persons, because the granting of such immunity might foreclose prosecution of the most culpable individuals involved and could not ensure that such immunized witnesses would provide truthful testimony. Additionally, the service of Grand Jury subpoenas upon the Subject Individuals would only alert them to the existence of this investigation, causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, or otherwise to compromise the investigation. The use of grand jury subpoenas to obtain documents from such entities as Paypal will not fulfill all of the goals of the investigation because such information, while helpful in identifying additional individuals

65

who may be utilizing IPC's services to further their criminal activities, does not reveal the individuals' motivations for establishing IBCs and LLCs through IPC or the individuals' purpose in transferring money and/or stock in and out of their IBCs and LLCs.

## Interviews of the Subject Individuals

133. Based upon your deponent's experience, I believe that interviews of the Subject Individuals would be fruitless. In your deponent's experience, those who have information relevant to this investigation – such as the identities of the persons involved in the criminal activity and the scope of the criminal activity in which they are involved – often decline to answer any questions posed by law enforcement agents. To the extent that such an individual is willing to answer questions, his information tends to contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Furthermore, any interviews would likely have the effect of alerting the individuals involved in the criminal activity, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence.

## Telephone Toll Analysis

134. Telephone toll analysis has been used in this investigation on the Subject Telephones, as described above. This analysis has verified frequent telephone communication between the Subject Telephones and other telephones. Toll records, however, do not record the identity of the parties to the conversations, cannot identify the nature or substance of the conversations, or differentiate between legitimate calls and calls for criminal purposes. Thus, toll records will not achieve all of the objectives of the investigation.

66

EDNY-IPC-000007515

## Trash Pulls

135. Trash pulls also will not achieve the objectives of the investigation either,

because, among other reasons, based on my training and experience, it is unlikely that relevant

items, if any, in the trash would be sufficient to fulfill all of the goals of the investigation.

Additionally, because many of the Subject Individuals are located outside of the United States,

the use of trash pulls is limited.

## Mail Covers

136. Mail covers will not achieve the objectives of the investigation because

mail covers will not disclose the content of communications between the Subject Individuals and

their accomplices. Additionally, because many of the Subject Individuals are located outside of

the United States, the use of mail covers is limited.

## E-Mail Search Warrants

137. As set forth above, e-mail search warrants have been executed in this

investigation thus far. While those e-mail search warrants have provided valuable information to

the investigation, they will not fulfill all of the goals of the investigation. As set forth above, the

Subject Individuals purposely refrain from communicating the full extent of their illegal

activities in writing, and rely on the telephones to communicate important information with their

co-conspirators. Additionally, the e-mails make it difficult to identify the individuals writing the

e-mail messages, and the e-mails do not disclose the individuals' motivation for transferring

money or requesting stock trades.

67

## Search Warrants

138. The execution of search warrants in this matter, at this time, will also not fulfill all of the goals of the investigation. Obtaining search warrants for IPC, Titan and Legacy's offices in Belize could assist in identifying the clients of those operations, but searches would be unlikely to reveal the nature and total scope of the illegal activities associated with those entities. As set forth above, the Subject Individuals purposely refrain from communicating the full extent of their illegal activities in writing, and rely on the telephones to communicate important information with their co-conspirators. Thus, search warrants executed at this time would be more likely to compromise the investigation by alerting the individuals involved to the investigation, and may result in the destruction of evidence, without obtaining conclusive proof against all of the members of the scheme. Additionally, the use of search warrants could alert unidentified individuals involved in the criminal activity, allowing them to insulate themselves further from successful detection.

## Financial Investigation

139. Based on my training and experience, it is unlikely that a financial investigation, such as service of Grand Jury subpoenas to financial institutions, would achieve all of the objectives of the investigation. Based on my training and experience, individuals engaged in money laundering, securities fraud and tax evasion make deposits into financial institutions in sophisticated ways that effectively eliminate a connection between the illegal activity and the proceeds of that illegal activity. Moreover, even were such a financial investigation to uncover evidence of possible concealment of funds, such evidence would likely not be sufficient to achieve the goals of this investigation (nor to prove money laundering) because it likely would not establish the actual underlying criminal conduct. Additionally, financial records alone will

68

not identify who is directing the buying and selling of stock or the transfer of funds, which is crucial in charging securities fraud (a specified unlawful activity for money laundering purposes), money laundering and wire fraud. For example, without intercepting wire communications on the Subject Telephones, it will be very difficult, if not impossible, to determine who is directing matched stock trading activity. Additionally, as set forth above, the entire purpose of the IBC/LLC structure established by BANDFIELD and utilized by brokerage firms such as a Titan or Legacy is to conceal the true ownership of the IBC and LLCs that are transferring stocks and money. Thus, financial records alone will not fulfill all of the goals of the investigation, including identifying the Subject Individuals' co-conspirators.

## Other Investigations

140.    The SEC is aware of the FBI's investigation, but to date has not issued subpoenas or other discovery requests to the Subject Individuals so as not to alert them and other members of the conspiracy that they are under SEC and law enforcement scrutiny. Nevertheless, use of the SEC's investigative tools will not achieve all of the goals of the investigation for the same reasons set forth above. As with the issuance of Grand Jury subpoenas, if any principals of this conspiracy, their co-conspirators and other participants were called to testify at an SEC deposition, they would most likely be uncooperative, testify falsely or invoke their Fifth Amendment privilege not to testify. In my experience, most conspirators will not confess to criminal activity at an SEC deposition or interview unless they are confronted with proof of their involvement in wrongdoing. The issuance of SEC deposition notices would therefore likely alert the Subject Individuals as to the existence of the investigation, which will likely hamper the FBI's ability to obtain additional evidence after the notice and may result in the destruction of evidence, without obtaining conclusive proof against all of the members of the scheme.

69

Moreover, none of the SEC discovery tools is likely to achieve all of the goals of the investigation because it is believed that the telephone is routinely relied upon to conduct the criminal schemes under investigation. Additionally, because many of the Subject Individuals are located in Belize, many of the SEC's investigative tools, such as subpoenas, are not viable options for advancing the investigation.

141. The SEC's investigation of Gibraltar, while yielding some documents, including financial records and depositions in that investigation, does not achieve the goals of this investigation. In that investigation, it is my understanding that the SEC did not depose the Subject Individuals or gather any documentary evidence that fully sets forth the scheme being investigated here. As detailed above, the SEC's investigation of Gibraltar was similarly limited, and did not yield enough evidence to charge anyone criminally in that case.

142. Additionally, the FBI's investigations into NTEK (including possible criminal activity of SCHOENGOOD and SHERMAN), GIARMOLEO and HAMDAN will not achieve all of the goals of the investigation. Law enforcement agents in those three investigations are focused on specific market manipulation schemes, and are not investigating the targets' potential use of offshore entities to launder the illegal proceeds of their criminal activities. Those investigations also face the same challenges that this investigation does, in that the ability of confidential informants and/or undercover agents to infiltrate the IPC, Titan and Legacy to determine the full scope of the scheme set forth above is limited, and documentary evidence, such as financial records, do not reveal the identity of the individuals who are transferring money and/or stock between various brokerage and bank accounts or their motivation for doing so.

70

143. Based upon the foregoing, it is your affiant's belief that the interception of wire communications is an essential investigative means in obtaining evidence of the offenses in which the Subject Individuals and others as yet unknown are involved.

## PRIOR APPLICATIONS

144. Based upon a check of the FBI, the Drug Enforcement Administration, Immigration and Customs Enforcement and U.S. Secret Service databases, which occurred variously on February 25, 2014 and February 27, 2014, I am aware of the following prior federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications which have been made involving the persons, premises or facilities named herein.

a. On February 17, 1998, the Honorable Kevin Thomas Duffy, United States District Judge, Southern District of New York, authorized the interception of wire communications to and from cellular telephone 908-875-0531 for a period of thirty (30) days. BUONOCORE was intercepted twice during that wiretap. Based upon information currently available to me, BUONOCORE was not named as a subject individual or subject interceptee.

b. On June 18, 2012, the Honorable George B. Daniels, United States District Judge, Southern District of New York, authorized the interception of wire communications to and from telephone 646-400-1829 for a period of thirty (30) days. On July 18, 2012, the Honorable Paul A. Crotty, United States District Judge, Southern District of New York, authorized interception of communications for an additional thirty (30) days. On August 22, 2012, the Honorable Allison J. Nathan, United States District Judge, Southern District of New York, authorized interception of communications for an additional thirty (30) days.

71

HAMDAN was intercepted once during this wiretap. Based upon information currently available to me, HAMDAN was not named as a subject individual or subject interceptee.

        c.      On July 27, 2012, the Honorable Paul A. Crotty, United States District Judge, Southern District of New York, authorized the interception of wire communications to and from telephone 646-288-5773 for a period of thirty (30) days. On September 9, 2012, the Honorable Paul G. Gardaphe, United States District Judge, Southern District of New York, authorized interception of communications for an additional thirty (30) days. HAMDAN was intercepted once during this wiretap. Based upon information currently available to me, HAMDAN was not named as a subject individual or subject interceptee.

## MINIMIZATION

        All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception or ten (10) days from the date of the Court's Order. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code, or if it is potentially subject to the attorney-client privilege. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the Subject Interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Because a receptionist often initially answers calls placed to

EDNY-IPC-000007521

the Subject Telephones, interception will occur through the transfer of those calls to others. Once that transfer occurs, the minimization procedures set forth herein will be followed. In the event wire communications are conducted in a language other than English, all law enforcement officers described above may utilize an interpreter in the language being spoken to interpret, monitor, intercept and record any such conversations under the direct supervision of a FBI agent, an agent of U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") or other duly deputized law enforcement officer in the event an interpreter who is a federal agent is not available. In the event any of the wire communications are conducted in a language other than English and/or are in code, and there is not reasonably available during the interception period an expert in the foreign language or code, minimization shall be accomplished as soon as practicable after such interception.

Federal Bureau of Investigation

Sworn to before me this
_____ day of March, 2014

The Honorable Alison J. Nathan
U.S. District Court Judge
Southern District of New York

73