**Exhibit K: February 3, 2014 Search Warrant**

SC:JPN/JMK

UNITED STATES DISTRICT COURT                    **14 M 104**
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION FOR A          AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT FOR:                            APPLICATION FOR A SEARCH
                                               WARRANT
THE PREMISES KNOWN AND DESCRIBED AS
ELECTRONIC MAIL ADDRESSES
"aaliyah@ipcoffshore.com",
"accounts@ipcoffshore.com",
"applications@ipcoffshore.com",
"andrew@ipcoffshore.com",
"bob@ipcoffshore.com",
"clodine@ipcoffshore.com",
"documents@ipcoffshore.com",
"glenna@ipcoffshore.com",
"lellia@ipcoffshore.com",
"patrick@ipcoffshore.com",
"transfers@ipcoffshore.com",
"aaliyah@ipc-offshore.com",
"andrew@ipc-offshore.com",
"andrewg@ipc-offshore.com",
"banking@ipc-offshore.com",
"bob@ipc-offshore.com",
"securities@ipc-offshore.com",
"wire@ipc-offshore.com",
"glenna@ipc-offshore.com",
"lellia@ipc-offshore.com",
"vtm@ipc-offshore.com",
"ipc-offshore@hotmail.com", and
"opulence10@yahoo.com"

- - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

             ███████████, being duly sworn, deposes and states that

he is a Special Agent with the Federal Bureau of Investigation ("FBI"),

duly appointed according to law and acting as such.

1

EDNY-IPC-000006948

Upon information and belief, there is probable cause to believe that there is located in THE PREMISES KNOWN AND DESCRIBED AS ELECTRONIC MAIL ADDRESSES "aaliyah@ipcoffshore.com", "accounts@ipcoffshore.com", "applications@ipcoffshore.com", "andrew@ipcoffshore.com", "bob@ipcoffshore.com", "clodine@ipcoffshore.com", "documents@ipcoffshore.com", "glenna@ipcoffshore.com", "lellia@ipcoffshore.com", "patrick@ipcoffshore.com", "transfers@ipcoffshore.com", "aaliyah@ipc-offshore.com", "andrew@ipc-offshore.com", "andrewg@ipc-offshore.com", "banking@ipc-offshore.com", "bob@ipc-offshore.com", "securities@ipc-offshore.com", "wire@ipc-offshore.com", "glenna@ipc-offshore.com", "lellia@ipc-offshore.com", "vtm@ipc-offshore.com", "ipc-offshore@hotmail.com", and "opulence10@yahoo.com" (collectively, the "SUBJECT EMAIL PREMISES") subscriber/profile information, email transmission information, subject headings, to/from information, folders and email content (including all of the foregoing for deleted messages), as described more fully in Attachments B1, B2, B3, and B4 which constitute evidence, fruits and instrumentalities of securities fraud, money laundering and tax evasion, in violation of Title 18, United States Code, Sections 1348 and 1956 and Title 26, United States Code, Section 7201, respectively, and conspiracy to commit securities fraud, money

2

laundering and tax evasion, in violation of Title 18, United States Code, Sections 371 (tax evasion conspiracy), 1349 (securities fraud conspiracy) and 1956(h) (money laundering conspiracy).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.   I am a Special Agent with the FBI.  I have been employed by the FBI for approximately 10 years.  I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for securities fraud, money laundering and tax evasion.  These investigations are conducted both in an undercover and overt capacity.  I have participated in investigations involving search warrants and arrest warrants.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

---

[1]      Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

3

EDNY-IPC-000006950

2.    I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from, among other sources of information: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, (c) consensual recordings made by an undercover law enforcement agent ("undercover agent"), (d) the review of toll records and other business records and (e) the review of investigative reports.

I.    BACKGROUND

A.    Relevant Individuals and Companies

3.    IPC is an offshore management company comprised of IPC Corporate Services, Inc. in Belize City, Belize and IPC Corporate Services, LLC in Clackamas, Oregon (collectively, "IPC").[2]  IPC's principal office is located in Belize.  IPC does not employ many employees.  In fact, information obtained from the email services providers that maintain the domain names of "@ipcoffshore.com" and "@ipc-offshore.com" indicates that the SUBJECT EMAIL PREMISES that contain those same domain names are the only active email accounts associated with those domains.  Additionally, during a November 6, 2013 visit to IPC's offices in Belize, an undercover agent was escorted through IPC's offices and introduced to IPC's employees,

---

[2]    Upon information and belief, I believe that "IPC" stands for International Privacy Corporation.

4

including Glenna Bergey, Patrick Gentle, Lellia Senticum, Aaliyah Whittaker, and Clodine Anderson.   Godfrey told the undercover agent that Aaliyah is responsible for setting up bank and securities accounts for clients, and that Clodine assists with that responsibility.   Godfrey stated that Lellia is responsible for incorporating IBCs, and that Patrick works in accounting at IPC.[3]

4.    Robert Bandfield, a U.S. citizen, founded and controls IPC.[4]   Bandfield has stated to an undercover agent that he

---

[3]    Based on those statements and my review of documents obtained during this investigation, I believe that: 1) the aaliyah@ipc-offshore.com and aaliyah@ipcoffshore.com accounts are used by Aaliyah Whittaker; 2) the lellia@ipc-offshore.com and lellia@ipcoffshore.com accounts are used by Lellia Senticum; 3) the patrick@ipcoffshore.com account is used by Patrick Gentle; the clodine@ipcoffshore.com account is used by Clodine Anderson; and the glenna@ipcoffshore.com and glenna@ipc-offshore.com accounts are used by Glenna Bergey.   Moreover, based on the information contained below, I believe that those email accounts will contain evidence of communications demonstrating control over the accounts by IPC's clients, as well as communications with Godfrey and Robert Bandfield concerning the creation and day-to-day activities of those accounts.

[4]    Bandfield was investigated by the FBI in approximately 1999 in connection with an investment fraud scheme.   During that investigation, a witness stated to the FBI, in substance and in part, that Bandfield made a presentation to him and others (at the behest of the primary target of the investigation) regarding IPC, and that Bandfield provided guidance regarding setting up offshore corporate and bank accounts in Belize and the Turks and Caicos Islands.   The witness further stated that Bandfield charged $1,350 for setting up the accounts.   The witness stated that, after he had utilized IPC's services to set up an offshore company and bank account, he was defrauded by the primary target of a large portion of his investment. Bandfield was not charged with a crime in connection with that investigation.

EDNY-IPC-000006952

is from Oregon and that he previously spent fifteen years in British Columbia, Canada, ten years in the Cayman Islands, a period of time in Turks and Caicos, and some additional time in Canada.   According to Bandfield, he has spent the last ten or eleven years in Belize. Based on documents obtained from an email service provider, Bandfield is listed as the primary user for the domain name of "ipcoffshore.com."   Bandfield is listed as "Bob Bandfield" on those documents, and the documents list the email of "bob@ipc-offshore.com" as a contact email for Bandfield.   Based on information that I obtained during the course of this investigation, it is clear that Bandfield runs IPC operations and directs and oversees IPC's employees in connection with IPC's business.

      5.   Andrew Godfrey, a citizen of Belize, is an employee of IPC who is located in Belize.

      6.   Titan International Securities, Inc. ("Titan"), located in Belize, is an offshore brokerage and investment management company.   Titan maintains brokerage accounts at Scottsdale Capital Advisors, a brokerage firm located in Arizona.   Bandfield told an undercover agent that he created Titan.

      7.   Legacy Global Markets, S.A. ("Legacy"), also located in Belize, is another offshore brokerage and investment management company.   It, too, maintains brokerage accounts at Scottsdale

EDNY-IPC-000006953

Capital Advisors in Arizona.   Bandfield told an undercover agent that he created Legacy.

     B.    <u>The Investigation</u>

     8.    In my training and experience, offshore management companies have historically been used by individuals to facilitate securities fraud, money laundering and tax evasion.   Specifically, individuals committing securities fraud often use offshore management companies to set up and manage offshore entities. Through these entities, individuals launder illegal stock proceeds (usually derived by stock manipulation or false disclosure schemes), conceal their ownership of large percentages of stock of public companies in violation of federal securities laws, and manipulate the trading of public companies by trading in an illicit fashion through accounts maintained in the names of the entities.   Stock fraudsters have traditionally used offshore entities to trade securities on their behalf in the public market, allowing the fraudsters to conceal their involvement in the trading and manipulation of the securities for their benefit.   Additionally, offshore management companies facilitate these individuals' evasion of U.S. Internal Revenue Service ("IRS") reporting requirements, tax payments associated with their gains, and control and transfer of illicit proceeds of the fraudulent schemes.

EDNY-IPC-000006954

9.   Beginning in approximately July 2011, the government began investigating Gibraltar Global Securities, Inc. ("Gibraltar" or "GGSI"), a Bahamas-based broker-dealer, for potential violations of U.S. law, including securities fraud, money laundering and tax evasion.   On or about November 9, 2012, an undercover agent contacted Christopher Lunn of Gibraltar, posing as a potential account holder who was in the stock promotion business.   During that call, Lunn explained that, due to recent regulatory scrutiny, Gibraltar was no longer opening new accounts.[5]   Lunn explained that a number of

---

[5]   On or about March 15, 2013, the Securities and Exchange Commission ("SEC") filed a complaint against Gibraltar, among other parties, for participating in a "pump and dump" scheme involving two publicly-traded U.S. companies.   Securities and Exchange Commission v. Gibraltar Global Securities, et al., Civ. No. 13-1735 (S.D.N.Y.). On or about April 18, 2013, the SEC filed a second complaint charging Gibraltar and Warren Davis, Gibraltar's owner and president, with unlawfully operating as a broker-dealer in the United States and participating in an illegal unregistered offering and sale of shares of Magnum d'Or, a micro-cap company.   Securities and Exchange Commission v. Gibraltar Global Securities, Inc. and Warren A. Davis, Civ. No. 13-2575 (S.D.N.Y.).   According to the second SEC complaint, beginning in 2008 and continuing through August 2012, Gibraltar, through its website, solicited U.S. customers, who were looking to sell shares of low-priced, thinly-traded stock, by advertising brokerage services, including the formation of offshore business corporations with nominee officers and directors that would enable U.S. customers to trade anonymously.   The complaint alleges that Gibraltar routinely accepted deposits of stock and arranged to have the stock transferred into Gibraltar's name.   Gibraltar then followed its customers' orders and sold the shares through various securities accounts maintained by Gibraltar at U.S. broker-dealers.   In exchange, Gibraltar charged the account holders a two to three percent commission.   Additionally, the complaint alleged that Gibraltar and Davis participated in the unregistered offering and sale of over 10 million shares of Magnum d'Or on behalf of U.S.

8

clients were setting up similar accounts at Belize-based brokerage firms with which Gibraltar had relationships.  Lunn noted that such an arrangement is "under the radar," and recommended the usage of Titan and Legacy.

10.  Lunn also stated that these Belize-based brokerage firms can set up an "IBC" for the undercover agent, which, in my training and experience, refers to an international business corporation ("IBC").  It is my understanding that an IBC is an offshore, untaxed company, formed under the laws of a foreign jurisdiction, that is not permitted to engage in business within the jurisdiction in which it was incorporated.  IBCs are commonly used for offshore banking, investment activities and asset protection. Owners of IBCs can deposit money and transfer stock to an IBC to facilitate banking and securities trading activities while maintaining a level of anonymity for the IBC's owner.  IBC ownership records are typically not publically available.

11.  At the conclusion of the call, Lunn offered to send an email to the undercover agent that included contact information for the Belize-based brokerage firms, among others, that Lunn and

---

customers, resulting in proceeds of over $11 million.  The SEC has obtained documents during the course of its investigation of Gibraltar indicating that, as of February 2010, a Gibraltar internal handbook stated that Gibraltar used IPC to establish IBCs and Belize-based bank accounts on behalf of its clients.

EDNY-IPC-000006956

the undercover agent had discussed.  On or about November 9, 2012, Lunn sent an email to the undercover agent in which he provided contact information for firms that could assist the undercover agent with opening an account.  Specifically, Lunn provided the contact information for Kelvin Leach at Titan and telephone numbers and an email address for Legacy.[6]

12.  On or about January 24, 2013, the undercover agent placed a telephone call to Kelvin Leach at Titan.  During this call, the undercover agent explained that he was interested in opening an account into which he could transfer money and with which he could buy and sell stock.  Leach explained that, because the undercover agent was a U.S. citizen, Titan could not open an individual account in the name of the undercover agent.  Leach instructed the undercover agent to contact "IPC Corporate Services" to set up a foreign corporation first (referred to by the undercover agent as an "IBC"), and then Titan could open a brokerage account for that foreign corporation.  Leach agreed to provide IPC's contact information to the undercover agent in an email.  At the conclusion of the call, the undercover agent confirmed that, once he set up the IBC and brokerage account at Titan in the IBC's name, "everything" would be "confidential," and that there would be "no communication with the IRS,

---

[6]    Lunn also provided contact information for two Bahamas-based brokerage firms.

EDNY-IPC-000006957

SEC in the United States." Leach confirmed that everything would then be "completely offshore." He also stated that all correspondence related to the account would go to the IBC and IPC. The undercover agent concluded the call by stating that he was looking for "asset protection and privacy." In response, Leach stated, "yep."

13.   Later that day, Leach sent an email to the undercover agent in which he copied Andrew Godfrey at the andrew@ipc-offshore.com email account (hereinafter, the "Godfrey IPC account") and provided a telephone number for Godfrey at "IPC Corporate Services."[7] The undercover agent then emailed Godfrey at the Godfrey IPC account address and asked him to call the undercover agent to discuss establishing an IBC. The undercover agent also requested that Godfrey email the documentation needed to establish an IBC and a brokerage account at IPC.

---

[7]   Telephone records confirm that the contact number provided by Leach for Godfrey at IPC is subscribed to by Robert Bandfield. Email records obtained pursuant to a search warrant for the Godfrey IPC account, which are referenced below, indicate that audio files of voice-mail messages for telephone number (503) 305-3897, an IPC phone number, are sent by email to glenna@ipc-offshore.com and Bandfield. That same telephone number is listed as a contact number for IPC on its web site, and is one of the numbers that the undercover agent used to contact IPC during the investigation. On at least one occasion, the undercover agent left a voice-mail message on that telephone line.

EDNY-IPC-000006958

14.   On or about January 25, 2013, the undercover agent had two telephone conversations with Godfrey at IPC.[8]  In summary, during the telephone calls, which were recorded, Godfrey explained that the undercover agent needed to set up an "LLC" and an IBC.  Based on my training and experience, I believe that an "LLC" is a limited liability company.  Godfrey explained that the LLC established by the undercover agent would then own the IBC, and that the "beneficial owner" of the LLC would be an individual working at IPC's office, ensuring that the undercover agent's name would not be associated with either entity.[9]

15.   Godfrey further explained that the LLC should be based in Nevis and that the IBC would be based in Belize.  Godfrey also stated that, because of Nevis's favorable laws, if anyone wanted to investigate the undercover agent's LLC for possible illegal criminal activity, it could take approximately eight years for any legal proceedings to occur in Nevis.  Godfrey also explained that IPC could establish brokerage accounts as part of their services for

---

[8]     The undercover agent was located in the Eastern District of New York during the telephone calls.

[9]     In my training and experience, the term "beneficial owner" in this context refers to an individual who is employed or associated with an offshore management company and who acts on behalf of an IBC as if he/she has discretionary control and authority over the assets of the IBC, but who in reality takes direction from another with respect to the acquisition or disposition of assets.

EDNY-IPC-000006959

the undercover agent at such broker-dealers as Titan and Legacy in the name of the undercover agent's IBC.

16.   During these telephone calls, the undercover agent explained that he expected to "buy and sell securities," and that he is a "stock promoter" who "bring[s] market awareness to certain micro-cap stocks."[10]   The undercover agent also stated that he wanted to receive fees from his clients through the offshore brokerage accounts, and that he wanted to do a "significant amount of trades," in reference to stocks.   The undercover agent expressed concern that the IRS and the SEC could obtain information about his transactions through the offshore brokerage accounts, and in response, Godfrey stated, "They can't get it.   You don't own this."   In context, Godfrey appears to be referring to the fact that the undercover agent's IBC would own the brokerage accounts at issue, and the undercover agent's name would not be associated with that IBC or the undercover agent's LLC (which owns the IBC).   Godfrey also explained that moving large sums of money through the offshore brokerage accounts would not trigger law enforcement scrutiny in the way that moving similar sums

_____

[10]      In my training and experience, "micro-cap stocks" refer to stocks of publicly-traded U.S. companies which have a low market capitalization.   Micro-cap stocks are often subject to price manipulation because they are thinly-traded and subject to less regulatory scrutiny than stocks that trade on notable exchanges, and large blocks of their stock are often controlled by a small group of individuals, which enables those in the group to control or orchestrate trading in those stocks.

EDNY-IPC-000006960

of money through a bank account would.  At the conclusion of the second telephone call, Godfrey asked the undercover agent for his email address so that he could send an email to the undercover agent containing a list of LLC and IBC names from which the undercover agent could choose.

17.  On or about January 25, 2013, Godfrey, using the Godfrey IPC account address, sent the undercover agent three documents.  The first document explained the wire instructions to IPC in Belize.  The second document, containing the title "Belize Shelf Companies," included a list of approximately nine existing shelf companies from which the undercover could choose.  The third document, containing the title "Nevis Shelf Companies," included a list of approximately 14 existing shelf companies from which the undercover agent could choose.

18.  On or about March 27, 2013, the undercover agent and Godfrey had another telephone conversation.[11]  During that call, Godfrey confirmed that he had sent an email to the undercover agent containing lists of Belize and Nevis shelf companies.  Godfrey then explained that the undercover agent needed to choose an LLC and an IBC from those lists, and then IPC would set up brokerage accounts at such broker-dealers as Titan and Legacy for the undercover agent

---

[11]    The undercover agent made the telephone call from the Eastern District of New York.

EDNY-IPC-000006961

using his chosen IBC (which the undercover agent's LLC would own). Godfrey further explained that IPC's fees for the described services was $3,300, which the undercover agent could pay via a wire transfer, a bank draft made out to IPC or through Paypal on the internet.

19.   On or about May 15, 2013, the undercover agent and Godfrey had another telephone conversation.[12]   During that call, the undercover agent explained to Godfrey that he was prepared to choose an LLC and an IBC and that he wanted to choose Crystal Capital, LLC as his LLC in Nevis, and Aladdin Assets Managements as his IBC in Belize.  When the undercover agent then asked Godfrey about paying IPC's fee through IPC's website, Godfrey transferred the undercover agent to a woman named Glenna, who Godfrey referred to as "my accountant."  Glenna then assisted the undercover agent in paying IPC's fee of $3,300 to set up an LLC and IBC for the undercover agent.[13]

20.   Godfrey then rejoined the telephone conversation and told the undercover agent that, while Aladdin Assets Managements was still available for the undercover agent to use, someone else was already "cooking" with Crystal Capital, LLC.  Godfrey then suggested that the undercover agent use Lion Mercantile as his IBC and Cavern Capital, LLC as his LLC.  The undercover agent agreed to use Godfrey's

---

[12]   The undercover agent made the telephone call from the Eastern District of New York.

[13]   It is my understanding, based on my participation in this investigation that Glenna and Bandfield are married.

15

suggestions.  Godfrey confirmed that the undercover agent wanted to set up brokerage accounts at both Titan and Legacy, and told the undercover agent that he could use his Titan and Legacy brokerage accounts as a bank account as well, as long as he traded stocks using the brokerage accounts in addition to transferring money in and out of the account.  Otherwise, Godfrey warned, the undercover agent could raise "red flags."  Godfrey further explained that, for example, the undercover agent should not wire $50,000 into the brokerage accounts and then wire $35,000 out of the accounts "the next day."  Godfrey cautioned that if the undercover agent deposited a large sum of money into the brokerage accounts, he would need to "let it [i.e., the money] sit for a while," and then transfer $5,000 out of the accounts while continuing to trade stocks using the accounts.

21.  Following this telephone call, the undercover agent sent an email to the Godfrey IPC account address in which the undercover agent confirmed the completion of his "order," in reference to having paid for IPC's services.  In response, Godfrey emailed the undercover agent using the Godfrey IPC account address and stated, "received the payment.  had to change from Cavern Capital llc, to Crystal Securities LLC as the other one was reserved and i was not aware of it."

22.  On or about May 20, 2013, the undercover agent received an email from Clodine Anderson at IPC from the

16

applications@ipcoffshore.com address (hereinafter, the "IPC applications email address").  In that email, Anderson referred to herself as "Banking & Securities Personnel."  In that email, Clodine stated that the "LGM" account for Lion Mercantile, Inc. had been opened, and included account number information for that account. In context, I believe that "LGM" is a reference to Legacy.  In response, the undercover agent sent an email to Godfrey at the Godfrey IPC account address and Anderson at the IPC applications email address asking for instructions for use of the Legacy account. Anderson responded to the undercover agent using the IPC applications email address.  In that email, Anderson instructed the undercover agent to contact Legacy directly and "ask for Brian" regarding his questions.  I believe that "Brian" is a reference to Legacy's owner, Brian de Wit.

23.  Records from Paypal for the time period of January 1, 2009 to February 5, 2013, show that approximately 65 individuals who listed a U.S. address on their Paypal accounts sent payments to IPC's Paypal account in amounts consistent with setting up or renewing offshore accounts.[14]  These payments include such notations as "Belize IBC & Nevis LLC," "3 companies each $1,000[ ]US" and "FIRST COMPANY[ ]SECOND COMPANY[ ]THIRD COMPANY[ ]ANNUAL."  IPC's Paypal

---

[14]   IPC's Paypal account is registered to Robert Bandfield.

EDNY-IPC-000006964

account opening documents list a domestic email account for IPC as opulence10@yahoo.com. According to information obtained from Yahoo! Inc., the email service provider for that email account, an alternate email contact for opulence10@yahoo.com is glenna@ipc-offshore.com. Moreover, the individual who registered the opulence10@yahoo.com account was Glenna Fay Bergey.

24. Additionally, U.S. tax laws require that individuals report foreign bank accounts containing $10,000 or more. Notably, only four of the 65 individuals with U.S. addresses who sent money to IPC's Paypal account reported having such foreign bank accounts by filing a Report of Foreign Bank and Financial Accounts form with the IRS. Of these four individuals, two individuals reported accounts in China. The other two individuals disclosed accounts in Panama and the Bahamas, two countries in which IPC appears to have the ability to set up accounts.

25. Of the 65 individuals listed in the Paypal records, 33 individuals have been identified through public SEC filings as either an officer, director, shareholder or consultant to a publicly-traded penny stock company. Additionally, law enforcement has already determined that a number of the individuals communicating with IPC by phone and email are under criminal investigation for various securities-related crimes and that some of the individuals

18

have convictions for securities fraud or SEC injunctions pending against them for securities violations.

26.   Given the nature of the business, the statements made by Bandfield and Godfrey during the course of this investigation, my review of emails obtained in this case and documents obtained from Paypal, the lack of IRS disclosures by individuals who used the Paypal system, and the histories of individuals who have communicated with IPC, I believe that U.S. citizens are using IPC to conceal their beneficial ownership of accounts and failing to disclose that beneficial ownership of those accounts to the IRS.  Additionally, given the fact that more than $364 million was transferred through Titan and Legacy during the period October 2010 through April 2013, and that many of the fees associated with establishing an IPC account are approximately $3,000, I believe that many accounts established by IPC hold in excess of $10,000.

27.   Moreover, based on my training and experience, the nature of IPC's business, the statements made by Bandfield and Godfrey during the course of this investigation, my review of emails obtained in this case and documents obtained from Paypal, the fact that the vast majority of the 65 individuals with U.S. addresses who used the Paypal system have not disclosed foreign bank accounts to the IRS,  the fact that approximately half of those individuals are associated with penny stock companies, and the fact that a number

19

EDNY-IPC-000006966

of individuals communicating with IPC are under investigation and/or have been subject to a conviction or SEC sanction, I believe that IPC's clients are using IPC's services to facilitate securities fraud, money laundering and tax evasion.

i. A Meeting in Belize

28. On or about November 6, 2013, the undercover agent met with Godfrey and Bandfield at IPC's office in Belize.[15] The meeting took place in a conference room and lasted approximately one and one quarter hours. The entire meeting was recorded by the undercover agent with an audio and video recording device.

29. At the beginning of the meeting, Godfrey opened a manila folder and indicated that he had a file pertaining to the undercover agent's account with IPC. Godfrey stated that there was no copy of the undercover agent's passport in the file, and requested that the undercover agent submit a copy of his passport to IPC for his file. Godfrey suggested that the undercover agent email a copy of the passport to him.

30. Godfrey also requested that the undercover agent provide IPC with a utility bill, a bank reference and a professional reference from an attorney or accountant. During the meeting, Bandfield and Godfrey suggested that the reference letters should

_____

[15]     Bandfield, who was not present at the start of the meeting, joined the meeting shortly after Godfrey and the undercover agent began discussing the undercover agent's account with IPC.

EDNY-IPC-000006967

indicate that the attorney or accountant knew the account holder, in this case the undercover agent, for a period of two years. At one point during the meeting, Bandfield provided the undercover agent with a template professional reference letter for the undercover agent to use.

31.    During the meeting, Bandfield discussed the benefits of opening an account with IPC.  Specifically, he indicated that a number of securities firms would not do business with Americans and that banks were closing their operations to Americans because of recent U.S. legislation.  To deal with this situation, Bandfield stated that IPC created a structure whereby it will open an account at a brokerage firm, such as Titan, on behalf of its client but under the name of an IBC.  Bandfield further stated that Godfrey or another nominee would be assigned to the particular IBC.  Bandfield indicated that a Belizean citizen could not sit on a Belize IBC as a nominee because of tax reasons; however, Bandfield stated that Godfrey or another Belizean nominee could own a Nevis LLC that, in turn, could own a Belize IBC.

32.    Bandfield stated that, if anyone asked any questions about who owns the IBC, IPC would indicate that the Belize IBC was owned by a Nevis LLC and that the Nevis LLC was owned by Godfrey or some other nominee.  Bandfield stated, "and that is how we are getting around it."  Based on my experience investigating securities

21

fraud cases, as well as my review of the video and other communications in this investigation, it is my belief that this structure, as articulated by Bandfield, is designed to conceal an IPC client's control of the IBC, its brokerage accounts and its assets. Moreover, based on my participation in this investigation, as well as my review of documents and recorded conversations obtained during the investigation, I am not aware of any legitimate business by IPC, and it is my belief that IPC was established for the sole purpose of facilitating securities fraud, money laundering and tax evasion.

33. In a clear attempt to assure the undercover agent that his assets would be safe, Bandfield indicated that while a nominee may own the LLC, IPC and Bandfield would have control over the nominee. If the undercover agent would like to have money moved or securities traded, the undercover agent would simply need to contact IPC, and IPC would make sure that money or securities are transferred or moved as directed by the undercover agent.

34. Bandfield further stated that, in order to demonstrate that the nominee owns the LLC, a certificate would be issued to the nominee reflecting his/her ownership. Bandfield told the undercover agent that he should not worry about the issuance of this certificate, because IPC has the ability to replace nominees without delay.

EDNY-IPC-000006969

35.   To make clear that the undercover agent would have control over assets and money, Bandfield told the undercover agent, "we know who ultimately is behind it [the LLC], but legally, [the nominee] owns it."  Additionally, Bandfield informed the undercover agent that Bandfield owned one percent of every one of the LLCs set up by IPC.  As a result, Bandfield would be able to prevent a nominee from making any changes to the structure of the LLC.

36.   Bandfield told the undercover agent that if he wanted to own everything and demonstrate outward control over the LLCs and IBCs, IPC will not do business with him because that type of structure "will hurt you in the long run."  Bandfield intimated that if a client wanted to own or outwardly control the entities or assets, then the IRS and creditors could make the client give the money back.  The IRS and creditors, however, could not take the money from a nominee, such as Godfrey.[16]

a.   Avoiding the Appearance of Control

37.   During the November 6, 2013 meeting, the undercover agent stated that he was in the stock promotion and investor awareness business and received a significant amount of stock in connection

---

[16]   During the meeting, Bandfield also stated that IPC is able to establish trusts on behalf of its clients.  Bandfield cautioned that the undercover agent should not be associated with the trust as a beneficiary or creator of the trust.  The above-referenced discussion about outward control occurred while Bandfield was discussing the trust structure.

EDNY-IPC-000006970

with his activities.   He further stated that he did not want to pay taxes and that he did not want the IRS to know about his activities. The undercover stated that the SEC was also looking at different aspects of his business and, thus, he needed to operate in an insulated environment.

38.   In response, Bandfield explained to the undercover agent that the brokers (i.e., Titan and Legacy) did not receive due diligence as to the identity of IPC's clients such as the undercover agent; rather, the brokers receive only due diligence as to the nominee of the IBC, LLC or trust.

39.   Bandfield also told the undercover agent that if he wanted to trade securities through his accounts at the brokers (i.e., Titan or Legacy), then the LLC or IBC would enable the undercover agent to have limited trading authority.   To conceal the undercover agent's control over the accounts, Bandfield suggested that the undercover agent arrange for the LLC or IBC to pay the undercover agent a nominal amount as a "fee" for trading services.   Bandfield suggested these nominal payments because "now we got a reason for you [the undercover agent] to have, you know, emailing them [the brokers] or talking to them, or what have you."   Bandfield warned that in a few years the government may be asking the undercover agent why the undercover agent was calling or emailing Titan.   Bandfield then instructed the undercover agent that, in response, he should

24

EDNY-IPC-000006971

refer the government to the "agreement" to "assist" the IBC and the "fee" which the undercover agent would report on his tax return. Bandfield said, "then there is no problem."  Based on Bandfield statements, and my experience investigating securities fraud cases, it is clear that Bandfield was suggesting that the undercover agent, the LLC and the IBC engage in deceptive acts to conceal the undercover agent's ownership and control over the brokerage accounts, which are nominally held by the LLC and IBC.

40.  With respect to trading in the brokerage accounts, Bandfield stated that one of the mistakes that people made was that they traded a lot of stocks in one IBC and had the same person appear as the signatory on all of the trading accounts of that IBC.  To prevent these mistakes, Bandfield suggested that the undercover agent maintain multiple IBCs and trade through accounts associated with the multiple IBCs.  As a result, Bandfield suggested, the undercover agent would be able to use multiple entities with different signatories to trade the securities without creating suspicion with U.S. brokerage firms.

41.  Bandfield also explained that he created Titan and Legacy and incorporated more than 5,000 companies.  He further stated that he has been setting up IBCs and LLCs for years and has provided these services to many individuals.

EDNY-IPC-000006972

b.   Discussion Concerning Stock Ownership Disclosures

42.   Bandfield also suggested ways in which the undercover agent could conceal the beneficial ownership of more than five percent of a public company's stock.[17]   Specifically, Bandfield told the undercover agent that if, for example, the undercover agent had six percent of a public company's stock, then he should hold four percent of the company's stock in the name of one entity and transfer the remaining two percent to another entity that maintains a brokerage account at a different brokerage firm.   Bandfield also warned the undercover agent that "we" would run into problems if the undercover agent were to use the same brokerage firm to trade a significant portion of a company's stock (e.g., twenty percent of a company's stock), even if the undercover agent traded the stock through multiple accounts established for the various entities.

---

[17]   Individuals who own or control more than 5% of a public reporting company's stock are obligated to make disclosures concerning their ownership.   I am aware that the disclosure obligations apply regardless of whether the stock is owned by one or more entities under common control of a beneficial owner (i.e., someone with discretionary control to dispose of or transfer the stock).   Based on my participation of other securities fraud investigations, it is my understanding that stock fraudsters who beneficially own more than 5% of a public reporting company's stock often conceal their ownership through offshore companies and IBCs. It is my understanding that those stock fraudsters also cause individuals associated with the IBCs or offshore companies to execute false beneficial ownership documents in order to conceal their own beneficial ownership and control of stock.

26

EDNY-IPC-000006973

43.   Bandfield also suggested that the undercover agent create multiple different IBCs and transfer a portion of a particular company's stock into the different IBCs.  Bandfield indicated that such a structure would avoid a situation where one IBC held five or six percent of a company's stock.  He also spoke about the possibility of one LLC owning a number of different IBCs with different nominees, to conceal the ownership and control of more than 5% of any one stock.  Bandfield indicated that it was the responsibility of IPC's clients, including the undercover agent, to make sure that no single IBC account was trading more than five percent of a company's stock.

44.   At one point during the meeting, Bandfield stated the undercover agent should not use the word "control" when speaking about his relationship to the IBCs or LLCs.  In fact, Bandfield said, the word "'control' is a bad word around here."

c.   Discussion Concerning the Transfer of Assets

45.   Bandfield also talked about the process through which the undercover agent would be able to buy and sell securities and transfer money.  Specifically, Bandfield told the undercover agent that if he wanted to buy or sell a security, he simply would need to direct Bandfield or someone at IPC to buy or sell the security.

46.   If the undercover agent intends to send funds by wire, Bandfield explained, the undercover agent simply would need to

27

EDNY-IPC-000006974

contact IPC or Bandfield, indicating that a transfer of funds should occur.  Bandfield cautioned the undercover agent about sending emails to IPC regarding the transfer of funds, saying, "you have to be a little careful on how you email that stuff [wire instructions]." Once IPC or Bandfield received the request, IPC would contact Titan and make the request to transfer funds from the entity's Titan account.  Bandfield again cautioned the undercover agent, stating that "Titan doesn't want you, who [is] doing the trading, to play with monies – if you are playing with the monies, it shows control." Bandfield further stated that even though the undercover agent might have limited trading authority over an account, only IPC would give the orders to transfer the funds.[18]

47.  Bandfield indicated that the undercover agent should be concerned about any connection between the undercover agent and the funds that he wired into one of the accounts.  As an alternative to using wire transfers, Bandfield suggested that the undercover agent transfer stock directly into his account.  That way, the undercover agent would be able to cause the issuance of stock for services and then deposit the stock in a Belize account.  Bandfield indicated that the undercover agent would then be able to sell the

---

[18]  As an alternative, Bandfield stated that if the undercover agent were to open an offshore brokerage firm, the undercover agent could move as much money as the undercover wanted into and out of the brokerage firm's accounts and "nobody would question it."

28

EDNY-IPC-000006975

stock and receive the sale proceeds.  As a result, Bandfield
suggested, the undercover agent effectively would be able to move
money out of the United States without there being any "trail" to
the undercover agent.  Bandfield suggested that if the undercover
agent needed to execute agreements in connection with the issuance
of the stock, the undercover agent should send the agreement to IPC
so that the nominee associated with the IBC could execute the
document.  Bandfield also suggested that the nominee would sign any
Form W-8BEN in connection with any accounts.  It is my understanding
that Form W-8BEN refers to an IRS form used to disclose beneficial
ownership of bank and brokerage accounts by foreign beneficial owners
for the purpose of U.S. tax withholding.  The form's certification
includes a statement that the beneficial owner of the account is not
a U.S. citizen.  In context, it is my belief that Bandfield was
explaining to the undercover agent that nominees for the IPC account
(i.e., individuals who are also employees of IPC) would be willing
to execute false Form W-8BENs indicating that U.S. citizens were not
beneficial owners of bank and brokerage accounts.

　　　　48.  Bandfield also cautioned the undercover agent about
sending wire transfers to particular parties.  Specifically,
Bandfield stated that Titan and Legacy would not send money transfers
to stock promoters because "it looks pretty bad."  Rather, Titan and
Legacy would wire funds to attorneys who have trust accounts and those

EDNY-IPC-000006976

attorneys would then forward the wires to the stock promoters.   In

my experience investigating securities fraud cases, individuals

intent on manipulating the price of a particular public company rely

on, and compensate, stock promoters who engage in activities to

artificially inflate a company's stock price.

> d.   Discussions Concerning the Creation of a Trust

49.   Bandfield spoke at length about the possibility of

IPC establishing an "irrevocable" trust on behalf of the undercover

agent.   Bandfield explained that the undercover agent could use the

trust to hold securities and transfer funds.   Bandfield explained

to the undercover agent that he should not be the settlor or

beneficiary of the trust, because then his relationship would need

to be reported to the IRS.   Instead, Bandfield suggested that the

undercover agent provide IPC with a "letter of wishes," which the

undercover could change at any time.   Bandfield stated that any

distribution of the trust would occur only after the undercover

agent's estate had settled, and the distribution would be in

accordance with undercover agent's wishes as set forth in the "letter

of wishes."

50.   Bandfield also explained that the trust structure

would allow the undercover agent to receive funds as a "loan" from

the trust.   By way of example, Bandfield explained that the

undercover agent would be able to withdraw $1 million from the trust

EDNY-IPC-000006977

as a "mortgage" on a condo owned by the undercover agent.   Bandfield explained that this withdrawal of money as a "loan" would enable the undercover agent to receive cash without paying taxes and that the undercover agent could then spend that money on whatever he wanted. For smaller transfers, Bandfield advised that the undercover agent could soon withdraw funds with debit cards that would not leave a "foot print."

 e.   Discussion Concerning the Internet and the Undercover Agent's History

51.   Bandfield stated that IPC needed updated phone and email contact information for its clients.   He cautioned that the Internet was not always "safe."   As a result, Godfrey stated that he or someone from IPC might email a client, stating, "please call me," because Godfrey wanted to discuss something with the client that he did not "want to put on the net [in an email]."[19]

---

[19]   Although Bandfield and Godfrey were cautious about using email to communicate about details of client transactions, it is clear that clients continue to communicate with IPC by email about details of their accounts.   In fact, emails obtained pursuant to search warrants in this investigation demonstrate that Bandfield, Godfrey and other employees of IPC routinely communicated with IPC clients about transaction details, including wire transfers, beneficial ownership forms and stock purchase agreements.   Those emails are evidence of the IPC clients' control over the accounts. Even email communications that simply contained an innocuous phrase (e.g., "call me") might be evidence of an individual's control over an IPC account because, based on Godfrey's statement above, it would likely indicate that the individual who sent the email wanted to provide instructions to IPC about a particular account.   Emails demonstrating such control and beneficial ownership would be

31

EDNY-IPC-000006978

52.   Bandfield also asked the undercover agent if he had any SEC violations or if he had any other issues in the past.   Godfrey asked whether the undercover agent had committed any murders. Bandfield stated that, regardless of the response, it would not be an issue, but that "we would have to do some alterations."

ii. Conversation with Rohn Knowles

53.   The same day, after meeting with Godfrey and Bandfield, the undercover agent met with Rohn Knowles, a securities trader with Titan, in Titan's offices.   Titan's offices are located on the same floor and adjacent to IPC's offices.   The undercover agent advised Knowles that he was in the stock promotion business and had already opened one account each at Titan and Legacy.

54.   Knowles told the undercover agent that he regularly worked with "Brian" at Legacy and that clients often split stock between the two brokerage firms.   He indicated that "we" (Titan and Legacy) might hold twenty or thirty percent of a company's stock within the brokerage firm, but assured the undercover agent that the stock would be maintained "in separate accounts, of course."   Based on my experience and other conversations and documents obtained in this investigation, I believe that "Brian" is a reference to Brian de Wit.

---

evidence of securities fraud, money laundering and tax evasion.

EDNY-IPC-000006979

55.  Knowles told the undercover agent that he would take orders to buy or sell securities from the undercover agent after the undercover agent returned to the United States.  Knowles, however, stated that he preferred to receive such orders by phone rather than online, because it was quicker and also because the undercover could let Knowles know whether he wanted Knowles to "work" a big trade "in a certain way."

56.  Knowles indicated that he could execute matched trades between two accounts controlled by the undercover agent at prices determined by the undercover agent.  To ensure that the trade would "print" (i.e., be visible to the public and other investors), Knowles suggested that the undercover use Knowles and Brian (de Wit) to execute such trades.  Based on my experience investigating this case and other securities fraud cases, I believe that Knowles was referring to, and agreeing to engage in, the simultaneous sale and purchase of a security by an individual, or group of individuals, designed to show market activity.  Such trades, which are known as matched trades, are most common in manipulation schemes, and do not reflect a bona fide sale of a security but, rather the false appearance of actual, bona fide market activity.

57.  Knowles indicated that if he tried to execute such a trade between two Titan accounts, rather than between a Titan account and a Legacy account, Titan's clearing firm would ask:

33

EDNY-IPC-000006980

"What's going on here?" Knowles recommended that the undercover use "me and Brian" for such trades and stated, "me and Brian do it all the time for other clients." Knowles then told the undercover agent what instructions to give Knowles and Brian (de Wit) to ensure the execution of such matched trades.

58. The undercover agent also indicated that he wanted to control the trading in particular stocks, that he wanted to move the price of particular stocks to certain levels, and asked Knowles whether he was comfortable with such activity. Knowles acknowledged that he was comfortable with such trading activity, repeatedly stating that is was "not a problem." Knowles also reassured the undercover agent that he frequently coordinated trades with Brian (de Wit) and that they communicated by Skype or by Blackberry PIN, "which is a little bit more secure." Knowles stated that, if the undercover agent wanted to execute coordinated trades in a particular stock, the undercover agent could simply call or "message" Knowles, advising Knowles to "coordinate with Brian." Knowles assured the undercover agent that he would then communicate with Brian (de Wit) as needed to coordinate trading of the stock as requested by the undercover agent. Based on my experience investigating securities fraud cases, the terminology used by Knowles when describing his communications with "Brian" are typical communications between

34

EDNY-IPC-000006981

individuals intent on manipulating trading in a particular public security.

59.   Knowles also acknowledged that the undercover agent was the person behind the IBC that had been set up by IPC.  This acknowledgement demonstrates that Knowles knows that the IPC clients are the true control persons behind the IBCs and LLCs used by IPC. Knowles also stated that Titan would not have opened the account directly for the undercover agent because the undercover agent was an American; the account, he explained, could only be set up because the undercover agent used the "structure" provided by Bandfield and IPC.  As a result, he advised, a regulator looking at Titan's book would not be able to see that IPC's clients, in fact, controlled the accounts.

60.   Knowles advised the undercover agent to contact IPC if he intended to transfer money out of the Titan brokerage account. All money transfers had to be signed off on by the nominee working for IPC.  Knowles cautioned that "we can't have an American signing off on a money movement, because, obviously, that would mean it's an American person's cash."  He also indicated that Titan could not send money directly to issuers or stock promoters, because such a transfer would raise a red flag with Titan's bank.

EDNY-IPC-000006982

C.    The First Email Search Warrant

61.    On August 26, 2013, law enforcement obtained search warrants to search two email accounts, the Godfrey IPC account address and the IPC applications email address.  See 13 M 743 (VMS) (E.D.N.Y.).  The email providers for the Godfrey IPC account and the IPC applications email address were GoDaddy.com, LLC ("GoDaddy") and Network Solutions, LLC ("Network Solutions"), respectively.  The search warrants called for the production of emails for the respective accounts for the period January 1, 2013 to the "present." On August 27, 2013, the government served the respective search warrants on GoDaddy and Network Solutions.

62.  On August 28, 2013, Network Solutions provided a response to the search warrant for the IPC applications email address.  Law enforcement determined that Network Solutions inadvertently produced email accounts for additional email addresses associated with the domain "ipcoffshore.com" in response to the search warrant, and ceased its review of the email production.  Law enforcement contacted Network Solutions, alerted the company to the fact that its production did not comply with the search warrant, and requested that Network Solution provide emails in accordance with the terms of the search warrant.

63.  On September 5, 2013, Network Solutions produced emails in response to the search warrant issued for the IPC

36

applications email address in accordance with the terms of the search warrant for that account.

64.  On October 16, 2013, GoDaddy provided a response to the search warrant issued for the Godfrey IPC account.  The emails produced included emails for the Godfrey IPC account for the period August 26, 2013 to October 15, 2013.  When law enforcement determined that the production dates for the email related to emails that were sent and received after August 26, 2013, law enforcement contacted GoDaddy and requested production of emails for the period between January 1, 2013 and August 26, 2013, as requested in the search warrant.  On December 5, 2013 and December 18, 2013, GoDaddy produced data to law enforcement from which law enforcement was able to extract emails responsive to the Godfrey IPC account search warrant.  It appeared to law enforcement that the December 5, 2013 and December 18, 2013 productions also contained emails unrelated to the Godfrey IPC account search warrant.  As a result, law enforcement did not attempt to access emails that were inadvertently produced and that were not responsive to the Godfrey IPC account search warrant.[20]

----

[20]   As a result of the difficulty in obtaining responses to the email search warrants to date from GoDaddy and Network Solutions, and as discussed below, the government seeks production of all SUBJECT EMAIL PREMISES for the time periods specified in the respective search warrant attachments for GoDaddy and Network Solutions.

EDNY-IPC-000006984

i.   Results of the First Email Search Warrant

65.   The results of the GoDaddy email search warrant reveal numerous communications between the Godfrey IPC account, the IPC applications email address, and individuals who appear to be clients of IPC.  Additionally, those same results contain communications among and between the SUBJECT EMAIL PREMISES and the Godfrey IPC account and the IPC applications email address.

66.   Some of the emails produced from GoDaddy appear to be sent from IPC clients and direct Godfrey or others associated with IPC to execute documents and agreements relating to various entities, including beneficial ownership forms and stock purchase agreements, and to take certain actions in connection with those entities.  For example, in one email, dated April 29, 2013, an individual asked whether Godfrey could provide a different address for a particular offshore entity because "we are trying to have different addresses for each assignee."  In another email, dated May 21, 2013, an individual who appears to be associated with a law firm in Miami, Florida wrote to Godfrey and aaliyah@ipcoffshore.com, and asked whether they could provide information relating to the "7 miles account" so that the account could be cleared with a financial firm's "compliance officer."  Additional emails, dated April 14, 2013, sent to the Godfrey IPC account and the andrewg@ipc-offshore.com address

38

EDNY-IPC-000006985

attach wire transfer instructions calling for the transfer of money to accounts in Wisconsin and Canada.

67. Additionally, on or about May 8, 2013, an individual identified as "Alain B. Houle" sent an email to the Godfrey IPC account and the lelia@ipc-offshore.com address and attached a beneficial ownership letter concerning the transfer of 1.15 million shares of Bio-Solutions Corp. into a Titan brokerage account in the name of "Redlink." In the email, "Alain B. Houle" asked that the beneficial ownership letter be signed and sent to Titan.

68. The GoDaddy search warrant production also contains multiple emails that refer to the bob@ipc-offshore.com account.[21] For example, on May 19, 2013, an individual identified as "Frank Grey" sent an email to the Godfrey IPC account and the bob@ipc-offshore.com asking that Godfrey and Bandfield "please print this out, execute, scan and send back to me as a PDF for Platinum Tribe." Attached to the email is a stock purchase agreement between Locksmith Financial Corporation, a company based in Vancouver, Canada and Platinum Tribe, a company based in Belize. The address referenced for Platinum Tribe in the stock purchase agreement is IPC address in Belize, the same address used by Godfrey and others associated with IPC in connection

---

[21] Based on my review of email communications in this case and documents obtained from email service providers, it is clear that the bob@ipcoffshore.com and bob@ipc-offshore.com accounts are associated with and used by Bandfield.

EDNY-IPC-000006986

with other Belize-based entities.   In another email, Bandfield sent

an email to the Godfrey IPC account from the bob@ipc-offshore.com

account, in which Bandfield directed Godfrey to execute a stock

transfer letter on behalf of an individual who appears to be an IPC

client.   The email from Bandfield contained within it an email, also

dated May 1, 2013, sent from someone believed to be an IPC client

to bob@ipc-offshore.com and lellia@ipc-offshore.com.

69.   Emails obtained from GoDaddy also reference the

bob@ipcoffshore.com account.   For example, on April 24, 2013, an

email account referred to as "Marketinvestor" sent an email to the

bob@ipcoffshore.com account, asking that a wire transfer be sent to

an account at the National Bank of Bahrain BSC.   That email was

subsequently forwarded to the Godfrey IPC account from the

"Marketinvestor" email account.

70.   Other emails contained in the GoDaddy search warrant

production referenced what appear to be administrative email

accounts associated with IPC.   For example, an email, dated April

24, 2013, sent from "Salim Rana" to accounts@ipcoffshore.com,

securities@ipc-offshore.com, bob@ipc-offshore.com and the Godfrey

IPC account referenced instructions from "Salim Rana" concerning

beneficial ownership and payments to Paypal.   The email from "Salim

Rana" contained within it an email, dated April 19, 2013, from the

accounts@ipcoffshore.com address, in which there appeared a

40

EDNY-IPC-000006987

signature block for Glenna Fay Bergey, listed as the "IPC Accounts Administrator."

71.   Additionally, an April 30, 2013 email sent to the accounts@ipcoffshore.com account from an individual who appeared to be an IPC client referenced the payments of incorporation fees through Paypal, and forwarded an email that contained a signature block for Patrick Gentle, an "IPC Accounts Administrator."

72.   Another email, dated April 15, 2013, sent from "Rick Weber" to documents@ipcoffshore.com, bob@ipc-offshore.com and the Godfrey IPC account, requested a wire transfer from "my Titan Acct." to a Chase Bank account in St. Petersburg Beach, Florida.

73.   Other emails similarly referenced the transfers@ipcoffshore.com account.  For example, on May 14, 2013, an email from bob@ipc-offshore.com to "Hyland Capital" and the Godfrey IPC account directed "Tim" not to send wire transfer requests to Rohn Knowles at Titan.  Instead, it directed that all wire transfer should be sent to transfers@ipcoffshore.com, "which then goes to both Andrew and myself."

74.   Emails obtained from GoDaddy also refer to the fact that employees of IPC act as nominees for IPC clients.  For example, an email from "Justin Mabanta", dated February 20, 2013, to bob@ipc-offshore.com, andrew@ipc-offshore.com and the Godfrey IPC account states that "Patrick Gentle" should be the only person listed

41

EDNY-IPC-000006988

on the "new Corporate Resolution" because he is the authorized
signatory for a brokerage account that was to be opened under the
name of "Park Financial Ltd."  In a subsequent email from Bandfield,
using the bob@ipc-offshore.com account, to "Justin Mabanta",
Bandfield instructed "Justin" to reach out to the "beneficial owner"
to see if the owner wants to open the brokerage account.  Based on
information and emails obtained during this investigation, I believe
that "Patrick Gentle" is an IPC accounts administrator and works in
accounting at IPC, and that he is the person associated with
patrick@ipcoffshore.com.  I also believe that, based on the context
of the emails with "Justin Mabanta", Patrick Gentle was acting as
a nominee for another individual in connection with the Park
Financial Ltd. entity.[22]

    D.    <u>Information Obtained from GoDaddy and Network Solutions</u>

        75.  Documents obtained from Network Solutions indicate
that the email accounts associated with the domain
"@ipcoffshore.com" were created on or about January 10, 2013.
Documents obtained from GoDaddy indicate that the email accounts of

---

[22]    Law enforcement has not yet obtained emails associated
with the patrick@ipcoffshore.com account; however, based on Patrick
Gentle's role at IPC, the nature of IPC's business, and email
communications obtained thus far, I believe that the
patrick@ipcoffshore.com account will contain email communications
with IPC clients and with Bandfield relating to IPC clients and
transactions, all of which are evidence of the client's control over
IPC's accounts.

42

EDNY-IPC-000006989

bob@ipc-offshore.com, glenna@ipc-offshore.com, and andrew@ipc-ofshore.com were created on or around February 4, 2010, and the email account of andrewg@ipc-offshore.com was created on or about February 5, 2010.  Documents obtained from Microsoft Corporation, the service provider for the ipc-offshore@hotmail.com account, indicate that Bandfield is the "user" of the ipc-offshore@hotmail.com account.

76.  Additionally, the government obtained information from Network Solutions and GoDaddy by court order pursuant to Title 18, U.S.C., Section 2703(d).  That information indicated numerous contacts between the SUBJECT EMAIL PREMISES.  For example, there were a total of 31 email communications between the accounts@ipcoffshore.com account and the bob@ipcoffshore.com and andrew@ipcoffshore.com accounts.  There were also a total of 11 email communications between the clodine@ipcoffshore.com account and the andrew@ipcoffshore.com, applications@ipcoffshore.com, and andrew@ipc-offshore.com accounts.  Additionally, there were a total of 5 email communications between the transfers@ipcoffshore.com account and the bob@ipcoffshore.com and andrew@ipc-offshore.com accounts.  There were 40 email communications between aaliyah@ipc-offshore.com account and the bob@ipcoffshore.com account.  There were also a total of 28 email communications between the glenna@ipc-offshore.com account and the bob@ipc-offshore.com

EDNY-IPC-000006990

account and the Godfrey IPC account.  Finally, there were 6 email communications between the ipc-offshore@hotmail.com account and the bob@ipc-offshore.com account.  The first email communication between those two accounts occurred on April 24, 2011.

II.   THE SUBJECT EMAIL PREMISES

77.   As set forth above, there is probable cause to search the SUBJECT EMAIL PREMISES.  The facts set forth above establish probable cause to believe that the entire IPC business was established for the purpose of facilitating securities fraud, money laundering and tax evasion.

78.   To begin, it is clear that Bandfield controls IPC. He has admitted that he created the company, and there is evidence that he did so as early as 1999.  It is also clear that employees of IPC work for Bandfield and that they take direction from him.  And it is clear that Bandfield relies on the employees to carry out his direction and communicate directly with IPC's clients in connection with IPC's business.  Numerous emails obtained during this investigation support that conclusion.  There is also evidence that Bandfield is the primary user for domain names set up for IPC.  For example, he is the registered user for the ipc-offshore@yahoo.com account and the primary user for the "ipcoffshore.com" domain name. Additionally, IPC's phone numbers and Paypal account are also registered to Bandfield.

44

79.   Moreover, it is clear that IPC's business, as
described by Bandfield to the undercover agent, is designed to
facilitate securities fraud, money laundering and tax evasion.   As
discussed above in great detail, Bandfield describes the business
as one in which individuals can conceal their control over the
accounts and assets in those accounts.   The clear purpose of this
concealment is to shield the client's control from the SEC and IRS.
To carry out this purpose, Bandfield stated to the undercover agent
that his employees or the nominees are willing to sign false tax
disclosures on behalf of IPC's clients and false beneficial ownership
disclosure forms in connection with the purchase and sale of stock.
He also indicated that IPC is able to divide a client's stock
ownership into multiple different accounts so as to cover up or
conceal the client's beneficial ownership of more than 5% of a public
reporting company's stock.   Bandfield also indicated that he formed
Titan and Legacy, two brokerage firms that provide trading services
to IPC's clients.   Based on the conversation between Knowles, a
securities trader at Titan, and the undercover agent, it is clear
that Titan and Legacy engage in manipulative trades on behalf of IPC's
clients.   Thus, it is clear that Bandfield and IPC are involved in
manipulative trading through Titan and Legacy.   Additionally,
Bandfield told the undercover agent that he has been using this same
business structure for years.   In fact, there is evidence

45

EDNY-IPC-000006992

demonstrating that IPC and Bandfield were involved in this business in 1999.  Finally, as noted above, I am not aware of any legitimate business conducted by IPC.

80.  As described above, emails obtained during the investigation also demonstrate that IPC provides the type of service that Bandfield explained to the undercover agent.  In fact, emails between IPC employees and IPC clients show that clients communicated directions to those employees in connection with the execution of beneficial ownership disclosure forms and stock purchase agreements, as well as transfer of funds by wire.

81.  Those communications are evidence of the IPC clients' control over the accounts.  Control, in the context of tax evasion and securities fraud, is an important element in determining beneficial ownership and discretion.

82.  Additionally, the text of those emails may be considered evidence of substantive crimes.  For example, emails from clients directing the transfer of money from an IPC account may be considered evidence of money laundering based on the nature and the source of the funds being moved.  Moreover, emails from Bandfield to the IPC employees are also evidence of Bandfield's control and involvement in IPC's business.

83.  Accordingly, there is probable cause to believe that the SUBJECT EMAIL PREMISES have been used to, and contain evidence

46

EDNY-IPC-000006993

and fruits of violations of, the commission of securities fraud, money laundering and tax evasion through: 1) the creation and use of LLCs and IBCs and offshore brokerage accounts at Titan and Legacy by IPC's clients; 2) manipulative trading at Titan and Legacy; 3) the execution of false tax and beneficial ownership forms; and 4) the transfer of illicit proceeds.

III. <u>TECHNICAL BACKGROUND</u>

84.   The SUBJECT EMAIL PREMISES are comprised of twenty-three accounts.   The SUBJECT EMAIL PREMISES that contain the domain name of "ipc-offshore.com" are hosted by GoDaddy.   The SUBJECT EMAIL PREMISES that contain the domain name of "ipcoffshore.com" are hosted by Network Solutions.   The email accounts of ipc-offshore@hotmail.com and opulence10@yahoo.com are hosted by Microsoft Corporation (hereinafter, "Microsoft") and Yahoo! Inc. (hereinafter, "Yahoo"), respectively.   GoDaddy, Network Solutions, Microsoft and Yahoo are collectively referred to as the "email providers."[23]   In my training and experience, I have learned

---

[23]   Attachments A1 and B1 relate to the email addresses hosted by GoDaddy.com and are attachments to the GoDaddy.com search warrant. Attachments A2 and B2 relate to the email addresses hosted by Network Solutions and are attachments to the Network Solutions search warrant.   Attachments A3 and B3 relate to the email address ipc-offshore@hotmail.com and are attachments to the Microsoft search warrant.   Attachments A4 and B4 relate to the email address opulence10@yahoo.com and are attachments to the Yahoo search warrant.

EDNY-IPC-000006994

that the email providers provide a variety of on-line services, including email access, to the general public.  The email providers allow subscribers to obtain email accounts, like the email accounts listed in Attachments A1, A2, A3, and A4.  Subscribers obtain email accounts by registering with the email providers.  During the registration process, the email providers ask subscribers to provide basic personal information.  Therefore, the computers of the email providers are likely to contain stored electronic communications (including retrieved and unretrieved email for the email providers' subscribers) and information concerning subscribers and their use of the email providers' services, such as account access information, the email transaction information, and account application information.

85.  In general, an email that is sent to the email providers' subscriber is stored in the subscriber's "mail box" on the email providers' servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on the email providers' servers indefinitely.

86.  When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to the email providers' servers, and then transmitted to its end destination.  The email providers often save a copy of the email sent.  Unless the

48

EDNY-IPC-000006995

sender of the email specifically deletes the email from the email providers' server, the email can remain on the system indefinitely.

87.   A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email.   If an email user writes a draft message but does not send it, that message may also be saved by the email providers but may not include all of these categories of data.

88.   A subscriber of the email providers can also store files, including emails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by the email providers.

89.   In my experience, subscribers may chose not to copy emails stored in their GoDaddy, Network Solutions, Microsoft or Yahoo account on a home computer or other location.   This is particularly true when they access their GoDaddy, Network Solutions, Microsoft or Yahoo account through the web, or if they do not wish to maintain particular emails or files in their residence or place of business.

90.   In general, email providers like GoDaddy, Network Solutions, Microsoft and Yahoo ask each of their subscribers to provide certain personal identifying information when registering for an email account.   This information can include the subscriber's full name, physical address, telephone numbers and other

49

EDNY-IPC-000006996

identifiers, alternative email addresses, and, for paying

subscribers, means and source of payment (including any credit or

bank account number).

91. Email providers typically retain certain

transactional information about the creation and use of each account

on their systems. This information can include the date on which

the account was created, the length of service, records of log-in

(i.e., session) times and durations, the types of service utilized,

the status of the account (including whether the account is inactive

or closed), the methods used to connect to the account (such as

logging into the account via the email provider's website), and other

log files that reflect usage of the account. In addition, email

providers often have records of the Internet Protocol address ("IP

address") used to register the account and the IP addresses associated

with particular logins to the account. Because every device that

connects to the Internet must use an IP address, IP address

information can help to identify which computers or other devices

were used to access the email account.

92. In some cases, email account users will communicate

directly with an email service provider about issues relating to the

account, such as technical problems, billing inquiries, or

complaints from other users. Email providers typically retain

records about such communications, including records of contacts

50

between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

93.   In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files.

IV.   INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

94.   I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require the email providers to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachments B1, B2, B3, and B4.   Upon receipt of the information described in Section I of Attachments B1, B2 B3, and B4, government-authorized persons will review that information to locate the items described in Section II of Attachments B1, B2, B3, and B4.

V.   CONCLUSION

95.   Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of the email providers there exists evidence of crimes.   Accordingly, search warrants are

51

EDNY-IPC-000006998

requested.

96.   This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.   18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

97.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

98.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrants.   I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into a criminal organization, and not all of the targets of this investigation will be searched at this time.   This case involves the use of an undercover agent and the government would have concern for the undercover agent's safety if information about this investigation is disclosed.   That concern is justified in this instance.   In fact, at one point during the November 6, 2013 Belize meeting referenced above, Bandfield stated that one of his clients was recently shot and killed.   Additionally,

52

EDNY-IPC-000006999

based upon.my training and experience, I have learned that criminals often learn about criminal affidavits and search warrants through the posting of such documents on the internet, and disseminate them to other criminals as they deem appropriate.  This case involves dozens of subjects in the United States and multiple subjects located in Belize and other foreign jurisdictions.

99.    Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the undercover agent's safety and the investigation, including by giving targets and subjects an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

100. Pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue Orders commanding GoDaddy, Microsoft, Yahoo and Network Solutions not to notify any person (including the subscribers or customers of the accounts listed in the attached warrants) of the existence of the attached warrants until further order of the Court.

WHEREFORE, your deponent respectfully requests that the requested search warrants be issued for THE PREMISES KNOWN AND DESCRIBED AS ELECTRONIC MAIL ADDRESSES "aaliyah@ipcoffshore.com", "accounts@ipcoffshore.com", "applications@ipcoffshore.com", "andrew@ipcoffshore.com", "bob@ipcoffshore.com",

EDNY-IPC-000007000

"clodine@ipcoffshore.com", "documents@ipcoffshore.com",

"glenna@ipcoffshore.com", "lellia@ipcoffshore.com",

"patrick@ipcoffshore.com", "transfers@ipcoffshore.com",

"aaliyah@ipc-offshore.com", "andrew@ipc-offshore.com",

"andrewg@ipc-offshore.com", "banking@ipc-offshore.com",

"bob@ipc-offshore.com", "securities@ipc-offshore.com",

"wire@ipc-offshore.com", "glenna@ipc-offshore.com",

"lellia@ipc-offshore.com", "vtm@ipc-offshore.com",

"ipc-offshore@hotmail.com", and "opulence10@yahoo.com".

EDNY-IPC-000007001

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application and search warrants, be sealed until further order of the Court.

█████████████████

Special Agent
Federal Bureau of Investigation

Sworn to before me this
3rd day of February, 2014

THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

55

EDNY-IPC-000007002

## ATTACHMENT A1
Property to Be Searched

This warrant applies to information associated with
"aaliyah@ipc-offshore.com", "andrew@ipc-offshore.com",
"andrewg@ipc-offshore.com", "banking@ipc-offshore.com",
"bob@ipc-offshore.com", "securities@ipc-offshore.com",
"wire@ipc-offshore.com", "glenna@ipc-offshore.com",
"lellia@ipc-offshore.com", and "vtm@ipc-offshore.com" that is
stored at premises owned, maintained, controlled, or operated by
GoDaddy.com, LLC, a company that accepts service of legal process
at 14455 N. Hayden Road, Suite 219, Scottsdale, AZ, 85260.

**ATTACHMENT B1**
Particular Things to be Seized

I.   Information to be disclosed by GoDaddy.com, LLC (the "Provider")

      To the extent that the information described in Attachment
A1 is within the possession, custody, or control of the Provider,
including any emails, records, files, logs or other information that
has been deleted but is still available to the Provider, or has been
preserved pursuant to requests made under 18 U.S.C. § 2703(f), the
Provider is required to disclose the following information to the
government for each account or identifier listed in Attachment A1:

   A.   The contents of all emails associated with the account,
        including stored or preserved copies of emails sent to and
        from the account, draft emails, the source and destination
        addresses associated with each email, the date and time
        at which each email was sent, and the size and length of
        each email, from February 4, 2010 to present;

   B.   All records or other information regarding the
        identification of the account, to include full name,
        physical address, telephone numbers and other
        identifiers, records of session times and durations, the
        date on which the accounts were created, the length of
        service, the IP address used to register the account,
        log-in IP addresses associated with session times and
        dates, account status, alternative email addresses
        provided during registration, methods of connecting, log
        files, and means and source of payment (including any
        credit or bank account number);

   C.   The types of service utilized;

   D.   All records or other information stored from February 4,
        2010 to present by an individual using the account,
        including address books, contact and buddy lists, calendar
        data, pictures, and files; and

   E.   All records pertaining to communications between the
        Provider and any person regarding the account, including
        contacts with support services and records of actions
        taken.

II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Sections 371, 1348, 1349 and 1956 and Title 26, United States Code, Section 7201, those violations involving Robert Bandfield, Andrew Godfrey, IPC, Rohn Knowles, Kelvin Leach, Brian de Wit and others, and occurring after February 4, 2010, including, for each account or identifier listed on Attachment A1, information pertaining to the following matters:

A.   Securities fraud, money laundering and tax evasion and conspiracy to commit those crimes;

B.   IPC, IPC Corporate Services, Inc. or IPC Corporate Services, LLC;

C.   Titan International Securities, Inc. and Legacy Global Markets, S.A.;

D.   An international business corporation or IBC;

E.   A limited liability company;

F.   Paypal;

G.   The setting up of offshore brokerage and bank accounts;

H.   The issuance, purchase, sale, deposit or transfer of securities;

I.   The deposit, transfer, debit, credit or withdrawal of money; and

J.   Records relating to who created, used, or communicated with the accounts or identifier, including records about their identities and whereabouts.

**ATTACHMENT A2**
Property to Be Searched

This warrant applies to information associated with "aaliyah@ipcoffshore.com", "accounts@ipcoffshore.com", "applications@ipcoffshore.com", "andrew@ipcoffshore.com", "bob@ipcoffshore.com", "clodine@ipcoffshore.com", "documents@ipcoffshore.com", "glenna@ipcoffshore.com", "lellia@ipcoffshore.com", "patrick@ipcoffshore.com", and "transfers@ipcoffshore.com" that is stored at premises owned, maintained, controlled, or operated by Network Solutions, LLC, a company that accepts service of legal process at 12808 Gran Bay Parkway West, Jacksonville, FL, 32258.

EDNY-IPC-000007006

**ATTACHMENT B2**
Particular Things to be Seized

I.   Information to be disclosed by Network Solutions, LLC (the "Provider")

     To the extent that the information described in Attachment A2 is within the possession, custody, or control of the Provider, including any emails, records, files, logs or other information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A2:

     A.   The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email, from January 1, 2013 to present;

     B.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the accounts were created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

     C.   The types of service utilized;

     D.   All records or other information stored from January 1, 2013 to present by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

     E.   All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Sections 371, 1348, 1349 and 1956 and Title 26, United States Code, Section 7201, those violations involving Robert Bandfield, Andrew Godfrey, IPC, Rohn Knowles, Kelvin Leach, Brian de Wit and others, and occurring after January 1, 2013, including, for each account or identifier listed on Attachment A2, information pertaining to the following matters:

A.   Securities fraud, money laundering and tax evasion and conspiracy to commit those crimes;
B.   IPC, IPC Corporate Services, Inc. or IPC Corporate Services, LLC;
C.   Titan International Securities, Inc. and Legacy Global Markets, S.A.;
D.   An international business corporation or IBC;
E.   A limited liability company;
F.   Paypal;
G.   The setting up of offshore brokerage and bank accounts;
H.   The issuance, purchase, sale, deposit or transfer of securities;
I.   The deposit, transfer, debit, credit or withdrawal of money; and
J.   Records relating to who created, used, or communicated with the accounts or identifier, including records about their identities and whereabouts.

EDNY-IPC-000007008

**ATTACHMENT A3**

Property to Be Searched

This warrant applies to information associated with
"ipc-offshore@hotmail.com" that is stored at premises owned,
maintained, controlled, or operated by Microsoft Corporation, a
company that accepts service of legal process at One Microsoft Way,
Redmond, Washington 98052-6399.

**ATTACHMENT B3**
Particular Things to be Seized

I.   Information to be disclosed by Microsoft Corporation (the "Provider")

To the extent that the information described in Attachment A3 is within the possession, custody, or control of the Provider, including any emails, records, files, logs or other information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A3:

K.   The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email, from April 24, 2011 to present;

L.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the accounts were created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

M.   The types of service utilized;

N.   All records or other information stored from April 24, 2011 to present by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

O.   All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

II.   Information to be seized by the government

        All information described above in Section I that constitutes
fruits, contraband, evidence and instrumentalities of violations of
Title 18, United States Code, Sections 371, 1348, 1349 and 1956 and
Title 26, United States Code, Section 7201, those violations
involving Robert Bandfield, Andrew Godfrey, IPC, Rohn Knowles,
Kelvin Leach, Brian de Wit and others, and occurring after April 24,
2011, including, for each account or identifier listed on Attachment
A3, information pertaining to the following matters:

        P.   Securities fraud, money laundering and tax evasion and
             conspiracy to commit those crimes;
        Q.   IPC, IPC Corporate Services, Inc. or IPC Corporate
             Services, LLC;
        R.   Titan International Securities, Inc. and Legacy Global
             Markets, S.A.;
        S.   An international business corporation or IBC;
        T.   A limited liability company;
        U.   Paypal;
        V.   The setting up of offshore brokerage and bank accounts;
        W.   The issuance, purchase, sale, deposit or transfer of
             securities;
        X.   The deposit, transfer, debit, credit or withdrawal of
             money; and
        Y.   Records relating to who created, used, or communicated
             with the accounts or identifier, including records about
             their identities and whereabouts.

**ATTACHMENT A4**
Property to Be Searched

This warrant applies to information associated with
opulence10@yahoo.com that is stored at premises owned, maintained,
controlled, or operated by Yahoo! Inc., a company that accepts
service of legal process at 701 First Avenue, Sunnyvale, California
94089.

**ATTACHMENT B4**
Particular Things to be Seized

I.    Information to be disclosed by Yahoo! Inc. (the "Provider")

         To the extent that the information described in Attachment
A4 is within the possession, custody, or control of the Provider,
including any emails, records, files, logs or other information that
has been deleted but is still available to the Provider, or has been
preserved pursuant to requests made under 18 U.S.C. § 2703(f), the
Provider is required to disclose the following information to the
government for each account or identifier listed in Attachment A4:

   Z.   The contents of all emails associated with the account,
        including stored or preserved copies of emails sent to and
        from the account, draft emails, the source and destination
        addresses associated with each email, the date and time
        at which each email was sent, and the size and length of
        each email, from January 1, 2009 to present;

   AA.  All records or other information regarding the
        identification of the account, to include full name,
        physical address, telephone numbers and other
        identifiers, records of session times and durations, the
        date on which the accounts were created, the length of
        service, the IP address used to register the account,
        log-in IP addresses associated with session times and
        dates, account status, alternative email addresses
        provided during registration, methods of connecting, log
        files, and means and source of payment (including any
        credit or bank account number);

   BB.  The types of service utilized;

   CC.  All records or other information stored from January 1,
        2009 to present by an individual using the account,
        including address books, contact and buddy lists, calendar
        data, pictures, and files; and

   DD.  All records pertaining to communications between the
        Provider and any person regarding the account, including
        contacts with support services and records of actions
        taken.

EDNY-IPC-000007013

II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Sections 371, 1348, 1349 and 1956 and Title 26, United States Code, Section 7201, those violations involving Robert Bandfield, Andrew Godfrey, IPC, Rohn Knowles, Kelvin Leach, Brian de Wit and others, and occurring after January 1, 2009, including, for each account or identifier listed on Attachment A4, information pertaining to the following matters:

   EE.   Securities fraud, money laundering and tax evasion and conspiracy to commit those crimes;
   FF.   IPC, IPC Corporate Services, Inc. or IPC Corporate Services, LLC;
   GG.   Titan International Securities, Inc. and Legacy Global Markets, S.A.;
   HH.   An international business corporation or IBC;
   II.   A limited liability company;
   JJ.   Paypal;
   KK.   The setting up of offshore brokerage and bank accounts;
   LL.   The issuance, purchase, sale, deposit or transfer of securities;
   MM.   The deposit, transfer, debit, credit or withdrawal of money; and
   NN.   Records relating to who created, used, or communicated with the accounts or identifier, including records about their identities and whereabouts.

EDNY-IPC-000007014