**Exhibit L: May 15, 2015 Search Warrant**

JMK:ICR
F. #2015R00828

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION FOR A
SEARCH WARRANT FOR:

AN APPLE MACBOOK AIR LAPTOP COMPUTER
WITH SERIAL NUMBER C02FKOJ1DDR1,

AN APPLE MACBOOK PRO LAPTOP
COMPUTER WITH SERIAL NUMBER
C02HT2V2F24T, AND

AN ORANGE AND WHITE LEXAR JUMPDRIVE
TWISTTURN 32 GIGABYTE UNIVERSAL
SERIAL BUS FLASH MEMORY DRIVE BEARING
THE NUMBER "LJDTT32G-000-114BB"

CURRENTLY IN THE CUSTODY OF THE
FEDERAL BUREAU OF INVESTIGATION
WITHIN THE EASTERN DISTRICT OF NEW
YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

FILED UNDER SEAL

AFFIDAVIT IN SUPPORT OF
AN APPLICATION UNDER
RULE 41 FOR A WARRANT
TO SEARCH AND SEIZE

EASTERN DISTRICT OF NEW YORK, SS:

███████████████, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

Upon information and belief, there is probable cause to believe that there is

located on the electronic devices known and described as AN APPLE MACBOOK AIR

LAPTOP COMPUTER WITH SERIAL NUMBER C02FKOJ1DDR1, (the "MacBook Air"),

AN APPLE MACBOOK PRO LAPTOP COMPUTER WITH SERIAL NUMBER

1

C02HT2V2F24T (the "MacBook Pro"), AND AN ORANGE AND WHITE LEXAR

JUMPDRIVE TWISTTURN 32 GIGABYTE UNIVERSAL SERIAL BUS FLASH

MEMORY DRIVE BEARING THE NUMBER "LJDTT32G-000-114BB" (the "USB Flash

Drive") (collectively, the "SUBJECT DEVICES") described in Attachment A, electronically

stored information as described more fully in Attachment B, which constitutes evidence, fruits

and instrumentalities of securities fraud, money laundering and tax evasion, in violation of

Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section

1956, and Title 26, United States Code, Section 7201, respectively, and conspiracy to commit

securities fraud, money laundering, and tax evasion, in violation of Title 18, United States

Code, Sections 371 and 1956(h).

The source of your deponent's information and the grounds for his belief are as

follows:[1]

1.      I am a Special Agent with the FBI.   I have been employed by the FBI for

approximately 12 years.   I am responsible for conducting and assisting in investigations into

the activities of individuals and criminal groups responsible for securities fraud, money

laundering and tax evasion.   These investigations are conducted both in an undercover and

overt capacity.   I have participated in investigations involving search warrants and arrest

warrants.   As a result of my training and experience, I am familiar with the techniques and

methods of operation used by individuals involved in criminal activity to conceal their

activities from detection by law enforcement authorities.

---

[1]      Because this affidavit is submitted for the limited purpose of establishing probable
cause for search warrants, I have not set forth each and every fact learned during the course of
the investigation.

EDNY-IPC-000026365

2.     I have personally participated in the investigation of the offenses discussed below.   I am familiar with the facts and circumstances of this investigation from, among other sources of information: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, (c) consensual recordings made by an undercover law enforcement agent ("undercover agent"), (d) the review of bank records and other business records, and (e) the review of investigative reports.

## I.     BACKGROUND

### A.     Relevant Individuals and Companies

3.     IPC was an offshore management company comprised of IPC Corporate Services, Inc. in Belize City, Belize, IPC Corporate Services, LLC in Clackmas, Oregon, and IPC Management Services, Inc. in Belize City, Belize (collectively, "IPC").[2]   IPC's principal office was located in Belize.   IPC did not employ many employees.   During a November 6, 2013 visit to IPC's offices in Belize, Andrew Godfrey, an IPC employee, escorted an undercover agent through IPC's offices and introduced the undercover agent to various IPC employees, including Glenna Fay Bergey, Patrick Gentle, Lellia Senticum, and Aaliyah Whittaker.

4.     Robert Bandfield, a U.S. citizen, founded and controlled IPC.[3]
Bandfield has stated to an undercover agent that he is from Oregon and that he previously

---

[2]     Upon information and belief, I believe that "IPC" stands for International Privacy Corporation.

[3]     Bandfield was investigated by the FBI in approximately 1999 in connection with an investment fraud scheme.   During that investigation, a witness stated to the FBI, in substance and in part, that Bandfield made a presentation to him and others (at the behest of the primary target of the investigation) regarding IPC, and that Bandfield provided guidance regarding setting up offshore corporate and bank accounts in Belize and the Turks and Caicos Islands. The witness further stated that Bandfield charged $1,350 for setting up the accounts.   The

EDNY-IPC-000026366

spent fifteen years in British Columbia, Canada, ten years in the Cayman Islands, a period of time in the Turks and Caicos Islands, and some additional time in Canada.   According to Bandfield, he has spent the last ten or eleven years in Belize.   Based on documents obtained from an email service provider, Bandfield is listed as the primary user for the domain name of "ipcoffshore.com."   Bandfield is listed as "Bob Bandfield" on those documents, and the documents include bob@ipc-offshore.com as a contact email address for Bandfield.   Based on information that I obtained during the course of this investigation, it is clear that Bandfield ran IPC and directed and oversaw IPC's employees in connection with IPC's business.

5.      Andrew Godfrey, a citizen of Belize, was an employee of IPC who is located in Belize.

6.      Titan International Securities, Inc. ("Titan"), which was located in Belize, was an offshore brokerage and investment management company.   Bandfield told an undercover agent that he created Titan.

7.      Legacy Global Markets, S.A. ("Legacy"), which was located in Belize and Panama, was another offshore brokerage and investment management company. Bandfield told an undercover agent that he created Legacy.

B.      The Investigation

8.      In my training and experience, offshore management companies have historically been used by individuals to facilitate securities fraud, money laundering and tax evasion.   Specifically, individuals committing securities fraud often use offshore

---

witness stated that, after he had utilized IPC's services to set up an offshore company and bank account, he was defrauded by the primary target of a large portion of his investment. Bandfield was not charged with a crime in connection with that investigation.

EDNY-IPC-000026367

management companies to set up and manage offshore entities.   Through these entities,

individuals launder illegal stock proceeds (usually derived by stock manipulation or false

disclosure schemes), conceal their ownership of large percentages of stock of public

companies in violation of federal securities laws, and manipulate the trading of public

companies by trading in an illicit fashion through accounts maintained in the names of the

entities.   Stock fraudsters have traditionally used offshore entities to trade securities on their

behalf in the public market, allowing the fraudsters to conceal their involvement in the trading

and manipulation of the securities for their benefit.   Additionally, offshore management

companies facilitate these individuals' evasion of U.S. Internal Revenue Service ("IRS")

reporting requirements, tax payments associated with their gains, and control and transfer of

illicit proceeds of the fraudulent schemes.

        9.      Beginning in approximately July 2011, the government began

investigating Gibraltar Global Securities, Inc. ("Gibraltar" or "GGSI"), a Bahamas-based

broker-dealer, for potential violations of U.S. law, including securities fraud, money

laundering and tax evasion.   On or about November 9, 2012, an undercover agent contacted

Christopher Lunn of Gibraltar, posing as a potential account holder who was in the stock

promotion business.   During that call, Lunn explained that, due to recent regulatory scrutiny,

Gibraltar was no longer opening new accounts.[4]   Lunn explained that a number of clients

---

[4]      On or about March 15, 2013, the U.S. Securities and Exchange Commission ("SEC")
filed a complaint against Gibraltar, among other parties, for participating in a "pump and
dump" scheme involving two publicly-traded U.S. companies.   Securities and Exchange
Commission v. Gibraltar Global Securities, et al., Civ. No. 13-1735 (S.D.N.Y.).   On or about
April 18, 2013, the SEC filed a second complaint charging Gibraltar and Warren Davis,
Gibraltar's owner and president, with unlawfully operating as a broker-dealer in the United

EDNY-IPC-000026368

were setting up similar accounts at Belize-based brokerage firms with which Gibraltar had relationships.   Lunn noted that such an arrangement is "under the radar," and recommended the usage of Titan and Legacy.

10.    Lunn also stated that these Belize-based brokerage firms can set up an "IBC" for the undercover agent, which, in my training and experience, refers to an international business corporation ("IBC").   It is my understanding that an IBC is an offshore, untaxed company, formed under the laws of a foreign jurisdiction, which is not permitted to engage in business within the jurisdiction in which it was incorporated.   IBCs are commonly used for offshore banking, investment activities and asset protection.   Owners of IBCs can deposit money and transfer stock to an IBC to facilitate banking and securities trading activities while maintaining a level of anonymity for the IBC's owner.   IBC ownership records are typically not publicly available.

---

States and participating in an illegal unregistered offering and sale of shares of Magnum d'Or, a micro-cap company.   Securities and Exchange Commission v. Gibraltar Global Securities, Inc. and Warren A. Davis, Civ. No. 13-2575 (S.D.N.Y.).   According to the second SEC complaint, beginning in 2008 and continuing through August 2012, Gibraltar, through its website, solicited U.S. customers, who were looking to sell shares of low-priced, thinly-traded stock, by advertising brokerage services, including the formation of offshore business corporations with nominee officers and directors that would enable U.S. customers to trade anonymously.   The complaint alleges that Gibraltar routinely accepted deposits of stock and arranged to have the stock transferred into Gibraltar's name.   Gibraltar then followed its customers' orders and sold the shares through various securities accounts maintained by Gibraltar at U.S. broker-dealers.   In exchange, Gibraltar charged the account holders a two to three percent commission.   Additionally, the complaint alleged that Gibraltar and Davis participated in the unregistered offering and sale of over 10 million shares of Magnum d'Or on behalf of U.S. customers, resulting in proceeds of over $11 million.   The SEC has obtained documents during the course of its investigation of Gibraltar indicating that, as of February 2010, a Gibraltar internal handbook stated that Gibraltar used IPC to establish corporate entities and Belize-based bank accounts on behalf of its clients.

EDNY-IPC-000026369

11.     At the conclusion of the call, Lunn offered to send an email to the undercover agent that included contact information for the Belize-based brokerage firms, among others, that Lunn and the undercover agent had discussed.   On or about November 9, 2012, Lunn sent an email to the undercover agent in which he provided contact information for firms that could assist the undercover agent with opening an account.   Specifically, Lunn provided the contact information for Kelvin Leach at Titan and telephone numbers and an email address for Legacy.[5]

12.     On or about January 24, 2013, the undercover agent placed a telephone call to Kelvin Leach at Titan.   During this call, the undercover agent explained that he was interested in opening an account into which he could transfer money and with which he could buy and sell stock.   Leach explained that, because the undercover agent was a U.S. citizen, Titan could not open an individual account in the name of the undercover agent.   Leach instructed the undercover agent to contact "IPC Corporate Services" to set up a foreign corporation first (referred to by the undercover agent as an "IBC"), and then Titan could open a brokerage account for that foreign corporation.   Leach agreed to provide IPC's contact information to the undercover agent in an email.   At the conclusion of the call, the undercover agent confirmed that, once he set up the IBC and brokerage account at Titan in the IBC's name, "everything" would be "confidential," and that there would be "no communication with the IRS, SEC in the United States."   Leach confirmed that everything would then be "completely offshore."   He also stated that all correspondence related to the account would go

---

[5]     Lunn also provided contact information for two Bahamas-based brokerage firms.

EDNY-IPC-000026370

to the IBC and IPC.   The undercover agent concluded the call by stating that he was looking for "asset protection and privacy."   In response, Leach stated, "yep."

13.   Later that day, Leach sent an email to the undercover agent in which he copied Andrew Godfrey at the andrew@ipc-offshore.com email account (hereinafter, the "Godfrey IPC email address") and provided a telephone number for Godfrey at "IPC Corporate Services."[6]   The undercover agent then emailed Godfrey at the Godfrey IPC email address and asked him to call the undercover agent to discuss establishing an IBC.   The undercover agent also requested that Godfrey email the documentation needed to establish an IBC and a brokerage account at IPC.

14.   On or about January 25, 2013, the undercover agent had two telephone conversations with Godfrey at IPC.[7]   In summary, during the telephone calls, which were recorded, Godfrey explained that the undercover agent needed to set up an "LLC" and an IBC. Based on my training and experience, I believe that an "LLC" is a limited liability company. Godfrey explained that the LLC established by the undercover agent would then own the IBC, and that the "beneficial owner" of the LLC would be an individual working at IPC's office, ensuring that the undercover agent's name would not be associated with either entity.[8]

---

[6]   Telephone records confirm that the contact number provided by Leach for Godfrey at IPC is subscribed to by Robert Bandfield.

[7]   The undercover agent was located in the Eastern District of New York during the telephone calls.

[8]   In my training and experience, the term "beneficial owner" in this context refers to an individual who is employed or associated with an offshore management company and who acts on behalf of an IBC as if he/she has discretionary control and authority over the assets of the IBC, but who in reality takes direction from another with respect to the acquisition or disposition of assets.

EDNY-IPC-000026371

15.    Godfrey further explained that the LLC would be based in Nevis and that the IBC would be based in Belize.   Godfrey also stated that, because of Nevis's favorable laws, if anyone wanted to investigate the undercover agent's LLC for possible illegal criminal activity, it could take approximately eight years for any legal proceedings to occur in Nevis. Godfrey also explained that IPC could establish brokerage accounts as part of their services for the undercover agent at such broker-dealers as Titan and Legacy in the name of the undercover agent's IBC.

16.    During these telephone calls, the undercover agent explained that he expected to "buy and sell securities," and that he is a "stock promoter" who "bring[s] market awareness to certain micro-cap stocks."[9]   The undercover agent also stated that he wanted to receive fees from his clients through the offshore brokerage accounts, and that he wanted to do a "significant amount of trades," in reference to stocks.   The undercover agent expressed concern that the IRS and the SEC could obtain information about his transactions through the offshore brokerage accounts, and in response, Godfrey stated, "They can't get it.   You don't own this."   In context, Godfrey appears to be referring to the fact that the undercover agent's IBC would own the brokerage accounts at issue, and the undercover agent's name would not be associated with that IBC or the undercover agent's LLC (which owns the IBC).   Godfrey also explained that moving large sums of money through the offshore brokerage accounts

---

[9]    In my training and experience, "micro-cap stocks" refer to stocks of publicly-traded U.S. companies which have a low market capitalization.   Micro-cap stocks are often subject to price manipulation because they are thinly-traded and subject to less regulatory scrutiny than stocks that trade on notable exchanges, and large blocks of their stock are often controlled by a small group of individuals, which enables those in the group to control or orchestrate trading in those stocks.

EDNY-IPC-000026372

would not trigger law enforcement scrutiny in the way that moving similar sums of money through a bank account would.   At the conclusion of the second telephone call, Godfrey asked the undercover agent for his email address so that he could send an email to the undercover agent containing a list of LLC and IBC names from which the undercover agent could choose.

17.     On or about January 25, 2013, Godfrey, using the Godfrey IPC email address, sent the undercover agent three documents.   The first document explained the wire instructions to IPC in Belize.   The second document, containing the title "Belize Shelf Companies," included a list of approximately nine existing shelf companies from which the undercover could choose.   The third document, containing the title "Nevis Shelf Companies," included a list of approximately 14 existing shelf companies from which the undercover agent could choose.

18.     On or about March 27, 2013, the undercover agent and Godfrey had another telephone conversation.[10]   During that call, Godfrey confirmed that he had sent an email to the undercover agent containing lists of Belize and Nevis shelf companies.   Godfrey then explained that the undercover agent needed to choose an LLC and an IBC from those lists, and then IPC would set up brokerage accounts at such broker-dealers as Titan and Legacy for the undercover agent using his chosen IBC (which the undercover agent's LLC would own). Godfrey further explained that IPC's fees for the described services was $3,300, which the undercover agent could pay via a wire transfer, a bank draft made out to IPC or through PayPal on the Internet.

---

[10]     The undercover agent made the telephone call from the Eastern District of New York.

EDNY-IPC-000026373

19.     On or about May 15, 2013, the undercover agent and Godfrey had another telephone conversation.[11]   During that call, the undercover agent explained to Godfrey that he was prepared to choose an LLC and an IBC and that he wanted to choose Crystal Capital, LLC as his LLC in Nevis, and Aladdin Assets Managements as his IBC in Belize.   When the undercover agent then asked Godfrey about paying IPC's fee through IPC's website, Godfrey transferred the undercover agent to a woman named Glenna, who Godfrey referred to as "my accountant."   Glenna then assisted the undercover agent in paying IPC's fee of $3,300 to set up an LLC and IBC for the undercover agent.[12]

20.     Godfrey then rejoined the telephone conversation and told the undercover agent that, while Aladdin Assets Managements was still available for the undercover agent to use, someone else was already "cooking" with Crystal Capital, LLC. Godfrey then suggested that the undercover agent use Lion Mercantile as his IBC and Cavern Capital, LLC as his LLC.   The undercover agent agreed to use Godfrey's suggestions. Godfrey confirmed that the undercover agent wanted to set up brokerage accounts at both Titan and Legacy, and told the undercover agent that he could use his Titan and Legacy brokerage accounts as bank accounts as well, as long as he traded stocks using the brokerage accounts in addition to transferring money in and out of the accounts.   Otherwise, Godfrey warned, the undercover agent could raise "red flags."   Godfrey further explained that, for example, the undercover agent should not wire $50,000 into the brokerage accounts and then wire $35,000 out of the accounts "the next day."   Godfrey cautioned that if the undercover

---

[11]     The undercover agent made the telephone call from the Eastern District of New York.

[12]     It is my understanding, based on my participation in this investigation, that "Glenna" is Glenna Fay Bergey, and that Bergey and Bandfield are in a long-term romantic relationship.

EDNY-IPC-000026374

agent deposited a large sum of money into the brokerage accounts, he would need to "let it [i.e., the money] sit for a while," and then transfer $5,000 out of the accounts while continuing to trade stocks using the accounts.

21.     Following this telephone call, the undercover agent sent an email to the Godfrey IPC email address in which the undercover agent confirmed the completion of his "order," in reference to having paid for IPC's services.   In response, Godfrey emailed the undercover agent using the Godfrey IPC email address and stated, "received the payment. had to change from Cavern Capital llc, to Crystal Securities LLC as the other one was reserved and i was not aware of it."

22.     Records from PayPal for the time period of January 1, 2009 to February 5, 2013 show that approximately 65 individuals who listed a U.S. address on their PayPal accounts sent payments to IPC's PayPal account in amounts consistent with setting up or renewing offshore accounts.[13]   These payments include such notations as "Belize IBC & Nevis LLC," "3 companies each $1,000[ ]US" and "FIRST COMPANY[ ]SECOND COMPANY[ ]THIRD COMPANY[ ]ANNUAL."   IPC's PayPal account opening documents list a domestic email account for IPC as opulence10@yahoo.com.   According to information obtained from Yahoo! Inc., the email service provider for that email account, an alternate email contact for opulence10@yahoo.com is glenna@ipc-offshore.com.[14]   Moreover, the individual who registered the opulence10@yahoo.com account was Glenna Fay Bergey.

---

[13]     IPC's PayPal account is registered to Robert Bandfield.

[14]     Based on my review of statements and documents obtained during this investigation, including emails, I believe that the glenna@ipcoffshore.com, glenna@ipc-offshore.com, and opulence10@yahoo.com accounts are used by Glenna Fay Bergey.

EDNY-IPC-000026375

23.     Additionally, U.S. tax laws require that individuals report foreign bank accounts containing $10,000 or more.   Notably, as of January 2014, only four of the 65 individuals with U.S. addresses who sent money to IPC's PayPal account reported having such foreign bank accounts by filing a Report of Foreign Bank and Financial Accounts form with the IRS.   Of these four individuals, two individuals reported accounts in China.   The other two individuals disclosed accounts in Panama and the Bahamas, two countries in which IPC appears to have the ability to set up accounts.

24.     Of the 65 individuals listed in the PayPal records, 33 individuals have been identified through public SEC filings as either an officer, director, shareholder or consultant to a publicly-traded penny stock company.   Additionally, law enforcement has already determined that a number of the individuals communicating with IPC by phone and email are under criminal investigation for various securities-related crimes and that some of the individuals have convictions for securities fraud or SEC injunctions pending against them for securities violations.

25.     Given the nature of the business, the statements made by Bandfield and Godfrey during the course of this investigation, my review of emails obtained in this case and documents obtained from PayPal, the lack of IRS disclosures by individuals who used the PayPal system to pay IPC, and the histories of individuals who have communicated with IPC, I believe that U.S. citizens are using IPC to conceal their beneficial ownership of accounts and failing to disclose that beneficial ownership of those accounts to the IRS.   Additionally, given the fact that more than $364 million was transferred through Titan and Legacy during the period October 2010 through April 2013, and that many of the fees associated with

EDNY-IPC-000026376

establishing an IPC account are approximately $3,000, I believe that many accounts established by IPC hold in excess of $10,000.

26.     Moreover, based on my training and experience, the nature of IPC's business, the statements made by Bandfield and Godfrey during the course of this investigation, my review of emails obtained in this case and documents obtained from PayPal, the fact that the vast majority of the 65 individuals with U.S. addresses who used the PayPal system to pay IPC have not disclosed foreign bank accounts to the IRS, the fact that approximately half of those individuals are associated with penny stock companies, and the fact that a number of individuals communicating with IPC are under investigation and/or have been subject to a conviction or SEC sanction, I believe that IPC's clients are using IPC's services to facilitate securities fraud, money laundering and tax evasion.

i.      The November 6, 2013 Meeting in Belize

27.     On or about November 6, 2013, the undercover agent met with Godfrey and Bandfield at IPC's offices in Belize.[15]   The entire meeting was recorded by the undercover agent with an audio and video recording device.

28.     At the beginning of the meeting, Godfrey opened a manila folder and indicated that he had a file pertaining to the undercover agent's account with IPC.   Godfrey stated that there was no copy of the undercover agent's passport in the file, and requested that the undercover agent submit a copy of his passport to IPC for his file.   Godfrey suggested that the undercover agent email a copy of the passport to him.

---

[15]     Bandfield, who was not present at the start of the meeting, joined the meeting shortly after Godfrey and the undercover agent began discussing the undercover agent's account with IPC.

EDNY-IPC-000026377

29.     Godfrey also requested that the undercover agent provide IPC with a utility bill, a bank reference and a professional reference from an attorney or accountant. During the meeting, Bandfield and Godfrey suggested that the reference letters should indicate that the attorney or accountant knew the account holder, in this case the undercover agent, for a period of two years.   At one point during the meeting, Bandfield provided the undercover agent with a template professional reference letter for the undercover agent to use.

30.     During the meeting, Bandfield discussed the benefits of opening an account with IPC.   Specifically, he indicated that a number of securities firms would not do business with Americans and that banks were closing their operations to Americans because of recent U.S. legislation.   To deal with this situation, Bandfield stated that IPC created a structure whereby it will open an account at a brokerage firm, such as Titan, on behalf of its client but under the name of an IBC.   Bandfield further stated that Godfrey or another nominee would be assigned to the particular IBC.   Bandfield indicated that a Belizean citizen could not sit on a Belize IBC as a nominee because of tax reasons; however, Bandfield stated that Godfrey or another Belizean nominee could own a Nevis LLC that, in turn, could own a Belize IBC.

31.     Bandfield stated that, if anyone asked any questions about who owns the IBC, IPC would indicate that the Belize IBC was owned by a Nevis LLC and that the Nevis LLC was owned by Godfrey or some other nominee.   Bandfield stated, "and that is how we are getting around it."   Based on my experience investigating securities fraud cases, as well as my review of the video of this meeting and other communications in this investigation, it is my belief that this structure, as articulated by Bandfield, is designed to conceal an IPC client's

EDNY-IPC-000026378

control of the IBC, its brokerage accounts and its assets.   Moreover, based on my participation in this investigation, as well as my review of documents and recorded conversations obtained during the investigation, I am not aware of any legitimate business by IPC, and it is my belief that IPC was established for the sole purpose of facilitating securities fraud, money laundering and tax evasion.

32.    In a clear attempt to assure the undercover agent that his assets would be safe, Bandfield indicated that while a nominee may own the LLC, IPC and Bandfield would have control over the nominee.   If the undercover agent would like to have money moved or securities traded, the undercover agent would simply need to contact IPC, and IPC would make sure that money or securities are transferred or moved as directed by the undercover agent.

33.    Bandfield further stated that, in order to demonstrate that the nominee owns the LLC, a certificate would be issued to the nominee reflecting his/her ownership. Bandfield told the undercover agent that he should not worry about the issuance of this certificate, because IPC has the ability to replace nominees without delay.

34.    To make clear that the undercover agent would have control over assets and money, Bandfield told the undercover agent, "we know who ultimately is behind it [the LLC], but legally, [the nominee] owns it."   Additionally, Bandfield informed the undercover agent that Bandfield owned one percent of every one of the LLCs set up by IPC.   As a result, Bandfield would be able to prevent a nominee from making any changes to the structure of the LLC.

EDNY-IPC-000026379

35.     Bandfield told the undercover agent that if he wanted to own everything and demonstrate outward control over the LLCs and IBCs, IPC will not do business with him because that type of structure "will hurt you in the long run."   Bandfield intimated that if a client wanted to own or outwardly control the entities or assets, then the IRS and creditors could make the client give the money back.   The IRS and creditors, however, could not take the money from a nominee, such as Godfrey.[16]

a.     Avoiding the Appearance of Control

36.     During the November 6, 2013 meeting, the undercover agent stated that he was in the stock promotion and investor awareness business and received a significant amount of stock in connection with his activities.   He further stated that he did not want to pay taxes and that he did not want the IRS to know about his activities.   The undercover agent stated that the SEC was also looking at different aspects of his business and, thus, he needed to operate in an insulated environment.

37.     In response, Bandfield explained to the undercover agent that the brokers (i.e., Titan and Legacy) did not receive due diligence as to the identity of IPC's clients such as the undercover agent; rather, the brokers receive only due diligence as to the nominee of the IBC, LLC or trust.

38.     Bandfield also told the undercover agent that if he wanted to trade securities through his accounts at the brokers (i.e., Titan or Legacy), then the LLC or IBC

---

[16]     During the meeting, Bandfield also stated that IPC is able to establish trusts on behalf of its clients.   Bandfield cautioned that the undercover agent should not be associated with the trust as a beneficiary or creator of the trust.   The above-referenced discussion about outward control occurred while Bandfield was discussing the trust structure.

EDNY-IPC-000026380

would enable the undercover agent to have limited trading authority.   To conceal the undercover agent's control over the accounts, Bandfield suggested that the undercover agent arrange for the LLC or IBC to pay the undercover agent a nominal amount as a "fee" for trading services.   Bandfield suggested these nominal payments because "now we got a reason for you [the undercover agent] to have, you know, emailing them [the brokers] or talking to them, or what have you."   Bandfield warned that in a few years the government may be asking the undercover agent why the undercover agent was calling or emailing Titan.   Bandfield then instructed the undercover agent that, in response, he should refer the government to the "agreement" to "assist" the IBC and the "fee" which the undercover agent would report on his tax return.   Bandfield said, "then there is no problem."   Based on Bandfield statements, and my experience investigating securities fraud cases, it is clear that Bandfield was suggesting that the undercover agent, the LLC and the IBC engage in deceptive acts to conceal the undercover agent's ownership and control over the brokerage accounts, which are nominally held by the LLC and IBC.

39.     With respect to trading in the brokerage accounts, Bandfield stated that one of the mistakes that people made was that they traded a lot of stocks in one IBC and had the same person appear as the signatory on all of the trading accounts of that IBC.   To prevent these mistakes, Bandfield suggested that the undercover agent maintain multiple IBCs and trade through accounts associated with the multiple IBCs.   As a result, Bandfield suggested, the undercover agent would be able to use multiple entities with different signatories to trade the securities without creating suspicion with U.S. brokerage firms.

EDNY-IPC-000026381

40.     Bandfield also explained that he created Titan and Legacy and incorporated more than 5,000 companies.   He further stated that he has been setting up IBCs and LLCs for years and has provided these services to many individuals.

b.     Discussion Concerning Stock Ownership Disclosures

41.     Bandfield also suggested ways in which the undercover agent could conceal the beneficial ownership of more than five percent of a public company's stock.[17] Specifically, Bandfield told the undercover agent that if, for example, the undercover agent had six percent of a public company's stock, then he should hold four percent of the company's stock in the name of one entity and transfer the remaining two percent to another entity that maintains a brokerage account at a different brokerage firm.   Bandfield also warned the undercover agent that "we" would run into problems if the undercover agent were to use the same brokerage firm to trade a significant portion of a company's stock (e.g., twenty percent of a company's stock), even if the undercover agent traded the stock through multiple accounts established for the various entities.

42.     Bandfield also suggested that the undercover agent create multiple different IBCs and transfer a portion of a particular company's stock into the different IBCs.

---

[17]     Individuals who own or control more than five percent of a public reporting company's stock are obligated to make disclosures concerning their ownership.   I am aware that the disclosure obligations apply regardless of whether the stock is owned by one or more entities under common control of a beneficial owner (i.e., someone with discretionary control to dispose of or transfer the stock).   Based on my participation of other securities fraud investigations, it is my understanding that stock fraudsters who beneficially own more than five percent of a public reporting company's stock often conceal their ownership through offshore companies and IBCs.   It is my understanding that those stock fraudsters also cause individuals associated with the IBCs or offshore companies to execute false beneficial ownership documents in order to conceal their own beneficial ownership and control of stock.

EDNY-IPC-000026382

Bandfield indicated that such a structure would avoid a situation where one IBC held five or six percent of a company's stock.   He also spoke about the possibility of one LLC owning a number of different IBCs with different nominees, to conceal the ownership and control of more than 5 percent of any one stock.   Bandfield indicated that it was the responsibility of IPC's clients, including the undercover agent, to make sure that no single IBC account was trading more than five percent of a company's stock.

43.     At one point during the meeting, Bandfield stated the undercover agent should not use the word "control" when speaking about his relationship to the IBCs or LLCs. In fact, Bandfield said, the word "'control' is a bad word around here."

c.     Discussion Concerning the Transfer of Assets

44.     Bandfield also talked about the process through which the undercover agent would be able to buy and sell securities and transfer money.   Specifically, Bandfield told the undercover agent that if he wanted to buy or sell a security, he simply would need to direct Bandfield or someone at IPC to buy or sell the security.

45.     If the undercover agent intends to send funds by wire, Bandfield explained, the undercover agent simply would need to contact IPC or Bandfield, indicating that a transfer of funds should occur.   Bandfield cautioned the undercover agent about sending emails to IPC regarding the transfer of funds, saying, "you have to be a little careful on how you email that stuff [wire instructions]."   Once IPC or Bandfield received the request, IPC would contact Titan and make the request to transfer funds from the entity's Titan account.   Bandfield again cautioned the undercover agent, stating that "Titan doesn't want you, who [is] doing the trading, to play with monies – if you are playing with the monies, it

EDNY-IPC-000026383

shows control." Bandfield further stated that even though the undercover agent might have limited trading authority over an account, only IPC would give the orders to transfer the funds.[18]

      46.    Bandfield indicated that the undercover agent should be concerned about any connection between the undercover agent and the funds that he wired into one of the accounts. Instead of using wire transfers, Bandfield suggested that the undercover agent transfer stock directly into his account. That way, the undercover agent would be able to cause the issuance of stock for services and then deposit the stock in a Belize account. Bandfield indicated that the undercover agent would then be able to sell the stock and receive the sale proceeds. As a result, Bandfield suggested, the undercover agent effectively would be able to move money out of the United States without there being any "trail" to the undercover agent. Bandfield suggested that if the undercover agent needed to execute agreements in connection with the issuance of the stock, the undercover agent should send the agreement to IPC so that the nominee associated with the IBC could execute the document. Bandfield also suggested that the nominee would sign any Form W-8BEN in connection with any accounts. It is my understanding that Form W-8BEN refers to an IRS form used to disclose beneficial ownership of bank and brokerage accounts by foreign beneficial owners for the purpose of U.S. tax withholding. The form's certification includes a statement that the beneficial owner of the account is not a U.S. citizen. In context, it is my belief that Bandfield

---

[18]    As an alternative, Bandfield stated that if the undercover agent were to open an offshore brokerage firm, the undercover agent could move as much money as the undercover wanted into and out of the brokerage firm's accounts and "nobody would question it."

EDNY-IPC-000026384

was explaining to the undercover agent that nominees for the IPC account (i.e., individuals who are also employees of IPC) would be willing to execute false Form W-8BENs indicating that U.S. citizens were not beneficial owners of bank and brokerage accounts.

47.     Bandfield also cautioned the undercover agent about sending wire transfers to particular parties.   Specifically, Bandfield stated that Titan and Legacy would not send money transfers to stock promoters because "it looks pretty bad."   Rather, Titan and Legacy would wire funds to attorneys who have trust accounts and those attorneys would then forward the wires to the stock promoters.   In my experience investigating securities fraud cases, individuals intent on manipulating the price of a particular public company rely on, and compensate, stock promoters who engage in activities to artificially inflate a company's stock price.

        d.      <u>Discussions Concerning the Creation of a Trust</u>

48.     Bandfield spoke at length about the possibility of IPC establishing an "irrevocable" trust on behalf of the undercover agent.   Bandfield explained that the undercover agent could use the trust to hold securities and transfer funds.   Bandfield explained to the undercover agent that he should not be the settlor or beneficiary of the trust, because then his relationship would need to be reported to the IRS.   Instead, Bandfield suggested that the undercover agent provide IPC with a "letter of wishes," which the undercover could change at any time.   Bandfield stated that any distribution of the trust would occur only after the undercover agent's estate had settled, and the distribution would be in accordance with undercover agent's wishes as set forth in the "letter of wishes."

EDNY-IPC-000026385

49.     Bandfield also explained that the trust structure would allow the undercover agent to receive funds as a "loan" from the trust.   By way of example, Bandfield explained that the undercover agent would be able to withdraw $1 million from the trust as a "mortgage" on a condo owned by the undercover agent.   Bandfield explained that this withdrawal of money as a "loan" would enable the undercover agent to receive cash without paying taxes and that the undercover agent could then spend that money on whatever he wanted. For smaller transfers, Bandfield advised that the undercover agent could soon withdraw funds with debit cards that would not leave a "foot print."

     e.    <u>Discussion Concerning the Internet and the Undercover Agent's History</u>

50.     Bandfield stated that IPC needed updated phone and email contact information for its clients.   He cautioned that the Internet was not always "safe."   As a result, Godfrey stated that he or someone from IPC might email a client, stating, "please call me," because Godfrey wanted to discuss something with the client that he did not "want to put on the net [in an email]."[19]

---

[19]     Although Bandfield and Godfrey were cautious about using email to communicate about details of client transactions, it is clear that clients communicated with IPC by email about details of their accounts.   In fact, emails obtained pursuant to search warrants in this investigation demonstrate that Bandfield, Godfrey and other employees of IPC routinely communicated with IPC clients about transaction details, including wire transfers, beneficial ownership forms and stock purchase agreements.   Those emails are evidence of the IPC clients' control over the accounts.   Even email communications that simply contained an innocuous phrase (e.g., "call me") might be evidence of an individual's control over an IPC account because, based on Godfrey's statement above, it would likely indicate that the individual who sent the email wanted to provide instructions to IPC about a particular account. Emails demonstrating such control and beneficial ownership would be evidence of securities fraud, money laundering and tax evasion.

EDNY-IPC-000026386

51.     Bandfield also asked the undercover agent if he had any SEC violations or if he had any other issues in the past.   Godfrey asked whether the undercover agent had committed any murders.   Bandfield stated that, regardless of the response, it would not be an issue, but that "we would have to do some alterations."

ii.     Conversation with Rohn Knowles

52.     The same day, after meeting with Godfrey and Bandfield, the undercover agent met with Rohn Knowles, a securities trader with Titan, in Titan's offices. Titan's offices are located on the same floor and adjacent to IPC's offices.   The undercover agent advised Knowles that he was in the stock promotion business and had already opened one account each at Titan and Legacy.

53.     Knowles told the undercover agent that he regularly worked with "Brian" at Legacy and that clients often split stock between the two brokerage firms.   He indicated that "we" (Titan and Legacy) might hold twenty or thirty percent of a company's stock within the brokerage firm, but assured the undercover agent that the stock would be maintained "in separate accounts, of course."   Based on my experience and other conversations and documents obtained in this investigation, I believe that "Brian" is a reference to Brian de Wit.

54.     Knowles told the undercover agent that he would take orders to buy or sell securities from the undercover agent after the undercover agent returned to the United States.   Knowles, however, stated that he preferred to receive such orders by phone rather than online, because it was quicker and also because the undercover could let Knowles know whether he wanted Knowles to "work" a big trade "in a certain way."

24

55.   Knowles indicated that he could execute matched trades between two accounts controlled by the undercover agent at prices determined by the undercover agent. To ensure that the trade would "print" (i.e., be visible to the public and other investors), Knowles suggested that the undercover use Knowles and Brian (de Wit) to execute such trades.   Based on my experience investigating this case and other securities fraud cases, I believe that Knowles was referring to, and agreeing to engage in, the simultaneous sale and purchase of a security by an individual, or group of individuals, designed to show market activity.   Such trades, which are known as matched trades, are most common in manipulation schemes, and do not reflect a bona fide sale of a security but, rather the false appearance of actual, bona fide market activity.

56.   Knowles indicated that if he tried to execute such a trade between two Titan accounts, rather than between a Titan account and a Legacy account, Titan's clearing firm would ask: "What's going on here?"   Knowles recommended that the undercover use "me and Brian" for such trades and stated, "me and Brian do it all the time for other clients." Knowles then told the undercover agent what instructions to give Knowles and Brian (de Wit) to ensure the execution of such matched trades.

57.   The undercover agent also indicated that he wanted to control the trading in particular stocks, that he wanted to move the price of particular stocks to certain levels, and asked Knowles whether he was comfortable with such activity.   Knowles acknowledged that he was comfortable with such trading activity, repeatedly stating that is was "not a problem." Knowles also reassured the undercover agent that he frequently coordinated trades with Brian (de Wit) and that they communicated by Skype or by Blackberry PIN, "which is a little bit

EDNY-IPC-000026388

more secure."   Knowles stated that, if the undercover agent wanted to execute coordinated

trades in a particular stock, the undercover agent could simply call or "message" Knowles,

advising Knowles to "coordinate with Brian."   Knowles assured the undercover agent that he

would then communicate with Brian (de Wit) as needed to coordinate trading of the stock as

requested by the undercover agent.   Based on my experience investigating securities fraud

cases, the terminology used by Knowles when describing his communications with "Brian"

are typical communications between individuals intent on manipulating trading in a particular

public security.

      58.   Knowles also acknowledged that the undercover agent was the person

behind the IBC that had been set up by IPC.   This acknowledgement demonstrates that

Knowles knows that the IPC clients are the true control persons behind the IBCs and LLCs

used by IPC.   Knowles also stated that Titan would not have opened the account directly for

the undercover agent because the undercover agent was an American; the account, he

explained, could only be set up because the undercover agent used the "structure" provided by

Bandfield and IPC.   As a result, he advised, a regulator looking at Titan's book would not be

able to see that IPC's clients, in fact, controlled the accounts.

      59.   Knowles advised the undercover agent to contact IPC if he intended to

transfer money out of the Titan brokerage account.   All money transfers had to be signed off

on by the nominee working for IPC.   Knowles cautioned that "we can't have an American

signing off on a money movement, because, obviously, that would mean it's an American

person's cash."   He also indicated that Titan could not send money directly to issuers or stock

promoters, because such a transfer would raise a red flag with Titan's bank.

EDNY-IPC-000026389

iii.   The March 4, 2014 Meeting in Belize

60.   On or about March 4, 2014, the undercover agent met with Bandfield and Godfrey again at IPC's offices in Belize.   This meeting was also recorded by the undercover agent with an audio and video recording device.   During that meeting, Bandfield explained, among other things, the corporate structure that IPC had established for the undercover agent, including six IBCs that were each owned by one of two LLCs established for the undercover agent.   Bandfield further explained to the undercover agent who the nominee was for each IBC, and that the nominees would sign any stock purchase agreements on behalf of the IBCs for the undercover agent.   Bandfield also explained that IPC had established brokerage accounts at various brokerage firms for the undercover agent for each of his IBCs, including accounts at such broker-dealers as Titan and Legacy.

61.   As the undercover agent and Bandfield had discussed during a phone call on December 11, 2013,[20] Bandfield also requested that the undercover agent pay IPC $9,600 in cash, which the undercover agent did at the meeting, for its services.   During the meeting, Bandfield further explained that he intended to refund the undercover agent the money that he paid to IPC through PayPal so that he can undo that paper trail between Bandfield and the undercover agent.   He also cautioned the undercover agent that he should

---

[20]   On December 11, 2013, the undercover agent placed a call to Bandfield, which was recorded.   In the course of that phone call, Bandfield noted that the undercover agent had paid IPC $3,300 via PayPal for the establishment of his initial IBC and LLC.   Bandfield stated that he wanted to "send back" that payment so that the undercover agent and Bandfield "have no direct connection at all."   Bandfield suggested that the undercover agent travel to Belize to pay IPC in cash for the corporate structure it was creating for him.   In summarizing the plan to "refund" the PayPal payment to IPC and instead pay IPC for its services in cash in Belize, the undercover agent stated: "it would extinguish our relationship - in one manner, and continue [it] in another."

27

EDNY-IPC-000026390

not call IPC from his office phone.   Bandfield further explained to the undercover agent that

he could transfer money from the brokerage accounts of the undercover agent's IBCs through

"loans" made by the IBCs to the undercover agent, or through the use of prepaid debit cards,

which Bandfield stated that he hoped to be able to offer IPC's clients soon.

iv.   Subsequent Communications with IPC

62.   Following this visit, the undercover agent had additional contact with

IPC employees, including Bandfield and Godfrey, through phone calls and email

communications.   For example, on or about April 25, 2014 and April 29, 2014, the

undercover agent, as instructed by Bandfield, sent emails to Bandfield at

bob@ipcoffshore.com requesting a "refund" of $3,300 – the amount of money paid by the

undercover agent via PayPal and then again in cash at the March 4, 2014 meeting.   In

response, on June 5, 2014, Bandfield, using the bob@ipcoffshore.com email address, stated to

the undercover agent that he understood that the undercover agent had "no need" for IPC's

services and that IPC was refunding him his deposit of $3,300.   Bandfield concluded the

email by stating: "We wish you the best in your future endeavors and are sorry we could not

assist you."

63.   On or about July 31, 2014, the undercover agent placed a phone call to

Bandfield, which was recorded.   During that call, the undercover agent and Bandfield

discussed meeting in the next few months to discuss the undercover agent's plans for the IBCs

and LLCs established for him by IPC.   During that call, Bandfield stated, in sum and

substance, that he was very busy, and that he was scheduled to meet with IPC clients

EDNY-IPC-000026391

throughout August.   Bandfield and the undercover agent discussed meeting when Bandfield

traveled to the United States, which Bandfield stated would likely occur in mid-September.

    C.    <u>The Email Search Warrants</u>

    64.    Law enforcement agents have obtained warrants to search a total of

twenty-three email accounts used by Bandfield and his employees, including Bergey.   The

first set of email search warrants were issued on August 26, 2013, <u>see</u> 13-M-743 (VMS)

(E.D.N.Y.), the second set of email search warrants were issued on February 3, 2014, <u>see</u>

14-M-104 (RLM) (E.D.N.Y.), and the third set of email search warrants were issued on August 6,

2014, 14-M-727 (RER) (E.D.N.Y.).   The documents produced by email service providers in

response to these search warrants (collectively the "Search Warrants Productions") demonstrate

that Bandfield and his employees, including Bergey, used their computers to communicate with

coconspirators and to carry out the securities fraud, tax evasion, and money laundering schemes

described above.

    65.    The Search Warrants Productions contained multiple emails that refer to

email accounts used by Bandfield.[21]   For example, on May 19, 2013, an individual identified

as "Frank Grey" sent an email to the Godfrey IPC email address and bob@ipc-offshore.com

asking that Godfrey and Bandfield "please print this out, execute, scan and send back to me as

a PDF for Platinum Tribe."   Attached to the email is a stock purchase agreement between

Locksmith Financial Corporation, a company based in Vancouver, Canada and Platinum

Tribe, a company based in Belize.   The address referenced for Platinum Tribe in the stock

---

[21]    Based on my review of email communications in this case and documents obtained
from email service providers, it is clear that the bob@ipcoffshore.com and
bob@ipc-offshore.com accounts are associated with and used by Bandfield.

EDNY-IPC-000026392

purchase agreement is the IPC address in Belize - the same address used by Godfrey and others associated with IPC in connection with other Belize-based entities.   In another email, Bandfield sent an email to the Godfrey IPC email address from the bob@ipc-offshore.com account, in which Bandfield directed Godfrey to execute a stock transfer letter on behalf of an individual who appears to be an IPC client.   The email from Bandfield contained within it an email, also dated May 1, 2013, sent from someone believed to be an IPC client to bob@ipc-offshore.com and lellia@ipc-offshore.com.[22]

66.     Other emails contained in the Search Warrants Production referenced what appear to be administrative email accounts associated with IPC that were used by Bergey, Bandfield, or others.  For example, an email dated December 21, 2009, sent from Bergey at her opulence10@yahoo.com email account to a customer service officer at British Caribbean Bank International Limited, listed nearly two dozen companies and associated bank accounts.   Bergey signed the email "Glenna Bergey per Bob Bandfield IPC."   Another email, dated April 24, 2013, sent from "Salim Rana" to accounts@ipcoffshore.com, securities@ipc-offshore.com, bob@ipc-offshore.com and the Godfrey IPC email address referenced instructions from "Salim Rana" concerning beneficial ownership and payments to PayPal.  The email from "Salim Rana" contained within it an email, dated April 19, 2013, from the accounts@ipcoffshore.com address, in which there appeared a signature block for Glenna Fay Bergey, listed as the "IPC Accounts Administrator."

---

[22]     Based on my review of documents obtained during this investigation, including emails, I believe that the lellia@ipc-offshore.com account is used by IPC employee Lellia Senticum.

EDNY-IPC-000026393

67.     Other emails similarly referenced the transfers@ipcoffshore.com account.   For example, on May 14, 2013, an email from bob@ipc-offshore.com to "Hyland Capital" and the Godfrey IPC email address directed "Tim" not to send wire transfer requests to Rohn Knowles at Titan.   Instead, it directed that all wire transfers should be sent to transfers@ipcoffshore.com, "which then goes to both Andrew and myself."

68.     Emails obtained from the Search Warrants Productions also refer to the fact that employees of IPC act as nominees for IPC clients.   For example, an email from "Justin Mabanta," dated February 20, 2013, to bob@ipc-offshore.com, andrew@ipc-offshore.com and the Godfrey IPC address states that "Patrick Gentle" should be the only person listed on the "new Corporate Resolution" because he is the authorized signatory for a brokerage account that was to be opened under the name of "Park Financial Ltd."   In a subsequent email from Bandfield, using the bob@ipc-offshore.com address, to "Justin Mabanta," Bandfield instructed "Justin" to reach out to the "beneficial owner" to see if the owner wants to open the brokerage account.   Based on information and emails obtained during this investigation, I believe that "Patrick Gentle" is an IPC accounts administrator and works in accounting at IPC, and that he is the person associated with patrick@ipcoffshore.com.   I also believe that, based on the context of the emails with "Justin Mabanta," Patrick Gentle was acting as a nominee for another individual in connection with the Park Financial Ltd. entity.

69.     On June 24, 2013, Bandfield, using the transfers@ipcoffshore.com email address, responded to a request made by "Ed Kotler" at deltaworldwideltd@gmail.com for the name of the person with "signing power" for "Delta Worldwide" for an upcoming share

EDNY-IPC-000026394

purchase agreement.   In that email, Bandfield responded "Aaliyah Whittaker – President" to Kotler.   This email demonstrates IPC's continued use of its employees, including Whittaker, as false nominees of companies that are actually controlled by other individuals.   In the email chain with Kotler, it appears that Kotler actually controls Delta Worldwide Ltd., and that Whittaker, who is listed as the president of the company, has no actual power or control over that entity.

70.   On November 5, 2013, "Jason Sunstein," who appears to be a client of IPC, forwarded an email to the transfers@ipcoffshore.com email address from a transfer agent who requested that a W-8BEN form be completed for Titan Mercantile Ltd., the intended shareholder of the stock at issue, because the entity was foreign.   In response, Bandfield, using the transfers@ipcoffshore.com email address, stated "As Attached," and attached a completed W-8BEN form for Titan Mercantile Ltd., which appears to be signed by Andrew Godfrey, acting as the president of the entity.

71.   The emails obtained pursuant to the Search Warrants Productions also provide information that assists law enforcement agents in identifying IPC's clients.   For example, on July 26, 2013, Glenna Fay Bergey, using the glenna@ipcoffshore.com email address, emailed "Ken Berscht" regarding his attempt to pay IPC $1,035 for its services.

72.   Many of the emails obtained pursuant to the Search Warrants Productions reflect IPC employees' efforts to keep track of the creation of IBCs for IPC's clients, and the nominees assigned to each IBC controlled by IPC's clients.   Other emails reflect IPC employees' efforts to track the collection of fees owed by IPC's clients and the transfers of money between client accounts.

EDNY-IPC-000026395

D.      Bandfield's Arrest and the Seizure of the Subject Devices

73.     On September 5, 2014, a grand jury sitting in the Eastern District of New York returned a three-count Indictment charging Bandfield, Godfrey, Knowles, Leach, De Wit, IPC, Legacy, Titan, and others with conspiracy to commit securities fraud, conspiracy to commit tax fraud, and money laundering conspiracy.   See United States v. Bandfield, 14-CR-476 (ILG) (E.D.N.Y.).   The same day, a warrant was issued for Bandfield's arrest.

74.     On September 9, 2014, Bandfield was stopped by United States Customs and Border Protection ("CBP") officers as he attempted to board an international flight from Miami International Airport in Miami, Florida to Belize City, Belize.

75.     While Bandfield was being detained by CBP officers, Bergey, who had planned to travel with Bandfield on the same flight and was in line to board the plane behind him, was approached by Homeland Security Investigations ("HSI") and FBI agents.   The HSI and FBI agents explained to Bergey that Bandfield was being placed under arrest.   The agents offered Bergey the option to board the flight and continue her travel to Belize as planned, or to delay her travel and board a later flight to Belize so that she could answer questions at a secondary inspection area.

76.     Bergey chose to accompany the HSI and FBI agents to the secondary inspection area where she agreed to be interviewed and made voluntary statements to law enforcement.

77.     At the secondary inspection area, HSI agents searched the luggage that Bandfield and Bergey checked on to the flight and were carrying with them on to the plane when Bandfield was placed under arrest.

33

EDNY-IPC-000026396

78.     In Bandfield's carry-on luggage, HSI agents found the MacBook Pro and the USB Flash Drive.[23]   In Bergey's carry-on luggage, HSI agents found the MacBook Air.   The two laptop computers and the USB Flash Drive were seized by HSI and later transferred to the custody of the FBI.

E.     Glenna Bergey's Statements to Law Enforcement

79.     As described above, Bergey agreed to be interviewed by law enforcement agents following Bandfield's arrest on September 9, 2014.   Bergey agreed to be interviewed by law enforcement agents again on September 10, 2014.   Bergey also communicated with law enforcement agents through multiple emails and phone calls in or about mid- to late October 2014.

80.     During these interviews and communications with law enforcement, Bergey stated, in sum and substance and in part, that Bergey and Bandfield had been a couple for approximately 11 years.[24]   She stated that she used the MacBook Air, and that Bandfield used the MacBook Pro that were seized by law enforcement agents at the time of Bandfield's arrest.   Bergey admitted that she handled accounting, billing, and bookkeeping for IPC, and she stated that she used the MacBook Air to check her work email while traveling.   She further stated that the email accounts she accessed from her MacBook Air were glenna@ipcoffshore.com, accounts@ipcoffshore.com, and opulence10@yahoo.com.   Bergey also explained that she created and used a spreadsheet on the MacBook Air to keep

---

[23]     A USB flash drive, also known as a thumb drive, is a small removable electronic data storage device that uses flash memory to store electronic data and can be connected to a computer using a Universal Serial Bus ("USB") connection.

[24]     Bergey confirmed that Bandfield and Bergey had not married.

EDNY-IPC-000026397

track of money flowing in and out of IPC's bank account.   She further explained that when she was not in IPC's offices, she would use the MacBook Air to access IPC's security cameras.

81.   When Bergey was interviewed on September 10, 2014, Bergey told law enforcement that she knew that Bandfield used the MacBook Pro to check his IPC emails and to access the security cameras at IPC's offices while he was traveling.   In a telephone conversation with law enforcement authorities approximately six weeks later, Bergey stated that she knew Bandfield used the MacBook Pro to check emails, but denied knowing whether Bandfield used the MacBook Pro to check his work emails, and stated that she did not want to speak for Bandfield.

F.   Summary

82.   As set forth above, there is probable cause to search the SUBJECT DEVICES.   The facts set forth above establish probable cause to believe that the entire IPC business was established for the purpose of facilitating securities fraud, money laundering and tax evasion, and that the business was ongoing at the time the SUBJECT DEVICES were seized from Bandfield and Bergey.

83.   Emails from Bandfield and Bergey to IPC employees, some of which may be stored on the SUBJECT DEVICES, are evidence of Bandfield's control of IPC's business and Bergey's involvement in IPC.   Similarly, Bergey's monitoring of IPC's employees using security cameras that she accessed from her MacBook Air and Bandfield's monitoring of IPC's security cameras through his MacBook Pro further evidence Bandfield's and Bergey's involvement in IPC.   Additionally, Bergey's maintenance of a spreadsheet in

EDNY-IPC-000026398

which she tracked IPC's financial transactions is direct evidence of securities fraud, money laundering, and tax evasion.

84.   Other electronically stored information on the SUBJECT DEVICES may also provide evidence of the schemes described above.   The complexity of these schemes, including the large number of entities, nominees, and accounts involved, required IPC's employees, including Bandfield and Bergey, to create and store documents to identify IPC's clients, their assigned IBCs, and the nominees who concealed IPC's clients' control over accounts created in the names of the IBCs.   Based upon the information I have obtained in the course of this investigation, I believe that IPC employees, including Bandfield and Bergey, used computers to organize and track information on IPC's clients, their assigned IBCs, the nominees for those IBCs, the movement of cash between IPC and client accounts, and to ensure that IPC and IPC's employees were paid for their role in this elaborate scheme.   There is probable cause to believe that Bandfield and Bergey used the SUBJECT DEVICES for these purposes.

85.   In addition, based on actual inspection of other evidence related to this investigation, including emails, spreadsheets, financial records, invoices, and other documents, I am aware that computer equipment was used to generate, store, and print documents used in the securities fraud, tax evasion, and money laundering schemes described above.

86.   Accordingly, there is probable cause to believe that the SUBJECT DEVICES have been used to, and contain evidence and fruits of violations of, the commission of securities fraud, money laundering and tax evasion.

EDNY-IPC-000026399

II.   INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

87.     As described above, the SUBJECT DEVICES to be searched are an Apple MacBook Air laptop computer with serial number C02FKOJ1DDR1, an Apple MacBook Pro laptop computer with serial number C02HT2V2F24T, and an orange and white Lexar JumpDrive TwistTurn 32 Gigabyte Universal Serial Bus Flash Memory Drive bearing the number "LJDTT32G-000-114BB."

88.     The SUBJECT DEVICES are currently in the custody of the FBI within the Eastern District of New York.   In my training and experience, I know that the SUBJECT DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICES first came into the possession of HSI.

89.     The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

III.   TECHNICAL BACKGROUND

A.   Technical Terms

90.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from

EDNY-IPC-000026400

and directed to that computer may be directed properly from its source to its destination.   Most

Internet service providers control a range of IP addresses.   Some computers have static—that is,

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP

addresses.

> b.   <u>Internet</u>: The Internet is a global network of computers and other

electronic devices that communicate with each other.   Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders, even when

the devices communicating with each other are in the same state.

> c.   <u>Storage medium</u>: A storage medium is any physical object upon

which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash

memory, CD-ROMs, and other magnetic or optical media.

B.   <u>Electronic Storage and Forensic Analysis</u>

> 91.   Based on my knowledge, training, and experience, I know that electronic

devices can store information for long periods of time.   Similarly, things that have been viewed

via the Internet are typically stored for some period of time on the device.   This information can

sometimes be recovered with forensics tools.

> 92.   There is probable cause to believe that things that were once stored on the

SUBJECT DEVICES may still be stored there, for at least the following reasons:

> a.   Based on my knowledge, training, and experience, I know that

computer files or remnants of such files can be recovered months or even years after they have

been downloaded onto a storage medium, deleted, or viewed via the Internet.   Electronic files

downloaded to a storage medium can be stored for years at little or no cost.   Even when files have

been deleted, they can be recovered months or years later using forensic tools.   This is so because

38

EDNY-IPC-000026401

when a person "deletes" a file on a computer, the data contained in the file does not actually

disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in

free space or slack space—that is, in space on the storage medium that is not currently being used

by an active file—for long periods of time before they are overwritten.   In addition, a computer's

operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage

media—in particular, computers' internal hard drives—contain electronic evidence of how a

computer has been used, what it has been used for, and who has used it.   To give a few examples,

this forensic evidence can take the form of operating system configurations, artifacts from

operating system or application operation, file system data structures, and virtual memory "swap"

or paging files.   Computer users typically do not erase or delete this evidence, because special

software is typically required for that task.   However, it is technically possible to delete this

information.

d.      Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

93.     As further described in Attachment B, this application seeks permission to

locate not only electronically stored information that might serve as direct evidence of the crimes

described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES

were used, the purpose of their use, who used them, and when.   There is probable cause to believe

that this forensic electronic evidence might be on the SUBJECT DEVICES because:

a.      Data on the storage medium can provide evidence of a file that was

once on the storage medium but has since been deleted or edited, or of a deleted portion of a file

EDNY-IPC-000026402

(such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b. Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

EDNY-IPC-000026403

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      I know that when an individual uses an electronic device to communicate with coconspirators using email or to issue electronic instructions to transfer money to or from an account, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

94.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

95.     Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

IV.    CONCLUSION AND REQUEST FOR SEALING

96.     I submit that this affidavit supports probable cause for a search warrant

EDNY-IPC-000026404

authorizing the examination of the SUBJECT DEVICES described in Attachment A to seek the items described in Attachment B.

97.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrants.   I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into a criminal organization, and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals often learn about criminal affidavits and search warrants through the posting of such documents on the Internet, and disseminate them to other criminals as they deem appropriate.   This case involves dozens of subjects in the United States and multiple subjects located in Belize and other foreign jurisdictions.

98.     Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the undercover agent's safety and the investigation, including by giving targets and subjects an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

EDNY-IPC-000026405

WHEREFORE, your deponent respectfully requests that the requested search

warrant be issued for the SUBJECT DEVICES,

IT IS FURTHER REQUESTED that all papers submitted in support of this

application, including the application and search warrant, be sealed until further order of the

Court.

Special Agent
Federal Bureau of Investigation

Sworn to before me this
15th day of May, 2015

THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

43

## ATTACHMENT A

### Property to Be Searched

The electronic devices to be searched are an Apple MacBook Air laptop computer with serial number C02FKOJ1DDR1, an Apple MacBook Pro laptop computer with serial number C02HT2V2F24T, and an orange and white Lexar JumpDrive TwistTurn 32 Gigabyte Universal Serial Bus Flash Memory Drive bearing the number "LJDTT32G-000-114BB" (collectively, the "SUBJECT DEVICES") which are currently in the custody of the Federal Bureau of Investigation within the Eastern District of New York.

This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

EDNY-IPC-000026407

**ATTACHMENT B**

Particular Things to be Seized

All records and information on the SUBJECT DEVICES described in Attachment A that constitute fruits, contraband, evidence and instrumentalities of violations of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Sections 371, and 1956 and Title 26, United States Code, Section 7201, those violations involving Robert Bandfield, Andrew Godfrey, IPC Corporate Services, Inc., IPC Corporate Services, LLC, and IPC Management Services, Inc., Rohn Knowles, Kelvin Leach, Brian de Wit, Titan International Securities, Inc. and Legacy Global Markets, S.A., and others, and occurring after January 1, 1999, including information pertaining to the following matters:

1. Securities fraud, money laundering, and tax evasion and conspiracy to commit those crimes;

2. IPC, IPC Corporate Services, Inc., IPC Corporate Services, LLC, and IPC Management Services, Inc.;

3. Titan International Securities, Inc. and Legacy Global Markets, S.A.;

4. An international business corporation or IBC;

5. A limited liability company;

6. PayPal;

7. The setting up of offshore brokerage and bank accounts;

8. The issuance, purchase, sale, deposit or transfer of securities;

9. The deposit, transfer, debit, credit or withdrawal of money;

10. Evidence of user attribution showing who used or owned the SUBJECT DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; Records of Internet Protocol addresses used; and

11. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any visual, photographic, or aural form.