**Exhibit N: Exhibit C, Financial Intelligence Unit Order**

# Exhibit C

IN THE SUPREME COURT OF BELIZE, A.D. 2014

CLAIM NO. 531 OF 2014

BETWEEN:

FINANCIAL INTELLIGENCE UNIT         **APPLICANT**

AND

| | |
|---|---|
| ROBERT BANFIELD | 1ST RESPONDENT |
| ANDREW GODFREY | 2ND RESPONDENT |
| KELVIN LEACH | 3RD RESPONDENT |
| ROHN KNOWLES | 4TH RESPONDENT |
| CEM CAN AKA 'JIM CAN' | 5TH RESPONDENT |
| BRIAN DE WIT | 6TH RESPONDENT |
| IPC MANAGEMENT SERVICES, INC | 7TH RESPONDENT |
| IPC CORPORATE SERVICES, INC | 8TH RESPONDENT |
| IPC CORPORATE SERVICES, LLC | 9TH RESPONDENT |
| TITAN INTERNATIONAL SECURITIES, INC | 10TH RESPONDENT |
| LEGACY GLOBAL MARKETS, S.A. | 11TH RESPONDENT |
| UNICORN INTERNATIONAL SECURITIES, LLC | 12TH RESPONDENT |

In Chambers.

BEFORE:    Hon. Chief Justice Kenneth Benjamin.

October 30 & 31, November 7, 2014.

Appearances:    Mr. Fred Lumor, SC, Ms. Sheena Pitts and Ms. Leni Ysaguirre with him, for the Applicant, the Financial Intelligence Unit.
Mrs. Marilyn Williams for the 1st, 2nd, 7th, 8th and 9th Respondents.
Mr. Eamon Courtenay, SC, Ms. Priscilla Banner and Ms. Iliana Swift with him, for the 3rd and 10th Respondents.
Mr. Godfrey Smith, SC, Ms. Leslie Mendez and Mrs. Ashanti Martin with him, for the 4th Respondent.
Mr. Michael Young, SC, Mrs. Deshawn Arzu-Torres with him, for the 5th and 12th Respondents.
Mr. Rodwell Williams, SC, Mr. Nigel Ebanks with him, for the 6th and 11th Respondents.

———

## JUDGMENT

## THE FREEZING ORDER

[1]     On September 23, 2014, the Applicant, the Financial Intelligence Unit ("the FIU") made an urgent application on an *ex parte* basis for a freezing order against the Respondents in respect of certain listed accounts and all funds held in their names or on their behalf in any financial institution in Belize.  The application also prayed for an order directing the Respondents to provide an accounting of all funds received by them and an account as to the whereabouts of the funds not held in the accounts listed in the application.  On September 24, 2014, this Court heard the application and made the following order:

> "That a Freezing Order is granted restraining the Respondents from dealing with any assets located within the jurisdiction whether by their servants or agents, or howsoever otherwise from dealing with, disposing of, withdrawing or removing from the jurisdiction all funds standing in their names, or on their behalf, in any financial institution or wheresoever located in Belize, including, but not limited to the accounts set out in the Schedule below until the 22nd day of October, 2014 or further order of this Honourable Court."

Additionally, orders were made providing for service of the Order and the documents in the proceedings on the Respondents, for the Respondents to apply for the discharge or variation of the order upon 48 hours' notice to the Applicant and for the further hearing of the matter.

## THE APPLICATIONS BEFORE THE COURT

[2]     Presently before the Court is an application by the FIU for the said freezing order made on September 24, 2014 to be extended "until charges are brought and/or further order of this Honourable Court". Additional Orders were sought for the Respondents to disclose their assets both within and outside of Belize and the confirmation of such information by affidavit.

[3]     The first application by the FIU was entitled "Application for extension of Freezing Order" and was stated to be made pursuant to sections 11(1)(d), 11(2), 39 and 40 of the Money Laundering and Terrorism (Prevention) Act 2008 ("MLTPA"). It was supported by the first and second affidavits of Eric Eusey, the Director of the FIU. The subsequent application by the FIU for the extension of the freezing order was supported by the fourth affidavit of Eric Eusey. The said application was headed "Application for Extension of Restraint Order", and it was stated that it was being made pursuant to sections 11(1)(d), 11(2), 39, 40 and 48 of the MLTPA, sections 18 and 28 of the Supreme Court of Judicature Act and the inherent jurisdiction of the Court. For completeness, it ought to be put on record that there was filed by the FIU a fifth affidavit by Eric Eusey that specifically addressed the question of service upon the 6th Respondent, Brain de Wit. The significance of the sequence of filing of the affidavit of Eric Eusey will be addressed later against the objection of the Respondents to the use of the fourth and fifth affidavits "to rectify deficiencies and fill omissions in the first and second affidavits filed by the Claimant in support of the Application" dated September 23, 2014.

[4]     The Respondents have all applied by Notice of Application for the discharge of the said freezing order of September 24, 2014 as follows:

(i)     On October 20, 2014, the 3rd, 4th and 10th Respondents applied by Amended Notice of Application pursuant to Rule 17.4(8) of the Supreme Court (Civil Procedures) Rules 2005 ("CPR") for the

3

discharge of the restraining order. This application was not supported by an affidavit;

(ii)    On October 24, 2014, the 5th and 12th Respondents applied by Amended Notice of Application for the discharge of the freezing order. In support of the application the 5th and 12th Respondents relied upon the first and second affidavits of Lelani Rivero, the Operations Manager of the 12th Respondent, Unicorn International Securities, LLC. Also filed was an affidavit sworn by Christopher Bruno, the Attorney-at-Law representing the 5th and 12th Respondents in the United States of America; this affidavit solely addressed the issue of acceptance of service on behalf of the 5th Respondent;

(iii)    On October 24, 2012, the 1st, 2nd, 7th, 8th and 9th Respondents filed an Amended Notice of Application pursuant to Rule 17.4(8) of the CPR and section 40(2) of the MLTPA for the discharge of the freezing order. This application was not accompanied by a supporting affidavit; and

(iv)    On October 27, 2014, by an Amended Notice of Application made pursuant to section 47(4) and (5) of the MLTPA and the inherent jurisdiction of the Court, the 6th and 11th Respondents sought orders that the freezing order "be wholly discharged and cease to have effect forthwith". The application was supported by the affidavit of the 6th Respondent, Brian de Wit.

It is to be noted that there was filed by the FIU an affidavit sworn to by Sheena Pitts, Attorney-at-Law, Legal Officer and Junior Counsel appearing for the FIU addressing issues of service relating to the service of the proceedings as well as in direct response to the assertions in the affidavit of Christopher Bruno on behalf of the 5th and 12th Respondents to which I have earlier alluded.

4

## THE PARTIES

[5]   The FIU is a statutory entity established by section 3 of the Financial Intelligence Unit Act, No. 35 of 2002 ("FIU Act"). Its powers and responsibilities are set out in section 7 of the FIU Act and section 11 of the MLTPA. By section 7(1)(a) of the FIU Act its responsibilities include inter alia, the investigation and prosecuting of financial crimes. Among the responsibilities and powers set out in section 11(1) of the MLTPA, there exists the discretionary power in section 11(1)(d) to "instruct any reporting entity to take such steps as may be appropriate, including the freezing of funds and other financial assets or economic resources of any person or entity, to facilitate any investigation, prosecution or proceeding for a money laundering offence or for terrorist financing, whether in Belize or elsewhere".

[6]   The brief biographical information gleaned from the first affidavit of Eric Eusey revealed the following: The 1st Respondent, Robert Banfield, is a citizen of the United States of America and resides in Belize City; the 2nd Respondent, Andrew Godfrey, is a citizen of Belize and resides in Belize City; the 3rd Respondent, Kelvin Leach, is a citizen of the Commonwealth of Bahamas and resides in Belize City; and Rohan Knowles, the 4th Respondent, is a citizen of the Commonwealth of the Bahamas and resides in Belize City.

[7]   The 5th Respondent, Cem Can also known as Jim Can, is a citizen of Canada. Though not presently in Belize, the second affidavit of Lelani Rivero, confirms that he is the President and Chief Executive Officer of the 12th Respondent, Unicorn Securities International, LLC, an international business company registered in Belize and carrying on business by virtue of a licence issued by the International Financial Services Commission.

[8]   The 6th Respondent, Brain de Wit, is a citizen of Canada. In his affidavit he confirmed that he is (and not was) the President of the 11th Respondent, Legacy Global Markets, SA. He further stated that he is resident in Victoria, British Columbia, Canada.

The 11th Respondent is a Belize international business company with a place of business in Belize. Exhibited to the affidavit of Brian de Wit was a valid licence issued by the International Financial Services Commission ("IFSC") to trade in "financial and commodity-based derivative instruments and other securities".

[9]   The 7th Respondent, IPC Management Services, LLC is a Nevada Limited Liability Company.   The 8th Respondent, IPC Corporate Services, Inc is a Belize international business company and the 9th Respondent, IPC Corporate Services, LLC is a Nevis Limited Liability Company.  The 7th, 8th and 9th Respondents all have their principal place of business in Belize City.

[10]   The 10th Respondent, Titan International Securities, Inc is a Belize international business company with its principal place of business in Belize City. Both the 11th and 12th Respondents are Belize international business companies, as previously stated, and their principal place of business is in Belize City.

[11]   In his second affidavit, Eric Eusey swore that there exists a close nexus between all of the Respondents and in paragraph 15 he stated as follows:

> "... the nature of the close nexus between the Respondent centers on the 1[st] Respondent who is believed to be the mastermind of the suspected criminal activities of all the Respondents."

BACKGROUND

[12]   In July 2014, the FIU was investigating the 10th Respondent, Titan International Securities, Inc. together with Cynk Technologies Inc and Warren Anthony Davis alleged to be associated with the 10th Respondent at that point in time.   In aid of the investigation, the FIU invoked section 11(1)(d) of the MLTPA referred to in paragraph 5 above and by letter dated July 14, 2014 requested a freeze of all accounts in the name of Warren Davis and the 10th Respondent or of which he was a signatory.  Upon the

6

expiry of the seven (7) business days allowed for the life of the freeze, the FIU did not seek to extend same.

[13] On September 9, 2014, the Attorney General's Ministry wrote to the FIU seeking assistance in effecting an urgent request from the Department of Justice in the United States of America pursuant to the Mutual Legal Assistance and International Cooperation Act No. 8 of 2014 ("MLAT Request"). The request was stated to be in connection with criminal investigations into the twelve Respondents for suspected offences of money laundering, securities fraud, tax evasion and conspiracy to commit the said offences.

[14] The FIU thereafter conducted investigations and collaborated with unnamed foreign competent authorities. The collaboration presumably related to the MLAT Request as the 2nd affidavit of Eric Eusey stated at paragraph 12 that a United States District Court Indictment was shared. The said Indictment was exhibited to the first affidavit of Mr. Eusey purely for the purposes of providing particulars of the 5th, 6th, 7th and 9th Respondents. Upon perusal of the Indictment CR 14-00476, it purported to be an Indictment issued by a grand jury of the U.S. District Court, Eastern District of New York on September 8, 2014 for three counts of conspiracy to commit securities fraud, conspiracy to defraud the United States and money laundering conspiracy against the twelve Respondents.

[15] On September 9, 2014, the FIU coordinated with the Belize Police Department to execute the MLAT Request by the search and seizure of documents at the premises of the corporate Respondents, namely the 7th, 8th, 9th, 10th, 11th and 12th Respondents. In the first affidavit of Eric Eusey, the FIU asserted that subsequent to the search and seizure the scope of its investigation broadened to include the offence of money laundering. In the second affidavit, it was further said that between September 9 and 11, 2014 "money laundering investigation intelligence" suggested that the Respondents were directly or indirectly associated with multiple accounts connected to various entities. These accounts were listed in a schedule to the first affidavit.

7

[16] On September 12, 2014, the FIU issued letters of instruction to three banking institutions, which qualified as reporting entities under the MLTPA, freezing the accounts directly or indirectly related to the Respondents. The instructions were given pursuant to section 11(2) which embraces section 11(1)(d) and enacts as follows:

> "Every order made by the Financial Intelligence Unit pursuant to paragraph (d) of subsection (1) above for the freezing of funds or financial assets of any person shall cease to have effect after seven business days from the making of the Order, unless within such period the FIU makes an application to a Judge of the Supreme Court in Chambers for an order for the freezing of such property, and the application shall be heard by the Court as soon as practicable."

It is pertinent to note that the letters included a listing of names that not only included those of the individual and corporate Respondents but also the names of other entities that are not named as Respondents. These other entities were not served nor did they participate in these proceedings.

[17] By the application made *ex parte* on September 23, 2014, the FIU sought and obtained an order for the freezing of the funds in the accounts listed and of all funds standing in the name of or on behalf of the Respondents wherever located in any financial institution in Belize. The said order was made until October 22, 2014 or until further order of the Court. A further order was made for the matter to be heard *inter partes* on October 14, 2014.

## LEGISLATIVE FRAMEWORK

[18] At the outset, it needs to be made plain that the Respondents are being investigated and have not been charged or convicted for any offence. The first and second affidavits of Eric Eusey are replete with references to an investigation

8

commenced and being continued.  Indeed, paragraph 31 of the first affidavit stated as follows:

> "31.  That there are strong grounds to believe that as a result of an investigation into the Respondents charges will be brought against them for the offence of money laundering and or any related predicate offences."

[19]  The purpose for which the MLTPA was enacted is set out in the long title as being: to make new and improved provisions for the investigation and prosecution of money laundering, terrorism and other related crimes and, among other things, to provide for the forfeiture of the proceeds of crime and terrorist property and to require reporting entities to take preventative measures to help combat money laundering and terrorist financing.  In furtherance of these objectives, the Act has clothed the FIU with certain powers.  Among these are the power under section 11(1)(d) to instruct any reporting entity to freeze the funds of any person or entity to facilitate any investigation for a money laundering offence, whether in Belize or elsewhere.  Section 11(2) goes on to restrict such freezing of funds to a period of seven (7) business days.

[20]  The Court received arguments as to the proper method of computation of seven (7) business days subsequent to the issuance of the administrative instruction imposing the freeze on September 12, 2014.  Learned Senior Counsel for the 3rd and 10th Respondents helpfully laid over an extract from Black's Law Dictionary which stated that Saturdays, Sundays and bank holidays are not to be treated as business days.  Accordingly, since September 22, 2014 was a bank holiday, the administrative freezing order would have expired at midnight on September 24, 2014.  Therefore, I have no difficulty concluding that the FIU made its application within seven business days of the life of the administrative order and before its expiry in compliance with section 11(2) of the MLTA.

9

[21]   The FIU is empowered by section 39(1) to apply to the Supreme Court for a restraining order against any realisable property held by the accused or specified realisable property held by a person other than the accused.   Section 39(2) contemplates that the application for a restraining order may be made *ex parte* and mandates that the said application be accompanied by an affidavit setting out the following:

"(a)   where the accused has been convicted of a serious crime, the serious crime for which he was convicted, the date of the conviction, the court before which the conviction was obtained and whether an appeal has been lodged against the conviction;

(b)   where the accused has not been convicted of a serious crime, the crime for which he is charged, or is being investigated and the grounds for believing that the defendant committed the offence;

(c)   a description of the property in respect of which the restraining order is sought;

(d)   the name and address of the person who is believed to be in possession of the property;

(e)   the grounds for the belief that the property is tainted property in relation to the offence or that the accused derived a benefit directly or indirectly from the commission of the offence;

(f)   where the application seeks a restraining order against property of a person other than the defendant, the grounds for the belief that the property is tainted property in relation to the offence and is subject to the effective control of the accused or is a gift caught by this Act, and

(g)   the grounds for the belief that a forfeiture order or a pecuniary penalty order may be or is likely to be made under this part in respect of the property."

10

[22] Having regard to the Respondents being under investigation and not charged or convicted the FIU was required to provide evidence on affidavit as to the crime for which they were being investigated and proof of the grounds for the belief that the Respondents had committed the offence. Further, the affidavit must contain the grounds for believing that the property in the listed accounts is tainted property in relation to the offence for which the Respondents are being investigated. Given that the names assigned to some of the accounts listed are not the names of the Respondents, para. (f) supra required that the FIU provide proof on affidavit that the property is tainted property in relation to the offences for which the Respondents are being investigated and that the said property is under the effective control of the accused or is a gift as defined in section 2(1) of the MLTPA.

[23] The power of the Court to make a restraining order against tainted property resides in section 40 of the MLTPA. Section 40(1) confers a discretion on the Court to make an order prohibiting the defendant or any person from disposing of, or otherwise dealing with, the property or such part of it as specified in the order. The import of this provision will become apparent in relation to the arguments dealing with the scope of the order.

[24] Before making a restraining order upon the application of the DPP or the FIU, the Court must be satisfied as to the following:

> "(a) the accused has been convicted of a serious crime or has been charged or is about to be charged with or is being investigated for a serious crime;
>
> (b) where the accused has not been convicted of a serious crime, there is reasonable cause to believe that the property is tainted property in relation to an offence or that the accused derived a benefit directly or indirectly from the commission of the offence;
>
> (c) where the application seeks a restraining order against property of a person other than the accused, there are reasonable grounds for

11

believing that the property is tainted property in relation to an offence and that the property is subject to the effective control of the accused or is property held by the defendant or a gift caught by this Act; and

(d)  there are reasonable grounds for believing that a forfeiture order or a pecuniary penalty order may be or likely to be made under this part in respect of the property."

By section 40(2), the restraining order makes provision for the meeting out of the frozen property of reasonable living expenses, legal expenses for defending criminal charges or to liquidate a debt incurred in good faith.

[25]   Needless to say, for the Court to be satisfied under section 40(1) paragraphs (a) to (d), proof by affidavit must be forthcoming from the FIU.

[26]   There is provision in section 40(4) for service of the application upon all persons in the application.  Such persons are given a right to appear and be heard.  However, this provision is made expressly subject to section 42 which allows for notice to be withheld where the giving of notice before making the order to persons having an interest in the property "would result in the disappearance, dissipation or reduction in value of the property".

[27]   Section 40(5) is specific to cases where the application is directed to a person being investigated or about to be charged.  The subsection enacts that the restraining order lapses if the person is not charged where the offence is one against the laws of Belize.  It is germane to pause here to highlight that nowhere in the affidavit of Eric Eusey in support of the application by the FIU is there any suggestion that it is conducting an investigation of the Respondents for an offence other than one against the laws of Belize.

12

[28]   As a requirement for making of a restraining order, the Court in its discretion may require the Government to give an undertaking as to damages or costs.  In the instant case, the FIU has given an undertaking as to damages on behalf of the Government of Belize.

[29]   It is provided in section 46 that a restraining order remains in force until either it is discharged, revoked or varied or if a forfeiture order is made in respect of the property that is the subject of the Order.

[30]   Section 47(1) provides that a person who has an interest in property affected by a restraining order may, at any time, apply to the Court for the order to be varied or revoked or made subject to such conditions as determined to be fit by the Court.  Such applications are to be made upon three clear days' written notice to the FIU and notice to such persons who appear to the Court to have an interest in the property.

[31]   Learned Senior Counsel Mr. Godfrey Smith argued that having regard to section 47(5), section 47 is available only to third parties with an interest in property that is the subject of a restraining order.  It was urged that the wording of section 47(5) leads to the conclusion that it does not apply to persons charged, convicted or being investigated. Section 47(5) enacts follows:

> "47.   (5)   An order under subsection (4) may only be made if the Court is satisfied that —
>
> (a)   the applicant is the lawful owner of the property or is entitled to lawful possession thereof and appears to be innocent of any complicity in the commission of a serious crime or any collusion in relation to such offence, and
>
> (b)   the property will no longer be required for the purposes of any investigation or as evidence in any proceedings."

13

In my view, the clear answer lies in the opening words of section 47(1) which permit a "person who has an interest in property in respect of which a restraining order was made" to apply for revocation or variation of the order.  The wide language operates to embrace all persons having an interest in the restrained property whether the person is charged, convicted, under investigation or a mere third party in whose hands the tainted property lies.  As I see it, the entire section is aimed at alleviating the restrictive nature of the restraining order where circumstances have changed from those required by section 40(1)(a) to (d).  Additionally, as astutely pointed out by Senior Counsel for the FIU, Mr. Lumor, any application made pursuant to section 47 must be supported by an affidavit attesting to the requirements of section 47(5).

[32]    By section 48, the FIU or the DPP are empowered to apply to the Supreme Court for an extension of the period of the operation of the restraining order.  However, the Court can only exercise its discretion to make the order for a specified period if satisfied that a forfeiture order may be made in respect of the property or part thereof or that a pecuniary penalty order may be made against the person.  This provision must be read along with sections 46 and 49.  Section 46 provides that a restraining order remains in force until it is discharged, revoked or varied or until a forfeiture order or a pecuniary penalty order is made in respect of the property which is the subject of the order.  Section 49 provides for a forfeiture order to be made in relation to tainted property upon the application of the FIU or DPP after a person has been convicted of a serious crime.  Having regard to the purport of sections 46 and 49, there can be no demur that section 48 is applicable to cases where the person has at the minimum been charged for a serious crime.

[33]    For clarity, it needs to be said that the combined effect of section 11(1)(d), 11(2), 39 and 40 is that in order to extend an administrative order issued by the FIU under section 11(1)(d) beyond the allowed seven business days, an application must be made before the order has expired.  This was done in the present case.  However, as conceded in the course of argument, the FIU is not precluded after the expiry date from making an application independent of section 11(1)(d) for a restraining order.

14

[34]   To succeed in its application made under section 11(2) for the freezing of funds to facilitate an investigation for a money laundering offence in Belize, the FIU was required to adduce proof on affidavit in fulfillment of the requirement of section 39(2), paragraphs (b) through (f).   Further, the FIU must satisfy the Court that the Respondents are being investigated for a serious crime and there is reasonable cause for believing that the funds in the listed accounts are tainted or that the Respondents or any of them derived a benefit directly or indirectly from the commission of the offence. Further, in relation to the Respondents, the Court must be satisfied that there are reasonable grounds for believing that a forfeiture order or a pecuniary  penalty order may be or is likely to be made under sections 49, 54 and 57.

## SCOPE OF THE ORDER

[35]   The Respondents contended that the scope of the restraining order made on September 24, 2014 is broader than is permitted under section 39 and 40 of MLTPA. The order as previously set out in paragraph 1 restrained the Respondents from "dealing with any assets located within the jurisdiction" and also in respect of "all funds standing in their names or on their behalf in any financial institution".

[36]   In the written submissions of the 3rd, 4th and 10th Respondents, the order was described as "total and sweeping".   The order operated to embrace all of the Respondents' assets in Belize, howsoever obtained, and whether or not tainted in relation to a serious offence or derived from a serious offence.  The property eligible to be the subject of a restraining order must be tainted property in relation to an offence.  It follows that the property must be specifically identified and the FIU must show to the Court reasonable cause to believe that the property is tainted property. Accordingly, the order, if it is to continue, cannot stand in the form in which it is presently framed. Paragraph (i) of section 40(1) contemplates the property or such part of it or interest in it be specified.

15

## THE DURATION OF THE ORDER

[37]   The Respondents are stated to be under investigation and section 40 empowers the Court, upon the application of the FIU to seek a restraining order.  However, section 40(5) employs mandatory language and enacts that where a person is being investigated or is about to be charged, any restraining order made by the court "shall lapse if the person is not charged" within 28 days where the offence is one against the laws of Belize.

[38]   Plainly, more than 28 days have elapsed since the order was made on September 24, 2014 and to date no charges have been laid against any of the Respondents.   The purport of section 40(5) is to place a time limit on the FIU for the laying of charges in circumstances where a restraining order is in force in relation to the property of person or persons under investigation.   Failure to observe the time limit results in the sanction in the form of the lapse of the restraining order.

[39]   No one can dispute the characterization by Senior Counsel Mr. Smith that the making of a restraining order is a draconian activity and that the State is urged to move swiftly where a crime has been committed otherwise the order is automatically terminated.  As I earlier iterated in paragraph 32, section 48 does not apply to those under investigation hence there is no power residing in the court to extend the period of the operation of the order beyond 28 days.

[40]   In the event that I am wrong, the Court must go on to ascertain whether the threshold established by section 48(2) has been reached by the FIU.   This would require an examination of the affidavits upon which the FIU relied in support of the original *ex parte* application.  But before leaving this point, it must be highlighted that, by the admission of its Director, the FIU has been investigating the 10th Respondent since July 2014.  It passed strange as to why the investigation has not yet yielded charges.

16

## EVIDENCE IN SUPPORT OF APPLICATION

[41]   As set out at length earlier, sections 39 and 40 place the burden on the FIU or DPP when applying for a restraining order.  The evidence required must fulfill the distinct requirements of, specific to this case, section 39(2) (b) through (g) and section 40(1) (a) (b) (c) and (d).  As to paragraph (a) of section 40(1), the Director of the FIU has sworn that the Respondents are being investigated.  Coupled with the search and seizure operation, it is fair to conclude that there is an investigation into money laundering offences relative to all the Respondents, individual and corporate.  Also, the property sought to be restrained has been listed in the Schedule to the urgent *ex parte* application and likewise the names and addresses of the reporting entities holding the accounts listed in the schedule.

[42]   In the case of **Clifford Pitt et al v DPP** – Civil Suit No. SVGHCV16/2003, the High Court of Saint Vincent and the Grenadines heard an application for the discharge or varying of a restraint order made ex parte in respect of the realisable property or assets owned or controlled by them whether in their names or not, whether solely or jointly owned, and whether or not located in or out of St. Vincent and the Grenadines.  The first Applicant had been charged with a relevant offence and the order was made on the basis that there were reasonable grounds for believing that Clifford Pitt had benefitted from the said relevant offence.  After examining the evidence on affidavit, Alleyne, J (as he then was) concluded as follows:

> "... the court must be satisfied that there is reasonable cause to believe that the defendant has benefitted from drug trafficking or from a relevant offence ... the DPP is under a burden to satisfy the court with evidence that there is reasonable cause to believe that Mr. Pitt has benefitted from a relevant offence ... It is not sufficient that he is suspected of involvement in those crimes.  There must be reasonable grounds for believing that he has benefitted from these crimes.  Paragraphs 4 and 5 of the affidavit do

17

> not discharge that burden, light as it is. The Order cannot be sustained on
> that ground."

For that reason and other grounds, the restraint order was discharged.

[43]   As in the **Clifford Pitt** case, the FIU must discharge the burden of establishing
the statutory pre-conditions and mere suspicion cannot suffice. The FIU has sought to
rely on five (5) affidavits sworn to by Eric Eusey. However, only the first two affidavits
were considered at the *ex parte* stage. The Respondents have objected to the
remaining three affidavits, especially the 4th affidavit being taken into consideration. I
am inclined to agree with the objection. It seems to me that unless the FIU can show
that subsequent affidavits do not present new material or material that was unavailable
at the time of the making of the urgent *ex parte* application, there can be no reliance on
the later affidavits. Ergo, the Court will take into account only the 1st and 2nd affidavits of
Eric Eusey. To rule otherwise would be to permit the FIU to bolster its original affidavit
evidence thereby earning the proverbial "two bites of the cherry".

[44]   The evidential framework is to be found in paragraphs 20 to 28 of the 1st affidavit.
Paragraph 20 stated that "as a result of the FIU's money laundering investigation
intelligence gathers between September 9, 2014 to (sic), September 11, 2014, suggest
that the Respondents were directly or indirectly associated with multiple accounts
connected to various entities". A schedule of the accounts held by the Respondents
was exhibited. This paragraph stated what the intelligence from the money laundering
investigation suggested. The deponent did not furnish any material to support the so-
called suggestion turned up by the intelligence. The Court is therefore unable to
determine on its own whether the conclusion is cogent. By being merely associated
one with the other, criminality can hardly be inferred and without it, it cannot be inferred
that the accounts are tainted.

[45]   It was pointed out by learned Senior Counsel, Mr. Courtenay, that the list shows
the names of entities which have not been served. Regardless of whether any of the

18

individual Respondents are signatories or associated in some way with these entities that is not enough to meet the requirement of showing that there are reasonable grounds for believing that the property is tainted property in relation to an offence or that the Respondents or any of them have derived a benefit directly or indirectly from the commission of the offence in issue as required by sections 39(2)(e) and 40(1)(b).

[46]    It is timely to here refer to the affidavit of Brian de Wit whereon he explained the source of the funds in considerably more detail than what was offered by the FIU.  He identified six (6) accounts associated with his name as personal savings and proceedings from his family's property.  He denied that the funds are the proceeds of crime or tainted in any way.  He went on to deny knowledge of six (6) accounts with which he was associated by the FIU.  A particular account was identified as the account opened to lodge the statutory deposit of $100,000.00 required IFSC of the 11th Respondent as a licence holder (alluded to in paragraph 8 above).  These assertions have not been effectively answered or rebutted by the FIU.

[47]    The content of paragraph 22 of the first affidavit of Mr. Eusey stated that the Respondents' employment and particulars of employment revealed a connection between multiple accounts directly or indirectly associated with the Respondents and the respective entities as a result of business activities.  The deponent elected not to take the court into his confidence and no documentary material was exhibited to explain the nature and particulars of the employment, thereby falling short of the threshold for tainted property.

[48]    Paragraph 23 spoke to control of the accounts by the Respondents being listed as either director, signatory, main holder or in some other capacity.  The conclusion that they would be directly or indirectly in control of such accounts may be logical, but where is the evidence to support the association as between the Respondents with the accounts.  Mr. Courtenay deemed this paragraph speculative and I can hardly disagree.  As to paragraph 24, reference is made to various structures being analysed but no hierarchical structure or any other structure to support a money laundering scheme in

19

the guise of a legitimate business product was offered.  The same applies to paragraph 25 which referred to structure of the business product offered by the Respondents revealing a web of companies hierarchical to each other in carefully chosen jurisdictions that enables and facilitates money laundering.  The hierarchy was not displayed and the jurisdictions were not named.

[49]  Having furnished no supporting documentation, the deponent concluded at paragraph 27 that the FIU believed that the Respondents have committed and are continuing to commit the offence of money laundering.  It was a conclusion drawn without a scintilla of evidence.  Paragraph 28 then went on to conclude on the unsubstantiated premises that the Respondents benefitted directly or indirectly in the form of the proceeds residing in their multiple accounts.

[50]  Without providing any documentary evidence save for the letters to the reporting entities, the MLAT Request letter and the US District Court Indictment, paragraphs 31 and 32 drew conclusions that:  (a)  there were strong grounds for the bringing of charges for the offence of money laundering and/or any related predicate offences against the Respondents; and (b)  a successful conviction would be likely to result in a forfeiture or pecuniary penalty order.  The latter conclusion, with respect, merely repeated the requirements of section 39(2)(g) and 40(1)(d), without supporting evidential basis.  Mr. Courtenay went on to question the expertise of Mr. Eusey to state the conclusions in paragraphs 31 and 32.  I am however content to highlight the absence of supporting data.

[51]  The second affidavit of Eric Eusey was originally filed to address the urgency of the application requiring its disposition on an *ex parte* basis.  Paragraphs 4 to 10 address matters of closing of accounts and withdrawal of funds.  No attempt was made to identify the source of the information as is required by Rule 30.3(2) of CPR.  It was quite rightly pointed out that if the Respondents were not aware of the administrative orders such closures and withdrawals would be in the normal course of business.

20

[52]    Given the paucity of details, the transactions described are equivocal where proof of the risk of dissipation of the funds is concerned. The Respondents further urged that the effect of the administrative orders operated to freeze the accounts while the application for the extension was being made, thereby precluding any dissipation.

[53]    Paragraphs 14 and 15 of the second affidavit repeated the reference in the first affidavit to a close nexus between the Respondents and identified the 1st Respondent as the mastermind of the suspected criminal activities of all the Respondents. Regrettably, no attempt was made to support these broad but devastating assertions as here again no documentary proof was furnished.

[54]    At the time of the *ex parte* hearing, I held the view and continue to hold the view that given the imminent expiry of the administrative freezing order and the limited time available before such expiry for service upon the Respondents, the FIU was justified in seeking to have the order extended on the basis of an *ex parte* application. In all practicality, if the matter had been served with a hearing set before the expiry date, the Respondents would no doubt have sought time to retain lawyers and take instructions by which time the administrative freeze would have expired by effluxion of time. Accordingly, there is no merit in the assertion that the original application ought not to have been heard ex parte.

[55]    Be that as it may, the FIU has woefully fallen short of the requirements of sections 39 and 40 of the MLTPA. There is total absence of material to ground an arguable case based on the statutory pre-conditions.

[56]    I have thus far proceeded on the basis that the Court ought only to take into account the first two affidavits relied upon to support the application made ex parte for a restraining order. However, since learned Senior Counsel for several of the Respondents have treated with the fourth and fifth affidavits on a contingent basis, the said affidavits ought to be scrutinized for completeness or in the event that this Court adopted an erroneous approach and ought properly to have taken them into account.

[57]   The fifth affidavit was filed on October 21, 2014 and specifically addressed the question of service being effected on the 6th Respondent, Brian de Wit.  This was the subject of a submission by Learned Senior Counsel, Mr. Rodwell Williams on the issue of the in personam jurisdiction of the Court.

[58]   The fourth affidavit of Mr. Eusey was filed on October 21, 2014 together with the application to extend the order of September 24, 2014.  The affidavit furnished the additional information that in addition to the 10th Respondent, the 3rd Respondent, Kelvin leach, was also being investigated since early July 2014.  It was also revealed that the Respondents are being investigated all together for being involved in the commission of a fraudulent scheme engaged in money laundering and related predicate offences which were for the first time identified as fraud and money laundering.  As I said earlier, there was no dispute as to whether the Respondents were being investigated by the FIU since early September 2014.  Paragraphs 3, 6 and 8 for the fifth affidavit all repeated the statements made in paragraphs 20, 22 and 25 respectively of the first affidavit.  However, paragraph 7 of the fifth affidavit set out what was suggested by the investigation and the intelligence garnered by the FIU.  Paragraph 7 reads as follows:

> "7    That the FIUs investigation and intelligence suggests that in or about and between January 2009 and September 2014 the Respondents together with other persons, devised and engaged in a scheme whereby they agreed to; (a)  make representations as to fact, whether expressed or implied, which is untrue or misleading; (b)   that these representations amounted to the concealment of their client's true beneficial ownership interests in various United States publicly traded companies; (c)  that the representations as to fact, made knowingly or recklessly, was done to make a gain for themselves    and/or their clients; (d)     that the Respondents concealed or falsified accounts or records or documents made or required for accounting purposes with a view to gain for themselves

22

and/or their clients; and (e) launder money for facilitating for their clients financial transactions in and out of Belize and into the United States which involved the proceeds of fraud and false accounting."

No documentation was exhibited to enlighten the court as to the scheme referred to. Indeed, some of the allegations against the respondents appear to mirror allegations of fact made in the US District Court Indictment, which carried little weight in this application save for information purposes.

[59]   For the first time, the deponent attempted to unveil the preliminary findings of the FIU as to the elements of the scheme presumably as alluded to in paragraph 7 set out above. The elements were listed in paragraphs 9 and 10 as follows:

"a)   That the first and seventh to ninth Respondents' (Bandfield and collectively the IPCs') business product offered and facilitated the creation of international business companies, trust formation and nominee services, among other things, that became the connection between the first and seventh to the ninth Respondents (Bandfield and the IPCs) and all the other Respondents.

b)   That the formation of these vehicles and through the use of nominee services enabled Bandfield and the IPCs to facilitate their clients in concealing their true beneficial ownership of the companies and the stocks that the companies owned so as to evade detection by United States Law Enforcement.

c)   That the nominee services was largely a hired service in that an employee or otherwise unrelated individual was paid to sign and act as a nominee who were mostly solicited by the second Respondent (Godfrey).

d)   That as a feature of the nominee services that the IPCs provided services for the provisioning of accounts with the 10th and 11th Respondents (Titan and Legacy) and the 12th Respondents

23

(Unicorn) under the ownership, management, and control of the fifth Respondent (Cem Can) to carry on brokerage services and trading for various United States publicly traded companies which was specifically performed by the fourth Respondent (Knowles) as a employee of the 10th Respondent (Titan) under the management and direction of the third Respondent (Leach).

e)   That thereafter said accounts and subsequent accounts created were controlled and operated not by the nominee but by the true beneficial owners who some have been found to be citizens of the United States contrary to the stated category of persons that said service could have been provided to; that is, not US citizens.

f)    That although the vehicle of the nomine services was being used to create brokerage accounts and brokerage services the nominee was never intended to be the true beneficiary of the services thereinbefore and after provided.

g)   That the particulars of the created accounts were never known used or controlled by the nominee but by the true beneficial owners.

h)   That in successfully fulfilling the true purpose and concealment of assets for clients the 12th Respondent (Unicorn) especially provided debit cards issued associated with the accounts in order to allow the true beneficial owners to have access and use of their monies.

i)    That the second, third, fourth, fifth and sixth Respondents (Godfrey, Leach, Knowles, Can and de Wit) were complicit in the business product that the first and seventh to ninth Respondents and 11th Respondent (Bandfield, the IPCs, and Legacy, respectively) provided through their employment with the entities.

j)    That any instructions relating to the services provided by the 10th or 12th Respondents (Titan and Unicorn) came from the true beneficial owners and not the nominee to the seventh to the ninth Respondents (the IPC's) and were then carried out by the second,

24

third, fourth and 12th Respondents (Godfrey, leach, Knowles and Unicorn) under the direction of the fifth and 10th Respondents (Cem Can and Titan).

k) That the firth through to the twelfth Respondents (Cem Can, de Wit, the IPC's, Titan, legacy, and Unicorn) were offering the same type of business product and would use each other as referrals and/or provide different aspects of the business product among each other."

Consistent with the pattern set in the first and second affidavits, the theory constructed by the FIU does not go beyond what Mr. Smith styled a 'theoretical construct'. Not a scintilla of evidence was provided to the Court.

[60]   Paragraph 12 repeated paragraph 23 of the first affidavit and went on to posit the conclusion that the accounts under the control of the Respondents control of the Respondents contain tainted property as proceeds derived from the commission of a serious crime.

[61]   By reference to the US District Court Indictment, paragraphs 16 and 17 of the fourth affidavit purported to place the elements of conspiracy to commit securities fraud and conspiracy to defraud the United States as being elements of the offences of fraud and false accounting under the laws of Belize.   With the greatest of respect to the Director, he has not established the expertise to render such an opinion which is devoid of any reasoning and the source of his belief has not been disclosed.

[62]   The remaining paragraphs of the fourth affidavit commencing at paragraph 19 were devoted to expressing the expectation of the FIU that charges would be laid against the Respondents, a successful conviction would demonstrate the scheme leading to the offences of money laundering, fraud and false accounting, thereby rendering the property held by the Respondents tainted property in relation to those offences and/or establishing that the Respondents benefitted from their criminal

25

conduct. Paragraph 21 goes on to posit that flowing from the successful conviction would be a forfeiture and/or pecuniary penalty order. These paragraphs served merely to regurgitate the expectation by the FIU that the pre-conditions of sections 39(2)(b) to (g) and 40(1)(a) to (d) would be fulfilled without any supporting material. In sum, the fourth affidavit, assuming it to be available for consideration by the Court, does not assist the FIU in satisfying the statutory pre-conditions for continuation of the restraining order made on September 24, 2014.

## MATERIAL NON-DISCLOSURE

[63]   Learned Counsel for the Respondents raised the issue of non-disclosure in the context of the FIU failing to provide the requisite information to support its conclusions as set out in the first, second and fourth affidavits of Mr. Eric Eusey.

[64]   Having dealt with the content of those affidavits at length and having highlighted the deficiencies with the result of the application failing to meet the statutory threshold set by sections 39 and 40 of the Act, it would serve no useful purpose to rehash the Court's observations in the context of the duty placed on the FIU in relation to the application for a Mareva-type restraint order to render full and frank disclosure of all matters considered by the Court to be relevant.

[65]   Having regard to the earlier findings, it would be pointless to address the arguments in relation to service upon the 6th Respondent. In addition, no charges have been laid or particularized the Court will reserve its ruling on the requirement of the identification of a predicate offence and the purport of section 3(2) of the MLTPA.

## CONCLUSIONS

[66]   In sum, the Court finds as follows:

(a) By virtue of section 40(5), the time limit of 28 days set for the laying of charges against the Respondents has expired and the Court is not empowered under section 48 to extend the restraining order made on September 24, 2014.

(b) The FIU has failed to satisfy the Court as to the requirements of section 39(2)(b) to (g) and section 40(1)(a) to (d) of the MLTPA.

[66] It is therefore ordered that the restraining order be discharged forthwith with costs of the several applications by the Respondents to be borne by the FIU. For the avoidance of doubt, the sealing order made by this Court on the 10th day of October, 2014 is also discharged.

KENNETH A. BENJAMIN
Chief Justice

27