**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____x

**UNITED STATES OF AMERICA,**

       **-v-**

                                        **Case No. 14-CR-476 (ILG)**

**GREGG MULHOLLAND**

               **Defendant.**
_____x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT GREGG MULHOLLAND'S PRETRIAL MOTIONS

James Kousouros
260 Madison Avenue, 22nd Floor
New York, New York 10016

Edward Sapone
240 Fulton Street, 23rd Floor
New York, NY 10038

_Attorneys for Gregg Mulholland_

i

## **Table of Contents**

Preliminary Statement ................................................................................................. 1

Statement of Facts ...................................................................................................... 2

   I.   The Pre-Wiretap Application Investigation .......................................................... 3

      a.   The Undercover Agent .................................................................................... 4

          i.   *Early Email and Telephone Contact with Subject Entities* ........................... 4

          ii.   *November 2013 Meetings in Belize at IPC and Titan* ................................. 7

          iii.   *Calls to IPC, Titan and Legacy after the Belize Meetings* ....................... 9

          iv.   *March 4, 2014 Visit to Belize* ................................................................. 10

      b.   Paypal Records and Telephone Toll Analysis .............................................. 10

   II.   The Post-Wiretap Application Investigation ..................................................... 11

Arguments ................................................................................................................. 13

   I.   Mr. Mulholland Asks the Court for an Order Allowing him to Join Co-Defendant Robert Bandfield's Pretrial Motions ............................................................................... 13

   II.   Evidence Obtained from the March 17, 2014 Wiretap Application Must be Suppressed . 15

      a.   The Fruits Of The March 2014 Wiretap Application Must Be Suppressed as the Affidavit Fails to Establish the Requisite Necessity under 18 U.S.C. § 2518 ...................... 15

          i.   *As an "Aggrieved Person," Mr. Mulholland Has Standing to Make this Challenge* . 15

          ii.   *No Necessity Existed Where Traditional Methods of Investigation Were Working and Their Further Use Remained Unexplored* ....................................................... 16

      b.   The Court Should Order a Franks Hearing Because the Affidavit Supporting the Wiretap Application Contained Omissions that Materially Affected the Court's Finding of Necessity ...................................................................................................................... 21

    i.     Email Search Warrants Were Producing the Information that the Government Sought through the use of Wires ........................................................................................ 22

    ii.    Physical Searches of the Target Businesses Could Have Yielded Identifying Information ............................................................................................................. 26

    iii.   The Government Had Recourse to an MLAT Request .......................................... 28

    iv.   These Omissions Amount to a Reckless Disregard for Truth ............................... 28

III.  Fruits of Searches from the MLAT Request Must be Suppressed .................................... 29

a.   Failure to Produce the MLAT is a Clear Violation of the Government's Obligations under Fed. R. Crim. Proc. Rule 16 .............................................................................................. 30

b.   The General Rule Against Suppressing Evidence Collected Abroad Has Exceptions that Apply to This Case ................................................................................................................ 32

IV.  The Government Should Specify Procedures it Took to Safeguard the Attorney Client Privilege ................................................................................................................................ 35

V.   The Government Should be Requested to Provide a Bill of Particulars ........................... 38

VI.  The Indictment Contains Surplusage as to the Foreign Account Tax Compliance Act "FATCA" ............................................................................................................................... 43

VII. The Government Should be Required to Provide 404(b) Evidence It Intends to Introduce at Trial .................................................................................................................................... 45

VIII.   The Government Should Disclose all Exculpatory and Impeachment Material Forthwith .............................................................................................................................. 48

IX.  Disclosure of Statements of Interviewed Individuals as *Brady* Material ........................ 55

X.   The Government Should be Directed to Provide Notice of Any Expert Testimony that it May Seek to Elicit at Trial ..................................................................................................... 58

XI.  The Government Should be Compelled to Provide a Witness List Prior to Trial ............. 60

XII. Permitting the Defendant to File Additional Motions Which May Arise From the Requests

Made Herein ........................................................................................................................... 60

CONCLUSION ........................................................................................................................... 60

# Table of Authorities

Cases

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) ...................................................................... 49, 56, 57, 58

*Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) ............................................................... 48

*Franks v. Delaware*, 438 U.S. 154 (1978) ................................................................................ 21, 22

*Giglio v. United States*, 405 U.S. 150, 154 (1972) ................................................. 49, 57, 58

*Huddleston v United States*, 485 U.S. 681 (1988) ............................................................. 46, 47

*Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) ...................................................... 49, 56, 57, 58

*nited States v. Gallo*, 654 F. Supp. 463, 480 (E.D.N.Y. 1987) ..................................................... 60

*nited States v. Kaplan*, 2003 U.S. Dist. LEXIS 21825, *30 (S.D.N.Y. 2003) ........................... 37

*Securities and Exchange Commission v. Gibraltar Global Securities and Warren A. Davis*, Civ. No. 13-2575 (S.D.N.Y.) ............................................................................................................ 3

*Securities and Exchange Commission v. Gibraltar Global Securities, et al.*, Civ. No. 13-1735 (S.D.N.Y.) ........................................................................................................................... 3

*United States v. Agurs*, 427 U.S. 97, 108 (1976) ..................................................................... 57

*United States v. Bagley*, 473 U.S. 667, 682 (1985) ................................................................ 49

*United States v. Bianco*, 998 F.2d 1112, 1125–26 (2d Cir.1993) .......................................... 22

*United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) ................................... 39

*United States v. Bortnovsky*, 820 F.2d 575 ........................................................................ 38, 39

*United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975) ................................................. 60

*United States v. Caruso*, 415 F.Supp. 847, 849 (S.D.N.Y.1976) ........................................... 16

*United States v. Castroneves*, 2009 U.S. Dist. LEXIS 18104, at *2 (S.D. Fla. 2009) ............... 31

*United States v. Chambers*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006) ........................................ 40

*United States v. Chas. Pfizer & Co.*, 217 F. Supp. 199, 201 (S.D.N.Y. 1963) .......................... 43

*United States v. Cole*, 807 F.2d 262, 267–68 (1st Cir.1986) ................................................. 22

*United States v. Coppa*, 267 F.3d 132, 142 (2001) ............................................................... 50

*United States v. Coreas*, 419 F.3d 151, 155 (2d Cir.2005) ............................................... 21, 22

*United States v. Covelli*, 210 F. Supp. 589 (N.D. Ill. 1962) ................................................... 39

*United States v. Crisona*, 271 F. Supp. 150 (S.D.N.Y. 1967) ................................................ 39

*United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992) ...................................................... 59

*United States v. De Palma*, 461 F.Supp. 778, 797 (S.D.N.Y. 1978) ....................................... 43

*United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.1985) ................................................ 21

*United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) ............................................... 48

*United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013) ..................................................... 32

*United States v. Goldman*, 439 F.Supp. 337 (S.D.N.Y. 1977) ............................................... 60

*United States v. Guerra–Marez*, 928 F.2d 665, 670–71 (5th Cir.1991) ................................ 22

*United States v. Halper*, 422 F.2d 432 (2d Cir. 1978) .......................................................... 47

*United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) ....................................... 21, 22

*United States v. Jacobs*, 117 F.3d 82, 87 (2d. Cir. 1997) ...................................................... 36

*United States v. Juan Vincent Gomez Castrillon*, 2007 U.S. Dist. LEXIS 61451, at *18 (S.D.N.Y. 2007) ............................................................................................................................... 31, 32

*United States v. King*, 991 F.Supp. 77, 88–90 (E.D.N.Y. 1998) ............................................ 22

*United States v. Levy*, 731 F.2d 997 (2d Cir. 1984) .............................................................. 47

*United States v. Lewis*, 482 F.2d 632, 643 (D.C. Cir. 1973) ...................................................... 48
*United States v. Lilla*, 699 F.2d 99, 103 (2d Cir. 1983) ............................................................ 18
*United States v. Long*, 917 F.2d 691, 702 (2d Cir. 1990) ........................................................ 59
*United States v. Marion*, 535 F.2d 697 (2d Cir. 1976) ............................................................ 17
*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .............................................................. 59
*United States v. Mosely*, 450 F.2d (506) (5th Cir. 1971), *cert. denied*, 405 U.S. 975 (1972) ....... 60
*United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984) ..................................................... 39
*United States v. Pilnick*, 267 F.Supp. 791 (S.D.N.Y. 1967) ...................................................... 43
*United States v. Rajaratnam*, 2010 WL 4867402 1, 18 (S.D.N.Y. Nov. 24, 2010)...................... 22
*United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983).................................................. 21
*United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir. 1973)................................................... 38
*United States v. Sanchez–Flores,* No. 94–CR–864, 1995 WL 765562, at *5 (S.D.N.Y. Dec. 29, 1995).................................................................................................................................. 22
*United States v. Schwartz*, 790 F.2d 1059, 1062 (3d Cir. 1986).................................................. 48
*United States v. Simmons*, 678 F.2d 1042.............................................................................. 46
*United States v. Stevens*, 935 F.2d 1360, 1400 (2d Cir. 1991) .................................................. 59
*United States v. Torres,* 910 F.2d 205, 231 (2d Cir. 1990)......................................................... 22
*United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) ............................................................. 49
*Yearsain v. United States*, 314 F.2d 881 (9th Cir. 1963),.......................................................... 39

Statutes
18 U.S.C. § 2518 (l)(c)........................................................................................................ 18
18 U.S.C. § 2518(1)(b) ....................................................................................................... 21
18 U.S.C. § 2518(11)(a)(ii).................................................................................................. 21
18 U.S.C. §2510(11) .......................................................................................................... 16
18 U.S.C. §2518(10)(a)....................................................................................................... 17
18 U.S.C. § 2518(3)(a)-(d)................................................................................................... 17
28 U.S.C. § 2071................................................................................................................ 59
Section 501(a) of The Hiring Incentives to Restore Employment Act of 2010............................ 44


Other Authorities
I.R.S. Notice 2011-53, 2011-32 I.R.B. 124 ............................................................................ 44
Treaty between the United States of America and the Government of Belize on Mutual Legal Assistance in Criminal Matters ................................................................................... 19, 28, 29

Rules
Federal Rule of Criminal Procedure 7(d)............................................................................... 38
Federal Rule of Criminal Procedure 7(f) ............................................................................... 43
Federal Rule of Criminal Procedure 16 ................................................................... 30, 45, 55, 59
Federal Rule of Evidence 104(b) ......................................................................................... 47
Federal Rule of Evidence 402 ............................................................................................. 47
Federal Rule of  Evidence 404(b) ................................................................................ 1, 45, 47
Federal Rule of Evidence 702 ............................................................................................. 59
Federal Rule of Evidence 705 ............................................................................................. 59

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

————————————————————x

**UNITED STATES OF AMERICA,**

        **-v-**

                                       **Case No. 14-CR-476 (ILG)**

**GREGG MULHOLLAND**

              **Defendant.**

————————————————————x

## Preliminary Statement

Defendant Gregg Mulholland respectfully submits this memorandum of law in support of his pretrial motions for an Order: i) allowing him to join in co-defendant Robert Bandfield's pretrial motions; ii) suppressing the fruits of the wiretaps authorized on March 17, 2014 and April 23, 2014, or in the alternative for a hearing to determine the propriety of the wiretaps; iii) suppressing the fruits of the searches conducted in Belize at the request of the United States government, or in the alternative, directing the government to produce a copy of its request for investigative assistance made to Belize under the Mutual Legal Assistance Treaty; iv) directing the government to detail the procedures it took to safeguard the defendant's attorney-client privilege; v) directing the government to provide a Bill of Particulars; vi) directing the government to redact surplusage from the indictment; vii) compelling the government to reveal any evidence it intends to introduce at trial pursuant to Rule 404(b) of the Federal Rules of Evidence sixty days prior to the commencement of trial; viii) directing the pre-trial disclosure of all exculpatory and impeachment material; ix) directing the disclosure of interviewed individuals and any recorded notes of said interviews; x) directing the government to provide notice of any expert testimony they may seek to elicit at trial;  xi) compelling the government to provide a

witness list prior to trial; xii) permitting the defendant to file additional motions which may arise from the requests made herein; and to provide any such further relief as to the Court may seem proper and in the interest of justice.

## Statement of Facts

The indictment before the Court alleges that between in or around the years 2009 and 2014, in the Eastern District of New York and elsewhere, Mr. Mulholland conspired with others to commit securities fraud and money laundering activities, and that he committed securities fraud with respect to trading in two stocks: VLNX and CYNK.  These charges are set forth in Counts One, Three, Four and Five of the government's superseding indictment.  *See* Superseding Indictment, 14-CR-00476-ILG, Dkt. No. 32, attached hereto and marked Exhibit "A".  That instrument is the result of a multi-year investigation, during which an undercover agent engaged in numerous consensually recorded telephone conversations, email communications, and on two occasions, visits to the offices of IPC Management Services (including IPC Corporate Services, Inc. and IPC Corporate Services, LLC, collectively referred to herein as "IPC") and Titan International Securities (herein, "Titan")  in Belize; the government conducted toll analyses on pen registers and intercepted telephones; the government seized email communications from several accounts pursuant to search warrants; and in which the government reviewed financial records, including PayPal payment records, to trace stock transfers and payments.  Despite these efforts, Mr. Mulholland hardly appears in the government's initial investigation and is implicated in this conduct by the words of a cooperating witness, who upon information and belief, represented himself as a lawyer to various parties during the course of the government's alleged conspiracy.

2

## I.     The Pre-Wiretap Application Investigation

In support of its application for wiretaps in March and April 2014, the government submitted an affidavit from FBI Special Agent ████████████████████, which sets forth the details of the government's early investigation.[1]  *See* Affidavit of Agent ██████ in Support of an Application for an Order Authorizing the Interception of Wire Communications (herein, "Third ██████ Aff. (Exhibit "B")")[2] (Mar. 17, 2014), attached hereto and marked Exhibit "B".  This statement makes clear that the road to the present charges began in or around July 2011.  At that time, US authorities were investigating Gibraltar Global Securities, Inc. (herein, "Gibraltar"), a Bahamas-based broker dealer.  *Id.* at ¶28.  During the course of the government's investigation, Gibraltar stopped opening new brokerage accounts due to regulatory scrutiny.  *Id.*  When it did so, US authorities learned through an undercover agent's contact with a Gibraltar employee that many of its customers were moving their business to Belize-based brokerage firms.  *Id.*[3]  US authorities then trained their focus on the activities of at least three individuals and entities operating in Belize: Robert Bandfield, IPC, Titan and Legacy Global Markets (herein, "Legacy").    During this pre-wiretap stage of its investigation,

---

[1] Throughout the course of its investigation, the government submitted various applications and affidavits to various federal courts for pen registers, email search warrants and wiretap affidavits.  Many of these applications, repeat the same facts.  This memorandum primarily cites to the facts set forth in the March 17, 2014 wiretap application because that is the application that precipitated the interceptions for which suppression is sought.

[2] FBI Special Agent ██████ submitted numerous affidavits to various federal courts.  He submitted affidavits on August 26, 2013, February 3, 2014 and August 6, 2014 in support of email search warrants; affidavits on March 15, 2014 and April 23, 2014 in support of wire intercepts; and an affidavit on May 15, 2015 to support a search of Co-Defendant Bandfield's computer.  As such, we have assigned a numerical number to each affidavit, based on its date of submission to the courts.  However, only three of these affidavits are citied through this memorandum.  For pin cite purposes, we refer to those as:  Second ██████ Aff. (Exhibit "K") refers to the email search on February 3, 2014; Third ██████Aff. (Exhibit "B") refers to the wire intercept application on March 17, 2014; and Sixth ██████ Aff. (Exhibit "L") refers to search warrant for Mr. Bandfield's computer on May 15, 2015.

[3] The Securities and Exchange Commission ultimately filed a complaint against Gibraltar on March 15, 2013.  Securities and Exchange Commission v. Gibraltar Global Securities, et al., Civ. No. 13-1735 (S.D.N.Y.).  It filed a second complaint on April 18, 2013 against Gibraltar and its owner.  Securities and Exchange Commission v. Gibraltar Global Securities and Warren A. Davis, Civ. No. 13-2575 (S.D.N.Y.)

international considerations notwithstanding, the government infiltrated these three organizations with relative ease, and mostly because its targets were eager to share details of their conduct with an undercover agent who posed as a prospective source of business.

### a. The Undercover Agent

#### i. *Early Email and Telephone Contact with Subject Entities*

In November 2012, Gibraltar employee Christopher Lunn provided an undercover agent the name and telephone number of Kelvin Leach (herein, "Mr. Leach") at Titan, and telephone numbers and an email address for Legacy. *See* Third █████ Aff. (Exhibit "B") ¶30. The agent contacted Mr. Leach at Titan under the assumed identity of ██████████ Mr. Leach, however, declined to open an account for the undercover agent and instead referred him to IPC. *Id.* at ¶31. The reason he referred him to IPC, Mr. Leach said, is because the undercover agent was an American citizen. *Id.* According to the government, Mr. Leach explained that the undercover agent should establish an international business corporation (herein, "IBC") at IPC. *Id.* Thereafter, IPC could establish accounts for the undercover agent at brokerage firms such as Titan or Legacy. *Id.*

In January 2013, Mr. Leach put the undercover agent in contact with Andrew Godfrey (herein, "Mr. Godfrey") at IPC. *See* Third █████Aff. (Exhibit "B") ¶32. Over the ensuing months, the undercover agent and he had several telephone and email exchanges. On January 25, 2013, the undercover agent engaged in a conversation during which Mr. Godfrey told the undercover that he would need to set up a structure that IPC creates, including a limited liability company (herein, "LLC) and an IBC. *Id.* at ¶34. Mr. Godfrey indicated to the agent that IPC had a number of shelf companies in Belize and Nevis from which the agent could select his LLC and IBC. *Id.* Mr. Godfrey further explained that the LLC established by the undercover agent would

own the agent's IBC, and that the "beneficial owner" of the LLC would be an individual working at IPC's office, ensuring that the undercover agent's name would not be associated with either entity, despite the fact that the undercover agent would control both entities. *Id.* Mr. Godfrey indicated that IPC had a number of clients similarly moving from the United States to different jurisdictions based on increased regulatory scrutiny in the United States. *Id.*

By May 15, 2013, Mr. Godfrey had made various representations to the undercover agent. He formulated a concrete plan in which a Nevis-based LLC would establish an IBC, which in turn would open brokerage accounts at firms such as Titan and Legacy, where the undercover agent's name would not appear as the beneficial owner. Moreover, Mr. Godfrey promised that:

> …the undercover agent could use his Titan and Legacy brokerage accounts as bank accounts…as long as he traded stocks using the brokerage accounts in addition to transferring money in and out.

*Id.* at ¶44. Significantly, however, neither Mr. Mulholland nor any other individual at Legacy was a party to these specific representations.[4]

At IPC, Mr. Godfrey established Cavern Capital, LLC for the undercover agent. Cavern Capital, LLC, in turn, owned an IBC by the name of Lion Mercantile, Inc. (herein, "Lion Mercantile"). *See* Third ███████ Aff. (Exhibit "B") ¶¶ 44, 45. On May 20, 2013, the agent

---

[4] Before he received advice regarding the use of the brokerage account as a bank account, the government undercover agent had overheard one conversation in which it appears that Mr. Godfrey was speaking to Brian de Wit at Legacy and saying:

> Brian, give me your international U.S. number—give me your toll free—8-8-8-4-0-0-5-4-6-1—no, no, no, this is, um, a person that, um, wants to—wants an account with you, we're getting ready to set it up with him and apparently it's some large numbers that he wants to move with you, so um, he's getting one with you, he's getting one at Seven Miles, you know, so um, I want him—he wants to know who to speak to here and discuss some things with you. Not right at this moment, I know you—but everyting is down, so he's uh [inaudible]—wants to do some big things with you.

Third ███████ Aff. (Exhibit "B") ¶42.

received an email stating that the account for Lion Mercantile had been opened at Legacy, and the email included account information for that account.  *Id*. at ¶46.  The undercover agent was then provided with Legacy's direct telephone number in Belize and told to ask for Brian De Wit (herein, "Mr. de Wit") regarding any questions.  *Id*.  Nearly five months later (and based on a delay which is not clearly explained), on September 25, 2013, the agent called Mr. Godfrey and confirmed that he had received an email stating that a brokerage account had also been set up for him at Titan. *Id.* at ¶47.  They discussed the possibility of meeting in Belize in November to talk about "future business." *Id.* at ¶50.

With brokerage accounts now in place, the agent contacted Legacy and Titan about funding his accounts.  On October 16, 2013, the undercover agent emailed Mr. de Wit at Legacy as ███████████ and related that "Andrew from IPC has assisted me in establishing an account at your firm."  *See* Email from ███████████ to Brian de Wit, October 16, 2013, attached hereto and marked Exhibit "C".[5]  That email also contained a forwarded email the undercover agent received from IPC.  *Id*.  But it did not identify the agent as a U.S. citizen.

Two days later, the undercover agent called Mr. de Wit and identified himself as an individual calling from "Lion Mercantile".  *See* Third ███████ Aff. (Exhibit "B") ¶51.  During that brief conversation, it was unclear if funds had reached the Lion Mercantile account at Legacy.  *Id*.  The undercover agent asked Mr. de Wit how he could obtain his username and password to access Lion Mercantile's account and transfer money into it.  *Id.* at ¶51. De Wit provided the agent with his email address and asked the agent to email him so that he could then provide the agent with all of that information.  *Id*.  Later that day, Caledonian Bank (where Legacy had an omnibus account), emailed the agent, at the request of Mr. de Wit, with

---

[5] This email is referenced in the wiretap affidavit, but a copy of it was not provided to the Court.

instructions for wiring money into Legacy's account. *Id.* at ¶52.[6]  It was not until October 30, 2013, however, that a confirmation of funds occurred in an email exchange. *See* Email from ████████████ to Brian de Wit, October 30, 2013, attached hereto and marked Exhibit "D".[7] Again, that email showed no indication of the undercover agent's U.S. citizenship.

## ii. *November 2013 Meetings in Belize at IPC and Titan*

In November of 2013, the undercover agent traveled to Belize and met with Andrew Godfrey and Robert Bandfield at IPC. *See* Third ████████ Aff. (Exhibit "B") ¶¶56.  The agent recorded these meetings with an audio and video recording device. *Id.* at ¶56.  At the meeting, Godfrey opened a manila folder and indicated that he had a file pertaining to the agent's account with IPC. *Id.* at ¶57.  Mr. Godfrey then asked for a copy of the agent's passport to add to the file. *Id*. Mr. Godfrey also asked that the agent provide a utility bill, a bank reference and a professional reference from an attorney or accountant indicating they had known the agent for a period of two years. *Id*. at ¶58.  Bandfield, meanwhile, provided the undercover agent with a template professional reference letter for the undercover to use. *Id*.

Bandfield then discussed the benefits of opening an account with IPC, namely that they were able to get around recent U.S. legislation by utilizing IPC's IBC-LLC structure.  He explained that if anyone asked questions about who owned the IBC, IPC would indicate that the Belize IBC was owned by a Nevis LLC and that the Nevis LLC was owned by a Belizean nominee, thereby shielding the true owner's identity. *Id.* at ¶60.  While the LLC might be owned by a nominee, Bandfield assured the agent that IPC and Bandfield would have control over the nominee and that the agent simply needed to contact IPC if he wanted to move or transfer money

---

[6] That same day, the agent called Mr. Leach for instructions on funding his account at Titan.  Mr. Leach asked the agent for his email address and said that he would send the wire details.  Later that day, Caledonian Bank (which also held an account for Titan), emailed the agent with instructions for wiring money into Titan's account.

[7] This email is also referenced in the wiretap affidavit, but a copy of it was not provided to the Court.

or securities. *Id.* at ¶61.  This control, Bandfield openly asserted, came from the fact that IPC has the ability to replace nominees without delay, due to a 1% interest it maintained in all the LLCs set up by IPC.  *Id.* at ¶63.  Again, these conversations were open and non-discrete.

During the meeting, the undercover agent stated that he was in the stock promotion and investor awareness business and received a significant amount of stock in connection with his activities.  Third ▮▮▮▮ Aff. (Exhibit "B") ¶¶65.  He further stated that he did not want to pay taxes and that he did not want the IRS to know about his activities. The undercover stated that the SEC was looking at different aspects of his business and, thus, he needed to operate in an insulated environment. *Id.* In response, Bandfield explained to the undercover agent that the brokers at Titan and Legacy did not receive due diligence as to the identity of IPC's clients such as the undercover agent; rather, the brokers receive only due diligence as to the nominee of the IBC, LLC or trust. *Id.* at ¶66.  Bandfield also cautioned that Titan and Legacy would not send money transfers directly to stock promoters. *Id.* at ¶77.  Instead, Titan and Legacy would send money to attorneys with trust accounts, and it was his belief that the attorneys would then forward the wires to the stock promoters. *Id.*

During his meeting with the agent, Bandfield spoke at length about the possibility of IPC establishing a trust on behalf of the agent, which he could use to hold securities and transfer funds. Third ▮▮▮▮ Aff. (Exhibit "B") ¶¶78-79. Bandfield explained that the trust structure would allow the agent to receive funds as a loan, without paying taxes, and that he would soon be able to withdraw funds with debit cards that would not leave a footprint. *Id.*

Also on November 6, 2013, the undercover agent met with Rohn Knowles (herein, "Mr. Knowles"), a securities trader at Titan, in Titan's offices located on the same floor as IPC's offices.  *Id.* at ¶¶40 and 82.  Mr. Knowles told the agent that he frequently worked with "Brian"

8

(Mr. de Wit) at Legacy. *Id*. at ¶83.  He also indicated that he could execute matched trades between two accounts controlled by the undercover agent at prices determined by the undercover agent. *Id*. at ¶85. To ensure that the trade would be visible to the public and other investors, Knowles suggested using he and Mr. de Wit at Legacy to execute such trades. *Id*. He stated that "me and Brian (de Wit) do it all the time for our clients." *Id*. at ¶86.

Noticeably, the undercover agent did not meet with any representatives of Legacy during this visit.  Unlike Titan, Legacy maintained its premises away from IPC, in "San Pedro, in the islands" in Belize.  Third ███████ Aff. (Exhibit "B") ¶40.  The agent had emailed Mr. de Wit the day before he purportedly traveled to Belize.  *See* Email from ████████████ to Brian de Wit, October 30, 2013, attached hereto and marked Exhibit "D".  Mr. de Wit responded that he was in Panama during the agent's travel dates, but readily made himself available for a Skype conference.  *Id*.

Up to this point, there can be no question that the government's investigation was making progress and that it had little trouble identifying, contacting and meeting with its targets, who explained in detail the manner in which these accounts were established and who identified the banking institution with whom they transacted business.

### iii.  *Calls to IPC, Titan and Legacy after the Belize Meetings*

On or about December 11, 2013, the agent called Mr. Bandfield and explained that he would like to establish five more IBCs owned by one of two Nevis-based LLCs. Third ███████ Aff. (Exhibit "B") ¶¶90. Bandfield, in turn, stated that IPC could establish brokerage accounts for each of the five IBCs and provided the agent with a list of available IBCs. *Id*.  Bandfield also suggested that the agent use another LLC, Rustic Partners, to own some of the IBCs. *Id*. at ¶92. These call, and all other calls, were consensually recorded.

On December 19, 2013, the undercover agent also called Knowles to let him know the agent intended to "get some trading going in the first quarter of next year." Third ███ Aff. (Exhibit "B") ¶¶98. Knowles states that he will talk to Mr. de Wit at Legacy about coordinating trades, and that they "do business all the time." *Id*. Later that day, the agent called Mr. de Wit at Legacy. *Id*. at ¶99. During that call, the agent confirmed he had transferred $30,000 into his IBC's account at Legacy. *Id*. Mr. de Wit responded by giving the agent a username and password for the account. The agent attempted to confirm that Mr. de Wit and Mr. Knowles worked well together and had previously collaborated on matched trades for clients. *Id*.

### iv. <u>March 4, 2014 Visit to Belize</u>

On March 4, 2014, the agent met again with Mr. Godfrey and Mr. Bandfield at IPC's offices in Belize. Third ███ Aff. (Exhibit "B") ¶99 fn.22. That meeting was recorded by audio and video. *Id*. During the meeting, the agent paid Bandfield $9,600 in cash for establishing the agent's LLC-IBC structure and for establishing five different brokerage accounts for him. *Id*. The undercover agent and Bandfield also discussed the agent's use of the LLCs and IBCs to further the agent's plans for illegal stock promotion. *Id*. The agent obtained this meeting with Mr. Bandfield with relative ease, who upon hearing that the undercover agent was traveling to Belize also suggested dinner with members of his staff. *See* Email from ███████ to Robert Bandfield, February 4, 2014, attached hereto and marked Exhibit "E". Counsel sees no indication, however, that the undercover agent tried to similarly coordinate with Mr. de Wit at Legacy's premises in San Pedro, Belize or elsewhere.

### b. Paypal Records and Telephone Toll Analysis

Also part of its early investigation, the government obtained records from PayPal for the time period of January 1, 2009 to February 5, 2013, which showed that approximately 65

individuals listing a U.S. address on their PayPal accounts sent money to IPC's PayPal account in amounts consistent with setting up or renewing offshore accounts. Third ██████ Aff. (Exhibit "B") ¶100.  Of the 65 individuals with U.S. addresses, only four reported having foreign bank accounts to the IRS. *Id.* at ¶101.  Of the 65 individuals, 33 were identified by public SEC filings as an officer, director, shareholder or consultant to a publicly traded penny stock company. *Id.*

Financial records the government obtained during this same period show that $364 million was transferred through Titan and Legacy from October 2010 through April 2013.  Third ██████ Aff. (Exhibit "B") ¶103.  As many of the PayPal fees were consistent with establishing an IPC account, Agent ██████ came to believe that many of the accounts established by IPC held in excess of the $10,000 threshold, thus requiring disclosure to the IRS. *Id.*

The government also conducted an analysis of toll records captured between January 1, 2013 and March 14, 2014.  These records revealed regular contact between telephone numbers tied to IPC, Titan and Legacy and eight telephone numbers associated with individuals with a history of participating in financial fraud and market manipulation schemes. *See generally,* Third ██████ Aff. (Exhibit "B") ¶¶105-122.   As to the telephone number 888-400-5461, which belonged to Legacy, the government claimed that of 3,200 calls, 152 tied to four individuals previously convicted of securities fraud or other financial regulatory violations.  *Id.* at ¶¶ 108, 115, 117 and 118.  None of those individuals is a co-defendant in this case.  Their calls represent only 4% of total calls to Legacy.

## II.    The Post-Wiretap Application Investigation

Four months after it funded accounts at Titan and Legacy, the government obtained its first Title III wiretap in this investigation.  The government collected wiretaps referencing an

11

individual referred to as "Stamps" and "Charlie Wolf", and recorded the voice of that individual,

on both the 888-400-5461 ("LGM Phone") and the 305-671-3493 ("IPC 305 Phone") during the

period of interception.  This also provided scant evidence of Mr. Mulholland's involvement.  But

the government would later link Mr. Mulholland to an individual referred to as "Stamps" and

"Charlie Wolf" in those wire intercepts through evidence provided by cooperating witnesses.

On April 3, 2014, the government's discovery shows that its wire intercepts heard Charlie

Wolf.  *See* Line 888-400-5461, Session 302 (April 3, 2014), attached hereto and marked Exhibit

"F".  This person was also intercepted on May 8, 2014.  *See* Line 305-671-3493, Sessions 614,

621, 622. 641 and 642 (May 8, 2014), attached hereto and marked Exhibit "G".  Meanwhile, an

individual by the name of "Stamps" was referred to in a conversation the government intercepted

on May 15, 2014 between an individual named Tom and Mr. de Wit.  *See* Line 888-400-5461,

Sessions 552 and 553 (May 15, 2014), attached hereto and marked Exhibit "H".  Stamps was

actually intercepted on a call with Mr. de Wit discussing the same matter.  *Id*. at Session 555.

The government came to learn the identity of this individual through one or more

cooperating witnesses.  At least one of those cooperating witnesses appears to be a lawyer by the

name of Terry Turner, who we believe the government would readily concede was working a

legal capacity for, *inter alia,* Mr. Mulholland.[8]

Presumably based on Mr. Turner's cooperation, the government charged Mr. Mulholland

in the Eastern District of New York.  He was later arrested on June 23, 2015 at the Phoenix Sky

Harbor International Airport.  Seven days after his arrest, the government named Mr. Mulholland

in a Superseding Indictment that also referenced to him as "Stamps" and "Charlie Wolf".  *See*

*generally,* Superseding Indictment, 14-CR-00476-ILG, Dkt. No. 32, attached hereto and marked

---

[8] Our belief is corroborated by firewalled documents provided to us by the government.  We do not identify or cite to these document as, in our view, the privileged nature of these documents is yet to be determined.  We are prepared, however, to make an *in camera* presentation to the Court.

Exhibit "A".

In the months since Mr. Mulholland's arrest, the government has produced voluminous discovery.  It has offered volumes more from searches conducted pursuant to an MLAT request made by the United States to the Belizean government.  At least part of the MLAT searches occurred on the premises of Legacy.  The government has offered the defense materials gained during these searches. But as co-defendant Robert Bandfield argues in his pretrial motions to this Court, these were gained through general searches that resulted in the seizure of materials that the government has not fully explored.  *See generally,* Memorandum of Law in Support of Robert Bandfield's Pretrial Motions, 14-CR-00476-ILG, Dkt. No. 72; *see also,* Arguments, *infra*, Part I.  As such, the evidentiary value of these searches is unclear.  Finally, the government has provided computer hard drives it seized and searched from Mr. Mulholland and his wife at the time of his arrest.  As of this filing date, the defense counsel has not had an opportunity to access and review these materials, and so reserves the right to seasonably supplement this motion.

This case is currently pending before the Honorable I. Leo Glasser.

## Arguments

### I.   Mr. Mulholland Asks the Court for an Order Allowing him to Join Co-Defendant Robert Bandfield's Pretrial Motions

As an initial matter, Mr. Mulholland requests that this Court grant an order allowing him to join Co-defendant Robert Bandfield's pre-trial motions.  Mr. Bandfield, through his counsel, filed pretrial motions on December 2, 2015 in which he argues substantially similar positions to the ones that Mr. Mulholland sets forth regarding the government's lack of production of the MLAT request.  *See,* Memorandum of Law in Support of Robert Bandfield's Pretrial Motions, 14-CR-00476-ILG, Dkt. No. 72.  In his pretrial motion, Mr. Bandfield argues for suppression on several grounds, mainly that:  the government has failed to meet its Rule of Criminal Procedure

13

Rule 16 obligations regarding the fruits of those searches; the searches were likely unreasonable and in violation of the Fourth Amendment; the government delayed in reviewing and offering to produce those materials; and that the government has offered those materials to the defendants in an untenable manner. *Id.* at *34. All of these arguments apply with equal force to Mr. Mulholland, and so to avoid duplicate submissions, we incorporate them here by reference and join in the suppression request.

In addition, Mr. Bandfield requests that this Court order the government to produce a Bill of Particulars. *Id.* at *34-43. The arguments in support of that request apply with equal force to Mr. Mulholland, and he incorporates them here by reference too. In this memorandum, Mr. Mulholland also seeks to supplement that request.

Mr. Bandfield has petitioned the Court for a severance of the trial and of counts in the indictment. *Id.* at *43. Mr. Mulholland does not join in this request at this time.[9]

Mr. Mulholland does, however, join Mr. Bandfield's request that the Court eliminate surplusage from the indictment. *Id.* at *49-52. Mr. Bandfield contends that the term 'nominee' is overbroad as used in the indictment, similarly contests the references to penny stocks being easily manipulated and enabling control groups to take control of them, and objects to references to corrupt clients and the use of the words "*inter alia*" and "among others". The arguments in support of the request to strike those terms apply with equal force to Mr. Mulholland, and he incorporates them here by reference. Moreover, he supplements Mr. Bandfield's motion by requesting that the Court strike the government's definition of "FATCA", explained at greater length later in this memorandum.

Mr. Bandfield requests that this Honorable Court set a schedule for the production of *Brady*, *Giglio* and *Jencks* disclosures. *Id.* at *52-55. Mr. Mulholland joins Mr. Bandfield's

---

[9] We may, at a later time and depending on how the evidence develops, file or join in the severance motion.

14

request, but also writes separately on these issues. Finally, Mr. Mulholland joins the request that the defendants be allowed to file additional appropriate motions. *Id.* at *55.

## II.    Evidence Obtained from the March 17, 2014 Wiretap Application Must be Suppressed

On March 17, 2014, the Honorable Alison J. Nathan, Federal District Judge for the Southern District of New York (herein, "SDNY"), responded to FBI Special Agent ████████ affidavit in support of probable with an order authorizing law enforcement to intercept wire communications to and from five telephone numbers: (1) 305-671-3493, a telephone number subscribed to by Robert Bandfield and serviced by Vonage; (2) 503-305-3897, a telephone number subscribed to by Robert Bandfield and serviced by Vonage; (3) 305-395-7896, a telephone number subscribed to by Titan International Securities, Inc., and serviced by Vonage; (4) 888-400-5461, a telephone number subscribed to by Legacy Global Markets and serviced by Phone.com; and (5) 305-407-8426, a telephone number subscribed to by Titan International Securities, Inc. and serviced by Vonage. The wiretaps on the five telephone lines ran for a period of 30 days. On April 23, 2014, the Honorable Kimba M. Wood, Federal District Judge for the SDNY, signed an order extending the period of interception for an additional 30 days. An affidavit from FBI Special Agent ████████ also supported that order.[10]

### a.    The Fruits Of The March 2014 Wiretap Application Must Be Suppressed as the Affidavit Fails to Establish the Requisite Necessity under 18 U.S.C. § 2518

#### i.    *As an "Aggrieved Person," Mr. Mulholland Has Standing to Make this Challenge*

Under federal law, any "aggrieved person" has standing to bring a motion to suppress the contents of intercepted wire or oral communications or evidence derived therefrom. *See* 18

---

[10] While we do not separately addressed the subsequent application, should the Court suppress the wiretap evidence, we request the opportunity to brief the issue of the derivative impact the wiretap evidence had on the subsequent application and whether they withstand scrutiny without the use of the wiretap evidence.

U.S.C. §2518(10)(a).   An "aggrieved person" means a person "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. §2510(11); *see also, United States v. Caruso,* 415 F.Supp. 847, 849 (S.D.N.Y.1976) (those whose conversations were intercepted or against whom the interception was directed, or on whose premises the conversations took place, may assert the unlawfulness of the interception).   Defendant Gregg Mulholland is referred to in connection with this case as "Stamps" and "Charlie Wolf." *See* Superseding Indictment, 14-CR-00476-ILG, Dkt. 32; Notes of Cooperating Witness, EDNY-TT-000012304.

 "Stamps" and "Charlie Wolf" were intercepted on both the 888-400-5461 ("LGM Phone") and the 305-671-3493 ("IPC 305 Phone") during the period of interception.   On April 3, 2014, the government's discovery shows that its wire intercepts heard Charlie Wolf.  *See* Line 888-400-5461, Session 302 (Exhibit "F").   He was also intercepted on May 8, 2014.  *See* Line 305-671-3493, Sessions 614, 621, 622. 641 and 642 (Exhibit "G").   Meanwhile, an individual by the name of "Stamps" was referred to in a conversation the government intercepted on May 15, 2014 between an individual named Tom and Mr. de Wit.  *See* Line 888-400-5461, Sessions 552 and 553 (Exhibit "H").   Later, Stamps was actually intercepted on a call with Mr. de Wit discussing the same matter.  *Id*. at Session 555.

Mr. Mulholland is an "aggrieved person," as defined in 18 U.S.C. §2510(11), and has standing to bring a motion to suppress the contents of the intercepted communications and evidence derived from them.

## ii. No Necessity Existed Where Traditional Methods of Investigation Were Working and Their Further Use Remained Unexplored

Title III prohibits all wiretapping and electronic surveillance except pursuant to carefully specified procedures. At 18 U.S.C. § 2518(3)(a)-(d), the federal electronic eavesdropping statute

requires that before issuing an order for interception of wire communications, a judge must determine, based on the facts in the affidavit, that there is probable cause to believe that a crime has been, is being, or is about to be committed; probable cause to believe that communications about the crime will be obtained through the wiretap; that alternative means have been tried and failed or appear too dangerous or unlikely to succeed; and probable cause that the premises or communications instrumentalities to be wiretapped are being used for criminal purposes or are used or owned by a target of the wiretap.

Moreover, 18 U.S.C. § 2518 (10)(a) "provides for suppression of evidence" on three grounds:

> [a]ny aggrieved person…may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that--
>
> (i) the communication was unlawfully intercepted;
>
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. §2518(10)(a).

The importance of strict compliance with the procedures imposed by Title III is evidenced by the Second Circuit's decision in *United States v. Marion*, 535 F.2d 697 (2d Cir. 1976), which provides:

> Congress carefully circumscribed utilization of the occasionally useful but potentially dangerous law enforcement tools of electronic surveillance in an effort to comply with the Fourth Amendment and to 'protect effectively the privacy of wire and oral communications (and) the integrity of court and administrative proceedings.' Pub.L. 90- 21351, Title III, § 801. To ignore or gloss over these restrictions, or view them as mere technicalities to be read in such a fashion as to render them nugatory, then, is to place in peril our cherished personal liberties.

*Id*. at 706.

The procedural step at issue in the instant motion is the required showing of necessity. Because electronic surveillance is such an invasive investigative technique, the necessity requirement ensures that such surveillance is not "routinely employed as the first step in criminal investigation" and that a showing as to the utilization of less intrusive investigative techniques were employed unsuccessfully or could not be safely employed be sufficiently set forth. *See United States v. Giordano*, 416 U.S. 505, 515 (1974). In this regard, every application for electronic surveillance must contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518 (l)(c).

Where traditional methods of investigation have not been attempted, "an affidavit offered in support of a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible." *United States v. Lilla*, 699 F.2d 99, 103 (2d Cir. 1983). The requirement of a "full and complete statement" regarding attempted or considered procedures "serves both to underscore the desirability of using less intrusive procedures and to provide courts with some indication of whether any efforts were made to avoid needless invasion of privacy." *Id*. at 104. Thus, the government's showing must include "detailed descriptions of the investigative events" attempted prior to the wiretap request. The government cannot rely solely on "generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Id*.

A review of the necessity portions of the Wiretap Application and supporting affidavit before this Court demonstrates the government's failure to comply with the requirements of 18 U.S.C. § 2518 (l)(c), (f), and (3)(c).   Indeed, the government made reference to the use or

18

potential use of an undercover agent, confidential informants, surveillance, Grand Jury subpoenas, interviews of subject individuals, telephone toll analysis, trash pulls, mail covers, email search warrants, search warrants, a financial investigation and the results of other investigations (mainly, the SEC's ongoing probe of Gibraltar). *See* Third ███████ Aff. (Exhibit "B") ¶¶ 127 – 143. But it too often understated the resounding success of these various investigative techniques, failed to provide adequate explanations as to why continuing the use of these primary methods would not have yield results and too strongly implied that the alternative means of investigation were not available. As to surveillance, it represented that because the individuals it sought to investigate were located in Belize, "regular surveillance of the individuals would be difficult to perform." *Id.* at ¶ 131. Trash pulls would not work, it asserted, because "many of the Subject Individuals are located outside of the United States…" *Id*. at 135. Mail covers would not work for the same reason. *Id*. at 136. "Additionally, because many of the Subject Individuals are located in Belize," subpoenas too, were deemed "not viable options for advancing the investigation." *Id*. at 140. Nowhere in the wiretap application does the government alert the federal court to the recourse it could (and did) seek under the MLAT mechanism in place between the United States and Belize, which arguably put all those methods readily within the government's reach.

As summarized for this Court in an earlier filing, the MLAT treaty allows the United States (as a Requesting State) to make a request of Belize (the Requested State) for various forms of assistance "in connection with the investigation, prosecution, and prevention of criminal offenses, and in proceedings related to criminal matters." *See* Treaty between the United States of America and the Government of Belize on Mutual Legal Assistance in Criminal Matters (herein, "The MLAT Treaty"), September 19, 2000, art. 11, available at:

http://www.state.gov/documents/organization/127200.pdf (Last viewed on December 2, 2015),
attached hereto and marked Exhibit "I"; *see also,* Letter to Assistant United States Attorney
Jacquelyn M. Kasulis, 14-CR-00476-ILG, Dkt. No. 67, attached hereto and marked Exhibit "J".
The Requesting State may rely on the local state for "executing requests for searches and
seizures." *Id*. at art. 1.2(1).  The MLAT Treaty allows the Requesting State to provide a
"description of any particular procedure to be followed in executing the request." The MLAT
Treaty at art. 4(g). When "specified in the request [these procedures] shall be followed except to
the extent that those procedures cannot lawfully be followed in the Requested State." *Id*. at art. 5.
As such, there is a presumption that the Requested State will act in accordance with the wishes of
the Requesting State.

In its March 2014, Agent ████████ did not delineate the broad authority of a foreign
nation he had available in this investigation.  And as argued in the request for a *Franks* hearing
below, the government did not provide the court an accurate picture of the possibilities available
through the use of search warrants for emails. Moreover, the government did not convey its
observations of the voluminous records and filing keeping procedures observed during its visits
to IPC and Titan in November 2013, and again during March 2014.  In sum, the government
downplayed the relative ease with which it could infiltrate the deepest corners of the alleged
conspiracy with the benefit of time and tools at its disposal, and being successfully employed at
the same time it was applying for the eavesdropping warrant.

Based upon the foregoing, it cannot be said that the government satisfied the firm
requirement that the supporting affidavit "must show with specificity why ***in this particular
investigation*** ordinary means of investigation will fail." *United States v. Robinson*, 698 F.2d 448,
453 (D.C. Cir. 1983); *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985).  As such, we

respectfully submit that the wiretap evidence and any derivative evidence therefrom should be suppressed, or in the alternative that a hearing be ordered to resolve factual issues necessary for the appropriate disposition of this motion.

### b. The Court Should Order a Franks Hearing Because the Affidavit Supporting the Wiretap Application Contained Omissions that Materially Affected the Court's Finding of Necessity

Title III requires that law enforcement provide the authorizing court with a "full and complete statement of the facts and circumstances relied upon by the applicant" to establish probable cause that the target phone was and would continue to be used to commit the specified offense. 18 U.S.C. § 2518(1)(b). Where a defendant makes a preliminary showing that the government's affidavit misstated or omitted material information, *Franks v. Delaware*, 438 U.S. 154 (1978), instructs a district court to hold a hearing to determine if the misstatements or omissions were made intentionally or with reckless disregard, and if so, determine *de novo* whether, "after setting aside the falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause." *United States v. Coreas,* 419 F.3d 151, 155 (2d Cir.2005). "Omissions from an affidavit that are claimed to be material are governed by the same rules." *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.1985).

The Second Circuit has extended the *Franks* analysis to other Title III requirements for obtaining a warrant. *See United States v. Bianco,* 998 F.2d 1112, 1125–26 (2d Cir.1993) (applying *Franks* to 18 U.S.C. § 2518(11)(a)(ii), which requires that the government explain why "specification of the place of interception is not practical"). And district courts in this Circuit have done so with respect to the issue of necessity in particular. *See United States v. King,* 991 F.Supp. 77, 88–90 (E.D.N.Y. 1998); *United States v. Sanchez–Flores,* No. 94–CR–864, 1995 WL 765562, at *5 (S.D.N.Y. Dec. 29, 1995); c*f. United States v. Guerra–Marez,* 928 F.2d 665,

670–71 (5th Cir.1991); *United States v. Cole,* 807 F.2d 262, 267–68 (1st Cir.1986); *Ippolito,* 774 F.2d at 1485 ("although *Franks* dealt specifically with probable cause, its reasoning applies [to Title III's necessity requirement] as well").

Like a court reviewing an affidavit containing misstatements or omissions as to probable cause, a court reviewing an affidavit for necessity must "decide if the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Torres,* 910 F.2d 205, 231 (2d Cir. 1990). Thus, to warrant suppression on the issue of necessity, a defendant must establish (1) that the omissions from the affidavit regarding the necessity of using wiretaps were the product of the government's "deliberate falsehood" or "reckless disregard for the truth", and (2) that, after inserting omitted information and setting aside misstatements, the affidavit fails to establish necessity. *See Coreas,* 419 F.3d at 155; *United States v. Rajaratnam,* 2010 WL 4867402 1, 18 (S.D.N.Y. Nov. 24, 2010).

### i. Email Search Warrants Were Producing the Information that the Government Sought through the use of Wires

One of the investigative techniques undertaken prior to the application for the wiretaps was the use of email search warrants. The government executed several email search warrants, seizing emails and account information for 23 email addresses associated with IPC.  The first set of email search warrants were issued on August 26, 2013, the second set of email search warrants were issued on February 3, 2014, and the third set of email search warrants were issued on August 6, 2014.  *See* Affidavit of Agent ███████ in Support of an Application for Email Search Warrant (Aug. 26, 2013)[11]; Affidavit of Agent ███████ in Support of an Application for

---

[11]  Seeking authorization to search the email accounts of andrew@ipc-offshore.com and applications@ipcoffshore.com.

Email Search Warrant (February 3, 2014) [12] (herein, "Second ███ Aff. Exhibit "K"), and Affidavit of Agent ███ in Support of an Application for Email Search Warrant (August 6, 2014)[13].

Notably, the first two sets of email search warrants were issued before the instant wiretaps were sought. In response to the February 3, 2014 warrant, Godaddy (an email provider) "produced all emails in its possession associated with all accounts established by the individual who had created IPC's domain name, resulting in the production of emails that were not requested in the search warrant." Second ███ Aff. (Exhibit "K") ¶80. While the defense does not suggest that a search of those erroneously produced emails would be proper, their existence demonstrates there was much to see in the email chain available to the government.

In fact, a later affidavit submitted by FBI Special Agent ███ in conjunction with an application for a search warrant on May 15, 2015, in which he sought authority to search two laptops and a jump drive seized following Robert Bandfield's arrest, provides important context in just how fruitful email searches could be for the government's investigation. Affidavit of FBI Agent ███ in Support of an Application Under Rule 41 for a Warrant to Search and Seize (May 15, 2015) (herein, Sixth ███ Aff. "Exhibit "L").

---

[12] Seeking authorization to search the email accounts of aaliya@ipcoffshore.com, accounts@ipcoffshore.com, applications@ipcoffshore.com, andrew@ipcoffshore.com, bob@ipcoffshore.com, clodine@ipcoffshore.com, documents@ipcoffshore.com, glenna@ipcoffshore.com, lellia@ipcoffshore.com, patrick@ipcoffshore.com, transfers@ipcoffshore.com, aaliya@ipc-offshore.com, andrew@ipc-offshore.com, andrewg@ipc-offshore.com, banking@ipc-offshore.com, bob@ipc-offshore.com, securities@ipc-offshore.com, wire@ipc-offshore.com, glenna@ipc-offshore.com, lellia@ipc-offshore.com, vtm@ipc-offshore.com, ipc-offshore@hotmail.com and opulence10@yahoo.com.

[13] Seeking authorization to search the email addresses of aaliya@ipcoffshore.com, accounts@ipcoffshore.com, applications@ipcoffshore.com, andrew@ipcoffshore.com, bob@ipcoffshore.com, clodine@ipcoffshore.com, documents@ipcoffshore.com, glenna@ipcoffshore.com, lellia@ipcoffshore.com, patrick@ipcoffshore.com, transfers@ipcoffshore.com, aaliyah@ipcoffshore.com, andrew@ipcoffshore.com, andrewg@ipc-offshore.com, banking@ipc-offshore.com, bob@ipc-offshore.com, securities@ipc-offshore.com, wire@ipc-offshore.com, glenna@ipc-offshore.com, lellia@ipc-offshore.com and vtm@ipc-offshore.com

In his May 15, 2015 affidavit, FBI Special Agent ███████ takes a remarkably positive view of the email search warrant results.  He informs the court:

> Although Bandfield and Godfrey were cautions about using email to communication about details of client transaction, it is clear that clients communicated with IPC by email about details of their accounts.  In fact, emails obtained pursuant to search warrants in this investigation demonstrate that Bandfield, Godfrey and other employees of IPC routinely communicated with IPC clients about transaction details, including wire transfers, beneficial ownership forms and stock purchase agreements.  Those emails are evidence of the IPC clients' control over the accounts.  Even email communications that simply contained innocuous phrase (<u>e.g.</u>, "call me") might be evidence of an individual's control over an IPC account because, based on Godfrey's statement above, it would likely indicate that the individual who sent the email wanted to provide instructions to IPC about a particular account.  Emails demonstrating such control and beneficial ownership would be evidence of securities fraud, money laundering and tax evasion.

Sixth ███████ Aff. "Exhibit L" at ¶50 fn.19.  He also states that: "The documents produced by email service providers in response to these search warrants (collectively the 'Search Warrants Productions') demonstrate that Bandfield and his employees, including Bergey, used their computers to communicate with coconspirators and to carry out the securities fraud, tax evasion, and money laundering schemes […]." *Id.* at ¶ 64.  Bergey, meanwhile, is the same individual with whom Mr. Bandfield invited the undercover agent to dine during his second visit to Belize. *See* Email from ███████ to Robert Bandfield, February 4, 2014 (Exhibit "E").

The affidavit goes on to provide numerous examples of emails between IPC employees and clients, offshore banks, and individuals serving as nominees, regarding stock purchases and transfers, companies and associated bank accounts, instructions concerning beneficial ownership and payments, and IPC's continued use of its employees, as false nominees of companies actually controlled by other individuals. *See* Sixth ███████ Aff. (Exhibit "L") ¶¶ 65-70.

Agent ███████ expressly concludes that "emails obtained pursuant to the Search Warrants Productions […] ***provide information that assists law enforcement agents in***

24

*identifying IPC's clients*.  *Id.* at ¶¶71 (emphasis added).  And for good measure, he provides an example after making this point:

> For example, on July 26, 2013, Glenna Fay Bergey, using the glenna@ipcoffshore.com email address, emailed "Ken Berscht" regarding his attempt to pay IPC $1,035 for its services.
> …
>
> Many of the emails obtained pursuant to the Search Warrants Productions reflect IPC employees' efforts to keep track of the creation of IBCs for IPC's clients, and the nominees assigned to each IBC controlled by IPC's clients. Other emails reflect IPC employees' efforts to track the collection of fees owed by IPC' s clients and the transfers of money between client accounts.

Sixth ███ Aff. (Exhibit "L") ¶¶71-72.  Again, Ms. Bergey is the same person with whom he was invited to dine at an earlier time, presumably to further discuss these transactions.

Having the ability to acquire these facts on or about July 2013, stands starkly at odds with Agent ███ view on email searches in the wire intercept affidavit.  There, the reviewing court was informed that "e-mail search warrants were executed and provided valuable information to the investigation." Third ███ Aff. (Exhibit "B") ¶137.  But it was more forcefully led to believe that "[email searches] will not fulfill all of the goals of the investigation, because the subject individuals purposely refrain from communicating the full extent of their illegal activities in writing," and "the e-mails make it difficult to identify the individuals writing the e-mail messages, and the e-mails do not disclose the individuals' motivation for transferring money or requesting stock trades." *Id.*  This understates the truth.

The omission of specific information about the returns of the email search warrants is wildly misleading given the reasons stated why they were unlikely to succeed: (1) that it was difficult to identify individuals from the email messages, and (2) that the subject individuals were not communicating about their illegal activities in writing. From the May 15, 2015

affidavit, it is clear that the email search warrants were successful at identifying IPC's clients, and provided numerous examples of the subject individuals and their co-conspirators communicating about the crimes outlined in the wiretap application before that request was made. The government should have reasonably assumed future email search warrants to continue to yield those types of results. Moreover, the identification of accounts, and presumably institutions from and into which funds were transferred, provided a veritable treasure trove of evidence through the use of subpoena power and cooperation with foreign institutions. These facts run contrary to the reasons stated in the government's affidavit justifying the necessity of the wiretaps. Without this information, it cannot be said that the court had a "full and complete" statement of the investigative procedures that had been tried and failed or why they appeared to be unlikely to succeed if tried or to be too dangerous.

### ii. Physical Searches of the Target Businesses Could Have Yielded Identifying Information

Another investigative technique which the government stated would be unlikely to succeed if tried was the use of search warrants. It was the government's position that searches would be unlikely to reveal the nature and total scope of the illegal activities being engaged in by the subject individuals and that search warrants executed at that time would be more likely to compromise the investigation by alerting the individuals involved without obtaining conclusive proof against all of the members of the scheme. *See* Third ███████ Aff. (Exhibit "B") ¶138.

Significantly, minimal emphasis is included in the wiretap application about the agent's observations from his visits to IPC or Titan. The affidavit mentions that during the November 2013 meeting at IPC's offices, the agent was asked for several personal identifying documents for inclusion with his file at IPC. Third ███████ Aff. (Exhibit "B") ¶57. It does not, however, relate the myriad physical files and several computers being utilized by IPC and Titan employees

seen on the video footage from the undercover agent's surveillance. It is reasonable to conclude that those file cabinets contained information regarding client accounts and other relevant documents which would in fact reveal the nature and scope of the illegal activities in which those entities were allegedly engaging. During these visits, introductions were made to anyone the undercover asked to meet. There is no evidence of identities withheld, transactions done in secret or even coded or veiled conversations. If there were ever a case—despite the international components—for which normal investigative techniques were found to be effective, this was it.

On September 9, 2014, less than six months after the initial application for the wiretaps, the government coordinated with the Belize Police Department to execute an MLAT Request for the search and seizure of documents at the premises of IPC, Titan and Legacy. While it is unknown exactly what was seized in conjunction with those searches, it constitutes **90% of the evidence** gathered for possible use against the defendants at trial. *See generally,* Memorandum of Law in Support of Robert Bandfield's Pretrial Motions, 14-CR-00476-ILG, Dkt. No. 72, at *8. The success of the searches and seizures for each of the subject entities, less than six months after the wiretaps were authorized, is proof positive that the use of search warrants would have, and in fact did, succeed in producing voluminous evidence of the alleged crimes and the participants thereof.

Simply stated, the omission of this information on the undercover agent's observations of the premises of IPC and Titan is material and fundamentally undermines the issuing magistrate's decision on necessity. Reliance on a claim of necessity occurred without the requisite "full and complete statement" of the investigative procedures being successfully utilize and others clearly available. Nowhere on this affidavit was the Court given the full flavor of the ease and entirely unobstructed access these agents had to the entire operation were investigating.

### iii.  The Government Had Recourse to an MLAT Request

Nowhere in the affidavit does the government alert the court to the recourse it could (and later did) seek under the MLAT mechanism in place between the United States and Belize.  At a minimum, the government could have requested that Belize assist its investigation.  If Belize denied the requested assistance it would need "to inform the Central Authority of the Requesting States of the basis for the denial." *See*, The MLAT Treaty (Exhibit "I"), art. 3.3. This denial could substantiate a claim that those normal investigative procedures were unavailable to it.  But in the absence of a denial, the government's claims that it could not conduct surveillance, trash pulls, mail covers or deploy subpoenas is an inaccurate characterization of the myriad investigative tools available.

The MLAT mechanism also provided a unique vehicle with which to surreptitiously conduct searches.  Given the broad manner in which a Requesting State could tailor an MLAT request, the US government could have requested the search of the files at IPC without disclosing its involvement in what would appear to be a Belize-led investigation.  The conversations conveyed in the wiretap application show that at least some members of the government's alleged conspiracy had a healthy disregard for the legal infrastructure of their host countries.  *See* Third ███████ Aff. (Exhibit "B") ¶34 (Citing to Mr. Godfrey's explanation of the costly and procedural delays that would ensue for a party making a legal inquiry in Nevis); *Id.* at ¶38 (Citing to Mr. Godfrey's explanation on how to sidestep Belize's anti-money laundering authority).  Finding the US government driving a locally-led investigation might have *ultimately* caused much surprise, but not immediate alarm.

### iv.  These Omissions Amount to a Reckless Disregard for Truth

28

If not the product of deliberate efforts to mislead the reviewing court, the nature and number of omissions from the wiretap application, result from, at a minimum, a reckless disregard for the truth on the part of the government. The wiretap affidavit even without the above-referenced omissions failed to justify the necessity of the wiretaps; with the inclusion of the omitted information, there can be no doubt that the government failed to establish that other investigative procedures had been tried and failed or appeared unlikely to succeed if tried.

As such, we respectfully submit that the wiretap evidence and any additional evidence derived therefrom should be suppressed, or in the alternative that a hearing be ordered to resolve factual issues necessary for the appropriate disposition of this motion.

## III.    Fruits of Searches from the MLAT Request Must be Suppressed

In the course of its investigation, the government relied on the assistance of authorities in Belize to execute a search warrant.  The government sought this help through a Mutual Legal Assistance Treaty ("MLAT"), a mechanism which has existed since the United States and Belize ratified an accord in July 2003, and which allows the United States government to seek the assistance of, and in some instances direct,[14] the actions of Belize during the course of a law enforcement investigation.  *See generally,* The MLAT Treaty (Exhibit "I").  Counsel has requested on more than one occasion that the government produce this request.  *See* Letter to Assistant United States Attorney Jacquelyn M. Kasulis, 14-CR-00476-ILG, Dkt. No. 67 (Exhibit "J").  Reviewing the request would assist counsel in ascertaining what directions the United States government conveyed to Belize in making its MLAT request, any communications that transpired between the two sovereign nations in regards to this request, and whether the United States assisted in any way in the preparation of the warrant, the physical execution of the MLAT,

---

[14] The mutual authoritative power granted in the MLAT treaty is indicative of the magnitude of cooperative intent of the participating countries in assisting each other in criminal investigations.

or in the post search cataloging of the evidence seized.  But the government has refused to produce this request.  *See* Response of Assistant United States Attorney Jacquelyn M. Kasulis, 14-CR-00476-ILG, Dkt. No. 71, attached hereto and marked Exhibit "M".

In refusing to produce the MLAT request and accompanying information, the government seems to embrace two related propositions.  First, the governments seems to posit that the MLAT request is not relevant to the preparation of Mr. Mulholland's defense and so the government can meet its obligations under Rule of Criminal Procedure 16 without producing it.  Second, it seems to assert that because the actions of foreign law enforcement officers do not fall within the purview of the Fourth Amendment, they cannot offend our constitutional norms, and so any mechanisms that triggered their actions must not be disclosed.  We respectfully disagree.

### a. **Failure to Produce the MLAT is a Clear Violation of the Government's Obligations under Fed. R. Crim. Proc. Rule 16**

As to the first proposition, Rule 16(a)(1)(E) specifies that a defendant is entitled to documents and objects "within the government's possession, custody, or control," when the "item is material to preparing the defense."  Rule of Crim. Proc. 16(a)(1)(E).  The timing of the MLAT request, the specific instructions contained within it, the communications surrounding the United States government's request to Belizean authorities, and any follow up action taken in an effort to comply with that request are all matters of great concern to Mr. Mulholland's defense.  As such, the admissibility of evidence derived from this request is clearly material to the defense—especially if it will form any part of the government's evidence in this case at trial.  In circumstances implicating constitutional concerns, moreover, courts have ordered the government to produce MLAT requests and related materials.  *See, United States v. Castroneves,* 2009 U.S. Dist. LEXIS 18104, at *2 (S.D. Fla. 2009); see *also, United States v. Juan Vincent Gomez Castrillon*, 2007 U.S. Dist. LEXIS 61451, at *18 (S.D.N.Y. 2007).

30

In *United States v. Castroneves*, the government sought a tolling order from a federal court on the basis that it had issued an MLAT request to Brazil and needed more time to complete its investigation. 2009 U.S. Dist. LEXIS 18104, *2 (S.D. Fl. 2009).  The court granted that request, thereby extending the statute of limitations.  *Id.*  When the defendants were finally indicted, they filed a motion to dismiss based on what they thought was a statute of limitations violation.  *Id.* 2-3.  The government responded by informing the defendants that the statute of limitations was tolled pursuant to its MLAT request.  *Id.* at *3.  Thereafter, the defendants filed a motion to compel discovery of the MLAT request made to Brazil and supporting documentation.  *Id.*  Finding those communications relevant to the defendant's motions to dismiss, the Court ordered the government to produce the MLAT request supporting materials.  "The government complied with that Order and produced the application, the supporting affidavit, and the correspondence received from the Brazilian authorities in response to the government's MLAT request."  *Id.*

In *United States v. Juan Vincent Gomez Castrillon*, the SDNY also ordered the government to produce MLAT materials to defendants even after it overruled a Fourth Amendment challenge.  2007 U.S. Dist. LEXIS 61451, at *16-19.  There, the defendants sought to contest wiretap evidence gathered in Columbia by local law enforcements that the US authorities later came to possess through an MLAT request.  The court disagreed that the defendants met the high bar required for suppression of evidence gathered abroad.  *Id.* at 16.  But it still found that "…documents relating to *inter alia* how the wiretaps relating to the evidentiary conversations came to be installed, how they were conducted and how the recorded conversations were preserved, are relevant and vital to the defense, if they are to mount an attack on the wiretap evidence at trial."  *Id.* at 18.

31

In this case, the defense cannot mount a viable and recognized constitutional challenge to the MLAT searches without the requested information. As such, it must be disclosed.

### b. The General Rule Against Suppressing Evidence Collected Abroad Has Exceptions that Apply to This Case

It should be apparent by now that the "international silver platter doctrine"—which seems to be the second proposition the government's stance embraces—must be counterbalanced against the hard reality that the rule is not inviolable. Indeed, this doctrine posits a "general rule against suppressing evidence collected by foreign law enforcement authorities abroad." *See United States v. Getto,* 729 F.3d 221, 227 (2d Cir. 2013). But it also provides two exceptions. The first exception that courts recognize is where "the conduct of foreign officials in acquiring the evidence is so extreme that it shocks the judicial conscience." *Id.* The second exception is "where cooperation with foreign law enforcement officials may implicate constitutional restrictions." *Id.* In *United States v. Juan Vincent Gomez Castrillon*, the court found these exception unmet (but still mandated disclosure of MLAT materials on other ground). In this particular case, these constitutional exceptions may actually be implicated.

Here, foreign court records indicate that the Attorney General's Ministry in Belize received the MLAT request, and then forwarded it on September 9, 2014 to the Financial Intelligence Unit ("FIU"). *See* Judgment, Financial Intelligence Unit and Robert Banfield, et. al., Claim No. 531 of 2014, In the Supreme Court of Belize, A.D. 2014, attached hereto and marked Exhibit "N". Those same records indicate that "[t]he FIU thereafter conducted investigations and collaborated with unnamed foreign competent authorities." *Id.* at ¶14. Later that day, the "FIU coordinated with the Belize Police Department to execute the MLAT Request by the search and seizure of documents at the premises of the corporate respondents, namely the 7th [IPC Management Services, Inc], 8th [IPC Corporate Services, Inc], 9th [IPC Corporate Services,

32

LLC], 10th [Titan International Securities, Inc], 11th [Legacy Global Markets, S.A.], and 12th [Unicorn International Securities, LLC] Respondents." *Id.* at ¶15. Subsequent to the search and seizure, however, the scope of the investigation "broadened to include the offense of money laundering." *Id.* Based on the results of these searches, the FIU sought a restraining order against monetary funds in Belize.

In reviewing these events, a Belizean court noted that at least 28 days elapsed after these searches and seizures without any criminal charges levied against the respondents named in the restraining order. *Id.* at 38. It found this turn of events out of step with local laws. Even as to the one respondent that was within the sights of the FIU before the execution of the MLAT, the Court aired its opinion that "[i]t passed strange as to why the investigation has not yielded charges." *Id.* at 40. After a searing condemnation as to the absence of independent evidence on which the FIU relied in seeking a restraining order, the Belizean Court ordered the restraining orders dissolved. *Id.* at ¶¶58-59, 66. These facts all point to indifferent local authorities acting at the seeming behest of an outside force. In fact, in addressing criticism that his agency "dropped the ball" in its handling of this matter, the FIU's new director has responded: "[n]o it wasn't a bungle because it wasn't a Belize case, it was a US case and the American government was very clear as to their request. They were very clear in respect to that and to the extent that is (*sic*) request, then that is as far as we go." *See* FIU's New Director Discusses Titanic Losses, available at http://www.7newsbelize.com/sstory.php?nid=32919 (Last viewed on December 4, 2015).

This statement, along with the position that co-defendant Robert Bandfield convincingly argues, makes the participation of the United States in local affairs real and clear. Video footage of at least one search that occurred after Belizean authorities received the MLAT request shows

U.S.-labeled vehicles participating in the search.  *See* Memorandum of Law in Support of Robert Bandfield's Pretrial Motions, 14-CR-00476-ILG, Dkt. No. 72 at *16.  News reports, moreover, indicate the participation of U.S.-funded anti-drug units.  *Id*.

While it may be that after receiving the MLAT request Belizean authorities acted of their own accord and without involvement of US agents, at present this Court cannot verify that claim. Representations made by local authorities to the Belizean courts in the above referenced proceeding indicate that there was some degree of communication and joint investigation after they received the MLAT request.  The statements of the FIU's new director all but concede the point of US-led involvement.  And the urgency of the request and the speed with which Belize responded to the United States government (at the cost of developing sufficient probable cause though an independent investigation) suggests that significant representations were made in the MLAT request or simultaneous communications.  While this extrapolation may be misguided, Mr. Mulholland should not be guessing at the significance of information that could have an impact of constitutional magnitude on his case.

Although significant hurdles are imposed when seeking to challenge extraterritorial conduct with implications in the United States, the fact remains that such challenges exist and are as judicially recognized as are the hurdles conceded. Where a constitutional challenge to the admissibility of evidence the government seeks to admit at trial may exist, the defense is entitled to the document that would substantiate that challenge.  Here, there is at minimum a facial challenge to the government's assertion that its agents did not participate in the gathering of evidence abroad. But as the government has chosen to withhold the MLAT request and information necessary to articulate a more incisive challenge, it should also bear the preclusion of evidence gained from that request at trial.

34

On this basis, and all of those set forth by Mr. Bandfield, Mr. Mulholland respectfully asks that this Court issue an order suppressing the fruits of any search derived from the government's MLAT request.  In the alternative, he requests that the Court order the government to produce the MLAT request and any communications surrounding its transmittal, acceptance and follow up by Belizean authorities so that he can examine the procedures employed in gathering evidence abroad and whether an agency relationship was formed at that time.

## IV.    The Government Should Specify Procedures it Took to Safeguard the Attorney Client Privilege

In its discovery production, the government concedes that the attorney-client privilege covers at least some of the documents it has produced.  Upon information and belief, the source of these privileged documents is a cooperating witness who was an attorney to multiple defendants charged in this case.  As such, the government has communicated its various efforts to review and sort privileged from non-privileged documents.  Mainly, these efforts consist of building a "firewall" (alternatively known as an "ethical" or "Chinese" wall) within its own office to review documents that may fall within the privilege.  *See* Letter of Assistant United States Attorney Tali Farhadian to Andrew M. Lankler, 14-CR-00476-ILG, Dkt. No. 42, attached hereto and marked Exhibit "O" ("The prosecution team did <u>not</u> review the materials that had been withheld by the firewall team as privileged (the "firewall materials"), nor have they been made aware of the contents of those materials.  The government here provides to you those firewall materials which the government has determined can be disclosed to your client; these are communications between officers of Legacy Global Markets S.A. and an attorney.")

The government has identified documents Bates-stamped EDNY-TT-PRIV-0000000000001 through EDNY-TT-PRIV-0000000000889 as possibly privileged.  *Id.*  It has also identified documents Bates-stamped EDNY-TT-PRIV-0000000000890 through EDNY-TT-

PRIV-0000000000896 as privileged too.  *See* Letter of Assistant United States Attorney Tali Farhadian to Andrew M. Lankler, 14-CR-00476-ILG, Dkt. No. 44, attached hereto and marked Exhibit "P".

While the defense appreciates the government's efforts in attempting to protect the attorney-client privilege in the course of its investigation, its efforts to do so fall woefully short. The government might argue that it took abundant precautions in its determination that the "crime fraud exception" applies.  Generally, "[a] party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime."  *United States v. Jacobs,* 117 F.3d 82, 87 (2d. Cir. 1997). Specifically, there is a "two-step process."  *Id.*  As the Second Circuit has explained:

> First, the proposed factual basis must strike "a prudent person" as constituting "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." Once there is a showing of a factual basis, the decision whether to engage in an *in camera* review of the evidence lies in the discretion of the district court. Second, if and when there has been an *in camera* review, the district court exercises its discretion again to determine whether the facts are such that the exception applies.

*Id.* (internal citations committed).  The defense recognizes that while a finding of probable cause that the "crime fraud exception" applies is required, an *in camera* review of documents is not similarly mandated.  *See United States v. Kaplan,* 2003 U.S. Dist. LEXIS 21825, *30 (S.D.N.Y. 2003).  But it is sometimes preferable, based on the unique facts of a case.

A situation such as that presented in *United States v. Kaplan* in which a court has granted a search warrant to seize documents that may be subject to the privilege is different from one in which documents are independently produced to the government by a motivated source.  Yet even there, the district court took an opportunity to join the chorus of tribunals that cast doubt on

the usefulness of an "ethical wall" that does not provide the defendant an opportunity to challenge potentially privileged materials landing in the hands of the prosecuting team:

> Although the Government cites five "recent publicly filed cases" in this district wherein an "ethical wall" has been employed, none of these cases resulted in opinions addressing the propriety of the use of ethical walls.  Moreover, it is not clear that judges in the cases were even aware of the use of an ethical wall, since a review of court records does not show the practice was ever challenged by the defendants. Certainly this Opinion should be counted among those disapproving the Government's use of an ethical wall team to "protect" the attorney-client and work-product privileges or to determine whether the crime-fraud exception applies, where potentially privileged materials are turned over to the trial team and case agents before any challenge to those determinations can be raised by a Defendant and determined by a court.

*United States v. Kaplan,* 2003 U.S. Dist. LEXIS 21825, *36-37 (S.D.N.Y. 2003).

In the situation at hand, the conflict of the government's cooperating witness is doubly clear and the likelihood of his admissions to be self-serving is high.  He is a lawyer who represents himself to give legal advice, but when pressed by government authorities, turns state's evidence and lines up as a cooperating witness against his clients.  As a result, an inquiry into the independent evidence upon which the government relied in making its determination of probable cause to believe the information he provided them was not privileged is of paramount importance and should be subject to challenge.  The cooperating witness' incentive to abuse the attorney-client privilege is great.  And it is this possibility that implicates serious due process concerns.

As this juncture, therefore, Mr. Mulholland preserves his right to challenge the use of documents gathered in violation of his attorney-client privilege and requests that the Court instruct the government to delineate the procedures it used in gathering documents from the cooperating witness, when it received these documents, the format in which it received these documents, and how they were subsequently used throughout the course of its investigation, which is to include the presentation of documents to the Grand Jury.  If such documents were improperly submitted to the Grand Jury that indicted Mr. Mulholland, there remains a possibility

of a legally defective indictment having been returned.  His need to be advised as to this fact is therefore paramount to defense counsel's ability to articulate this argument.

## V.    The Government Should be Requested to Provide a Bill of Particulars

The purposes behind a Bill of Particulars are clearly set forth both by statute and precedent.  Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him.  This enables him to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.  *United States v. Bortnovsky*, 820 F.2d 575, 574 (2d Cir. 1987).

The Second Circuit has made clear that the "principal function of a bill of particulars is to apprise a defendant of the essential facts of the crime for which he has been indicted, especially in the instances where the indictment does little more than track the language of the statute allegedly violated."  *United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir. 1973).

Generally speaking, a Bill of Particulars is not designed to elicit "evidentiary" material nor may it compel the government to reveal its entire case, or all of the evidence it hopes to adduce at trial.  Nevertheless, the defendant is entitled to know the theory of the government's case, *Yearsain v. United States*, 314 F.2d 881 (9th Cir. 1963), and it is not an impediment to the granting of a Bill of Particulars that such information is "evidentiary" where the requested information is necessary to the preparation of the defendant's defense.  *United States v. Crisona*, 271 F. Supp. 150 (S.D.N.Y. 1967); *United States v. Covelli*, 210 F. Supp. 589 (N.D. Ill. 1962). While a decision as to whether or not to grant a motion for a bill of particulars rests in the discretion of the trial court, *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984), that

discretion is not unlimited.  The Second Circuit has found the failure to grant such a motion can be reversible error.  *See United States v. Bortnovsky*, *supra*.

The need for a Bill of Particulars in this matter arises from both the complex nature of the allegations levied against Mr. Mulholland and also the voluminous amount of discovery provided.  "[S]ometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (citing *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987)).  In this case, much of the government's discovery is of a technical nature that cannot easily be separated into relevant and irrelevant parts.

As of today, the government has made at least six rounds of discovery production.  It has produced financial records from Scottsdale Capital Advisors, Bank of America, PayPal, Bank of New York Mellon, the Federal Reserve, Saxo Bank, Beaufort Securities Limited, and Commerzbank.  *See* Government Letters Accompanying Discovery Productions, 14-CR-00476-ILG, Dkt. Nos. 37, 38, 42, 44, 54, attached hereto and marked Exhibit "Q" (Identifying Government Bates Nos. EDNY-IPC-6663-6888, EDNY-IPC-12194-13879, EDNY-IPC-13880-15921, EDNY-IPC-16413-16448, EDNY-IPC-164449-16464, EDNY-IPC-16465-17966, EDNY-IPC-17967-17991, EDNY-IPC-17992-17994, EDNY-IPC-17995, EDNY-IPC-17996-18001, EDNY-IPC-18002-20951, EDNY-IPC-20952-20953, EDNY-IPC-20954, EDNY-IPC-20955-21818, EDNY-IPC-23630-25839, EDNY-IPC-25840-25954, EDNY-IPC-25955-25956, EDNY-IPC-26250-26259 as financial records).  The government has also provided the emails, pen registers and personal journals that tie to dozens of individuals; and it has represented itself to be in possession of 13 four terabyte hard drives, 1 one terabyte hard drive and 1 500 gigabyte hard drive that also tie back to several different individuals.  It is from within this mountain of

documents that the government expects Mr. Mulholland to mine forty transactions in which he participated that could possibly constitute 'pump and dump" schemes.

Recently, the government has offered to assist the defense in identifying limited documents within the discovery. *See* Response of Assistant United States Attorney Jacquelyn M. Kasulis, Dkt. No. 71 (Exhibit "M"). The government has also agreed to produce some discovery in searchable form. *See* Memorandum of Law in Support of Robert Bandfield's Pretrial Motions, 14-CR-00476-ILG, Dkt. No. 72 at *40, fn.11. But these gestures do not go far enough given the complexity of the government's case.

In some circumstances, courts have looked favorably upon the government providing the defendant's a road map with which to understand the discovery it has produced. For example, at least one district court denied the request for a Bill of Particulars upon a showing that:

> ...the Government has attempted to distill the "mountain" of potential evidence for the defendants, providing them with "roadmaps" explaining which documents support each overt act alleged in the Superseding Indictment. Moreover, at oral argument, the Government stated that it planned to provide the defendants with a subset of documents, culled out from the voluminous records, that it believes support the charges and may be used in its case-in-chief. Accordingly, defendants have or will have sufficient information to defend against these charges.

*United States v. Chambers*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006) (internal quotations omitted). But here it is unclear whether the government intends to provide assistance in identifying all records that would substantiate that Mr. Mulholland and others worked between 2009 and September 2014 to create "numerous shell companies and bank accounts through which passed approximately $500 million in fraudulent proceeds connected to more than 100 U.S. citizens and residents." Superseding Indictment, 14-CR-00476-ILG, Dkt. No. 32, ¶22. Or that it will identify all the evidence to support is claims that Mr. Mullholland was "responsible for fraudulently manipulating the stock of more than forty U.S. publicly traded companies and then transferring,

through attorney escrow accounts associated with five offshore law firms, approximately $300 million in fraudulent proceeds into, *inter alia*, accounts controlled by the Mulholland Group in the U.S. and Canada." *Id*. at ¶23.

The government may find support for its allegations at any point within tens of thousands of pages of discovery. And such circumstances, a general roadmap is no different than asking Mr. Mulholland to find randomly dispersed needles in myriad haystacks. It does not alleviate the concern of surprise at trial.

To be clear, and from a practical standpoint, in order for counsel to be effectively prepared in a case involving millions of documents, more pointed particulars must be provided. The government has had years to review this discovery with many individuals involved. To permit such a one-sided playing field offends the sense of fairness and due process the constitution requires. Sound policy reasons resonate in favor of a court order specifying that the government must assist in identifying relevant documents for the defense within its discovery that substantiate the claims in its indictment or by providing a Bill of Particulars so that Mr. Mulholland can do the same in anticipation of trial.

Based on the foregoing, the government should be requested to file a Bill of Particulars specifying:

- names of shell companies the government maintains were used for a pump and dump scheme;

- the attorney escrow accounts and the holders thereof allegedly used by the defendants to commit the crimes charged;

- the names of the IBCs which were created for purposes of committing the crimes charged in the indictment, the beneficial owners of said IBCs, the "true" owners of the IBC's;

- the nominees claimed by the government to have controlled each of the companies that the government claims were used for the pump and dump scheme;

41

- the names of any "sham" companies claimed by the government to have been used to park shares;

- each "penny stock" alleged by the government to have been used by the defendants to facilitate the crimes charged;

- the "wash trades" made by the defendants or by others acting on their behalf, when said wash trades were executed, by whom they were executed and the manner in which these particular trades furthered the conspiracy as related to each company;

- With respect to the allegations of "pump and dump", Mr. Mulholland request that the government identify:

  o For each company charged as part of this conspiracy, the companies or individuals claimed to have controlled the shares of the company, or the "float";

  o The manner in which shares were fraudulently inflated;

  o By whom the shares were fraudulently inflated;

  o The brokers used to transact the trades involved;

  o The false and misleading press releases, by whom they were put out, and at whose directions they were put out;

  o The false and misleading representations made in the press releases;

  o The individuals claimed to have falsely enhanced the stock prices and the trades the government claims were made at the "dump" period;

  o The manner in which the defendants impeded the IRS from conducting its functions of revenue collection;

- With respect to alleged FATCA violations, the relevant parts of that statute that the government claims were applicable to the defendants and that they sought to violate through their conduct;

- With respect to the money laundering and fraudulent sales of securities charges, Mr. Mulholland requests that the government identify the monetary transactions and fraudulent sales of securities that forms the basis for these charges. In this regard, we ask that the government identify the connection between each specific monetary transaction and the specific sale of securities that ties to that transaction.

- The precise documents it used before the Grand Jury which were gained from the cooperating witness with whom Mr. Mulholland or Legacy can claim an attorney-client privilege.

Mr. Mullholland submits that there is no conceivable prejudice to the government from having to specify the limited particulars delineated above. We should add that this will also enable the defense to prepare for trial in a more expeditious manner.

## VI. The Indictment Contains Surplusage as to the Foreign Account Tax Compliance Act "FATCA"

In conformity with Rule of Criminal Procedure 7(d), Mr. Mulholland moves to strike surplusage from the indictment. That rule states that upon "…the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). Surplusage is broadly construed as "allegations…not relevant to the crime charged" and which "are inflammatory and prejudicial." *See United States v. De Palma*, 461 F.Supp. 778, 797 (S.D.N.Y. 1978) citing to *United States v. Pilnick*, 267 F.Supp. 791 (S.D.N.Y. 1967) and *United States v. Chas. Pfizer & Co.*, 217 F. Supp. 199, 201 (S.D.N.Y. 1963). As such, in an indictment "[t]he Government may broadly allege that which it intends to prove and that which, under applicable principles of law it may prove." *Id.* at 797. But "[t]he language of the Indictment cannot be more prejudicial than the evidence offered to sustain it." *Id.* Here, in describing the FATCA regime, the government's superseding indictment makes sweeping conclusions of law that invade the Court's province to determine the applicable law and instruct the jury.

In setting forth "Relevant Regulatory Principles and Definitions", the Superseding Indictment defines the Foreign Account Tax Compliance Act ("FATCA") as a federal law enacted in March 2010 "that targeted tax non-compliance by U.S. taxpayers with foreign financial accounts and offshore assets." *See* Superseding Indictment, 14-CR-00476-ILG, Dkt. No. 32, Section II, ¶14. It further states that "FATCA required foreign financial institutions to report to the Internal Revenue Service ("IRS") certain financial information about accounts held

43

by U.S. taxpayers or foreign entities in which U.S. taxpayers held a substantial ownership interest." *Id*. These statements shade a far more complicated truth, which cannot be easily distilled to a "principle" as set forth in the government's indictment.

Stating that FATCA is a law that came into effect in 2010 is a misstatement. It is a law that *started* coming into effect in 2010 and that aimed at overhauling the Qualified Intermediary system for reporting withholding taxes. Section 501(a) of The Hiring Incentives to Restore Employment Act of 2010, Pub. L. 111-147 (H.R. 2847) added a new chapter 4 (sections 1471 — 1474) to Subtitle A of the Internal Revenue Code. Chapter 4 expanded the information reporting requirements imposed on foreign financial institutions as defined in section 1471(d)(4) with respect to certain United States accounts as defined in section 1471(d)(1). It also imposed withholding, documentation, and reporting requirements with respect to certain payments made to certain foreign entities. Section 501(d)(1) of the Act made chapter 4 generally effective for payments made after December 31, 2012. *See* I.R.S. Notice 2010-60, 2010-37 I.R.B 329. But certain entities had until the end of 2013 to opt into the FATCA regime.[15] *See* I.R.S. Notice 2011-53, 2011-32 I.R.B. 124, at §IIA.1. Later, reforms aimed at how certain financial institutions abroad dealt with certain pass thru payments were stalled until January 1, 2015. *Id*. at §IIC.2.

Beyond the fact that it is incumbent on the government to state the manner in which Mr. Mulholland and other co-defendant's conspired to evade an act not possibly being enforced during all times of the government's alleged conspiracy, a bare statement that the act was enforceable misleads the jury and creates surplusage in the indictment.

---

[15] Entities participating in the FATCA regime became Participating Foreign Financial Institutions (P-FFI) and entities not participating in it became known as Non-Participating Financial Institutions (NP-FFI). *See generally*, 26 U.S.C. §§ 1471-1474. Despite its far reaching nature, then, FATCA did not immediately reach every individual or entity possibly subject to US tax laws.

44

## VII.   The Government Should be Required to Provide 404(b) Evidence It Intends to Introduce at Trial

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident (Fed. R. Evid. 404(b)). Given the inherent prejudice in such testimony, Federal Rule of Evidence 404(b) requires:

> [u]pon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial, if the Court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The defendant respectfully requests that the government be compelled, sixty days prior to trial, to provide the defense with any prior or similar act evidence it intends to introduce at trial.

This request is made pursuant to Fed. Rule of Crim. Proc. 16 (a)(1)(c) and, as such we ask that the government be directed to disclose any and all acts which the government will seek to introduce pursuant to Rule 404(b) in such time so as to permit sufficient time for the defense to move to preclude the introduction of such evidence.  We ask that this notice be provided well in advance of trial as it is likely that some such acts will date back several months or years and in order for the defense to effectively investigate and posit cogent and meritorious arguments in support of preclusion, sufficient notice is required. While we understand that our request for sixty days may be longer than is usually granted, as set forth, *supra*, this case involves an international investigation in Belize and possibly multiple other jurisdictions.   Given the compelling nature of other crimes evidence, we must be afforded an adequate opportunity to thoroughly investigate any evidence the government seeks to introduce.   The temporal and geographic reach of the instant matter requires an extended allotment of time to investigate this evidence.

45

Such notice should include the nature of this evidence, the pertinent witnesses, any supporting documentation, and the legal theory of admissibility to be relied upon by the government. Such a procedure is necessary to enable the accused to file appropriate *motions in limine* and to allow this Court to make a considered pretrial determination of the admissibility of any such evidence proffered by the government. Moreover, such pretrial notice would provide the defense an opportunity to challenge the evidence on its merits and/or discuss with the government the possibility of stipulating to such evidence in a manner which ameliorates any ensuing prejudice from the introduction thereof.

Like the majority of other Circuits, the Second Circuit follows an inclusionary approach to the admission of 404(b) evidence. Under this inclusionary approach, evidence of other crimes is admissible for appropriate purposes other than to show a defendant's criminal propensity. *See e.g.*, *United States v. Simmons*, 678 F.2d 1042, 1050 (3rd Cir. 1982). In *Huddleston v United States*, 485 U.S. 681 (1988), the United States Supreme Court overruled the Second Circuit's then established requirement that similar act evidence could be admitted only if the government established, by a preponderance of evidence, that the accused committed the act. The *Huddleston* Court held that the government need only present evidence which would permit a jury to "reasonably conclude" that the defendant committed the act. A defendant's ability to fully and articulately contest similar act evidence is therefore clearly "material" to the preparation of the defense in light of the relaxed burden upon the government and the inclusionary approach to this evidence. Our need for the earliest possible production of this proposed evidence is also amplified by the limited burden imposed upon the government.

An "inclusionary view of the rule regarding other crimes and similar evidence... is by no means [a] view that such evidence is either presumed relevant or automatically admissible. Its

46

relevance to an issue truly in dispute must be demonstrated." *United States v. Halper*, 422 F.2d 432 (2d Cir. 1978). In *Huddleston v United States*, *supra*, the Supreme Court established a four pronged test for admission of uncharged crimes evidence. The evidence must be: (1) offered for a proper purpose consistent with Rule 404b; (2) it must satisfy Federal Rule of Evidence § 402 as enforced by Federal Rule of Evidence §104(b); (3) the probative value of the evidence must outweigh its prejudicial impact and; (4) a limiting instruction may be given by the court which would properly guide the jury in the manner in which the evidence sought for introduction is to be considered.

While we understand that Rule 404(b) contains a non-exhaustive list of purposes for which other act or crime evidence may be admitted, the government must explain in detail the purposes for which the evidence is sought to be admitted. Only with such information can a Court reasonably decide whether the evidence falls within the ambit of permissible purposes to warrant admission of this evidence. Once the Court determines that the evidence is admissible, it must then balance the probative value of the evidence against its prejudicial impact under Federal Rule of Evidence § 403. *See generally, United States v. Levy*, 731 F.2d 997 (2d Cir. 1984). In performing the balancing analysis required by Rule 403, the trial court must consider a variety of factors including the obvious prejudice which arises from the introduction of evidence suggesting that the defendant has engaged in other criminal activity in addition to the offenses with which he is charged. Such evidence implies that since he committed the other crimes, the defendant must also be guilty of the crimes for which he is on trial. *United States v. Schwartz*, 790 F.2d 1059, 1062 (3d Cir. 1986); s*ee also*; *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) ("A classic example of unfair prejudice is a jury's conclusion...that since the defendant committed so many other crimes, he must have committed this one too"). "Other crimes, wrongs

or acts" evidence may also tend to unfairly excite the jurors' emotions against the defendant. *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Additionally, evidence of other crimes may confuse or mislead the jury. The danger of this multifaceted prejudice pervading the fact finders' consideration must be scrupulously guarded against to prevent convictions based on propensity and not the evidence of the crime charged. As such, early disclosure and an opportunity to litigate the admissibility of the proffered evidence is necessary to facilitate a fair and just determination. Indeed, the trial court's discretionary function is ultimately aborted if both the defendant and the Court are to confront the issue of admissibility of "other crimes, wrongs, or acts," evidence on the eve of or in the heat of trial. *United States v. Lewis*, 482 F.2d 632, 643 (D.C. Cir. 1973). Thus, the defendant and the Court should have sufficient notice and opportunity to perform the delicate analysis required by Rule 403.

Based upon the foregoing, this Court should require the government to disclose "other crimes, wrongs, or acts" evidence it intends to use against this defendant as well as against any other co-defendant or co-conspirator. This disclosure must be made well in advance of trial to enable the allegations to be sufficiently and effectively investigated and contested. In addition, this Court should hold a hearing prior to trial to resolve all legal and factual issues regarding the admissibility of such evidence.

## VIII. The Government Should Disclose all Exculpatory and Impeachment Material Forthwith

A prosecutor has a constitutional duty to disclose material, exculpatory evidence to the defense, regardless of whether defense counsel makes a specific request. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty extends not only to information relevant to guilt, but also to evidence that would tend to impeach the prosecution's witnesses. *Bagley*, 473 U.S. at 676-77 ("When the reliability of a given witness

48

may well be determinative of guilt or innocence, non-disclosure of evidence affecting credibility falls within the general rule of *Brady*.")  (internal quotation marks and brackets omitted); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

A breach of that duty violates due process when: (1) the prosecution suppresses impeachment evidence that was actually or constructively in its possession, regardless of the good or bad faith of the prosecutor; and (2) the suppressed evidence was material. A defendant does not need to show that the evidence, if disclosed, would have resulted in his acquittal; rather, he needs to show only that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995); *Bagley*, 473 U.S. at 682 (Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome.").

Impeachment evidence has been deemed to fall within the standard of materiality for *Brady* purposes.  *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) ("Evidence of impeachment is material . . . where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." (internal quotation marks omitted)).

Even if the prosecutor is not directly aware of the evidence sought herein, a *Brady/Giglio* violation can still occur if the evidence was in the prosecutor's constructive possession.  For example, in *Kyles v. Whitley*, *supra*, the Supreme Court held that state prosecutors have a duty to disclose impeachment evidence known to the police, even if the prosecutors themselves were not actually aware of the information.  The Court stated:

> . . . the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such

[undisclosed favorable] evidence and make disclosure when the point of "reasonable probability" is reached. ***This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.***

*Id*. at 437 (emphasis added).

It is clear that the law in this Circuit is that such material must be provided to the defense "no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *United States v. Coppa*, 267 F.3d 132, 142 (2001). This, of course, begs the essential question, since "[t]he linking of the scope of the disclosure obligation with the remedy for its breach creates both a responsibility and a problem for the prosecutor." *Id*. As such, it would appear that disclosure of such information at the earliest feasible juncture relieves the prosecutor of having to predict both the outcome of the trial and the relative impact that late disclosure might have on that result. We therefore maintain that all exculpatory and impeachment material as detailed herein be disclosed forthwith.

Based on the foregoing, a request is here made for an Order directing the pre-trial disclosure of all exculpatory and impeachment material, including but not limited to:

    a.    Any and all information and/or material which tends to exonerate the accused, GREGG MULHOLLAND, or which tends to show that he did not knowingly commit any offenses alleged in the Indictment. This request includes complete and partial vindication;

    b.    Any evidence from any cooperating witness which suggests that the conduct herein was precipitated by the advice of counsel;

    c.    Any and all evidence which tends to impeach the credibility of any prospective government witness, including but not limited to:

        (1)    Any and all records or information revealing prior criminal convictions or guilty verdicts or juvenile adjudications, including but not limited to relevant "rap sheets" or records of departmental infractions or sustained acts of misconduct of each witness the prosecutor intends to call at trial;

        (2)    Any and all records and information revealing prior or

50

subsequent misconduct, unethical conduct, criminal acts or bad acts of any witness the prosecutor intends to call at trial;

(3)    Any and all allegations of prior or subsequent misconduct, unethical conduct, criminal acts or bad acts of any witness the prosecutor intends to call at trial of which the prosecutor knows or through the exercise of reasonable diligence should have reason to know;

(4)    Any and all consideration or promises of consideration given during the course of the investigation and preparation of this matter by any law enforcement officials, including prosecutors or agents, police or informers, to or on behalf of any witness, or on behalf of a relative of any such witness the government intends to call at trial, or any such consideration or promises expected or hoped for by any such witness, or relative of any witness, at any future time. Such "consideration" refers to anything which arguably could be of value or use to a witness, or relative of the witness, including but not limited to: formal or informal, direct or indirect, leniency; favorable treatment or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative, regulatory, disciplinary or other matter involving the state or federal government or agency thereof, any association (including legal association), any other authority, or other parties; civil, criminal or tax immunity grants; relief from forfeiture; payments of money, rewards or fees, witness fees and special witness fees; provisions of food, clothing, transportation, legal services, alcohol or drug related rehabilitation services or other benefits; placement in a "witness protection" program, informer status of the witness; letters to anyone advising the recipient of the witness's or the relative's cooperation; recommendations concerning licensing, certification or registration (including liquor licenses and the license to practice law); recommendations concerning federal aid or benefits; promises to take affirmative action to help the status of the witness, or relative of the witness, in a profession, business, or employment, or promises not to jeopardize such status; aid or efforts in securing or maintaining the business or employment of a witness, or a relative of the witness; and anything else which arguably could reveal any interest, motive or bias of the witness in favor of the

prosecution or against Gregg Mulholland or which could act as an inducement to testify or to color his testimony;

(5) Any and all statements formal and informal, oral or written by the prosecution, it's agents and representatives to any person (including counsel for such persons) whom the prosecution intends to call as a witness at trial pertaining in any way to the possible or likely course or outcome of any government action state or federal, civil or criminal or licensing (including liquor licenses and the license to practice law) matters against the witness, or anyone related by blood or marriage to the witness;

(6) Any statements read or made by the Government to the departments of pre-trial services or probation in connection with the prosecution or conviction of any prosecution witness or potential prosecution witness;

(7) Any and all threats, express or implied, direct or indirect, or other coercion directed against any witness, or against a relative of such witness, whom the prosecutor intends to call at trial; criminal prosecutions, investigations, or potential prosecutions pending or which could be brought against any such witness, or relative of such witness; any probationary, parole, deferred prosecution or custodial status of any such witness, or relative of such witness; and any civil, tax court, court of claims, administrative, or other pending or potential legal disputes or transactions involving any such witness, or relative of such witness, and the state of federal government, any agency thereof or any regulatory body or association or over which the state or federal government, agency, body or association has real, apparent or perceived influence;

(8) A list of any and all requests, demands, or complaints made of the government by any witness which arguably could be developed on cross-examination to demonstrate any hope or expectation on the part of the witness for favorable governmental action in his behalf or on behalf of a relative to such witness (regardless of whether or not the government has agreed to provide any favorable action);

(9) With respect to each witness the government intends to call at trial, or any member of the immediate family of any such witness, disclose copies of all indictments, complaints or informations filed against such person by the federal, or

52

any state or local government, all administrative, disciplinary, regulatory, licensing, tax, customs, or immigration proceedings brought by the federal, or any state or local government, or by any regulatory body or association, and state what counts or actions have been the subject of guilty pleas, convictions, consent decrees, dismissals, or understandings to dismiss at a future date; the date or dates on which pleas of guilty, if any, took place; and the names of the judges or hearing officers before whom such pleas were taken. If the government does not have copies of all indictments, complaints, or proceedings, state the dates and places of arrests, hearings, indictments, and informations, the charges brought, and the disposition of those charges or matters so far as it is known to the government;

(10)    With respect to each witness the government intends to call at trial, or any member of the immediate family of any such witness, a written summary of all charges or proceedings which could be brought by the federal, or any state or local government, but which have not or will not or which the witness believes have not or will not be brought, because the witness is cooperating with or has cooperated with the government, or for any reason. Include copies of all memoranda of understanding between the government and its witnesses, whether by way of a letter to the attorney for a witness or otherwise;

(11)    Any material not otherwise listed which reflects or evidences the motivation of any witness either to cooperate with the government or any bias or hostility against Gregg Mulholland; the existence and identification of each occasion on which a witness had testified before any court, grand jury, administrative, regulatory, disciplinary body or other association, or otherwise officially narrated in the investigation of this case, the indictment of the facts of this case, and any testimony, statements or documents given by the witness regarding same;

(12)    All judicial proceedings in any criminal cases, and all regulatory, association or disciplinary proceedings (including licensing for liquor sales or law practice) of which the government knows or through the exercise of reasonable diligence should have reason to know in which testimony by any person has been given, regarding the misconduct, criminal acts or bad acts of any witness the

53

government intends to call at the trial of this action;

(13)    Any statements or documents, including but not limited to, judicial, regulatory, administrative, disciplinary, association or grand jury testimony, or federal, state or local tax returns, made or executed by any potential prosecution witness in connection with this action or related to this action, which he prosecution knows or through the exercise of reasonable diligence should have reason to know, is false;

(14)    Copies of all medical and psychiatric reports known to the prosecutor or which can reasonably be known to the prosecutor concerning any witness the prosecutor intends to call at trial which may arguably affect the witness's credibility or his ability to perceive, state or recall events;

(15)    All documents and other evidence regarding drug or alcohol usage and/or dependency by any individual the government intends to call as witness at trial, including but not limited to records relating to treatment of such individual in any federal, state, city or military drug or detoxification program;

(16)    Any written or oral statements, whether or not reduced to writing, made by any potential prosecution witness which in any way contradicts or is inconsistent with or different from other oral or written statements he has made;

(17)    Any requests prepared by the prosecution for permission to grant formal or informal immunity or leniency for any witness, whether or not such request was granted;

(18)    Copies of any and all records of law enforcement agencies reflecting intra- departmental disciplinary action taken against any law enforcement official or agent who will testify at trial;

(19)    Copies of any and all records of any law enforcement or other governmental agency reflecting any commendations, awards, or recognition or any kind, or requests for any commendations, awards or recognition of any kind made to or by any government agent or law enforcement officer for any work, action or conduct in connection with the investigation and prosecution of this case or any related case; and

54

(20) The same records and information requested in items "(1)" through "(19) " with respect to each ***non-witness declarant*** whose statements will be offered in evidence at trial.

c. The identifying information for any written or oral statements made by any person with knowledge and information concerning the events charged in the Indictment and whose version of the same events is contrary to, or non-supportive of, the accusations set forth in the Indictment.

d. The name and address of any person and any written or oral statement which the Government reasonably believes has information helpful to the preparation of the defense and;

e. The name and address of any witness to any offense or offenses charged in the Indictment that have made any written or oral statement whom the Government does not intend to call as a witness in this case.

## IX. Disclosure of Statements of Interviewed Individuals as *Brady* Material

The government has provided Rule 16 discovery materials to the defense in this case. Upon information and belief, a major portion of the government's proof at trial will consist of the testimony of at least two cooperators. Upon information and belief, the government has also interviewed several individuals in connection with the investigation of the activities charged against Gregg Mulholland and these individuals are cooperators who have struck agreements with the government in exchange for their information and potential trial testimony.

Upon further information and belief, these individuals may have made statements which are contradictory or inconsistent with statements of other individuals and contradictory or inconsistent with the theory of the government's case against this defendant as set forth in the Indictment. As such, Mr. Mulholland moves, pursuant to *Kyles v. Whitley*, 514 U.S. 419 (1995), for the production of [1] any contradictory or inconsistent statements made to any law enforcement personnel/prosecutors by any individual[s], regardless of whether the government intends to call those individuals in its direct case; and [2] any evidence that would tend to

inculpate someone other than Mr. Mulholland in any count in the Indictment and/or overt act; and [3] or any evidence which is inconsistent with the theory of the government's case, as set forth in its Indictment, as it pertains to the specific role or activities of Mr. Mulholland.  The defendant requests the production of these statements or evidence, irrespective of whether the government intends to call the individual cooperator[s] or codefendant[s] as a witness.

The *Kyles* decision involved a New Orleans, Louisiana homicide prosecution where the police withheld from the prosecutor inconsistent statements of its witnesses and other evidence tending to implicate an individual other than the defendant. When the defense filed a detailed pre-trial motion for the disclosure of *Brady* material, the prosecution filed the routine response that no exculpatory evidence existed. After a jury was unable to reach a verdict in the first trial, the defendant was convicted on re-trial and was sentenced to death. It was during the post judgment proceedings that the defendant discovered the existence of overwhelming exculpatory evidence in the police files.

When the case reached the United States Supreme Court, the Court determined that a *Brady* violation had been committed when the Louisiana state prosecutor suppressed a series of inconsistent and contradictory statements made by its main informant and other civilian eyewitnesses concerning physical evidence seized and the identification of the defendant as a participant.  Although the opinion in *Kyles* is a fact-based analysis of whether there was, in fact, a "reasonable probability" that the suppressed statements would have led to a different result by the jury, the Court took the opportunity to address the prosecutor's affirmative obligations under *Brady*.  It is these obligations we invoke herein.

In *Kyles*, the Louisiana state prosecutor argued that it should not be held accountable under both *Bagley* and *Brady* for evidence known "only" to the police investigators and not

known to the prosecutor. Justice Souter specifically rejected this narrow view of prosecutorial responsibility:

> [A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure a fair trial.

*Kyles v. Whitley*, supra. The Court thus concluded that the "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, id. citing *Giglio v. United States*, 405 U.S. 150, 154 (1972). Justice Souter made clear that "procedures and regulations" can and must be established to ensure the communication of exculpatory evidence between police investigator and prosecutor, so that the prosecutor can meet its *Brady* obligations.

We submit that the government has an affirmative duty to specifically inquire of each investigating officer whether he or she is aware of any exculpatory information. Justice Souter was confident that the "prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id*. at 509 (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). This is especially important in a case such as this which involves several subjects, cooperators and informants in different states and perhaps Belize. Typically, law enforcement conducts several interviews with informants, some of whom are not necessarily arrested or brought in to speak directly with prosecutors. Their information, however, is still relied upon and used in the investigation and forms the partial basis for the prosecutions which follow. Any statements which fall within the doctrines enunciated in *Brady*, *Giglio* and *Kyles* must be communicated to the government by law enforcement and provided to the defense and it is the duty of the government to affirmatively inquire as to the existence of any such information.

As stated above, the defendant is entitled to the disclosure, whether or not the government intends to call the individuals as witness. In this regard, the *Kyles* Court reasoned that the defendant had the right to call the informant as an adverse witness and examine on the inconsistencies, question the investigating police officers on their knowledge of the inconsistent statements, or use them to attack the reliability of the investigation itself.  We request that these rights, of constitutional dimension, be fully accorded to Mr. Mulholland in this matter.

## X.    The Government Should be Directed to Provide Notice of Any Expert Testimony that it May Seek to Elicit at Trial

To the extent that any expert is permitted to testify in this case, it is respectfully asserted that this Court should direct the government to disclose to defense counsel the name and address of each expert, a summary of his/her anticipated testimony, and the reports, studies or other data on which such expert testimony will rely. Timely disclosure of this information is needed to enable counsel to file a motion *in limine* prior to trial to properly restrict the scope and extent of the proposed testimony. Absent such disclosure, the witness will be free to say anything, claim the source is some confidential government document or witness, without counsel effectively confronting this testimony.

To this end, the government is barred from using experts solely to bolster the credibility of the government's fact witnesses by mirroring their version of events. *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992). In particular, the *Cruz* court condemned the technique of having an expert state that a given set of facts is consistent with criminal behavior and then arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct. *Id*. Rather, the expert's testimony must deal with operations which have esoteric aspects reasonably perceived as beyond the ken of the jury and that expert testimony cannot be used solely to bolster the credibility of the government's fact witnesses by mirroring

58

their version of events. *Id; see also; United States v. Castillo*, 924 F.2d 1227, 1231 (2d Cir. 1991); *United States v. Scop*, 846 F.2d 135, 139-43 (2d cir. 1988).

Further, any expert called by the government should, pursuant to Fed.R.Evid. Rule 702, deal only with issues that are beyond the knowledge or understanding of an average juror. *Cruz*, 981 F.2d at 662; *United States v. Stevens*, 935 F.2d 1360, 1400 (2d Cir. 1991) (expert testimony properly barred where it would have pitched to the common sense of the jury). It is patently improper for an expert witness to merely parrot the testimony of other witnesses with respect to information which is certainly not beyond the ken of the average juror. *See*, *United States v. Long*, 917 F.2d 691, 702 (2d Cir. 1990); s*ee also, United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008).

The United States Supreme Court, pursuant to the rule-making authority granted by 28 U.S.C. § 2071, et seq., promulgated amendments to the Federal Rules of Criminal Procedure, effective December 31, 1993. One of the Rules which was amended by the Court was Rule 16(a)(1)(E).[16] That rule provides:

> (E) EXPERT WITNESSES. At the defendant's requests, the government shall disclose to the defendant a written summary of testimony the government intends to use under *Rules 702*, *703*, or *705* of the Federal Rules of Evidence during its case in chief at trial...The summary...shall describe the witnesses' opinions, the basis and the reasons for those opinions and the witnesses' qualifications.

The rule permits the opposing party to evaluate, prior to trial, whether the proposed witness meets the qualifications of an expert within the meaning of the Federal Rules of Evidence and whether the proposed testimony is admissible pursuant to the federal Rules of Evidence.  In light of Rule 705 and Rule 16, it is respectfully requested that the government be directed to provide the requested information to the defense.

---

[16] This rule is now found at 16(a)(1)(G).

## XI. The Government Should be Compelled to Provide a Witness List Prior to Trial

The government should be directed to identify its prospective witnesses at a time which will enable the defense enough time to conduct a thorough investigation of these witnesses and prepare cross-examination. It is respectfully submitted that, in the absence of any showing of a risk to any witness from disclosure, the defendant's request is not unreasonable. Nor will the production of a witness list be, in any way, prejudicial to the prosecution. The court's observation in *United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975), of the reasons for requiring disclosure of a witness list are clearly applicable here:

> The most potent argument for compulsory disclosure of the identity of the prosecution's witnesses is that, without the benefit of such disclosure, the defense may be substantially hampered in its preparation for trial . . . . Although continuances, which tend to mitigate the detrimental effects of unpreparedness, are sometimes obtainable, not only are they merely a partial solution to the problem of unpreparedness but, in addition, their prolongation of trials is of course costly to both the government and the defendant.

*Id*. at 301. *See also United States v. Mosely*, 450 F.2d (506) (5th Cir. 1971), *cert. denied*, 405 U.S. 975 (1972); *United States v. Goldman*, 439 F.Supp. 337 (S.D.N.Y. 1977). As Judge Weinstein so cogently stated, "[p]recision, accuracy and fairness suffer under a system of trial by ambush." *United States v. Gallo*, 654 F. Supp. 463, 480 (E.D.N.Y. 1987).

We request that the government disclose a list of witnesses in a manner which will afford the defense sufficient time to prepare for trial of this matter.

## XII. Permitting the Defendant to File Additional Motions Which May Arise From the Requests Made Herein

Given the nature of the instant motion, the defense respectfully requests the opportunity, if necessary, to file additional motions, based upon the resolution of the issues raised herein.

## CONCLUSION

For the foregoing reasons, defendant Gregg Mulholland's motions should be granted in

60

their entirety.

Dated:       New York, New York
              December 7, 2015

                                      Respectfully Submitted

                                  _____/s/_____
                                  JAMES KOUSOUROS
                                  260 Madison Ave. 22nd. Fl.
                                  New York, New York 10016

                                  _____/s/_____
                                  EDWARD SAPONE
                                  240 Fulton Street, 23rd Floor
                                  New York, NY 10038

CC:      Honorable I. Leo Glasser

         Assistant United States Attorney Jacquelyn Kasulis

         Assistant United States Attorney Michael Kielty