1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - -    X

UNITED STATES OF AMERICA,    :    14 CR 476 (S-2) (ILG)

                             :

     -against-               :
                                  United States Courthouse
                                  Brooklyn, New York
ROBERT BANDFIELD            :
GREGG MULHOLLAND

                                  April 21, 2016
          Defendants.       :    10:30 o'clock a.m.

- - - - - - - - - - - -    X

                TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE I. LEO GLASSER
          SENIOR UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:         ROBERT L. CAPERS
                            United States Attorney
                            BY: JACQUELYN M. KASULIS
                                WINSTON M. PAES
                                MICHAEL T. KEILTY
                            Assistant United States Attorneys
                            271 Cadman Plaza East
                            Brooklyn, New York

For the Defendants:         EUGENE E. INGOGLIA, ESQ.
                            SAVANNAH STEVENSON, ESQ.
                            Attorneys for R. Bandfield

                            JAMES KOUSOUROS, ESQ.
                            Attorney for G. Mulholland

GR     OCR     CM     CRR     CSR

2

Court Reporter:          Gene Rudolph
                         225 Cadman Plaza East
                         Brooklyn, New York
                         (718) 613-2538


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.



* * * * * * * *




THE CLERK:  Criminal cause for suppression hearing,

the United States versus Robert Bandfield and Gregg

Mulholland.

        Counsel, please state your appearances for the

record.

        MS. KASULIS:  Jacquelyn Kasulis and Michael Keilty

on behalf of the United States.

        Good morning, Your Honor.

        THE COURT:  Good morning.

        MR. INGOGLIA:  Good morning, Judge.

        Gene Ingoglia and Savannah Stevenson for

Mr. Bandfield.

        THE COURT:  Good morning.

        MR. KOUSOUROS:  Good morning, Your Honor.

        On behalf of Gregg Mulholland, James Kousouros.

3

1          THE COURT:  Good morning.

2          I think the first order of business this morning is

3    to arraign the defendants on the superseding indictment.  Why

4    don't we do that before we move on to the business of this

5    morning.

6          Mr. Mulholland and Mr. Bandfield, would you come up

7    for a minute?

8          MS. KASULIS:  Would Your Honor like us to approach

9    as well?

10          THE COURT:  That would be nice.

11          MS. KASULIS:  Your Honor, before we proceed,

12   AUSA Winston Paes who is also assigned to this case, he wanted

13   me to inform the Court that he is tied up in another matter

14   and plans to join us as soon as that matter resolves.

15          THE COURT:  I was about to ask, where is Mr. Paes.

16          MS. KASULIS:  He is on his way.

17          THE COURT:  All right.

18          Mr. Bandfield, good morning.

19          THE DEFENDANT BANDFIELD:  Good morning.

20          THE COURT:  Mr. Mulholland, good morning to you.

21          THE DEFENDANT MULHOLLAND:  Good morning.

22          THE COURT:  Have each of you received the second

23   superseding indictment?

24          Mr. Bandfield, have you?

25          THE DEFENDANT BANDFIELD:  Yes, I have.

4

1          THE COURT:  Have you had an opportunity to discuss

2     it with Mr. Ingoglia?

3          THE DEFENDANT BANDFIELD:  Yes, I have.

4          THE COURT:  Would you like me to read that

5     indictment to you?

6          THE DEFENDANT BANDFIELD:  No, thank you.

7          THE COURT:  How do you plead to it?

8          THE DEFENDANT BANDFIELD:  Not guilty.

9          THE COURT:  Mr. Mulholland, if I asked you the same

10    questions, would your answers be the same?

11         Have you received a copy of this indictment?

12         THE DEFENDANT MULHOLLAND:  Yes, sir.

13         THE COURT:  You discussed it with Mr. Kousouros?

14         THE DEFENDANT MULHOLLAND:  Yes, sir.

15         THE COURT:  Would you like me to read it to you?

16         THE DEFENDANT MULHOLLAND:  No, thank you.

17         THE COURT:  How do you plead to it?

18         THE DEFENDANT MULHOLLAND:  Not guilty, sir.

19         THE COURT:  Thank you.

20         I think you both can sit down and we can proceed

21    with the business of this morning.

22         Let me make sure we are all on the same page as to

23    why we are here this morning.

24         First, having reread the transcript of the last time

25    we were all here together, I find that I have ruled on many of

1    the motions which have been made but what are still

2    outstanding and waiting my decision is the Rule 16 motion

3    questions.

4           Mr. Mulholland had some objections to the wiretap

5    affidavits, and I don't know whether you are or aren't

6    proceeding with the Franks motion.  That seems to have been

7    left in the air at the time.

8           There were some question about surplusage but

9    everything else I think has pretty well been decided.

10          What we are here for this morning is to determine

11   the motion to suppress the evidence that was seized by the

12   searches that were conducted in Belize.  It was agreed that

13   this is not a case which involves shocking the conscience of

14   the Court insofar as the investigation was concerned.  I think

15   the parties agreed to that.

16          So the only business before us this morning is to

17   determine whether or not the foreign law enforcement agencies

18   became agents of the United States enforcement agencies, and

19   whether or not, if there were some cooperation agreements

20   between the two agencies, it was designed or intended to evade

21   Fourth Amendment restrictions.

22          I think that's all we are here for.  If I am wrong,

23   I would expect I would have heard about it by now.

24          Assuming that that is correct, I think the purpose

25   of the hearing is to receive evidence from the government,

6

1    which is the government's burden now to overcome the motion to

2    suppress regarding that agency issue.  If you are ready to

3    proceed, Ms. Kasulis, I am ready too.

4              MS. KASULIS:  Great, Your Honor.

5              There are two issues I wanted to raise with the

6    Court before we proceed.

7              The first is that we, as a courtesy to the witness,

8    would like to place a binder that is up there with the

9    exhibits and the 3500 material for the witnesses for ease of

10   reference during the course of the direct examination.  I am

11   assuming defense counsel wants to do the same with respect to

12   cross-examination.  We just wanted to make sure that the Court

13   had given us permission to do so.

14             THE COURT:  Sure.

15             MS. KASULIS:  Okay.  The second issue, and I raised

16   this with Mr. Ingoglia yesterday and I wanted to raise with

17   the Court, is that the government turned over 3500 material

18   for seven witnesses who could possibly have information

19   related to the issues at hand.  The government today intends

20   to call two witnesses, FBI Special Agent Thomas McGuire and a

21   Regional Security Officer with the State Department, Special

22   Agent Timothy Reid.

23             In the course of investigating -- excuse me --

24   preparing for this hearing, the government learned yesterday

25   that one of the witnesses, IRS Deputy Attache Troy Caldron,

1    who we did not intend to call today as a witness but we did in

2    fact turn over some 3500 material for, when we spoke with him

3    yesterday we learned that he had had more participation in

4    meetings with local Belizean law enforcement than the

5    government had been aware of when it had made its initial

6    disclosures.

7              We immediately asked Mr. Caldron to provide -- he

8    had some notes of meetings and phone calls around the time

9    period that were relevant to this proceeding, and so we asked

10   him to immediately provide those to the government.  We turned

11   those over yesterday to Mr. Ingoglia and Mr. Kousouros.

12             We did call Mr. Ingoglia as soon as we learned of

13   this new development and proposed that, if necessary, we'd put

14   this matter on for a second day of hearing to allow obviously

15   the defense to evaluate the recently disclosed information and

16   to determine -- the government as well -- to determine if

17   calling these witnesses is necessary.

18             I wanted to inform the Court of that development and

19   our proposal for a potential second day of hearing.

20             THE COURT:  All right.  Thank you very much.

21             If you are ready to proceed, Ms. Kasulis, why don't

22   you call your witness?

23             MR. INGOGLIA:  A couple of procedural things before

24   we start, if I might.

25             THE COURT:  Sure.

1        MR. INGOGLIA:  I did get the material last night.

2   Ms. Kasulis did call me and inform me of that newly learned

3   knowledge and I appreciate her openness.  Her suggested remedy

4   I think may be appropriate.  We will take a look at the

5   material but my inclination is unfortunately it may be

6   appropriate.

7        I think right now -- I don't know that -- the

8   witness personally but I think the second intended witness is

9   in the courtroom and I would ask that they leave during the

10  other's testimony.

11       Regarding the Agent McGuire's testimony today, I

12  just want to say a couple of things.  I guess we are noting

13  objections.

14       We don't know what Agent McGuire is going to say

15  because there has been no notes of what his -- any statements

16  that he may have made to the prosecutors about his anticipated

17  testimony.  I have asked the prosecutors about this and they

18  have told me that they understand their legal obligations.

19       I will acknowledging to -- I am sort of expressing

20  some bafflement as to how that could be because it seems to me

21  you can't avoid your disclosure obligations by choosing not to

22  take notes.  But regardless, so we object to that.

23       We are going to have to hear his testimony on the

24  fly and that may mean that my cross is somewhat more

25  cumbersome than it otherwise would have been and so I ask the

9

1  Court's indulgence on that.  It is hard for me to know what he

2  is going to say.

3         On the production that we received on Friday night,

4  we received a production of mostly emails relating to the

5  seven witnesses that Ms. Kasulis mentioned and they seem to

6  stop on September 15th.  If I were watching the movie of this

7  story, you would see a search take place on the 9th of

8  September and a flurry of activity leading up to that by

9  US law enforcement and then after that by US law enforcement

10  going down to Belize and the last scene we see in the

11  documents is Agent McGuire saying I am going to go meet with

12  the Belizeans to look at what they have found and then the

13  screen goes black.

14         I don't know why that is.  I will inquire of Agent

15  McGuire if he stopped using his emails during the subsequent

16  time, but it seems to us that documents that happened after

17  that time could still reflect on the issues that are at play

18  here and so we think we should have seen that stuff.  I know

19  the government disagrees.  But we think this is our

20  opportunity to try to explore the facts that we don't really

21  have access to and we'd ask the Court for a little leeway in

22  trying to explore these facts.

23         We think the government should produce those emails

24  even though they go later in time.

25         I know that the US Attorney's Office has grown tired

1   of my repeated calls for the government to produce their MLAT

2   request, which prompted the search.  This is the one that the

3   US Government prepared and it is what initiated the search.

4          We had a colloquy about this at our last court

5   appearance.  I think Your Honor made some observations about

6   Cesar's wife and desire that the government act in fairness

7   and not necessarily with rigid adherence to its strict

8   obligations.  Nonetheless, we have never gotten that from

9   them.

10          The good news is, we have located what we believe is

11  the MLAT request in Belize.  We have marked it as an exhibit.

12  We are going to ask Agent McGuire about it.  I expect that

13  Agent McGuire is familiar with the MLAT request.  So he will

14  be able to tell us whether that is in fact an accurate copy or

15  not.

16          That will be -- that will be something we go

17  through.  I hope that the government won't stand on ceremony

18  at this point and make us try to call someone from Belize to

19  certify that this document is in fact the MLAT request that

20  the US Attorney's Office and the agents are the only people in

21  this courtroom who are familiar with and know the accuracy of.

22  That's my hope.

23          Those are my, I guess, preliminary requests and

24  comments.

25          THE COURT:  Mr. Kousouros, did you want to add

1    anything to it.

2            MR. KOUSOUROS:  Your Honor, I join in that request.

3            THE COURT:  Two things.  First, if I ask the

4    government if they wish to respond, the government will, I'm

5    sure, tell me that they are fully aware of and conscious of

6    their constitutional obligations.  And the implicit assumption

7    that the government either isn't, or if they are, they are

8    avoiding them, is an assumption I am loathe to make at this

9    point.  I assume that the government has turned over all that

10   the government is obliged to turn over pursuant to 3500 of

11   Title 18 of the United States Code.

12            Insofar as your anticipated problems well, why don't

13   we wait until those problems arise.

14            MR. INGOGLIA:  All right.

15            THE COURT:  We can deal with them then.

16            MR. INGOGLIA:  I understand your reaction.

17            THE COURT:  With respect to statements I made at the

18   last hearing with respect to fairness and so on, I like to

19   believe that what happens in my courtroom, and hopefully in

20   every courtroom in every federal court, in every court for

21   that matter, is with an aim to provide justice in accordance

22   with the law and that the parties conduct themselves fairly,

23   professionally, with integrity.  That is really what we are

24   about.

25            I assume that the defense conducts itself in that

1  way in discharging its obligations to turn over Rule 16

2  material that they may be required to do.

3          With respect to the word "fairness," I understand

4  that there are limitations with respect to what a defense is

5  obligated to do and what may be a fair thing to do.  The two

6  may not necessarily be synonymous.

7          To the extent that obligations are being complied

8  with, legal obligations are being complied with, I can't

9  direct anything more.

10         Having said all that, I am ready to proceed.

11         If Mr. McGuire or Agent McGuire is -- is that your

12 first witness?

13         MS. KASULIS:  Yes.

14         THE COURT:  If he is here and is ready.

15         MS. KASULIS:  Yes.

16         THE COURT:  I think Mr. Ingoglia requested that the

17 other witness who may be in the courtroom be excused.

18         MS. KASULIS:  That's correct, Your Honor.  We are

19 happy to do that.

20         THE COURT:  Okay.  Is Special Agent McGuire here?

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Why don't you step up here to the

23 witness box?

24         THE WITNESS:  Yes.

25         THE CLERK:  Please raise your right hand.

1              (The witness is duly sworn/affirmed.)

2              THE CLERK:  Please be seated.

3              Please state and spell your full name for the

4    record.

5              THE WITNESS:  My name is Thomas McGuire,

6    T H O M A S, M C G U I R E.

7              THE COURT:  All right, Ms. Kasulis.

8              MS. KASULIS:  Thank you, Your Honor.

9    DIRECT EXAMINATION

10   BY MS. KASULIS:

11   Q    Special Agent McGuire, by whom are you employed?

12   A    I am employed by the Federal Bureau of Investigation,

13   also known as the FBI.

14   Q    How long have you been employed with the FBI?

15   A    For 13-and-a-half years.

16   Q    And your current position with the FBI is Special Agent;

17   is that correct?

18   A    Correct.

19   Q    How long have you held that position?

20   A    For 13 years.

21   Q    Are you assigned to a particular squad at the FBI?

22   A    Yes.

23        I am assigned to squad C 43 New York.  That is a

24   squad that investigates white collar crime and money

25   laundering.

McGuire - direct - Kasulis                    14

1    Q    Can you just briefly describe your responsibilities as a

2    Special Agent assigned to squad C 43 in New York?

3    A    I am a Special Agent.  My task is to collect evidence,

4    investigate criminal activity, through such things as

5    interviews, arrests, obtaining search warrants, review of

6    financial documents.  We collect the evidence and we present

7    it to the US Attorney's Office.

8    Q    Were you involved in an investigation of Robert

9    Bandfield, among other individuals?

10   A    Yes, I was.

11   Q    What was your role in that investigation?

12   A    I am the FBI case agent assigned to this investigation.

13   Q    What does that mean, that you are the case agent assigned

14   to the investigation?

15   A    It means that I am the lead agent for this case as far as

16   the FBI is concerned.

17   Q    Did any other agencies besides the FBI participate in

18   this investigation?

19   A    Yes; the Internal Revenue Service, the IRS, and Homeland

20   Security Investigations, HSI, also participated in this

21   investigation.

22   Q    Who from the IRS participated in this investigation?

23   A    Several IRS agents.  The IRS case agent is Special Agent

24   John Carrano.

25   Q    Who from HSI participated in this investigation?

GR      OCR      CM      CRR      CSR

McGuire - direct - Kasulis                    15

A     Also numerous agents of the his, but the case agent is
Special Agent Justin Kittelstad.

            MS. KASULIS:  For the record, Your Honor, I would
like to note that AUSA Winston Paes has joined us at counsel
table.

            THE COURT:  Thank you.

Q     When did the investigation of Robert Bandfield and others
begin?

A     Around November 2012.

Q     Was Robert Bandfield eventually arrested as part of that
investigation?

A     Yes; he was arrested in Miami on September 9, 2014.

Q     In the course of the investigation, did you learn where
Robert Bandfield resided?

A     Yes; at the time he resided in Belize City, Belize.

Q     Did you come to learn about any businesses that
Mr. Bandfield operated?

A     Yes.

            Mr. Bandfield operated three businesses; IPC
Corporate Services, IPC Management Services and another
business also named IPC Management Services.  All three of
them were operated out of the office in Belize City, Belize.

Q     For purposes of this hearing today, can we refer to those
entities collectively as IPC?

A     Yes.

McGuire - direct - Kasulis                    16

1   Q    Where specifically in Belize was IPC located and operated

2   out of?

3   A    IPC's office was in suite 4o4 at the Matalon Building.

4   The Matalon Building is one of the newer office buildings in a

5   business district in Belize.

6   Q    As part of this investigation, did you also investigate

7   brokerage firms, including Titan International Securities,

8   Legacy Global Market and Unicorn International Securities?

9   A    Yes.

10        All three of them also had offices in Belize.  Titan

11  International Securities had an office at suite 403

12  immediately adjacent to IPC's office.  Unicorn International

13  Securities had an office about two blocks away at the Gordon

14  House, which is another office building in Belize City.

15  Legacy Global Market was mostly operated out of Panama but had

16  a small physical presence within IPC's office.  One desk

17  within IPC's office was assigned to Legacy because Legacy was

18  required to have a physical presence in Belize for regulatory

19  purposes.

20  Q    When you say that Titan was in suite 403 directly

21  adjacent to IPC's office, is that also in the Matalon Building

22  in Belize City, Belize?

23  A    That is correct.

24  Q    In the course of this investigation, did you travel to

25  Belize?

1    A    Yes, I did; there were several trips to Belize.

2    Q    How many trips in total to Belize did you take in

3    connection with this investigation?

4    A    In connection with the Bandfield investigations, four

5    trips.

6    Q    When was the first trip?

7    A    The first trip was in November 2013.

8    Q    Why did you travel to Belize in November of 2013?

9    A    One component of this investigation was an undercover

10   investigation.  The undercover agent had arranged a meeting

11   with IPC, Mr. Bandfield, and in November 2013, the undercover

12   agent traveled to Belize to meet with Mr. Bandfield.  As part

13   of that investigation, myself and other agents traveled to

14   Belize to support the undercover agent.

15   Q    During that trip, did you have any contact with any

16   members of the Belizean law enforcement?

17   A    I did not.

18   Q    When was the second trip to Belize that you took as part

19   of this investigation?

20   A    In March 2014, the undercover agent again traveled to

21   Belize, similarly a meeting had been set up with Mr. Bandfield

22   and other subjects.  When the undercover agent traveled to

23   Belize City, myself and other agents traveled to Belize to

24   support the undercover agent.

25   Q    During that trip, did you have any contact with any

1   member of the Belizean law enforcement?

2   A    I did not.

3   Q    When was your next trip to Belize?

4   A    There were two trips in September 2014.  The first trip

5   was from September 14th to September 20th and then again from

6   September 26th to September 30th.

7   Q    Why was there that short break between September 20th and

8   September 26th when you were not in Belize?

9   A    I returned to New York because it was my son's first

10  birthday.

11  Q    Why did you travel to Belize on September 14, 2014?

12  A    One or two days after the September 19th searches in

13  Belize that were conducted by Belize authorities, we received

14  information from the Department of Justice, from our

15  Department of Justice, that Belize authorities wanted

16  US agents to promptly travel to Belize to review the evidence

17  seized by Belize authorities.

18  Q    When did the Belizean authorities seize that evidence?

19  A    On September 9, 2014.

20  Q    Did you have an understanding as to what prompted that

21  seizure of evidence?

22  A    My understanding is that the Department of Justice Office

23  of International Affairs submitted an MLAT request, Mutual

24  Legal Assistance Request to the Belize government and based on

25  that MLAT request Belize authorities obtained a search warrant

McGuire - direct - Kasulis                    19

1   and executed that search warrant on the offices of IPC, Titan,

2   Unicorn and Legacy insofar as it was located within the IPC

3   office.

4   Q    Did those searches occur on the same day that Robert

5   Bandfield was arrested?

6   A    That is correct.

7   Q    When was Robert Bandfield arrested in relation to when

8   those searches were executed?

9   A    Mr. Bandfield was arrested around 1:00 pm Miami time.

10  Those searches occurred that afternoon and that evening.

11  Q    Do you have an understanding as to when the MLAT request

12  was transmitted to Belize in relation to when Mr. Bandfield

13  was arrested?

14  A    My understanding is it was submitted as soon as possible

15  after we received confirmation that Mr. Bandfield was in

16  custody.

17  Q    Now, Special Agent McGuire, did you participate in the

18  September 9, 2014 searches of IPC, Titan and Legacy's office

19  in Belize City, Belize?

20  A    I did not.

21  Q    Did you control those searches in any way?

22  A    I did not.

23  Q    Did you direct Belizean law enforcement in any way in

24  relation to those searches on that day?

25  A    I did not.

McGuire - direct - Kasulis                    20

1   Q    Are you aware of any other US member of law enforcement

2   who participated in the searches on September 9, 2014, that

3   were executed by Belizean authorities?

4   A    No.

5   Q    Are you aware of any member of US Government or US law

6   enforcement directing or controlling Belizean authorities at

7   that search on September 9, 2014?

8   A    No.

9   Q    How did you first learn, Special Agent McGuire, about the

10  searches on September 9, 2014?

11  A    In the afternoon of September 9, 2014, I received an

12  email from you, AUSA Jackie Kasulis, advising that attorneys

13  for defendants Knowles and Leach had reached out to the

14  Attorney's Office and advised that their clients had been

15  detained.  That was the first indication to me that some type

16  of law enforcement activity was happening in Belize.

17         About an hour later, so this was around 6:00 or

18  7:00 pm that evening, I received information indirectly from

19  the US embassy that there were rumors that Belize authorities

20  were executing a search warrant.  We then asked for a

21  follow-up confirmation and late that evening we received

22  confirmation from the US embassy that in fact Belize

23  authorities were at the time in the process of executing

24  several search warrants.

25         Also later that day I saw a number of news articles

1   in Belize media that reported that searches were being

2   conducted at IPC, Titan, Legacy's office, and then around

3   11:00 pm there was another news article saying that searches

4   may also have been conducted at Unicorn International

5   Securities.

6   Q     Where were you on September 9, 2014?

7   A     I was in New York City.

8   Q     What was your reaction to these reports that the searches

9   were being executed in Belize?

10  A     I was very surprised.

11  Q     Why is that?

12  A     We were under the impression that the MLAT process would

13  be very slow, that it would take several weeks or maybe even

14  months to lead to a search and we were very concerned that

15  evidence will be moved or destroyed.  We were very surprised

16  when we learned that Belize authorities had executed that

17  search warrant that same day.

18  Q     On September 9, 2014, did you know what evidence the

19  Belizean authorities had seized from the offices that we have

20  discussed today?

21  A     I didn't know.

22        The only information I got from one or two of these

23  newspaper articles said that a large cargo truck had pulled up

24  to the office and a large number of documents had been

25  removed.

McGuire - direct - Kasulis                    22

1   Q     Did you speak with any member of Belizean law enforcement

2   on September 9, 2014?

3   A     I did not.

4   Q     Now, after you learned of the searches, what happened

5   after that?

6   A     The following day, on September 10th, we tried to obtain

7   more information through the US embassy about the scope of the

8   search and what had happened.  Then I think on September 10th

9   or September 11th we were advised by the US Department of

10  Justice OIA that the Belize authorities were now formally

11  requesting that US agents travel to Belize.

12            So my task as case agent was to make travel

13  arrangements for myself and other agents to travel to Belize

14  and there was internal discussion about how soon we could go,

15  how many people should go, how many agents we would need to

16  review and possibly copy those records.

17            (Continued on next page.)

18

19

20

21

22

23

24

25

1    BY MS. KASULIS:   (Continuing)

2    Q    And did you, in fact, travel to Belize?

3    A    Yes.  As mentioned previously, on September 14th, that

4    was a Sunday, I traveled to Belize together with other agents.

5    Q    And what happened when you traveled to Belize on

6    September 14, 2014?

7    A    So, September 14th was the travel day.  September 15th

8    which was the Monday, we first met with the U.S. Ambassador at

9    the U.S. Embassy.  We were told that there could be no contact

10   with Belize authorities until we met with the ambassador and

11   got his approval.

12          Later that day, in the afternoon, we first met with

13   the attorney general's office, they were our official point of

14   contact for the MLAT request, and we met with them to take a

15   first look at the evidence.  We went to the office of the

16   attorney general and we saw approximately 100 or 120 boxes

17   where, stored at the attorney general's office.  The attorney

18   general's office then also advised that additional evidence

19   was maintained by the FIU, the Financial Intelligence Unit.

20   They told us that they were maintained by the FIU only because

21   they didn't have enough storage space and also because the

22   FIU, as a law enforcement agency, had an evidence locker where

23   they locked up the computers that were seized.

24          So, later that day, we then together with

25   representatives of the attorney general's office, we traveled

1    to the office of the FIU to sort of take a first look.  We saw

2    there were approximately 100 boxes.  We saw that they had a

3    lot of computers.

4    Q    In the course of meeting with the attorney general's

5    office, did you learn whether or not the FIU had any

6    participation in the September 9, 2014 searches?

7    A    Yes, I did.  The representative of the A.G.'s office who

8    my point of contact Ms. Burns advised that the search was

9    conducted and directed by the attorney general's office but

10   they had requested assistance from the FIU because they needed

11   additional bodies to execute the search and also because the

12   FIU had experience with white collar investigations.

13   Q    And was anyone else from U.S. law enforcement with you

14   during your meeting with the attorney general's office?

15   A    Yes, Special Agent John Carrano, the IRS case agent, and

16   assistant legal attache Tyler McCurdy who is the FBI assistant

17   legal attache.  He's not located in Belize, but his office

18   covers the region.

19   Q    And were there any members from the FIU at your meeting

20   with the attorney general's office on September 15, 2014?

21   A    So at the first meeting I attended at the attorney

22   general's office, there was no member of the FIU present.

23   When we then went to the office of the FIU, we, of course, met

24   with members of the FIU, we met with one of their computer

25   experts who gave us an overview of what evidence was seized

Case 1:14-cr-00476-ILG   Document 112   Filed 05/06/16   Page 25 of 139 PageID #: 1099

1    and also we met with other members of the FIU, the Financial

2    Intelligence Unit.

3    Q    Now, as the lead case agent for the FBI on this

4    investigation, have you ever met with anyone from the Belizean

5    Central Authority or the attorney general's office before

6    September 15, 2014?

7    A    I have not.

8    Q    And had you ever met with anyone from the FIU prior to

9    September 15, 2014?

10   A    No.

11   Q    Did you have any communication with any member of the FIU

12   prior to September 15, 2014?

13   A    I did not have any communication.

14   Q    And did you have any communication with the Central

15   Authority of Belize prior to September 15, 2014?

16   A    I did not.

17   Q    Now, at the time when you were in Belize following the

18   searches, did you have any understanding as to whether the

19   Belizean authorities had obtained a search warrant to search

20   the corporate offices that we've discussed today?

21   A    Yes.  My understanding was and still is that they

22   obtained a search warrant after receiving the MLAT request.

23   Pursuant to that search warrant, they executed the search

24   warrants.

25   Q    And did you have an opportunity then to review the

McGuire - direct - Kasulis                    26

1   evidence that had been seized from the corporate offices of

2   IBC, Titan and Unicorn?

3   A    I did.

4   Q    And what was the process for the reviewing of the

5   evidence by U.S. law enforcement?

6   A    We had some exchange with the attorney general's office

7   about the logistics.  We had sort of worked out an agreement

8   where we rented a small conference room at the hotel, this

9   would be our secure location, and picked up the evidence,

10  about 80 boxes at a time.  We transported it to the hotel.  We

11  safeguarded the evidence there and we reviewed it and we

12  scanned, we scanned the paper documents.  We also had a

13  forensic computer team in Belize that similarly picked up the

14  computers and secured them in one of the hotel rooms and they

15  made forensic images of the computers.

16  Q    And did you have any impression of the scope of the

17  evidence that had been obtained from IBC, Titan and Unicorn's

18  offices on September 9, 2014?

19  A    Yes.  My impression was that it was broad, that they had

20  taken a lot of documents.  When we looked through the

21  documents, all the documents taken related to IBC, Titan and

22  Unicorn, it was the type of documents I would expect to be

23  seized if we executed a search warrant in the U.S.

24  Q    Now, I want to --

25             THE COURT:  I take it the search warrant you are

1   referring to is the search warrant issued by the Belize

2   authorities and its court?

3           THE WITNESS:  Can you restate that question?

4           THE COURT:  The search warrant that you have been

5   referring to was the search warrant that was issued by the

6   court in Belize?

7           THE WITNESS:  Correct.

8   Q    And did you have any involvement, Special Agent McGuire,

9   in obtaining that search warrant in Belize?

10  A    I did not and I've actually never seen that search

11  warrant.

12  Q    Now, even though you didn't participate in the searches

13  on September 9, 2014 in Belize, did you ever consider the

14  possibility of participating in searches of the offices of

15  IBC, Titan and Unicorn in Belize in the course of the

16  investigation?

17  A    Yes, I did.  For several months leading up to the search,

18  there was a lot of internal discussions among the FBI, with

19  the U.S. Attorney's Office, with OIA how best to secure that

20  evidence.

21          One proposal that I personally favored and I think

22  the FBI supported was rather than go the MLAT route, to obtain

23  this evidence through police-to-police cooperation.  So this

24  would entail us at the appropriate time meeting with the

25  counterpart of FIU sharing the evidence of our investigation

McGuire - direct - Kasulis                    28

1   so the FIU could then make their own determination whether

2   they want to open or continue a criminal investigation,

3   whether they would obtain a search warrant, if they obtained

4   the search warrant, we could then get copies of that evidence

5   seized by the FIU.

6           In the course of planning these different options,

7   we became aware the FIU does not have a lot of capabilities to

8   process computer evidence so we thought that it might be

9   helpful if FBI agents trained in forensic analysis of

10  computers could be present.  There were discussions where

11  myself and Special Agent John Carrano might be present at such

12  a search.  However, that was one of the options discussed.

13  That was favored by me and the FBI, but that plan was never

14  approved and that plan was never executed.

15  Q    And with respect to that plan, would an MLAT ever issue

16  regarding the plan that you just discussed?

17  A    Yes.  According to this plan, we would first obtain the

18  evidence informally with police-to-police cooperation and then

19  later, sending an MLAT request to obtain a formal copy for

20  trial purposes that was served on the Belizean authorities.

21  Q    Now, in this plan that you discussed, you talked about

22  sharing information about the U.S. investigation with members

23  of the FIU.

24          Did you have a sense of the timing for sharing

25  information about the FIU?

1   A     Yes, the plan was very clear.  We did not want to share

2   any information about our investigation with the Belize

3   authorities until right after we were informed that

4   Mr. Bandfield was in custody.

5   Q     And why is that, Special Agent McGuire?

6   A     We had grave concerns that our investigation could be,

7   lead to or the subjects could become aware of this

8   investigation for several reasons.  Mr. Bandfield's right-hand

9   man Andrew Godfrey is a justice of the peace in Belize and he

10  had made several comments that he can approve search warrants

11  or that he's involved with the criminal procedure processes in

12  Belize.  An unindicted co-conspirator, one of the persons in

13  Belize is actually a police officer so we were concerned that

14  maybe if the FIU would execute a search warrant at that time,

15  that police officer would do the search and that police

16  officer would become aware of the investigation.

17          Additionally, Mr. Bandfield's common-law wife Glenna

18  Bergey is a prominent member of a nonprofit foundation which

19  is run by the Prime Minister's wife.  She talked about this

20  foundation quite a bit with the undercover agents so we

21  understand that Glenna Bergey and, indirectly, Mr. Bandfield

22  have a connection to the Prime Minister's family.

23          So, because of all these concerns, the plan was

24  always to arrest Mr. Bandfield and maybe some other subjects

25  and then immediately thereafter, share all our information

1   with the FIU.  We believe that we had a lot of information

2   that this information would clearly be sufficient for the FIU

3   to obtain a search warrant from a Belize judge and we were

4   hoping that we could plan this so that they could move

5   quickly, secure the location and then maybe obtain a search

6   warrant in a few days.  As mentioned before, that plan was not

7   approved and it was not executed.

8   Q    And in the months leading up to the search in early

9   September 2014, were you aware of whether the FIU had any

10  investigations into the targets of the subject matter of the

11  U.S. investigation?

12  A    Yes, there was a somewhat connected investigation.

13       I think around June 2014, there was a lot of media

14  articles regarding CYNK.  It was a penny stock that was

15  subject of a large pump-and-dump scheme.  CYNK had a large

16  presence in Belize.  There was a lot of media attention in

17  Belize.  We learned that the FIU had opened an investigation

18  independently and had reached out to the U.S. Securities and

19  Exchange Commission to obtain additional information about

20  CYNK, Philip Kueber and Titan International Securities.

21  Q    And what, if any, concerns did you have about the FIU's

22  own investigation into CYNK?

23  A    So, when we learned about this, our concern was that the

24  FIU would then take steps such as a search warrant,

25  interviews, arrests that would then lead other defendants to

McGuire - direct - Kasulis                31

1   move or destroy evidence.  So, our objective was to find out

2   from the FIU the scope of their investigation and intended

3   next steps without revealing to the FIU the scope of our own

4   investigation.

5   Q    Did you or any other member of U.S. law enforcement ever

6   direct the FIU members with respect to their CYNK

7   investigation?

8   A    No.

9   Q    Now, you had talked about your plan for searches and you

10  made a reference that that plan didn't happen.  Why didn't

11  that plan happen?

12  A    Any law enforcement activity we conduct in a foreign

13  country has to be coordinated through the Department of

14  Justice Office of International Affairs.  They were looped

15  into these conversations.

16       DOJ OIA made the determination that the better

17  approach was to serve the MLAT, to have no involvement in the

18  process at all, to let the MLAT process play out on its own.

19  They specifically told us that we were not allowed to share

20  information with the FIU or participate in the searches or any

21  way influence the searches.  So, we were -- first I was

22  disappointed because I thought that was not the best plan, but

23  that was a decision made and we abided by that decision.

24  Q    And so you followed OIA's instructions?

25  A    Absolutely.

McGuire - direct - Kasulis                      32

1   Q    Now, did there come a point in time where you actually

2   did share the information about the targets of your

3   investigation and evidence that had been obtained about the

4   U.S. investigation with Belizean law enforcement?

5   A    Yes.  The first meeting with the FIU was on

6   September 15th.  I think it was fairly brief because the focus

7   was to look at the evidence, but in those two weeks in Belize,

8   there were follow-up meetings with the FIU.  We had to share

9   information with them about our investigation.  We again tried

10  to find out what the scope of their investigation would be and

11  if they had an interest to initiate their own investigation

12  against some of these targets.

13          We understood that one of the defendants, Andrew

14  Godfrey, is a citizen of Belize, that extradition might be

15  difficult.  We discussed with the FIU whether we could share

16  evidence with the FIU to assist the FIU in developing the

17  whole criminal investigation against Andrew Godfrey.

18  Q    So all of these discussions that you're talking about,

19  did they happen before or after the search on September 9,

20  2015?

21  A    After.

22          MS. KASULIS:  One moment, Your Honor.

23          THE COURT:  Yes.

24          (Pause.)

25  Q    Special Agent McGuire, thank you.

McGuire - cross - Ingoglia                    33

1           MS. KASULIS:  We have no further questions at this

2    time.

3           THE COURT:  Mr. Ingoglia?

4           MR. INGOGLIA:  Thank you, Judge.  May I approach the

5    witness with a binder?

6           THE COURT:  Surely.

7           MR. INGOGLIA:  Would you like one for yourself,

8    Judge?

9           THE COURT:  I would.  Thank you.

10          MS. KASULIS:  And, Your Honor, I do want to note

11   that the government did provide a copy of its 3500 material

12   exhibits to the Court I believe it was a day or two ago.  It

13   was delivered to chambers.

14          THE COURT:  Is that in a binder?

15          MS. KASULIS:  Yes.

16          THE COURT:  This is part of that?

17          MS. KASULIS:  Those are the defense exhibits.

18          THE COURT:  Okay.  Have you seen these?

19          MS. KASULIS:  I have, Your Honor.

20          THE COURT:  Okay.

21          MS. KASULIS:  Thank you.

22   CROSS-EXAMINATION

23   BY MR. INGOGLIA:

24   Q    Good morning, Agent McGuire.

25   A    Good morning.

1   Q    I want to start with the period of time after you learned

2   that the search had taken place in Belize on September 9th.

3          That MLAT request that had been sent out on

4   September 9th, that requested an expedited search, correct?

5   A    I have not actually seen that final version of the MLAT.

6   I think I've seen parts of it because I assisted the

7   prosecutors in drafting the factual portions of the MLAT, but

8   I'm not sure I actually saw the official version of the MLAT.

9   Q    Do you have an understanding that the MLAT asked Belizean

10  authorities to conduct an expedited search?

11  A    Yes.  The U.S. Government was definitely asking for this

12  to be done promptly.

13  Q    And you learned the same day that, in fact, Belize had

14  responded by sending teams promptly to the sites to collect

15  evidence, is that right?

16  A    That is correct.

17  Q    I want to direct your attention to Defense Exhibit 7 in

18  your binder.  The first 41 defense exhibits are tabbed so you

19  can just turn to the tab to find them.

20         Do you see that document, Agent McGuire?

21  A    I do.

22  Q    Do you recognize this document?

23  A    Yes.  This is an e-mail sent from FBI legal attache agent

24  Kaplan to myself and my supervisor.

25         MR. INGOGLIA:  The defense offers Defense Exhibit 7.

1          MS. KASULIS:  No objection.

2          THE COURT:  It is received.

3          (So marked.)

4    Q    Agent McGuire, does reading this e-mail refresh your

5    memory that you got a sense of the scope of the search even

6    before you went down to Belize and saw it for yourself?

7    A    Absolutely.  So, after the search was executed on

8    September 9th leading up to our travel on September 14th, we

9    find out the scope of the items seized and it was part of my

10   responsibilities to get the administrative approvals for

11   travel and actually determine how much agents we need, how

12   many forensic agents we would need and what agent from what

13   agency would come and support this effort.

14   Q    And who is Jason Kaplan?

15   A    He's the FBI legal attache at our San Salvador office but

16   he also covers the country of Belize but he's not himself

17   physically in Belize.

18   Q    What's the job of the legal attache?

19   A    They represent the FBI's interest in foreign countries

20   and they liaison with foreign officials.

21   Q    Did you get a sense starting on or about the 11th that

22   the Belizean authorities had seized a substantial quantity of

23   documents and materials?

24   A    Yes.  We learned -- between the search and our travel, we

25   learned that about 240 boxes had been seized and a large

1  number of computers, I think 20 to 30.  We later learned that

2  it was more closer to 60 computers.

3  Q    You said you were surprised that they had acted so

4  quickly.  Is that right?

5  A    That is right.

6  Q    You weren't surprised that they took so much though, were

7  you?

8  A    No.

9  Q    You said you did some work on at least early versions of

10 the MLAT request, is that right?

11 A    I reviewed -- so the way the MLAT is drafted, I think,

12 Jacquelyn Kasulis, as far as I'm concerned, she did the draft

13 and she would send me portions and say look at this, is this

14 correct.  I swore an affidavit that I was the agent dealing

15 with all the facts, yes.

16 Q    You knew -- you had done search warrants in the U.S.

17 before, correct?

18 A    Yes, and they were very similar to, similar in terms of

19 the investigation and the types of evidence we are seeking.

20 Q    Did you as part of your review of pieces of the MLAT

21 request, have an opportunity to review the section of the MLAT

22 request that detailed what documents the U.S. was requesting

23 that Belize search for and take?

24       Do you understand what I'm asking?

25 A    I understand.  I'm not sure only because there were a lot

McGuire - cross - Ingoglia                    37

1   of search warrants and affidavits done before and they were

2   all very similar, but my understanding is that the MLAT

3   requested evidence related to IPC and Unicorn and Legacy in

4   the setting up of offshore companies, securities for money

5   laundering reasons.

6   Q    Do you remember one of the requests being, for any

7   documents related to IPC, any of the different versions of the

8   IPC entities?  Do you remember that being one of the requests?

9   A    I mean my understanding was that's what we're asking for,

10  yes.

11  Q    That's a fairly broad request, right?

12  A    I -- it is similar to what we would request in a U.S.

13  search warrant.

14  Q    Well, a U.S. search warrant of, say, IBM, would you ask

15  for documents related to IBM?  Would you get a judge to sign

16  that?

17  A    I'm not sure.  When we do a search warrant --

18            THE COURT:  I sustain an objection to that,

19  Mr. Ingoglia, on the basis of relevance to avoid confusion

20  with me.  Move on.

21  Q    About how many agents went down to Belize altogether from

22  the FBI?

23  A    From the FBI?  I think it would have been about ten.

24  Q    And how about from the IRS?

25  A    Six or eight, and two from his.

McGuire - cross - Ingoglia                    38

1    Q     And tell me what his is again?

2    A     Homeland Security Investigations.  They have a squad in

3    New York assigned to securities fraud and money laundering.

4    Q     Even before you got down to Belize, did you understand

5    that among the documents seized were some number of documents

6    that were going to be non-pertinent to your investigation?

7    A     We were told by OIA that the Belizean authorities had

8    asked that agents review the evidence because non-pertinent

9    evidence would have to be returned promptly.  That is all the

10   information I have about this matter.

11   Q     At that time?

12   A     Yes.

13   Q     Got it.  And you arranged to stay at the Radisson, is

14   that right?

15   A     Correct.

16   Q     U.S. officials made that choice, is that right?

17   A     Yes.  Belize City is a very dangerous city and there's

18   really only one safe place.  It's a Radisson hotel.  It's a

19   bit run down, but that's where most U.S. officials stay when

20   they travel to Belize City.

21   Q     But the Belizeans didn't require that you stay at hotels

22   a lot of times?

23   A     No.

24   Q     And you met with the Ambassador and the Embassy team that

25   day, is that correct?

McGuire - cross - Ingoglia                    39

1    A     On September 15th, yes.

2    Q     The Monday, September 15th?

3    A     Correct.

4    Q     And who -- do you remember who was there for the embassy

5    team?

6    A     Special Agent John Carrano was there with me.  I think

7    assistant legal attache Tyler McCurdy and Timothy Reid who

8    works for the Department of State and some other Embassy

9    officials together with the U.S. Ambassador.

10   Q     Did anyone tell you that any U.S. personnel had been

11   talking with any Belizean officials about the search, the

12   possibility of the search before September 9th?

13   A     Yes.  I was aware that there was contact from U.S.

14   officials with Belize authorities in general terms to

15   determine what the requirements would be for a search, what

16   agency Belize would be responsible, how quickly they could

17   respond to this.  In fact, some of this contact was done by

18   FBI agents in Belize and this was sort of leading up to our

19   plan.

20         When comparing the two options, should we work with

21   the FIU or the MLAT route, we tried to gather information and

22   it was critical for us to know will they do a search warrant,

23   how long would it take, what type of evidence would they need.

24   So we obtained a lot of this information in general terms, but

25   made sure that we did not reveal the targets of our

1    investigation to any authorities in Belize.

2    Q    So what is the source of the information you just told

3    me?  How did you learn that?

4    A    I learned this through conversations with the legal

5    attache and assistant legal attaches from the IRS and the FBI.

6    Q    Do you have a sense of who it was -- let's start with the

7    FBI -- at the FBI that was having those kind of conversations

8    with FIU prior to September 9th?

9    A    Yes.  For example, in April or May 2014, assistant legal

10   attache, I think it was Brett Curtis at the time and FBI legal

11   attache Jason Kaplan met with FIU.  We had specifically -- I

12   say "we," it was the FBI and OIA -- specifically asked them to

13   talk to Belize authorities and find out how this works, what,

14   is this activity legal in Belize, what are the statutes, what

15   is the process for obtaining a search warrant, what agency

16   would be in charge of the search warrant.  I said that myself

17   and the FBI, we favored sort of a police-to-police cooperation

18   with the FIU.  So, we were primarily interested in what are

19   the procedures for the FIU to obtain a search warrant of such

20   an investigation.

21   Q    My question is who at the FBI is having that

22   conversation.  It wasn't you.  I understand.  So who at the

23   FBI is having that conversation with the FIU?

24   A    Jason Kaplan, a legal attache.  I don't think he was very

25   involved because he was overseeing as assistant legal attache.

1    There was one meeting was with Brett Curtis who at the time

2    was the assistant legal attache.  Brett Curtis was then

3    reassigned and later on, Tyler McCurdy.

4    Q    As far as you can remember sitting here today, anybody

5    else from the FBI having any conversations with FIU on the

6    subject of the search?

7    A    Yes.  There was an agent, Special Agent Eric Williams,

8    who traveled to Belize to meet with the FIU.  Originally, this

9    meeting was set up for an unrelated matter.  So I mentioned in

10   June of 2014 -- the CYNK story sort of hit the news, there was

11   a lot of activity and we wanted to find out more about the

12   FIU's investigation of CYNK.  We also were concerned that if

13   we reached out directly to the FIU which sort of tipped the

14   hand and alert them we were very interested in the

15   investigation.

16          We learned by luck that Special Agent Eric Williams

17   had a meeting scheduled with the FIU about two days later on

18   an unrelated matter.  I think he was assigned there for a gang

19   related investigation and we thought this would be a good

20   opportunity for him to ask the FIU in sort of a low-key

21   approach can you share information about CYNK investigation.

22          Special Agent Williams was not aware of the

23   investigation so I sort of briefed him.  I said here's the

24   background of the our investigation, here's what I want to

25   obtain, information I want you to obtain from the FIU.  I told

McGuire - cross - Ingoglia                    42

1    him what not to disclose.  I told him you could not disclose

2    our subject, you could not disclose our investigation, with

3    the exception that if the FIU were to say are you

4    investigating CYNK and Philip Kueber which was all over the

5    news, he would then say that the FBI was also looking at this.

6    I think that was fairly obvious.

7            I'm not sure if he actually provided that

8    information to the FIU because I'm not sure if he actually

9    asked about it.

10   Q    Okay.  So this interaction with Agent Williams that you

11   had was in July 2014 approximately, is that right?

12   A    In June or July.

13   Q    Right.  And at that time, your investigation of

14   Mr. Bandfield was well underway, correct?

15   A    Correct.

16   Q    You already had meetings with your CI, you had come down

17   to Belize to meet and coordinate with your CI prior to that,

18   right?

19   A    Correct.

20   Q    And FIU, you testified to earlier, had at some point an

21   investigation into CYNK, right?  That was where they froze

22   some assets for a week or so, is that right?

23           Is that the investigation you're talking about?

24   A    Correct.  So based on the newspaper articles and based on

25   the information obtained from a bank in Belize, on their own,

1  they opened a criminal investigation of CYNK and Philip Kueber

2  and I think Titan International Securities or Titan's owner,

3  Warren Davis.

4         When Eric Williams met with them, he obtained more

5  details.  That's why I know why, how they opened this

6  investigation.  He also learned that they were not planning

7  any immediate investigative steps, that they were freezing

8  those assets, they were trying to extend the asset freeze, and

9  that, generally, my understanding is that the FIU was going to

10 sort of sit back and see if another foreign agency would do an

11 investigation and then focus on seizing the proceeds of the

12 illegal activity.  So, we learned that they were not planning

13 to do an immediate sort of overt investigation of CYNK.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. INGOGLIA:

2  Q    Everything you just told me you learned from Agent

3  Williams, is that right?

4  A    That is correct.

5  Q    And let's look at a couple of the documents.  In your

6  binder in the pocket there's a handful of documents that are

7  not tabbed.  The top one is Defense Exhibit 24.  Do you see

8  that?

9  A    I do.

10  Q    And could you take a look at that and tell me if you

11  recognize what that is?

12       MS. KASULIS:  Excuse me, your Honor.  We don't have

13  a copy of Defense Exhibit 42.  Ours stops at 41.

14       MR. INGOGLIA:  These are all Government Exhibits'.

15  I'll tell the 3500 number if you want.  3500-GM-56.  I think

16  we're going to hand you a stack of paper that has the defense

17  exhibits.

18       MS. KASULIS:  Thank you.

19  BY MR. INGOGLIA:

20  Q    Agent McGuire, do you recognize that?

21  A    Yes.  It's an e-mail that I myself sent on July 22, 2014

22  to AUSA Jacquelyn Kasulis and the case agent John Carrano,

23  Jason Kaplan and others.

24       MR. INGOGLIA:  The defense offers Defendant's

25  Exhibit 42.

McGuire - cross - Ingoglia                    45

1            MS. KASULIS:  No objection.

2            THE COURT:  Received.

3            (So marked.)

4    Q    Does this refresh your recollection as to when this

5    interaction with Agent Williams took place?

6    A    Yes.  In July 2014.

7    Q    Could you turn to the next document, Defendant's Exhibit

8    43.

9    A    Okay.

10   Q    My question is going to be:  Do you recognize those

11   documents?

12           MS. KASULIS:  I'm sorry.  I didn't hear the

13   question.

14   Q    Do you recognize that document?

15   A    Yes.  So this is an e-mail exchange I had with Special

16   Agent Eric Williams.

17           MR. INGOGLIA:  The defense offers Defendant's

18   Exhibit 43.

19           MS. KASULIS:  No objection.

20           THE COURT:  43?

21           MR. INGOGLIA:  Correct.

22           THE COURT:  Yes.  It's received.

23           (So marked.)

24   Q    Agent McGuire, this e-mail relates to the subject matter

25   of your testimony just a moment ago, is that right?

McGuire - cross - Ingoglia                    46

1    A    That is correct.  What the e-mail shows is that we

2    provided Eric Williams with a lot of information about our

3    case.  He's FBI.  He of course can know who our targets are.

4    I wanted him to be knowledgeable.  In this e-mail and

5    subsequent e-mails we told him what information we should

6    obtain from the FIU and what he could and couldn't disclose to

7    the FIU.

8    Q    On page two, if you turn to page two, you give him some

9    questions that you want him to ask FIU, is that correct?

10                  THE COURT:  Page two of what?

11                  MR. INGOGLIA:  Page two of Defendant's Exhibit 43.

12   The second page.  Under the banner information you should

13   obtain.

14   Q    Do you see that?

15   A    Correct.

16   Q    Among those things is what will likely happen in the next

17   two months, is that correct?

18   A    That is right.

19   Q    And then I guess it's the third starred -- I call it a

20   bullet point -- under that section.  Do you see that first

21   sentence?  It says if the FBI were to provide specific

22   information?

23   A    Yes.

24   Q    That evidence of security and fraud and money laundering

25   were located at a specific location in Belize, would the FIU

1    be interested to reviewing this information so it can obtain a

2    search warrant?  Is that something you wanted Agent Williams

3    to convey to the FIU?

4    A    That was questions I wanted him to ask.  This was the

5    sort of police to police cooperation and how this might have

6    to work would be as mentioned in this e-mail.  We would meet

7    with the FIU.  We would share the evidence from our case.  The

8    FIU would then review that, decide if they wanted to seek a

9    search warrant and maybe execute a search warrant.  So my

10   question for Special Agent Williams was:  Can you ask them if

11   such a proposal would be possible?  Would it be possible that

12   if we went down there and shared that information and they

13   reviewed it and decided it was sufficient to obtain a search

14   warrant if they could obtain such a search warrant.

15   Q    That's right.  You wanted him to ask those questions to

16   FIU?

17   A    Yes.

18   Q    That's what you were saying in this e-mail?

19   A    I wanted him to obtain this information, yes.

20   Q    Prior to Agent Williams' visit with FIU, had FIU reached

21   out to the FBI and said, hey, we would like some assistance

22   with our' CYNK investigation?

23   A    They had reached out only the to SEC.  They reached out

24   to the SEC to obtain information related to their CYNK

25   investigation, because when they acted the SEC, the SEC

McGuire - cross - Ingoglia                          48

1   contacted us and let us know that the FIU had made the

2   request.

3   Q     FIU learned of the investigation?

4   A     Yes.

5   Q     The FIU didn't reach out to the FBI?

6   A     No.

7   Q     The FIU knew that the FBI existed, right?  They had a

8   relationship with the FBI?

9   A     Well, they had met with FBI officials before, yes.

10  Q     They were meeting with Agent Williams that same week on a

11  different matter, correct?

12  A     Right.

13  Q     So they at least had the ability to reach out to some

14  agents of the FBI if they had questions or were receiving

15  assistance, right?

16  A     Yes.

17  Q     But you are suggesting to Agent Williams that he ask them

18  if the FIU would be interested in doing a search warrant,

19  depending on what information the FBI was able to share, is

20  that right?  Not in those words but in substance?

21  A     Right.  I think this is important.  What I had asked

22  Agent Williams to obtain was he should present the following

23  scenario.  We travelled to Belize.  We present the evidence of

24  our investigation.  The FIU would then review that evidence.

25  As you know I believe that we had substantial evidence of

1    illegal activities happening not only in the U.S. but in

2    Belize and the FIU would have the review that evidence and

3    determine whether they wanted to obtain a search warrant.

4    Q    What I am trying inartfully ask is:  It was the FBI

5    saying to FIU under what circumstances could you get a search

6    warrant?

7    A    Yes.

8    Q    And not the other way around?

9    A    Right.  But because I and the FBI were sort of advancing

10   in proposal that we work with the FIU.  We did not reveal to

11   them the details of our investigation.  But it was sort of in

12   general terms.  Sort of the hypothetical if we had a case and

13   we came to you with the evidence, what would you do, what

14   would the process be.

15   Q    Is that a yes?

16   A    We asked them whether they could execute a search warrant

17   if we later asked them and as you know we did not ask them and

18   this proposal was not completed.

19   Q    I would like you, if you could, to turn your attention to

20   what's been marked as Defendant's Exhibit 45.

21   A    Yes.

22   Q    The question is:  Do you recognize that document?

23   A    Yes.  This is another e-mail exchange between me and

24   Special Agent Williams on July 24.

25            MR. INGOGLIA:  The defense offers Defendant's

1   Exhibit 45.

2          MS. KASULIS:  No objection.

3          THE COURT:  Received.

4          (So marked.)

5   Q    So, am I right, the subject line of the e-mail below is

6   follow-up.  Am I right that this e-mail takes place after

7   Agent Williams has called you and given you an update on what

8   happened at the meeting?

9   A    That is correct.

10  Q    And if you look at the bottom part, the part of the

11  message that's addressed to Eric from you?

12  A    Okay.

13  Q    You reference an e-mail summary.  Had you discussed with

14  Agent Williams that Agent Williams was going to prepare an

15  e-mail summary of the meeting he had had with FIU?

16  A    He was definitely going to prepare a summary and

17  typically this is a memo written to the file but because he's

18  traveling in Belize and this was urgent he had sent me a

19  summary by e-mail.

20  Q    And at the time you sent these e-mails you had your

21  active investigation into Banfield, right?

22  A    Very much so, yes.

23  Q    And others, but since my client is Banfield, I'm asking

24  about Banfield.  And into Titan and Legacy and the other

25  entities?

McGuire - cross - Ingoglia                    51

A      That is correct.

Q      You were working with the U.S. Attorney's Office, you
were working with IRS, as part of that investigation, right?

A      Correct.

Q      And FIU had its small investigation into Titan and the
other people you mentioned, but not Banfield, correct?

A      That is correct.

Q      And they did get a one week asset freeze that was
subsequently tossed by the Belizean court, is that correct?

A      I don't know that it was tossed.  I think it expired.  My
understanding is the FIU can obtain on its own a one week
administrative freeze.  If they want to extend it they have to
go to a judge.  My understanding that freeze was not extended.

Q      In the second two paragraphs of your correspondence with
Agent Williams it's fair to say you're giving him some advice
and how to craft his summary?

A      So Eric Williams was not familiar with the investigation.
He's not an agent assigned to white collar investigations.  So
I asked him to write a summary.  But I wanted to highlight for
him two points that were very important for us.  It might not
be apparent for Agent Williams that this was important.  One
thing we wanted to have documented is that the FIU had
initiated the investigation of the CYNK.  We had sort of heard
this before.  We wanted Eric Williams to document this because
he had heard this first hand.

McGuire - cross - Ingoglia                    52

1          I explained to Eric Williams that this is important

2    because it makes a difference whether we have a case and asked

3    the FIU to do something or whether the FIU has a case on their

4    own or based on information we provide take action.  This was

5    not clear to me that the fine distinctions was apparent to

6    Eric Williams and I highlighted this for him and asked him to

7    make sure he writes this up in a lot of detail.

8    Q    Along the lines you were writing here, following your

9    lead in your e-mail?

10   A    Correct.  He had told me -- I talked to the FIU and they

11   told me they opened this investigation.  I told him when you

12   write this up, make sure you document this.  This very

13   important to us.

14   Q    FIU hadn't an investigation into Banfield?

15   A    Right.  Nothing in this investigation mention Banfield.

16   Q    There is a difference between them opening a case and

17   asking the U.S. government for a case and the U.S. government

18   having a case and asking the FIU to do a search warrant for

19   us?  Were you initiating the conversation?  Wasn't the U.S.

20   government going to FIU and asking questions about a search

21   warrant?

22   A    Let's get this straight.  The FIU on its own issued an

23   investigation of the CYNK, contacted the SEC.  We learned

24   about this.  Eric Williams met with the FIU a few days later.

25   This was our opportunity to get this information firsthand.

1    At that meeting there were two objectives.  One is find out

2    the status of the CYNK investigation.  The next step, finding

3    out in hypothetical form from the FIU if we were to share

4    information could you obtain a search warrant which is the

5    plan that I and the FBI had favored that we do, this police to

6    police cooperation, and that's the plan that was not executed

7    because it was not approved.  So this e-mail is trying to get

8    more information from the FIU how the process works so we can

9    determine whether the plan we liked could have worked.

10   Q    I'm going to move on to the last e-mail in this sequence

11   which is marked as Defendant's Exhibit 46.  Could you take a

12   look at that and see if you recognize it?

13   A    I do not.  Sorry.  46.  I was looking at 47.

14          THE COURT:  You want 46.  Do you have 46?

15          THE WITNESS:  I have 46 in front of me.

16          THE COURT:  You have it?

17          THE WITNESS:  Yes.  Thank you.

18   A    So this is more e-mails between me and Eric Williams and

19   then I forward that information to the FBI the legal attache

20   and assistant attache and also my supervisor and another case

21   agent.

22          MR. INGOGLIA:  The defendants offers Defendant's

23   Exhibit 46.

24          MS. KASULIS:  No objection.

25          THE COURT:  Received.

McGuire - cross - Ingoglia                    54

1              (So marked.)

2    Q    Is this at the bottom Agent Williams' summary of his

3    meeting with FIU?

4    A    That is correct.

5    Q    Have you had a chance to read this prior to today?

6    A    I have.

7    Q    The substance that's set forth by Agent Williams, is that

8    consistent with what he told you on the phone before you saw

9    this e-mail when you had the telephonic update?

10   A    Yes.

11   Q    Is there anything that Agent Williams told you about that

12   meeting that's not reflected in this document?

13   A    I don't think so.

14   Q    Did Agent Williams talk about any particular locations

15   for a possible search?

16   A    Only like hypothetical.  No specific addresses or

17   locations were revealed to the FIU.

18   Q    Not the Matalon Building?

19   A    Absolutely not.

20   Q    You told him not to do that, Agent Williams?

21   A    I made this very clear, because our concern was if we ask

22   too many questions about CYNK, the FIU might start wondering

23   if we don't have a case, maybe we have a big case and the

24   subjects became aware of the investigation.

25   Q    Agent Williams did disregard some of your advice in the

1  course of his conversation with FIU, isn't that right?

2  A    I don't think so.

3  Q    Didn't he volunteer on his own the possibility of FBI

4  CART assistance to FIU?

5  A    He volunteered something.  But that was not disregarding

6  my instructions.

7  Q    You hadn't told him not to offer CART advice?

8  A    No.  I had asked him to get more information about how

9  their process would work if we pursue that route and what he

10  wrote and what he told me on the phone is he had on his own

11  decided that he would ask the FIU if CART assistance would be

12  useful or if that would be something they would consider.

13  This goes back to we knew I think even before this meeting

14  that the FIU and police law enforcement authorities in general

15  don't have capabilities to process computers.

16  Q    Got you.  That's your conversation with Agent Williams.

17  We discussed I think everyone from the FBI that you know of

18  now that had met with FIU prior to September 19?

19  A    Relating to this investigation, yes.

20  Q    Yes.  I'm not asking about any other investigations.

21  A    Yes.

22  Q    And how about other law enforcement -- U.S. law

23  enforcement agencies, are you aware of any contact between,

24  for example, members of the IRS and FIU on the subject of

25  searches and if so who?

1    A     Similar to the FBI, the IRS has a legal attache program.

2    They had an assistant legal attache in Belize for I think a

3    ninety-day assignment and that he was Troy Calderon and he

4    represented the IRS's interest in Belize during the summer of

5    2014.

6    Q     Anybody else from IRS that you know talked to FIU?

7    A     As far as I know Troy was the only one.

8    Q     You were not present for those or you were?

9    A     I did not meet with the FIU until September 15.

10   Q     So whatever conversations Troy had you were not a witness

11   to them?

12   A     That's correct.

13   Q     Let's go back to September 15.  You finally see the

14   evidence for the first time.  Could you describe what it

15   looked like?  You said there were hundreds of boxes, about

16   100?

17   A     About 240 boxes.  They were sort of the bankers boxes

18   filled with paper documents, files, the type of documents you

19   would expect to see in an office, a brokerage firm.  There

20   were a lot of computers, some hard drives, some other

21   electronic items.

22   Q     Photocopy machine?

23   A     There was a photocopy machine, yes.

24   Q     Other equipment not capable of storing information,

25   keyboards and -- I don't know -- a scale, something else?

Case 1:14-cr-00476-ILG   Document 112   Filed 05/06/16   Page 57 of 139 PageID #: 1131

1        MS. KASULIS:  Objection, your Honor.

2        THE COURT:  Mr. Ingoglia, I want to make sure I

3   understand why we're here.  Please, correct me if my

4   understanding is faulty.  I believe we are here to determine

5   whether or not the search was in violation of some Fourth

6   Amendment limitation.

7        MR. INGOGLIA:  I agree with that.

8        THE COURT:  What happened thereafter would seem to

9   me is really beyond the scope of what it is we're here to

10  determine.  We're here to determine whether there was control,

11  direction given by the United States to the law enforcement

12  authorities in Belize with respect to the conduct of the

13  search and the seizure of materials.  What was done thereafter

14  it would seem to me has no Fourth Amendment application.

15       Am I correct about that?

16       MR. INGOGLIA:  I don't think so, judge.

17       THE COURT:  I'm sorry.

18       MR. INGOGLIA:  Because the defense theory is, in

19  part -- we spent the first part of the inquiry asking about

20  meetings prior to and I think you don't have any objection to

21  my asking questions about that.  But afterwards, the defense

22  theory is the government says go get the stuff.  The MLAT

23  request is extraordinarily broad.  It essentially says take

24  everything.  Belize says okay.  They don't say it out loud but

25  they do it.  They go, they take all the stuff, every literal

McGuire - cross - Ingoglia                    58

1  thing that's in the office and they move it down the street.
2  I mean they box it and move it down the street and they put it
3  in a different building and they leave it there and then they
4  call up the United States and they say, Hey, guys, here it is.
5          THE COURT:  Mr. Ingoglia, we can have this
6  discussion at a later point.  Why don't you proceed now.
7  Again, I'm really at a loss to understand what the relevance
8  is of having taken boxes that had already been seized, the
9  search had already been conducted and done whatever it is they
10 did with it.  There's no responsibility, I assume you would
11 agree, up to this point that the United States had with the
12 conduct of the search.  They didn't control it.  They didn't
13 direct it.  They didn't authorize it.  They didn't obtain the
14 search warrant.
15         MR. INGOGLIA:  No.
16         THE COURT:  Assuming that I'm right about that, it
17 seems to me what happened thereafter, looking at the material
18 which they had no role in obtaining, does not implicate the
19 Fourth Amendment in some way that I can perceive.
20         MR. INGOGLIA:  I understand what you're saying.  I
21 don't agree that you're right.  I was not trying to give you a
22 speech.  I was trying to answer your question.  I explained
23 why we think the subsequent conduct is relevant.  I'm not
24 going to go through exhaustive detail about it.
25         THE COURT:  Move on Mr. Ingoglia.

1          MR. INGOGLIA:  Judge, I am going to take a few

2    moments to move ahead in my outline.  I ask your indulgence to

3    do that, if you want to take a two-minute break for other

4    people's biological needs.

5          THE COURT:  All right.  Why don't we take a

6    five-minute break.

7          (Recess taken.)

8          (In open court.)

9          MR. INGOGLIA:  May I continue, judge?

10         THE COURT:  I think Mr. Kousouros might want to hear

11   what you have to say.

12         MR. INGOGLIA:  Fair enough.

13         THE COURT:  All right.  Mr. Ingoglia.

14         MR. INGOGLIA:  Thank you, your Honor.  I'm going

15   back to the time before September 9 at your direction and I

16   note my objection.

17         THE COURT:  I'm sorry.

18         MR. INGOGLIA:  I object that you are not going to

19   let me ask questions about the later period.  I'm not arguing

20   with you.  I'm just noting my objection.

21         THE COURT:  Mr. Ingoglia, I haven't prohibited you

22   from doing anything yet.  I'm asking about the relevance of

23   it.  You're disagreeing with me.  It may be, Mr. Ingoglia,

24   that there may be something that I don't know that you know.

25   It's possible.  I didn't prohibit you.  I'm telling you that I

1    fail to see the relevance of it and if you continue along that

2    line I may reach the point where I'll say it's not the purpose

3    of this proceeding.

4          Am I wrong about my understanding that the purpose

5    of this proceeding is the validity of a search and a seizure?

6          MR. INGOGLIA:  You're not wrong, judge.

7          THE COURT:  All right.

8          Am I also correct in understanding that the validity

9    of the search and seizure would be dependent upon whether or

10   not the United States government controlled, directed,

11   commanded in some way the law enforcement agency in Belize?

12         MR. INGOGLIA:  Whether they had that kind of

13   relationship, yes.

14         THE COURT:  Right.  Okay.  Now, that relationship

15   would be significant for the purpose of determining whether at

16   the time the search was undertaken and the materials seized it

17   was done under the direction of under the control of, and so

18   on, of the United States.

19         MR. INGOGLIA:  I think that's where I don't entirely

20   agree with you.  I agree with what you said, which is if you

21   could establish that you wouldn't need to go beyond.

22         THE COURT:  That's correct.

23         MR. INGOGLIA:  I also think that if -- there's no

24   case that I am aware of that has ever had -- that has been

25   litigated where the contents of an office are moved by the

1   foreign country and as far as we know so far, we have not

2   talked to all the witnesses yet, there's no indication that

3   the U.S. was involved in that initial search.  It may be that

4   we'll learn something different from the agents we have not

5   heard from yet.  From this agent he doesn't know of any such

6   interaction, so I agree with that.  But if the U.S. asks for a

7   broad search, the Belizean authorities take everything,

8   literally everything and just move it.  They don't search it.

9   They seize it.  They move it over here, six steps to the left

10  and then they invite the U.S. to come down and conduct a

11  search.  To me that's an offer and acceptance and then the

12  U.S. exercises control over that at a latter point, I think is

13  not in dispute.  I don't think the government can point to a

14  single case where the U.S. goes to the other country and goes

15  through all the papers and picks out -- it does a search, but

16  it just does a search two weeks later.  I realize what I am

17  not arguing is that point -- this is not a point where I can

18  point to a case and say, yes, there's case authority that says

19  that I am right, but there's also case authority that says

20  that I am wrong.  I think that it's a logical argument.

21          And the reason I think it's a logical argument is

22  this:  If the purpose of the exclusionary rule is to deter

23  U.S. conduct and the reason why we don't apply it

24  internationally is there's no value in deterring international

25  bad actors, if they knock down the door or if they don't get

1    warrant or follow proper procedures, having a warrant in the

2    United States doesn't deter them.

3           If the U.S. in their MLAT request asks for

4    everything on an expedited basis and be secured.  And the MLAT

5    application by the way is directly relevant to that question.

6    I don't know how we're going to get it in.  And then the U.S.

7    agents go down to the other country --

8           THE COURT:  Mr. Ingoglia, there's no need reviewing

9    what happened.  I know that.

10          MR. INGOGLIA:  I'm trying to state my theory.

11          THE COURT:  Please.

12          MR. INGOGLIA:  Okay.

13          THE COURT:  I would simply observe that if there

14   were a case which supported your view I'm sure you would have

15   found it by now.  In any event, move on.

16          MR. INGOGLIA:  I'm moving on, judge.

17          THE COURT:  Up to a point.  There will come a time

18   when I'm going to tell you that it's irrelevant and you're

19   consuming time unnecessarily.  So move on.  So far I have not

20   prohibited you from doing anything.  I'm encouraging you to

21   think about where it is you're going.

22          MR. INGOGLIA:  I appreciate that.

23          THE COURT:  Move on.

24   BY MR. INGOGLIA:

25   Q    Agents McGuire, directing your attention to September 2,

McGuire - cross - Ingoglia                    63

1  the week before the September 9 search.

2  A    Okay.

3  Q    At that point were you aware -- did you have plans to

4  arrest Mr. Banfield on September 9?

5  A    Yes.  I was to arrest him September 8 or September 9.  By

6  that time we had known he would be in Miami from September 3

7  to September 9.  So this was our window of opportunity to

8  coordinate the arrest and indictment and do whatever we could

9  to advance the investigation.

10 Q    As of September 2 the never executed plan that was

11 considered to do police to police --

12 A    Cooperation.

13 Q    -- cooperation that was still a live possibility on

14 September 2, is that right?

15 A    It was what I favored, what the FBI favored.  There was

16 sort of a variation.  We understood that we were definitely

17 doing an MLAT and one concern would be the very bureaucratic

18 process might take weeks or months.  We had discussed

19 internally would there be an opportunity that immediately

20 after we arrest Mr. Banfield the MLAT gets served and

21 expedited the shipping of the MLAT we could, for example, have

22 an assistant legal attache of the FBI personally deliver a

23 copy of that to the FIU or attorney general's office.  Our

24 concern was by the time that Fedex arrives and it gets bounced

25 around a lot of the evidence might be gone.  The last

1   iteration of this plan that was not executed was that myself

2   and one computer specialized agent, called a CART agent, would

3   travel to Belize on September 7, two days before the planned

4   arrest.  They would then be in Belize so that if the police

5   authorities execute the MLAT and said we need help, we need

6   the computer guy to help us, we would be in Belize and be

7   ready to help.  I actually booked a ticket for those dates.

8   The FBI management said you cannot travel to Belize unless

9   there's a firm commitment that there's a meeting, that you

10  can't sit in Belize and wait.  So then I cancelled that

11  ticket.  We decided we had to wait until on September 10 or 11

12  when police authorities formally requested our presence and

13  then my travel was approved and I traveled there on September

14  14.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1    EXAMINATION CONTINUES

2    BY  MR. INGOGLIA:

3    Q    Understood.

4         But on September 2nd, that hadn't been resolved yet?

5         How it was going to happen hadn't been resolved yet,

6    is that fair?

7    A    That is correct.

8    Q    You were a week out from the arrest and you were

9    concerned -- you and the other agents were concerned about the

10   possibility that evidence would be destroyed if it wasn't

11   secured right away after Bandfield's arrest, is that fair?

12   A    Yes.

13   Q    Agent Carrano at one point referred to the bonfire in

14   Belize.

15        Do you remember hearing that or seeing that written

16   at some point?

17   A    I remember that.

18        I think it was his way of expressing that evidence

19   might be destroyed.

20   Q    Did you just in that window from that last week convey to

21   anybody at FIU the US Government's concern about the

22   possibility that evidence would be destroyed?

23   A    I did not have any contact with FIU until September 15th.

24        It is my understanding that nobody in the US

25   government advised the FIU or the Belize government who the

1  targets were.  Leading up to the search, there was a lot of

2  communication in hypothetical form what would happen if we do

3  a search warrant, how quickly could you do it.  These

4  discussions continued.

5  Q    What's your basis to believe that no one from the

6  US government had those conversations?

7  A    The FBI, the legal attaches, it was their job to interact

8  with the foreign government officials, but to some degree they

9  take direction from me as a case agent.  They would ask in

10 preparation for such a meeting what can we prepare, what can

11 we reveal.  We have throughout the whole period always told

12 everybody involved, we must not reveal that Mr. Bandfield is a

13 subject of this investigation for the reasons previously

14 stated.  I would be very surprised if anybody revealed that

15 information to anybody in Belize.

16 Q    With respect to IRS, do you know one way or the other

17 what conversations IRS was having with FIU?

18 A    I received some updates on those information.  They were

19 very similar.  They were asking about how the process would

20 work to obtain information from the FIU.  Again, the directive

21 for the IRS legal attache was the same, not reveal that

22 Bandfield is the target of this investigation.

23 Q    Not just Bandfield but also the location?

24 A    Correct.

25 Q    How about the possibility that an urgent request to

McGuire - cross - Ingoglia                    67

1    secure premises might be forthcoming in the near future, is

2    that something that was discussed with FIU?

3    A    I think that might have been discussed, yes.

4    Q    That was the way of not giving away the precise location

5    but trying to make sure that you could set something in motion

6    quickly or to establish whether you could set something in

7    motion quickly to preserve the evidence?

8    A    Right.

9    Q    Working with FIU?

10   A    Throughout this six-month period we are trying to get

11   information, how would the process in Belize work.  It

12   mattered to us how quickly it would happen, who would be in

13   charge, anything we could do to make sure this happens

14   quickly.  So I think there were discussions with FIU about how

15   long would it take to obtain a search warrant.

16        I think one -- once I received information that it

17   might take about a week for the FIU to review the evidence and

18   determine whether they wanted to get a search warrant, once I

19   did -- the information was that the typically get a search

20   warrant within one day.  All of these discussions were about

21   the FIU obtaining a search warrant after we shared

22   information, which didn't happen.

23        I think there were also conversations about how

24   quickly the MLAT process would be -- how quickly that would

25   happen.  I really was not part of that investigation much

1  because OIA and the US Attorney's Office would have had those

2  contact maybe with Belize authorities but I was not in the

3  loop.

4  Q    I know you -- you have testified that you didn't have

5  these conversations.  You didn't talk to anybody from FIU

6  during this time period.  So I am only asking what you -- what

7  contacts others had.  If you are not present I am not asking

8  you to tell us what others said if you don't know and didn't

9  hear it.  I am interested to know what the universe of people

10  you were talking with at FIU and if you know what kind of

11  information was conveyed from the US to the FIU.

12         What I understand you to be saying is not the

13  target, not the names of the target, not the precise location,

14  but there could be a location we'd ask you to move on quickly

15  if we decided to ask you and secure it, would you be able to

16  secure it.

17         Is that broadly your understanding or have I

18  misstated?

19  A    These are the same questions I would ask.  I am not a

20  field office.

21  Q    I am just asking if that was the conversation.

22  A    Yes.  This is the information we wanted to obtain from

23  the Belize government, how would that work and how quickly

24  could they move so we could plan accordingly.  In the end our

25  decision was, number one priority to arrest Mr. Bandfield in

McGuire - cross - Ingoglia                    69

1   that we would not release any information until after the

2   arrest and if that meant that there would be a big delay and

3   maybe the evidence gets moved or destroyed, be as it be.  The

4   priority was to arrest Mr. Bandfield.

5   Q    Could I direct you to what has been marked as defense

6   Exhibit 20.

7         My first question is going to be, do you recognize

8   that.

9   A    Yes.

10        This is an email chain.

11        THE COURT:  It is being offered?

12        MR. INGOGLIA:  Yes.

13        MS. KASULIS:  No objection, Your Honor.

14        THE COURT:  Received.

15        (Marked)

16  A    This is an email being forwarded to me on September 4th

17  and I think the original email was sent September 2nd.

18  Q    Are you -- is this something you have seen in advance of

19  your testimony today?

20  A    Yes, I have.

21  Q    Can I direct you to the one, two, the third page of the

22  email that has the number 64 at the bottom?

23  A    Okay.

24  Q    And the body of the email is from Troy Caldron of the IRS

25  to Mr. Eusey at FIU.

1              Do you see that section?

2   A    I do.

3   Q    Do you see the second sentence of Mr. Caldron's email,

4   where he says, we would like to be able to proceed with the

5   FIU conducting the search warrant if all the elements are met

6   as you see fit.

7              Did you see that?

8   A    Yes.

9   Q    Do you have an understanding of what Troy Caldron

10  discussed with Mr. Eusey of FIU that led him to say we would

11  like to be able to proceed with the FIU conducting the search

12  warrant?

13  A    Yes.

14             As I mentioned before, the plan that I and the FBI

15  favored was to share information police to police.  Under this

16  route we would share information with the FIU.  The FIU would

17  then review that information, obtain a search warrant and

18  execute that search warrant.

19  Q    This is an example of the kind of communications you were

20  describing a moment ago for planning purposes?

21  A    Correct.

22             And these were also where we did not reveal the

23  details of the investigation.  We revealed sort of in the form

24  of a hypothetical if we had such an investigation.  I have no

25  doubt the FIU understood we had some investigation.  I am

McGuire - cross - Ingoglia                71

1   convinced that they had no idea that we were investigating

2   Mr. Bandfield.

3   Q     I understand.

4             This is more active than hypothetical, isn't it?

5             If you look to the second page, the second -- the

6   section you just read, Troy Caldron saying we would like to be

7   able to proceed with the FIU conducting the search warrant,

8   and then asked for a meeting.

9             And on page 63, the prior page, Mr. Eusey writes

10  back, you see at the bottom of the page there?  He says we can

11  meet at Friday at 10:00 am.  I think it's best we plan

12  assiduously.  I assume he means the two of them for this

13  exercise.

14            Doesn't that sound more than just a hypothetical?

15  A     What I mentioned before, the last iteration of this plan

16  would be we arrest Bandfield, we serve the MLAT, we -- we were

17  discussing internally whether that MLAT would be assigned to

18  the FIU.  My understanding is Belize law enforcement does not

19  have a lot of capabilities.  The FIU is the one part of law

20  enforcement that is sort of working white collar crimes,

21  securities fraud and would have the expertise.  Our

22  preference, my preference was always that the FIU be very

23  involved in this because they know a lot more about this than

24  the typical Belize police officers who work in drug crimes and

25  murders.  So that was our preference but, again, that was part

McGuire - cross - Ingoglia                    72

1    of the plan that was not approved and not executed.

2    Q    The derailing of that plan, the decision not to execute

3    that plan, happens very, very late in the game?

4    A    That is correct.

5              So early on the decision was made, we are doing an

6    MLAT.  No discussions.  That's the only way to do it.  But

7    then there was conversation about could we hand deliver the

8    MLAT.  So on September 3rd is the date Mr. Bandfield is

9    already in Miami.  So between September 3rd and September 9th,

10   we sort of had some options.  We were planning how we could

11   make sure as soon as this goes public we are in the best

12   position for Belize authorities to move quickly.

13             THE COURT:  Just so that I am clear, all of the

14   conversations and discussions that you have been asked about

15   were internal between you and Caldron and Williams and other

16   members of the United States law enforcement agency, is that

17   correct?

18             THE WITNESS:  That is correct.

19   Q    Not the email though, right?

20             THE COURT:  Excuse me.

21   A    My conversations.

22             THE COURT:  These conversations and the emails as

23   well, as I glanced at them and looked at them, were all

24   internal amongst the law enforcement people here in the United

25   States, as to what it is that you might like to do?

1          THE WITNESS:  Correct.

2          Some emails were like this one, from the FIU to the

3    legal attache.  They would forward it to me.  It is clear

4    under our organizational structure, it would be totally

5    inappropriate for me to reach out to the FIU.  I have to go

6    through the legal attache and OIA.  So they have that contact.

7    They fed this information back to me because as case agent one

8    of my responsibilities was to plan the takedown, what happens

9    first, who gets arrested first.  I got all this information so

10   I could articulate a plan.  I articulated two, the one I liked

11   and the one I didn't like so much.  The one I didn't like so

12   much was the one approved and I would execute it.

13         THE COURT:  Move on.

14   Q    For clarity, Agent McGuire, FIU is not a US law

15   enforcement agency, is that correct?

16   A    That is correct.

17         MR. INGOGLIA:  Judge, the silence means I am moving

18   on.

19         THE COURT:  Excuse me?

20         MR. INGOGLIA:  The silence you are hearing is me

21   moving on past some things.

22         THE COURT:  I understand.

23   Q    You testified earlier today about Jason Kaplan.

24   A    I did.

25   Q    Did you have any discussions or I guess with any US

McGuire - cross - Ingoglia                    74

1   agents or officials about the option of denying US involvement

2   in the searches?

3   A    I did not have such discussion.

4            I think you are referring to email that I received.

5   Q    You did receive an email that referenced that?

6   A    Yes.

7   Q    If you turn to Defendant's Exhibit 12, the question will

8   be, do you recognize defense Exhibit 12.

9   A    I do.

10           It's an email I received from FBI legal attache

11  Jason Kaplan, dated August 31, 2014.

12           MR. INGOGLIA:  The defense offers defense Exhibit

13  12.

14           MS. KASULIS:  No objection.

15           THE COURT:  Received.

16           (Marked.)

17  Q    Have you worked with Jason Kaplan on other occasions

18  other than this case?

19  A    No.

20  Q    So you have no past experience with him?

21           This is the first time you dealt with him?

22  A    Not this email, this investigation.

23  Q    This investigation?

24  A    Correct.

25  Q    Apart from the email, did you ever have a discussion with

McGuire - cross - Ingoglia                    75

1    Mr. Kaplan about the possibility of denying US involvement in

2    the Belizean operation?

3    A    No.

4    Q    Do you see item four in this email from Kaplan to you in

5    the middle of the page of defense Exhibit 12?

6    A    I do.

7    Q    He's responding to your question about what should you

8    wear, is that right?

9    A    Yes.

10           The question was, any chance that we want the FBI

11   team to wear FBI jackets.  I assume not.  We could bring them

12   just in case.

13   Q    That was your question?

14   A    Yes.

15   Q    His answer is no FBI uniform is necessary but if CART

16   slash ERT wants to, it isn't a problem.  It will eliminate the

17   option of denying our involvement if we ever wanted to do

18   that.  That's his response to you?

19   A    Correct.

20   Q    Your response in the email doesn't engage on that point

21   at all, is that right?

22   A    Correct.

23   Q    At the time do you remember noticing that he had written

24   that?

25   A    I read it.  At the time this did not seem important at

McGuire - cross - Ingoglia                    76

1    all because I asked him whether the agents should bring the

2    FBI jackets.  He had said not necessary but if they want to

3    they can.  He had answered my question.

4    Q    That was what you had been asking about?

5    A    Right.

6    Q    Have you ever discussed with him the second half of this

7    response, which was, eliminate the option of denying our

8    involvement if you ever want to do that?

9    A    No.

10   Q    Do you have any idea what he was referring to?

11          MS. KASULIS:  Objection, Your Honor; calls for

12   speculation.

13          THE COURT:  Sustained.

14   Q    Have you ever denied FBI involvement in a matter or

15   structured your involvement so FBI involvement could be

16   denied?

17   A    Part of this case involved an undercover investigation.

18   We go to great lengths to make sure that the subjects and the

19   public does not become aware of this investigation.  So in

20   that way we take a lot of measures to conceal our involvement

21   in criminal investigation.

22          I am not aware of denying it.  There was

23   definitely -- so there is a lot of activity we do design to

24   conceal our involvement in an investigation.

25

GR      OCR      CM      CRR      CSR

McGuire - cross - Ingoglia                    77

1    BY MR. INGOGLIA:   (Continuing)

2    Q    The only reason I'm using the word "deny" is that's the

3    word Mr. Kaplan used but you're not -- let me ask it this way.

4         Was there U.S. involvement in the September 9th

5    search that you were now denying FBI involvement in?

6    A    Absolutely not.

7         THE COURT:  Mr. Ingoglia, I respect your

8    disagreement with me, but I am going to ask you to conclude

9    your examination if your questions are absolutely irrelevant

10   to what I conceive to be the issue in this hearing.  With all

11   due respect to your disagreement with me, I am going to tell

12   you that if you can't get to the core issue as I see it, I am

13   going to ask you to conclude your cross-examination.

14        MR. INGOGLIA:  I hear your words, Judge, and I'm

15   endeavoring to get to just that core issue.  I've abandoned

16   all inquiry about after September 9th.  I'm only talking about

17   before September 9th.

18   Q    Agent McGuire, can I direct your attention to Defense

19   Exhibit 23.

20   A    Okay.

21   Q    Do you recognize that document?

22   A    Yes.  This is an e-mail chain or that's an e-mail sent

23   from me to my supervisor and other agents and then the reply

24   from assistant legal attache Tyler McCurdy.

25        MR. INGOGLIA:  Defense offers Defense Exhibit 23.

McGuire - cross - Ingoglia                78

1          MS. KASULIS:  No objection.

2          THE COURT:  Received.

3          (So marked.)

4   Q     Agent McGuire, this is September 5th and is this the plan

5   that ultimately was executed or did the plan change again

6   after September 5th?

7   A     My e-mail is dated September 4th.  Let me read it first.

8   Q     Of course.

9          (Pause.)

10  A     So this was not executed in the way I had proposed it.

11  In a similar matter but not the way.

12  Q     What changed subsequent to this e-mail?

13  A     Right.  So what I, the FBI suggested is that if

14  Mr. Bandfield gets arrested on September 9th, the last day we

15  know he was in Miami, we did not want the investigation to

16  become public and part of that would be not to do a press

17  release.  We previously talked about maybe arresting based on

18  a complaint rather on an indictment because the indictment

19  would have to be unsealed and it would reveal the whole scope

20  of our investigations.

21          In this e-mail, it was clear that eventually on

22  September 9th, this investigation would become public, that we

23  would travel to Belize as of Sunday, September 13th.  That's a

24  typo.  It should be actually September 14th.  The MLAT would

25  then be served.  After the MLAT is served, we would meet with

McGuire - cross - Ingoglia                    79

1   the Belize authorities and we hoped with this plan, which

2   really didn't happen, is we could buy us a couple of days

3   where the public in Belize are not aware of the investigation.

4   Q    Do you see where, at the top, Agent McCurdy is writing to

5   you and in the last sentence, he says, So arrange everything

6   with the ambassador and FIU prior and have the MLAT timed to

7   arrive on Tuesday instead.

8             Do you see that?

9   A    Correct.

10  Q    Did any part of that happen?

11            Were the arrangements made with FIU prior to the

12  MLAT arriving or did that not happen?

13  A    So, that did not happen.  The idea was we had said the

14  best of the imperfect options would be we could at least

15  schedule a meeting with the FIU, for example, say why don't we

16  meet on September 9th in the morning, we won't tell you what

17  it's about, we can tell you it's about a big investigation.

18  At least that meeting is on the books and at that meeting, we

19  would reveal the investigation.

20            It turns out that Mr. Eusey was on vacation that

21  week so we were not able to set up that meeting.  There was

22  discussion about whether they would meet on Friday.  There was

23  a concern that meeting with Mr. Eusey meeting on Friday would

24  be too early, definitely too early to reveal any information.

25            So, the idea here is we could do some planning ahead

1    in terms of setting up a meeting, but the substantive sharing

2    of information would only happen after Mr. Bandfield is

3    arrested.

4    Q    I have two documents I just want you to look at and see

5    if you recognize them.  Defense Exhibit 11 and 27.

6              (Pause.)

7    A    Okay.  I'm looking at Exhibit No. 11.

8    Q    Do you recognize that one?

9    A    I do.  It's an e-mail exchange between me and Jason

10   Kaplan on September 9th.

11             MR. INGOGLIA:  The defense offers Defense 11.

12             MS. KASULIS:  No objection.

13             THE COURT:  Received.

14             (So marked.)

15   Q    Could you look at 27?

16             (Pause.)

17   Q    Do you recognize that document?

18   A    I do.  It's an e-mail between me and Stephen Flatley.

19   I'm not sure if he was an agent or an FBI employee, but he's

20   on our CART team so he's a computer expert.

21             MR. INGOGLIA:  The defense offers Defense

22   Exhibit 27.

23             MS. KASULIS:  No objection.

24             THE COURT:  It's received.

25             (So marked.)

McGuire - cross - Ingoglia                    81

1   Q    Agent McGuire, can you look at Defense Exhibit 39, what's

2   been marked for identification as Defense Exhibit 39?

3   A    Okay.

4   Q    And the question is have you ever seen that before?

5   A    I don't think so.  I've seen ...

6          (Pause.)

7          THE COURT:  Is there a question that is pending?

8          MR. INGOGLIA:  I think he's continuing to answer.

9   A    So now that I'm looking at it, I have not seen this

10  before.  I mentioned before that I think I've seen drafts of

11  texts that were then being incorporated in the MLAT and I

12  assisted in reviewing some portion of the MLAT, but the final

13  version I have not seen.

14  Q    Did you ever ask when you were in Belize to see the

15  arrest warrant?

16  A    You mean the search warrant?

17  Q    I'm sorry, the search warrant that the Belizean courts,

18  that you understand the Belizean courts entered.

19  A    Well, in Belize, I don't think we asked.  I think there

20  was subsequent discussion afterwards about obtaining this

21  search warrant.

22  Q    And whether you asked for a copy or not, did you ever lay

23  eyes on it while you were down there?

24  A    No, I've never seen the search warrants.

25  Q    Are you aware that the Supreme Court of Belize has ruled

McGuire - cross - Ingoglia                    82

1  that the searches of Unicorn and Titan were unconstitutional

2  under Belizean law?

3              MS. KASULIS:  Objection, Your Honor.

4              THE COURT:  Sustained.

5              MR. INGOGLIA:  One moment, Judge.

6              (Pause.)

7  Q    Agent McGuire, are you aware of any meetings between U.S.

8  personnel and the police commissioner in Belize?

9  A    Related to this investigation?

10 Q    Yes.

11 A    I'm not.  I remember that there was conversation about

12 whether there would be such a meeting similar to the FIU,

13 whether we would schedule a meeting beforehand, whether maybe

14 the MLAT would be delivered to the police commissioner.  There

15 was an internal discussion whether the FIU would even be in

16 charge of executing the MLAT, but I don't have details about

17 such a meeting.

18 Q    Do you remember who it was that you had the discussion

19 with, which U.S. law enforcement you had the discussion with?

20 A    I remember as part of the planning, we learned through

21 OIA that the MLAT would actually be delivered to the police

22 commissioner, not the FIU, so we had reached out to the legal

23 attaches in Belize to say what do you know about the police

24 commissioner, give us more information about the police

25 commissioner, and I think information came back that we have a

McGuire - cross - Kousouros                    83

1   good relationship with the police commissioner.

2   Q    But you're not, you're not aware whether there's a

3   meeting or not?

4   A    Correct.

5   Q    And I'll direct your attention to what's been marked as

6   Defense 16.  My question is going to be do you recognize that.

7   A    I do.  It's an e-mail exchange between me and Jason

8   Kaplan and others dated September 2nd.

9            MR. INGOGLIA:  Defense offers Defense 16.

10            MS. KASULIS:  No objection.

11            THE COURT:  Received.

12            (So marked.)

13            MR. INGOGLIA:  No further questions, Judge.

14            THE COURT:  Mr. Kousouros, do you wish to inquire?

15            MR. KOUSOUROS:  Very briefly, sir.

16   CROSS-EXAMINATION

17   MR. KOUSOUROS:

18   Q    Good afternoon, sir.

19   A    Good afternoon.

20   Q    I'm going to ask you just some general questions as my

21   colleague has discussed the particulars with you.

22            You had an investigation that involved individuals

23   in Belize, correct?

24   A    Among others, yes.

25   Q    Okay.  And you had conducted part of your investigation

CMH      OCR      RMR      CRR      FCRR

McGuire - cross - Kousouros                    84

1   without anybody's assistance; you had traveled there, you had

2   undercover operations, conversations that were had, correct?

3   A    Without assistance, correct.

4   Q    Right.  You didn't need to involve anybody in the

5   Belizean government with those aspects of your investigation,

6   correct?

7   A    We are required to make a notification.

8   Q    Okay.  And upon your arrival there and in the conduct of

9   your investigation, you noticed, you visited or your

10  operatives visited offices in which what you believe to be

11  illegal activities were being conducted, correct?

12  A    So, the undercover agent went into these offices of IBC,

13  Titan and Unicorn.  I myself have not.

14  Q    I said and your operatives.

15  A    Okay.

16  Q    So you knew of locations, offices, desks, materials,

17  computers and the like that were being used in another country

18  related to your investigation, correct?

19  A    That is correct.

20  Q    And there's no question for the Court that you wanted, in

21  fact, needed to get your hands on those materials, correct?

22  A    We wanted to get those documents because they constituted

23  evidence of criminal activity in the U.S.

24  Q    Okay.  "Yes" or "no" works.

25       You needed to get -- what you were looking at in

1    terms of desks, computers and the like, you wanted and, in

2    your opinion as an investigating Special Agent, you needed

3    those materials to further your investigation and potential

4    prosecution, correct?

5    A    "Yes" to wanted.  "No" to needed.  I'm not sure what you

6    mean by needed.  The more evidence we get, it helps the cases.

7    New evidence identifies subjects.

8    Q    That's perfect.

9    A    Okay.

10   Q    And you needed to figure out a way in order to obtain

11   those things, correct?

12   A    Correct.

13   Q    Okay.  And part of the way you tried to figure it out was

14   as you've testified, you explored certain alternatives,

15   correct?

16   A    That is correct.

17   Q    One of the alternatives was figuring out a way to get the

18   FIU to do it within the context of your investigation in terms

19   of nondisclosure of subjects and so on and so forth, correct?

20   A    That is not correct.  I don't understand, in the context

21   of no disclosure.  The option --

22   Q    Let me explain.

23   A    Okay.

24   Q    What you testified to was you did communicate with FIU to

25   see if they could execute a search warrant but you didn't want

McGuire - cross - Kousouros                    86

1   to give them too much information, is that correct?

2   A    We didn't want to give them any information identifying

3   the subjects, correct.

4   Q    Okay.  But you were exploring the alternative of having

5   the FIU conduct searches targeting the materials that you

6   wanted to further your investigation, correct?

7   A    Correct.

8   Q    And that didn't work?  That was not pursued?

9   A    Because that plan was not approved, correct.

10  Q    Okay.  And to be clear, while FIU to your knowledge was

11  investigating CYNK, to your knowledge, they had no intention

12  of executing a search warrant at the time that you were

13  exploring this alternative, correct?

14  A    That is correct.

15  Q    And so you turned to the alternative of the MLAT request

16  ultimately, correct?

17  A    Correct.

18  Q    And, again, the purpose was to engage the Belizean

19  authorities in order to get your hands on the information, the

20  documents, the computers, the physical evidence that you

21  wanted to further your investigation, correct?

22  A    Yes.

23  Q    And the United States Government pursued that route and

24  drafted an MLAT request and timed it in a particular way that

25  you felt comfortable with, correct?

McGuire - cross - Kousouros                    87

1    A    Yes, we timed it that it would occur after Mr. Bandfield

2    was arrested.

3    Q    And the targeted information in the MLAT request was the

4    documents and everything else that you wanted to receive from

5    that location, correct?

6    A    I would have to look at the MLAT request to tell you

7    what's in it.

8    Q    Okay.  And you coordinated your travels to Belize upon

9    the execution of the search warrant with the execution of the

10   MLAT request, correct?

11   A    We requested -- OIA served the MLAT and then we waited.

12   And then --

13   Q    Agent -- I'm sorry.

14            THE COURT:  Agent McGuire, listen to the question.

15            THE WITNESS:  Okay.

16            THE COURT:  Just try to answer the question.

17            THE WITNESS:  Yes.

18            THE COURT:  Did you arrange your travel.

19   Q    That's all.

20   A    Did I plan the travel around the MLAT request?

21   Q    Yes.

22   A    Yes.

23   Q    Okay.  And to your knowledge, all of these materials,

24   whatever was taken pursuant to the search warrant, was seized

25   by the Belizean police, correct?

McGuire - cross - Kousouros                    88

1   A    By Belizean authorities, yes.

2   Q    And all of it was moved to a different location, correct?

3   A    I've only seen what they moved and everything they moved

4   I saw.

5   Q    Okay.  To your knowledge, sir, did the Belizean

6   authorities, whoever confiscated these materials pursuant to

7   the MLAT request, did they, other than to inventory it, search

8   through it?

9        THE COURT:  Search what?

10       MR. KOUSOUROS:  Search through it.

11       THE COURT:  Search what?

12       MR. KOUSOUROS:  Through the materials they got.

13       THE COURT:  You mean did they investigate it?

14       MR. KOUSOUROS:  That's all.  I just want to know

15   whether they did anything other than inventory what they

16   seized.

17       MS. KASULIS:  Objection.  Calls for speculation.

18       THE COURT:  I'll allow it.

19   A    On September 16th, we took custody of the evidence and

20   during that time, it was in U.S. custody.  Belizean

21   authorities stopped by just to check up on us, but they did

22   not review it.  So while I was in Belize, while we had the

23   evidence, Belizean authorities did not review the evidence.

24   Q    Prior to your arrival there, did you receive any

25   communications or inventory of what had been taken?

McGuire - redirect - Kasulis                    89

1    A    Not prior to travel, no.

2    Q    Upon your arrival, did you receive any inventory of what

3    had been taken?  Let me put it another way.  It's a simple

4    question.

5             Did you ever receive any information that upon the

6    Belizean authorities conducting the search, did you ever

7    receive any information that they had investigated the

8    materials beyond inventorying them, if you know, sir?

9    A    I don't know.

10   Q    Thank you.

11            MR. KOUSOUROS:  Nothing further, Your Honor.

12            THE COURT:  Ms. Kasulis, do you have any redirect?

13            MR. KOUSOUROS:  Every time you say "Ms. Kasulis," I

14   think you're talking to me.

15            THE COURT:  I prefaced the question with "Ms."

16            MS. KASULIS:  Your Honor, I just have one brief

17   question or one exhibit to question about.

18   REDIRECT EXAMINATION

19   BY MS. KASULIS:

20   Q    I'm going to refer you back to Defense Exhibit 16,

21   Special Agent McGuire.

22   A    Okay.

23   Q    Defense Exhibit 16 appears to be the first e-mails from

24   you to Jason Kaplan, Tyler McCurdy with a cc to Jonathan

25   Walters.  Who is Jonathan Walters?

1    A     He's an FBI agent.  At the time, he was the co-case agent

2    on the Bandfield investigation.

3    Q     And the date of that e-mail is September 2nd and the time

4    is 4:03 p.m. on, in 2014?

5    A     That's correct.

6    Q     And in this e-mail, do you discuss the possibility of

7    where the MLAT will be routed when it's served?

8    A     Correct.  So we then learned around that time that the

9    MLAT would be sent --

10              THE COURT:  The question is did you.  That's yes or

11   no.

12   A     Yes.

13              THE COURT:  Okay.

14   Q     And where did you believe at this point in time the MLAT

15   would be routed?

16   A     To the police commissioner.

17   Q     And you ask here:  Have either of you -- directed to

18   Jason Kaplan and Tyler McCurdy -- met with the police

19   commissioner and you then asked about the likelihood of

20   getting cooperation because the IRS ALAT, as you write, hadn't

21   met the commissioner, is that right?

22   A     That's correct.

23   Q     And then Jason Kaplan responds to you within it looks

24   like a half hour saying:  I have met the commissioner.  He is

25   very cooperative.  I'm not sure about competition with the

McGuire - redirect - Kasulis                    91

1    FIU.  Is that right?

2    A     Correct.

3    Q     Do you have any understanding whether Jason Kaplan had

4    met with the commissioner in the context of this investigation

5    when he wrote this e-mail to you?

6    A     Yes.  My understanding is that he had met with him

7    previously during an unrelated investigation.

8              MS. KASULIS:  No further questions.

9              THE COURT:  Is there no further cross?

10             (Witness excused.)

11             I think this would be a good time to recess for

12   lunch and we will resume at 2 o'clock.

13             MR. KOUSOUROS:  Your Honor, if at all possible, sir,

14   I have an incredibly brief conference before Judge Cogan at

15   2 o'clock.  It really is very brief.

16             THE COURT:  Well, see if you can advance that

17   conference.

18             MR. KOUSOUROS:  I'm going to run upstairs right now.

19             THE COURT:  Right.  Okay.

20             MR. KOUSOUROS:  Or downstairs.

21             THE COURT:  All right.  If you tell him that you are

22   due here at 2 o'clock, I am sure he will be understanding.

23             All right.  We will resume at 2 o'clock.

24             (Luncheon recess.)

25

1          A F T E R N O O N       S E S S I O N

2              THE COURT:  Are we ready?

3              MS. KASULIS:  Yes, Your Honor.

4              THE COURT:  Mr. Ingoglia, are you ready?

5              MR. INGOGLIA:  I don't have my client.

6              THE COURT:  I know.  When your clients are here, you

7    are ready?

8              MR. INGOGLIA:  Yes.

9              THE COURT:  Mr. Kousouros?

10             MR. KOUSOUROS:  Yes.

11             (Defendants present)

12             THE COURT:  All right.  Call your witness, please.

13             MR. KEILTY:  Your Honor, the government calls

14   Special Agent Timothy Reid of the Diplomatic Security Service.

15             THE CLERK:  Please raise your right hand.

16             (The witness is duly sworn/affirmed.)

17             THE CLERK:  Please be seated.  Please state and

18   spell your full name for the record.

19             THE WITNESS:  Timothy Reid, R E I D, T I M O T H Y.

20             THE COURT:  All right.

21   DIRECT EXAMINATION

22   BY MR. KEILTY:

23   Q    Good afternoon, Agent Reid.

24   A    Sir.

25   Q    Agent Reid, where are you employed?

Reid - direct - Keilty                               93

1   A    I am currently employed with the US Department of State,

2   Diplomatic Security Service.

3   Q    Is the Diplomatic Security Service sometimes referred to

4   as DSS?

5   A    Yes, sir, it is.

6   Q    Is it okay if I call it DSS today?

7   A    Yes, sir.

8   Q    What is your title at DSS?

9   A    I am a Special Agent.

10  Q    What does DSS do?

11  A    Diplomatic Security Service is responsible for securing

12  foreign US diplomatic facilities overseas, investigating

13  passport and visa fraud, as well as protecting US diplomats

14  overseas.

15  Q    Agent Reid, how long have you worked at DSS?

16  A    I have been with DSS for 12 years.

17  Q    What is your current position at DSS?

18  A    I am assigned to the US embassy in Belmopan, in Belize.

19          THE COURT:  Agent Reid, if you would slow down a

20  little bit?  This Court reporter is pretty good.

21          THE WITNESS:  Yes, sir.  It's the caffeine.  Forgive

22  me, sir.

23          THE COURT:  Okay.  All right.  Go ahead.

24  Q    Approximately how long have you held that position, Agent

25  Reid?

1   A    I have been at the US embassy for going on two years now,

2   sir.

3   Q    Agent Reid, in approximately September 2014, what was

4   your position?

5   A    I was the DSS regional security officer for

6   investigations in Belmopan, Belize.

7   Q    That was at the embassy in Belize?

8   A    Yes, sir, it was.

9   Q    In September 2014, Agent Reid, were there other law

10  enforcement personnel assigned to the embassy?

11  A    Yes, sir.

12  Q    Who are they?

13  A    There are two other diplomatic security service agents

14  assigned to the regional security office where I am assigned,

15  as well as three agents assigned to the Drug Enforcement

16  Administration office.

17  Q    Agent Reid, can you briefly describe your duties as an

18  assistant regional security officer in the embassy of Belize?

19  A    Yes, sir.

20       My responsibility is to investigate passport and

21  visa fraud.  Principally, that -- people targeting the US

22  embassy or the consular processes, to support the regional

23  security office in protecting Americans.  Part of my job

24  responsibility is liaison with US law enforcement.  As part of

25  that duty is also to facilitate meetings with personnel,

1  facilitate their E-Country clearance process and work with the

2  Belizean government to target areas of our core statute.

3  Q    Agent Reid, you mentioned E-Country clearance.

4         Can you please explain what E-Country clearance is?

5  A    E-Country clearance is the formalized request for

6  executive branch agencies to request of the US ambassador or

7  his designatge to come to Belize on official business.

8  Q    Is this a way that the embassy approves official business

9  in Belize?

10  A    Yes, sir, it is.

11  Q    Is there a way that the embassy tracks these approval

12  requests with the various governmental agencies?

13  A    Yes, sir.

14         The system goes by the same name as the E-Country

15  clearance database.

16  Q    Agent Reid, I am showing you what's been marked as

17  Government Exhibit 2 for identification.

18         Do you recognize Government Exhibit 2?

19         It will be in your binder.  It should also be on

20  your screen.

21  A    The screen -- here we are.  Yes, I do.

22  Q    What is Government Exhibit 2?

23  A    The E-Country clearance summary report.  This report I

24  requested of the ambassador's secretary, encapsulating all the

25  requests that were sent to post from I believe August 1st

Reid - direct - Keilty                           96

1   through October 1st of 2014.

2   Q    Is Government Exhibit 2 a record that is kept in the

3   regular course of business by the Department of State?

4   A    Yes, sir, it is.

5           MR. KEILTY:  Your Honor, the government moves to

6   admit Government Exhibit 2 into evidence.

7           MR. INGOGLIA:  No objection.

8           THE COURT:  Received.

9           (Marked.)

10  Q    Agent Reid, if you look on Government Exhibit 2, I

11  have -- actually on the document appearing on your screen I

12  have highlighted certain entries.  It won't be highlighted in

13  your binder.  For ease the government has highlighted certain

14  entries.

15          Turn to Government Exhibit 2.  On the bottom of page

16  two, in the second to last row, the column that lists the

17  itinerary number, do you see an itinerary number with the last

18  three digits 568.

19  A    Yes, sir.

20  Q    Can you tell us what that row indicates?

21  A    The row indicates that Thomas McGuire from the Department

22  of Justice, specifically the FBI, was given country clearance

23  to be in Belize from September 14th through September 20th.

24  Q    Who is Thomas McGuire?

25  A    Thomas McGuire is a Special Agent with the FBI and the

1  case agent on the Titan Bandfield case.

2  Q    Agent Reid, looking at the top of page three of

3  Government Exhibit 2, you see an itinerary number with the

4  last three digits 530?

5  A    Yes, sir.

6  Q    Can you tell us what that row indicates?

7  A    This row shows that Special Agent John Carrano from the

8  Department of Treasury, IRS, was approved to be in Belize from

9  September 14th to September 20th of 2014.

10 Q    Who is John Carrano?

11 A    John Carrano is the Special Agent from IRS that is

12 investigating the Titan-Bandfield case.

13 Q    Now, Agent Reid, does this spreadsheet indicate that the

14 personnel listed here were actually in the country at the time

15 period listed?

16 A    No, sir.

17 Q    What does it indicate?

18 A    This is simply just permission granted by the Chief of

19 Admission for those people to come to Belize.  It is not

20 necessarily a tracker whether or not they were there.

21 Q    In the two entries we just looked at, do you know if

22 Agents McGuire and Carrano from September 14th to

23 September 20th were actually in Belize during this time

24 period?

25 A    Yes, sir, they were.

GR      OCR      CM      CRR      CSR

Reid - direct - Keilty                98

1    Q     How do you know that?

2    A     I had meetings with both agents Carrano and McGuire

3    during that time period.  Met John Carrano while he was

4    duplicating evidence in the -- that was recovered during the

5    searches at the Matalon Building and then I met Agent McGuire

6    during a meeting with the ambassador.

7    Q     Directing your attention further down towards the bottom

8    third, bottom third of page three, do you see an itinerary

9    number with the last three digits of 327?

10   A     Yes, sir.

11   Q     Can you indicate what that represents?

12   A     This shows that John Carrano, Shawn Chandler, William

13   Clark and Carolyn Working, all of which from -- all from the

14   Department of Treasury, IRS were granted permission to be in

15   Belize from September 20th through September 27th.

16   Q     And further down can you locate the last itinerary

17   number, the last three digits of 249, and let the Court know

18   what that indicates?

19   A     It shows that Thomas McGuire from the FBI was permitted

20   or granted permission to be in Belize from September 26th

21   through September 30th.

22   Q     Agent Reid, looking at the personnel listed adjacent to

23   Agent McGuire, specifically the itinerary numbers 514, 434,

24   164 and 631; do you see that?

25   A     Yes, sir.

1   Q    To your knowledge, who are these individuals?

2   A    I believe these are the individuals that were part of the

3   FBI team to help duplicate the evidence that was seized at the

4   Matalon building.

5   Q    Agent Reid, turning back to page two of Government

6   Exhibit 2, can you please take a look towards the bottom of

7   the page itinerary number five, last three digits 513?

8   A    Could you focus that a little?

9   Q    Sure.

10  A    Okay, sir.

11       Which number?

12  Q    The last three digits are 513.

13  A    Yes, sir.

14  Q    What does this indicate?

15  A    This shows that John Carrano, Special Agent John Carrano

16  had been approved for presence in Belize on September 7th

17  through September 13th of 2014.

18  Q    Agent Reid, I believe you testified that this document

19  only indicates whether an individual has been approved to

20  enter the country, is that correct?

21  A    That's correct.

22  Q    This document does not indicate whether that person was

23  actually in the country; is that correct?

24  A    Yes, sir, it is correct.

25  Q    Agent Reid, are you familiar with what an MLAT is?

Reid - direct - Keilty                    100

1    A    Yes, sir.

2    Q    What is it?

3    A    And MLAT is the Mutual Legal Assistance Treaty.  This is

4    the bilateral agreement between Belize and the United States

5    or any other country, for that matter, as it relates to

6    agreements relating to criminal justice process.

7    Q    Agent Reid, were you aware that an MLAT was transmitted

8    from the United States on September 19, 2014, requesting

9    Belizean authorities to certain IPC, Titan, Unicorn, and

10   Legacy offices his Belize City?

11   A    No, sir.

12   Q    Did you come to learn whether those searches actually

13   took place?

14   A    I did.

15   Q    How you the come to learn that?

16   A    Found out through my staff, that there had been a large

17   scale search operation going on at the Matalon Building.  I

18   learned about it that way.

19   Q    What is your understanding of what date that took place?

20   A    I believe that transpired on September 9th of 2014.

21   Q    Agent Reid, what if any contact did you have that day

22   with Belizean authorities regarding that search?

23   A    None.

24   Q    Agent Reid, what is your understanding of the whereabouts

25   of other DSS personnel in Belize on September 9, 2014?

Reid - direct - Keilty                101

1   A    All the DSS agent were at the US embassy on

2   September 9th.

3   Q    How do you know that?

4   A    I saw them there.

5   Q    Agent Reid, have you had the opportunity to view news

6   footage on the searches conducted on September 9, 2014?

7   A    Yes, sir.

8   Q    What did you observe in that footage?

9   A    I have seen several pictures.  Most of them covered the

10  police either taking boxes out or standing in front of the

11  Matalon Building.  Several of the pictures were officers in

12  uniform or they are carrying boxes.  Some of the vehicles were

13  posed in front and different things in the foreground and

14  background.

15  Q    What if anything did you recognize about those vehicles?

16  A    The vehicles were the traditional dark blue police

17  vehicles that were donated to the Belizean police by the

18  International Narcotics and Law Enforcement, INL.

19  Q    What is INL?

20  A    INL is the office that is responsible from the Department

21  of State for helping foreign police partners by giving

22  material support, i.e., police cars, holsters and also

23  affording a lot of training.

24  Q    Agent Reid, are you aware if the INL has provided

25  equipment or vehicles to the Belizean government in the past?

Reid - direct - Keilty                    102

1  A    Yes, sir, they have.

2         They have given small bits of material as well as

3  large vehicle donations.  I think the large -- largest vehicle

4  donation point was 2013 to 2014, early 2014, which was the

5  majority of the blue Ford F 150s that are all around Belize.

6  Q    How do you know about this donation to the Belizean

7  government?

8  A    I contacted the INL section and actually, I should say, I

9  work with the INL section on a regular basis.  Specifically as

10 relates to the vehicles, I asked the INL specialist to run a

11 report about all the vehicles that had been donated to the

12 Belizean government.

13 Q    Agent Reid, for what purpose, if you know, are these

14 vehicles used?

15         I will rephrase.

16         Why are these vehicles provided to the Belizean

17 government?

18 A    There is a need.  Frankly, there is a need for the

19 Belizean police to have good running cars.  It's a limited

20 capacity country so they were donated as part of that as

21 traditional police vehicles.

22 Q    Agent Reid, I am showing you what's been marked as

23 Government Exhibit 3 for identification.  It's also in your

24 binder.

25         Do you know what this document is?

GR        OCR        CM        CRR        CSR

1  A    This is the spreadsheet maintained by the INL section for

2  vehicle accountability for items donated to the Belizean

3  police.

4  Q    How do you recognize this document, if you do?

5  A    This is the document that was provided to me by an INL

6  specialist at my request.

7  Q    Is Government Exhibit 3 a record that is kept in the

8  regular course of business by the Department of State?

9  A    Yes, sir, it is.

10         MR. KEILTY:  Your Honor, the government moves to

11  admit Government Exhibit 3.

12         MR. INGOGLIA:  No objection.

13         THE COURT:  It is received.

14         (Marked.)

15  Q    Agent Reid, looking at Government Exhibit 3, can you

16  briefly describe what each column represents on this document?

17  A    Yes, sir.

18         Pull back a little bit.

19  Q    I can.

20  A    Each column represents the location of where the item is

21  supposed to be located.

22         The tag number or the license plate number I believe

23  is what the second column is.

24         The asset description is the actual vehicle itself.

25         What type of vehicle it is.

1           Asset class description is the tracking for their

2   own database, which shows that there was a vehicle that was

3   donated.

4           The subclass is the actual type of vehicle.

5           The serial, VIN number is the next column.

6           The model as it is listed on the list here.

7           And then the year that was donated.

8           And the color of the vehicle that was donated.

9   Q    Agent Reid, do you have an understanding of in late 2013,

10  early 2014, the majority of what type model vehicles were

11  provided to the Belizean government?

12  A    Yes, sir.

13          There was a large number of blue or dark blue,

14  predominantly blue Ford F 150s.

15  Q    Agent Reid, according to Government Exhibit 3, what type

16  units were these vehicles provided to?

17  A    They were provided to, as it is listed here, sir,

18  different units that are specialists in Belize -- the Criminal

19  Investigation Branch, the various precincts, the canine units,

20  the mobile interdiction team and a variety of other trucks.

21  Q    You mentioned the Criminal Investigation Branch.  You

22  mentioned precincts.

23          Are Criminal Investigation Branches associated with

24  certain precincts?

25  A    It is a national police force.  So the CIB has both

1    precinct responsibility as well as national chain of command.

2    Q    Looking at Government Exhibit 3, were any vehicles

3    donated to any of antidrug units in Belize?

4    A    There is a donation of a vehicle, I think it's listed on

5    this form, that was to the Antinarcotics Unit or ANU Belize

6    City.  That shows Toyota Hilux, double cabin, vehicle Ford

7    F 150.  DNU is the current name for the antidrug unit

8    previously.

9    Q    Agent Reid, do you have an understanding of how these

10   vehicles were outfitted prior to being provided to the

11   Belizean government?

12   A    Yes, sir.

13   Q    Can you explain?

14   A    Each vehicle is tailored to the unit that they are going

15   to be assigned to.  The lighting and the radio packages that

16   are placed in the vehicles are different depending on which

17   unit they are assigned to.  In addition to the radios and the

18   lighting and the sirens and such, they are labeled with

19   various decals, Belize Police, Call 911.  Then each vehicle

20   with very limited exception has a US flag on the quarter

21   panels as well as the tailgate.  The flag is pretty large.

22   Q    Agent Reid, I am now showing what's been marked as

23   Government Exhibit 1 for identification.

24        Do you recognize Government Exhibit 1?

25   A    Yes, sir.

1   Q     How do you recognize Government Exhibit 1?

2   A     This is the sticker, the decal that is placed on

3   the -- or copy of it anyway, that is placed on the back or on

4   the vehicles themselves after they are donated.

5   Q     Is Government Exhibit 1 a true and accurate copy of the

6   decal that would have been placed on the donated vehicles in

7   late 2013, early 2014?

8   A     Yes, sir, it is.

9         MR. KEILTY:  Your Honor, the government moves to

10  admit Government Exhibit 1.

11        MR. INGOGLIA:  No objection.

12        THE COURT:  Received.

13        (Marked.)

14  Q     Agent Reid, once these vehicles are donated to the

15  Belizean government, whose property do they become?

16  A     They belong to the Belizean government.

17  Q     Does INL or International Narcotic and Law Enforcement

18  arm of the State Department ever use these vehicles in regard

19  to operations?

20  A     No, sir, they don't.

21  Q     What, if any, requirement does the US Government place

22  upon the Belizean government with respect to the use of these

23  vehicles?

24  A     They don't put any restrictions as to the use of the

25  vehicles.  They are the property of the Belizean government.

Reid - cross - Ingoglia                    107

1          MR. KEILTY:  Your Honor, could I have a moment?

2          THE COURT:  Sure.

3          (Pause)

4          MR. KEILTY:  No further questions, Your Honor.

5          THE COURT:  Mr. Ingoglia?

6          MR. INGOGLIA:  Thank you, Judge.

7    CROSS-EXAMINATION

8    BY MR. INGOGLIA:

9    Q    Good afternoon, Agent Reid.

10   A    Sir.

11   Q    You testified you watched some news footage.  When did

12   you watch that?

13   A    I got it from a -- the Internet source.  I can't remember

14   which news outlet.  It was online.

15   Q    Approximately what timeframe was it that you watched it?

16   A    Late afternoon, I believe.

17   Q    Was it on the day of the search itself or was it more

18   recently?

19   A    I think it was the day of the search the first time we

20   heard about it.

21   Q    Is it captured somewhere on a disk or do you remember

22   what the site was that you searched?

23   A    I don't, sir.  I apologize, I don't.

24   Q    Were you able to see plates on the vehicles that you saw

25   in the news footage?

GR      OCR      CM      CRR      CSR

Reid - cross - Ingoglia                    108

1    A     Not that I can recall.

2    Q     You didn't tie back the specific vehicles you saw in the

3    video to Government Exhibit 3?

4    A     No, sir, I did not.

5    Q     But it was the type of vehicles is what you are

6    observing?

7    A     Pretty ubiquitous, the Ford F 150 is a very common police

8    vehicle.  They are seen all throughout the country.  We

9    recognize them as the primary police car.  Actually, they are

10   all over the place.

11   Q     Is there a particular kind of vehicle that US personnel

12   drive in Belize?

13   A     No, sir.

14   Q     It varies?

15   A     Yes, sir.

16   Q     What kind of vehicle do you drive?

17   A     I drive a black Ford Explorer.

18   Q     I think you said that on the day of the search some staff

19   informed you that they had heard a search was underway?

20   A     Yes, sir.

21   Q     Was that staff located inside your building or is it

22   someone that called you?

23   A     Yes.  They are inside our building.

24   Q     Was there any US personnel who went to the location to

25   observe what was happening?

1   A    No, sir, not that I am aware.

2   Q    Nobody reported back to you with such thing?

3   A    No, sir.

4   Q    Did you ever see -- come to see a search warrant issued

5   by a Belize court in this -- related to the searches?

6   A    No, sir.

7   Q    Did you ever see the US MLAT request?

8   A    After the fact I did.

9   Q    You did.

10       MR. INGOGLIA:  May I have a moment, Your Honor?

11       THE COURT:  Sure.

12   Q    I think in the binder that is still there.  Is there a

13   defense exhibit binder in front of you?

14   A    Yes, sir.

15   Q    Could you turn to tab 39?

16       THE COURT:  What was the number?

17       MR. INGOGLIA:  39.

18   Q    It's kind of a long document.  Maybe you will take a

19   moment and leaf through it, see if it looks familiar.

20       (Pause.)

21       Does that look familiar?

22   A    Yes, sir, it looks familiar, by format.

23   Q    Can you -- in what way does the format look familiar?

24   A    Just the header.  It is consistent with correspondence

25   that I have seen before.  But I didn't -- I have to admit, I

Reid - cross - Kousouros                    110

1    have not read the entire MLAT that was furnished.

2    Q    In the past when you saw the MLAT, you didn't read the

3    whole thing?

4    A    I have not read the entire MLAT, no, sir.

5    Q    So you can't tell looking at this whether this is an

6    accurate copy of it or not?

7    A    I couldn't.

8              MR. INGOGLIA:  Okay.  No further questions, Judge.

9              THE COURT:  Mr. Kousouros?

10             MR. KOUSOUROS:  One or two, Judge.

11   CROSS EXAMINATION

12   BY MR. KOUSOUROS:

13   Q    Good afternoon, sir.

14   A    Sir.

15   Q    Does the United States have any of its own vehicles in

16   Belize?

17   A    Yes, sir.

18   Q    Would they be the same type of vehicles that you were

19   referring to?

20   A    We have two -- no.

21             We have several different types of vehicles, mostly

22   US marked vehicles.

23   Q    The vehicles that you saw in the news coverage, you have

24   those type of vehicles down in Belize?

25   A    I believe we may have one Ford F 150.  I believe it's got

1  diplomatic -- red diplomatic plates.

2  Q     That's all I want to know.

3        It looks different from the ones on those --

4  A     It doesn't have stickers all over it.

5            MR. KOUSOUROS:  Thank you, Judge.

6            THE COURT:  Anything redirect?

7            MR. KEILTY:  No, Your Honor.

8            THE COURT:  Thank you.  You are excused.  Thank you

9  very much.

10           THE WITNESS:  Thank you, sir.

11           (Witness excused.)

12           THE COURT:  Do we have another witness?

13           MS. KASULIS:  Your Honor, those are our two

14 witnesses for the day.

15           THE COURT:  The government is resting?

16           MS. KASULIS:  No, Your Honor, with respect to what

17 we raised earlier about the potential need for a second day

18 hearing for the recently discovered information.

19           THE COURT:  Okay.  Mr. Ingoglia?

20           MR. INGOGLIA:  We are only interested in talking to

21 any agents that the US in the effort that it's undertaking

22 right now determines had contact with the Belizean law

23 enforcement prior to September 9th such that there exists the

24 possibility that we want to explore what the communications

25 were.  That's the case with the recently identified

1  information.  With respect to that agent, and if in course of

2  follow-up on that they identify another person, then we would

3  want to talk to that person.  But nobody that we are currently

4  aware of.  We are waiting for the conclusion of the US

5  Attorney's Office's inquiry.

6           THE COURT:  Just so that I'm sure I understand, you

7  were given some additional material last night?

8           MR. INGOGLIA:  Correct.

9           THE COURT:  The question before me is whether after

10  you have examined that material you'd want to examine another

11  witness?

12           MR. INGOGLIA:  Yes.

13           I'd want to examine the witness whose name I am

14  forgetting who the government identified to us yesterday.

15           MS. KASULIS:  His name is Troy Caldron.

16           THE COURT:  You want to examine that witness?

17           MR. INGOGLIA:  I believe so, yes, Judge.

18           THE COURT:  Ms. Kasulis?

19           MS. KASULIS:  Your Honor, again, we discovered

20  yesterday that Mr. Caldron did have multiple meetings with the

21  FIU in the months leading up to the search.  We discovered

22  that, we turned that information over to Mr. Ingoglia and

23  discussed making Mr. Caldron available if Mr. Ingoglia wants

24  to examine him but that Mr. Caldron is in Texas.  We

25  discovered this yesterday.

1           THE COURT:  Okay.

2           MS. KASULIS:  He needs time to review the

3    information.  We propose that we would ask the Court for a

4    second day of hearing.

5           THE COURT:  Okay.  Are you going to calling him?

6           MS. KASULIS:  I think we are still gathering the

7    information, Your Honor, and want to have an opportunity to

8    review it.

9           THE COURT:  Okay.  Let me have another day.

10          You want another day this week or next week?

11          MS. KASULIS:  We are still in the process.

12   Definitely next week because we are still getting his

13   information to produce to the defense.  I don't want to have

14   another issue with not having everything.

15          THE COURT:  Okay.

16          MR. KOUSOUROS:  Your Honor, I will be unavailable

17   next week.  My daughter is graduating and we will be out of

18   town.  I can't miss that.

19          THE COURT:  What about the week after?

20          MR. KOUSOUROS:  We will be back.

21          THE COURT:  Okay.

22          MS. KASULIS:  Yes.

23          MR. INGOGLIA:  That works for us.

24          MS. KASULIS:  I think it is the week of May 2nd.

25   That will work for the government.

114

1        THE COURT:  What date?

2        MR. KOUSOUROS:  Fourth, fifth or sixth.

3        THE COURT:  What date are we talking about?

4        MS. KASULIS:  It's the week of the second.  I think

5   Mr. Kousouros was asking for the fourth, fifth or sixth.

6        THE COURT:  Mr. Kessler, a date?

7        THE CLERK:  May 4th, at 10:30 am.

8        MS. KASULIS:  That works for the government, Your

9   Honor.

10        THE COURT:  Okay.

11        MR. INGOGLIA:  I will be here.

12        THE COURT:  All right.

13        MR. KOUSOUROS:  I will too.

14        THE COURT:  May 4, 10:30.

15        I'd also like to talk to counsel about fixing a

16   trial date.  Let's see if we can get that solved.  Can we fix

17   a trial date at the end of May or in June?

18        MS. KASULIS:  End of May would work for the

19   government, Your Honor.

20        THE COURT:  All right.  Good.

21        Mr. Ingoglia?

22        MR. INGOGLIA:  I think that's fine, Judge.

23        THE COURT:  Good.

24        MR. KOUSOUROS:  I won't know until I come back from

25   Judge Cogan's part, Judge.

GR      OCR      CM      CRR      CSR

1        THE COURT:  We are going to start a trial at the end

2   of May.

3        MR. KOUSOUROS:  May 31st?

4        THE COURT:  You can tell Judge Cogan, the case has

5   been here for a while.  We need to start a trial at the end of

6   May.  Okay?

7        How long --

8        MR. KOUSOUROS:  I'm sorry.  I just want to be clear

9   with you, we already have a trial date for May 31st there.  I

10  may no longer be on the case after today.  But that is a

11  retrial of a trial which ended in a hung jury a month ago.  I

12  am not telling you that I would schedule a trial somewhere

13  else when you say the end of May.  It's already been

14  scheduled.  If there is a problem I will alert the Court.

15  Quite frankly, I don't think there will be a problem.

16       THE COURT:  May 31st, at 10:00 o'clock.  Why don't

17  the three of you come up here.

18       MR. KOUSOUROS:  What I think is going to happen is I

19  am no longer going to be on that case.

20       THE COURT:  That's wonderful.

21       MR. KOUSOUROS:  If for whatever reason -- well, it

22  is.  If for whatever reason --

23       THE COURT:  You will be on this case.

24       MR. KOUSOUROS:  I am on this case.

25       THE COURT:  You are on this case.

GR      OCR      CM      CRR      CSR

1          May 31st, 10:30.

2          How long do you contemplate this case will take.

3          MS. KASULIS:  Approximately three  weeks, Your

4     Honor.

5          THE COURT:  How many witnesses do you think you are

6     going to call, just offhand?

7          MS. KASULIS:  At least two cooperating witnesses,

8     experts.  Around ten witnesses, Your Honor.

9          THE COURT:  Okay.

10          MR. INGOGLIA:  That is fine.

11          THE COURT:  Do you contemplate calling any

12     witnesses?  We won't know until some future date, a usual

13     defense response to that.

14          Why don't we meet a week before.  I think you have

15     tried cases before me, Mr. Kousouros.

16          MR. KOUSOUROS:  Yes.

17          THE COURT:  I don't think the others have.  We will

18     have some talk about how I go about picking a jury.

19          MR. KOUSOUROS:  Quickly.

20          THE COURT:  And things of that sort.  Okay.

21          MR. INGOGLIA:  Okay.

22          THE COURT:  We will give you a pretrial order.

23          THE CLERK:  Judge, the week just previous to the

24     trial is the week of the Judicial Conference.

25          THE COURT:  That's going to be Wednesday and

1   Thursday.  Make it early that week.

2          THE CLERK:  All right.  May 24th, that's Tuesday, at

3   2:30.

4          THE COURT:  I think the judicial conference starts

5   on Wednesday, does it?

6          MS. KASULIS:  That works for the government.

7          MR. INGOGLIA:  That's fine.

8          THE COURT:  May 24th.

9          I will check.  Whether day of the week is that?

10         THE CLERK:  That's Tuesday.

11         THE COURT:  What's on Monday?

12         THE CLERK:  Monday is available as well, the 23rd.

13         THE COURT:  I think that might be safer.

14         THE CLERK:  All right.  Monday, the 23rd, at 2:30

15   pm.

16         MR. PAES:  I'm sorry.  Can we do it in the morning,

17   by any chance?

18         THE CLERK:  12:00 noon.

19         MR. KOUSOUROS:  You guys are very fast for me.

20   Fine.

21         MR. INGOGLIA:  Judge, the 31st I noticed, at least

22   on my calendar, is a Tuesday.  Do you intend to start on a

23   Tuesday?

24         THE CLERK:  Monday is a holiday.

25         MR. INGOGLIA:  Tuesday it is.

118

1          MR. KOUSOUROS:  Gives us three days to prepare.

2          THE COURT:  All right.  If there are any motions

3     in limine or evidentiary issues that you have some concern

4     about, I think the pretrial order makes reference with respect

5     to all of that.

6          MR. KOUSOUROS:  I understand that you have

7     considered these issues but what I would like to ask is what

8     the government's intention is in terms of the provision of the

9     3500 material.  It's probably going to be very voluminous in

10    this case.  It is just a matter of human ability to review it.

11         THE COURT:  I know.

12         MR. KOUSOUROS:  Yes.

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

GR      OCR      CM      CRR      CSR

119

1          THE COURT:  Mr. Kousouros, you want me to ask the

2     government.  I can ask them.  I am going to get the same

3     answer.  I do not have any authority to do anything with 3500

4     because the statute says that the government is obligated to

5     turn material over to the defense when the defense witness

6     testifies.

7          MR. KOUSOUROS:  But I know that if you were to just

8     make a suggestion, I think they would actually heed it.

9          MR. PAES:  Maybe I can address it.

10          THE COURT:  Give it to them tomorrow if you have it.

11     Give it to them as quickly as you can.  Unless there is some

12     question about witness danger or tampering or things of that

13     sort, there's no reason to hold on to it.

14          MR. KOUSOUROS:  It's really just a matter of culling

15     through millions of documents what they're going to use.

16     Nothing is a secret.

17          THE COURT:  I understand.  The government would

18     generally be very cooperative up to a point.

19          MR. KOUSOUROS:  Thank you for your suggestion.

20          MS. KASULIS:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          (Matter adjourned.)

23

24

25

120

1                        I N D E X

2

3   W I T N E S S E S:

4

5    Thomas McGuire                                13

6    DIRECT EXAMINATION                            13

7    CROSS-EXAMINATION                             33

8    CROSS-EXAMINATION                             83

9    MR. KOUSOUROS

10   REDIRECT EXAMINATION                          89

11                                                 92

12   Timothy Reid

13   DIRECT EXAMINATION                            92

14   CROSS-EXAMINATION                             107

15   CROSS EXAMINATION                             110

16

17  E X H I B I T S:

18

19   Exhibit 42                                    44

20   Exhibit 43                                    45

21   Exhibit 45                                    50

22   Exhibit 46                                    53

23   2                                             96

24   3                                             103

25   1                                             106

GR        OCR        CM        CRR        CSR

| | | |
|---|---|---|
| 1 | 7 | 34 |
| 2 | 20 | 69 |
| 3 | 12 | 74 |
| 4 | 23 | 77 |
| 5 | 11 | 80 |
| 6 | 27 | 80 |
| 7 | 16 | 83 |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

GR        OCR        CM        CRR        CSR

1

## 1

**1** [6] - 105:23, 105:24, 106:1, 106:5, 106:10, 120:25
**10** [1] - 64:11
**100** [3] - 23:16, 24:2, 56:16
**103** [1] - 120:24
**106** [1] - 120:25
**107** [1] - 120:14
**10:00** [2] - 71:11, 115:16
**10:30** [4] - 1:10, 114:7, 114:14, 116:1
**10th** [2] - 22:6, 22:8
**11** [5] - 64:11, 80:5, 80:7, 80:11, 121:5
**110** [1] - 120:15
**11:00** [1] - 21:3
**11th** [2] - 22:9, 35:21
**12** [6] - 74:7, 74:8, 74:13, 75:5, 93:16, 121:3
**120** [1] - 23:16
**12:00** [1] - 117:18
**13** [3] - 13:20, 120:5, 120:6
**13-and-a-half** [1] - 13:15
**13th** [2] - 78:23, 99:17
**14** [4] - 1:4, 18:11, 23:6, 64:14
**14th** [8] - 18:5, 23:3, 23:7, 35:8, 78:24, 96:23, 97:9, 97:22
**15** [7] - 24:20, 25:6, 25:9, 25:12, 25:15, 56:9, 56:13
**150** [3] - 105:7, 108:7, 110:25
**150s** [2] - 102:5, 104:14
**15th** [6] - 9:6, 23:7, 32:6, 39:1, 39:2, 65:23
**16** [7] - 5:2, 12:1, 83:6, 83:9, 89:20, 89:23, 121:7
**164** [1] - 98:24
**16th** [1] - 88:19
**18** [1] - 11:11
**19** [2] - 55:18, 100:8
**19th** [1] - 18:12
**1:00** [1] - 19:9
**1st** [2] - 95:25, 96:1

## 2

**2** [17] - 62:25, 63:10, 63:14, 91:12, 91:15, 91:22, 91:23, 95:17, 95:18, 95:22, 96:2, 96:6, 96:10, 96:15, 97:3, 99:6, 120:23
**20** [3] - 36:1, 69:6, 121:2
**2012** [1] - 15:9
**2013** [6] - 17:7, 17:8, 17:11, 102:4, 104:9, 106:7
**2014** [45] - 15:12, 17:20, 18:4, 18:11, 18:19, 19:18, 20:2, 20:7, 20:10, 20:11, 21:6, 21:18, 22:2, 23:6, 24:6, 24:20, 25:6, 25:9, 25:12, 25:15, 26:18, 27:13, 30:9, 30:13, 40:9, 41:10, 42:11, 44:21, 45:6, 56:5, 74:11, 90:4, 94:3, 94:9,

96:1, 97:9, 99:17, 100:8, 100:20, 100:25, 101:6, 102:4, 104:10, 106:7
**2015** [1] - 32:20
**2016** [1] - 1:9
**20th** [6] - 18:5, 18:7, 96:23, 97:9, 97:23, 98:15
**21** [1] - 1:9
**22** [1] - 44:21
**225** [1] - 2:2
**23** [3] - 77:19, 77:25, 121:4
**23rd** [2] - 117:12, 117:14
**24** [2] - 44:7, 49:24
**240** [2] - 35:25, 56:17
**249** [1] - 98:17
**24th** [2] - 117:2, 117:8
**26th** [3] - 18:6, 18:8, 98:20
**27** [4] - 80:5, 80:15, 80:22, 121:6
**271** [1] - 1:20
**27th** [1] - 98:15
**2:30** [2] - 117:3, 117:14
**2nd** [5] - 65:4, 69:17, 83:8, 90:3, 113:24

## 3

**3** [9] - 63:6, 102:23, 103:7, 103:11, 103:15, 104:15, 105:2, 108:3, 120:24
**30** [1] - 36:1
**30th** [2] - 18:6, 98:21
**31** [1] - 74:11
**31st** [5] - 115:3, 115:9, 115:16, 116:1, 117:21
**327** [1] - 98:9
**33** [1] - 120:7
**34** [1] - 121:1
**3500** [8] - 6:9, 6:17, 7:2, 11:10, 33:11, 44:15, 118:9, 119:3
**3500-GM-56** [1] - 44:15
**39** [4] - 81:1, 81:2, 109:15, 109:17
**3rd** [2] - 72:8, 72:9

## 4

**4** [1] - 114:14
**403** [2] - 16:11, 16:20
**41** [2] - 34:18, 44:13
**42** [3] - 44:13, 44:25, 120:19
**43** [7] - 13:23, 14:2, 45:8, 45:18, 45:20, 46:11, 120:20
**434** [1] - 98:23
**44** [1] - 120:19
**45** [4] - 49:20, 50:1, 120:20, 120:21
**46** [7] - 53:11, 53:13, 53:14, 53:15, 53:23, 120:22
**47** [1] - 53:13
**476** [1] - 1:4
**4:03** [1] - 90:4
**4o4** [1] - 16:3

**4th** [3] - 69:16, 78:7, 114:7

## 5

**50** [1] - 120:21
**513** [2] - 99:7, 99:12
**514** [1] - 98:23
**53** [1] - 120:22
**530** [1] - 97:4
**568** [1] - 96:18
**5th** [2] - 78:4, 78:6

## 6

**60** [1] - 36:2
**613-2538** [1] - 2:3
**63** [1] - 71:9
**631** [1] - 98:24
**64** [1] - 69:22
**69** [1] - 121:2
**6:00** [1] - 20:17

## 7

**7** [4] - 34:17, 34:25, 64:3, 121:1
**718** [1] - 2:3
**74** [1] - 121:3
**77** [1] - 121:4
**7:00** [1] - 20:18
**7th** [1] - 99:16

## 8

**8** [1] - 63:5
**80** [3] - 26:10, 121:5, 121:6
**83** [2] - 120:8, 121:7
**89** [1] - 120:10

## 9

**9** [21] - 15:12, 18:19, 19:18, 20:2, 20:7, 20:10, 20:11, 21:6, 21:18, 22:2, 24:6, 26:18, 27:13, 32:19, 59:15, 63:1, 63:4, 63:5, 63:7, 100:25, 101:6
**911** [1] - 105:19
**92** [2] - 120:11, 120:13
**96** [1] - 120:23
**9th** [17] - 9:7, 34:2, 34:4, 35:8, 39:12, 40:8, 72:9, 77:4, 77:16, 77:17, 78:14, 78:22, 79:16, 80:10, 100:20, 101:2, 111:23

## A

**A.G.'s** [1] - 24:7
**a.m** [1] - 1:10

GR      OCR      CM      CRR      CSR

**abandoned** [1] - 77:15
**abided** [1] - 31:23
**ability** [2] - 48:13, 118:10
**able** [8] - 10:14, 48:19, 68:15, 70:4, 70:11, 71:7, 79:21, 107:24
**absolutely** [5] - 31:25, 35:7, 54:19, 77:6, 77:9
**acceptance** [1] - 61:11
**access** [1] - 9:21
**accordance** [1] - 11:21
**according** [2] - 28:17, 104:15
**accordingly** [1] - 68:24
**accountability** [1] - 103:2
**accuracy** [1] - 10:21
**accurate** [3] - 10:14, 106:5, 110:6
**acknowledging** [1] - 8:19
**act** [1] - 10:6
**acted** [2] - 36:3, 47:25
**action** [1] - 52:4
**active** [2] - 50:21, 71:4
**activities** [2] - 49:1, 84:11
**activity** [9] - 9:8, 14:4, 20:16, 31:12, 40:14, 41:11, 43:12, 76:23, 84:23
**actors** [1] - 61:25
**actual** [2] - 103:24, 104:4
**add** [1] - 10:25
**addition** [1] - 105:17
**additional** [4] - 23:18, 24:11, 30:19, 112:7
**additionally** [1] - 29:17
**address** [1] - 119:9
**addressed** [1] - 50:11
**addresses** [1] - 54:16
**adherence** [1] - 10:7
**adjacent** [3] - 16:12, 16:21, 98:22
**adjourned** [1] - 119:22
**Administration** [1] - 94:16
**administrative** [2] - 35:10, 51:12
**Admission** [1] - 97:19
**admit** [4] - 96:6, 103:11, 106:10, 109:25
**advance** [3] - 63:9, 69:18, 91:16
**advancing** [1] - 49:9
**advice** [3] - 51:15, 54:25, 55:7
**advised** [5] - 20:14, 22:9, 23:18, 24:8, 65:25
**advising** [1] - 20:12
**Affairs** [2] - 18:23, 31:14
**affidavit** [1] - 36:14
**affidavits** [2] - 5:5, 37:1
**affording** [1] - 101:23
**afternoon** [9] - 19:10, 20:11, 23:12, 83:18, 83:19, 92:23, 107:9, 107:16, 110:13
**afterwards** [2] - 57:21, 81:20
**agencies** [7] - 5:17, 5:18, 5:20, 14:17, 55:23, 95:6, 95:12
**agency** [9] - 6:2, 23:22, 35:13, 39:16, 40:15, 43:10, 60:11, 72:16, 73:15

**agent** [37] - 14:12, 14:13, 14:15, 14:23, 15:1, 17:10, 17:12, 17:14, 17:20, 17:22, 17:24, 22:12, 24:15, 25:3, 34:23, 35:12, 36:14, 41:7, 44:20, 44:22, 45:24, 51:18, 53:21, 61:5, 64:2, 65:13, 66:9, 73:7, 80:19, 84:12, 87:13, 90:1, 97:1, 101:1, 112:1
**Agent** [101] - 6:20, 6:22, 8:11, 8:14, 9:11, 9:14, 10:12, 10:13, 12:11, 12:20, 13:11, 13:16, 14:2, 14:3, 14:23, 15:2, 19:17, 20:9, 24:15, 27:8, 28:11, 29:5, 32:25, 33:24, 34:20, 35:4, 39:6, 41:7, 41:16, 41:22, 42:10, 44:2, 45:5, 45:16, 47:2, 47:10, 47:20, 48:10, 48:17, 48:22, 49:24, 50:7, 50:14, 51:15, 51:21, 54:2, 54:7, 54:11, 54:14, 54:20, 54:25, 55:16, 73:14, 77:18, 78:4, 79:4, 81:1, 82:7, 85:2, 87:14, 89:21, 92:14, 92:23, 92:25, 93:9, 93:15, 93:19, 93:24, 94:3, 94:9, 94:17, 95:3, 95:16, 96:10, 96:25, 97:2, 97:7, 97:11, 97:13, 98:5, 98:22, 98:23, 99:5, 99:15, 99:18, 99:25, 100:7, 100:21, 100:24, 101:5, 101:24, 102:13, 102:22, 103:15, 104:9, 104:15, 105:9, 105:22, 106:14, 107:9
**Agents** [1] - 97:22
**agents** [30] - 5:18, 10:20, 14:23, 15:1, 17:13, 17:23, 18:16, 22:11, 22:13, 22:15, 23:4, 28:9, 29:20, 35:11, 35:12, 37:21, 38:8, 39:18, 48:14, 61:4, 62:7, 62:25, 65:9, 74:1, 76:1, 77:23, 94:13, 94:15, 98:2, 111:21
**ago** [4] - 33:12, 45:25, 70:20, 115:11
**agree** [6] - 57:7, 58:11, 58:21, 60:20, 61:6
**agreed** [2] - 5:12, 5:15
**agreement** [2] - 26:7, 100:4
**agreements** [2] - 5:19, 100:6
**ahead** [3] - 59:2, 79:25, 93:23
**aided** [1] - 2:5
**aim** [1] - 11:21
**air** [1] - 5:7
**ALAT** [1] - 90:20
**alert** [2] - 41:14, 115:14
**allow** [2] - 7:14, 88:18
**allowed** [1] - 31:19
**alternative** [3] - 86:4, 86:13, 86:15
**alternatives** [2] - 85:14, 85:17
**altogether** [1] - 37:21
**Ambassador** [3] - 23:8, 38:24, 39:9
**ambassador** [4] - 23:10, 79:6, 95:6, 98:6
**ambassador's** [1] - 95:24
**Amendment** [4] - 5:21, 57:6, 57:14, 58:19
**AMERICA** [1] - 1:4
**Americans** [1] - 94:23
**analysis** [1] - 28:9
**Andrew** [3] - 29:9, 32:13, 32:17
**answer** [5] - 58:22, 75:15, 81:8, 87:16,

119:3
**answered** [1] - 76:3
**answers** [1] - 4:10
**anticipated** [2] - 8:16, 11:12
**antidrug** [2] - 105:3, 105:7
**Antinarcotics** [1] - 105:5
**ANU** [1] - 105:5
**anyway** [1] - 106:3
**apart** [1] - 74:25
**apologize** [1] - 107:23
**apparent** [2] - 51:21, 52:5
**appearance** [1] - 10:5
**APPEARANCES** [1] - 1:15
**appearances** [1] - 2:14
**appearing** [1] - 96:11
**application** [2] - 57:14, 62:5
**apply** [1] - 61:23
**appreciate** [2] - 8:3, 62:22
**approach** [4] - 3:8, 31:17, 33:4, 41:21
**appropriate** [3] - 8:4, 8:6, 27:24
**approval** [2] - 23:11, 95:11
**approvals** [1] - 35:10
**approve** [1] - 29:10
**approved** [10] - 28:14, 30:7, 53:7, 64:13, 72:1, 73:12, 86:9, 97:8, 99:16, 99:19
**approves** [1] - 95:8
**April** [2] - 1:9, 40:9
**areas** [1] - 95:2
**arguing** [2] - 59:19, 61:17
**argument** [2] - 61:20, 61:21
**arise** [1] - 11:13
**arm** [1] - 106:18
**arraign** [1] - 3:3
**arrange** [2] - 79:5, 87:18
**arranged** [2] - 17:10, 38:13
**arrangements** [2] - 22:13, 79:11
**arrest** [13] - 29:24, 63:4, 63:5, 63:8, 63:20, 64:4, 65:8, 65:11, 68:25, 69:2, 69:4, 71:16, 81:15
**arrested** [10] - 15:10, 15:12, 19:5, 19:7, 19:9, 19:13, 73:9, 78:14, 80:3, 87:2
**arresting** [1] - 78:17
**arrests** [2] - 14:5, 30:25
**arrival** [3] - 84:8, 88:24, 89:2
**arrive** [1] - 79:7
**arrives** [1] - 63:24
**arriving** [1] - 79:12
**article** [1] - 21:3
**articles** [4] - 20:25, 21:23, 30:14, 42:24
**articulate** [1] - 73:10
**articulated** [1] - 73:10
**aspects** [1] - 84:5
**asset** [4] - 43:8, 51:8, 103:24, 104:1
**assets** [2] - 42:22, 43:8
**assiduously** [1] - 71:12
**assigned** [18] - 3:12, 13:21, 13:23,

14:2, 14:12, 14:13, 16:17, 38:3, 41:18, 51:18, 71:17, 93:18, 94:10, 94:14, 94:15, 105:15, 105:17

**assignment** [1] - 56:3
**assist** [1] - 32:16
**assistance** [7] - 24:10, 47:21, 48:15, 55:4, 55:11, 84:1, 84:3
**Assistance** [2] - 18:24, 100:3
**assistant** [12] - 24:16, 39:7, 40:5, 40:9, 40:25, 41:2, 53:20, 56:2, 63:22, 77:24, 94:18
**Assistant** [1] - 1:19
**assisted** [2] - 34:6, 81:12
**associated** [1] - 104:23
**assume** [5] - 11:9, 11:25, 58:10, 71:12, 75:11
**assuming** [3] - 5:24, 6:11, 58:16
**assumption** [2] - 11:6, 11:8
**Attache** [1] - 6:25
**attache** [22] - 24:16, 24:17, 34:23, 35:15, 35:18, 39:7, 40:5, 40:10, 40:11, 40:24, 40:25, 41:2, 53:19, 53:20, 56:1, 56:2, 63:22, 66:21, 73:3, 73:6, 74:10, 77:24
**attaches** [3] - 40:5, 66:7, 82:23
**attended** [1] - 24:21
**attention** [7] - 30:16, 34:17, 49:19, 62:25, 77:18, 83:5, 98:7
**Attorney** [2] - 1:17, 1:24
**attorney** [13] - 23:13, 23:16, 23:17, 23:25, 24:4, 24:9, 24:14, 24:20, 24:21, 25:5, 26:6, 63:23
**Attorney's** [8] - 9:25, 10:20, 14:7, 20:14, 27:19, 51:2, 68:1, 112:5
**attorneys** [1] - 20:12
**Attorneys** [2] - 1:19, 1:23
**August** [2] - 74:11, 95:25
**AUSA** [4] - 3:12, 15:4, 20:12, 44:22
**authorities** [39] - 18:13, 18:15, 18:17, 18:18, 18:25, 20:3, 20:6, 20:19, 20:23, 21:16, 21:19, 22:10, 23:10, 25:19, 27:2, 28:20, 29:3, 34:10, 35:22, 38:7, 39:14, 40:1, 40:13, 55:14, 57:12, 61:7, 64:5, 64:12, 68:2, 72:12, 79:1, 86:19, 88:1, 88:6, 88:21, 88:23, 89:6, 100:9, 100:22
**authority** [3] - 61:18, 61:19, 119:3
**Authority** [2] - 25:5, 25:15
**authorize** [1] - 58:13
**available** [2] - 112:23, 117:12
**avoid** [2] - 8:21, 37:19
**avoiding** [1] - 11:8
**aware** [24] - 7:5, 11:5, 20:1, 20:5, 28:7, 29:7, 29:16, 30:9, 39:13, 41:22, 54:24, 55:23, 60:24, 63:3, 76:19, 76:22, 79:3, 81:25, 82:7, 83:2, 100:7, 101:24, 109:1, 112:4

**B**

**background** [2] - 41:24, 101:14
**bad** [1] - 61:25
**bafflement** [1] - 8:20
**BANDFIELD** [6] - 1:8, 3:19, 3:25, 4:3, 4:6, 4:8
**Bandfield** [39] - 1:23, 2:12, 2:22, 3:6, 3:18, 3:24, 14:9, 15:7, 15:10, 15:14, 15:17, 15:19, 17:4, 17:11, 17:12, 17:21, 19:5, 19:7, 19:9, 19:12, 19:15, 29:4, 29:21, 29:24, 42:14, 66:12, 66:22, 66:23, 68:25, 69:4, 71:2, 71:16, 72:8, 78:14, 80:2, 87:1, 90:2, 97:1, 97:12
**Bandfield's** [3] - 29:8, 29:17, 65:11
**Banfield** [8] - 50:21, 50:23, 50:24, 51:6, 52:14, 52:15, 63:4, 63:20
**bank** [1] - 42:25
**bankers** [1] - 56:17
**banner** [1] - 46:12
**based** [5] - 18:24, 42:24, 52:4, 78:17
**basis** [4] - 37:19, 62:4, 66:5, 102:9
**became** [3] - 5:18, 28:7, 54:24
**become** [6] - 29:7, 29:16, 76:19, 78:16, 78:22, 106:15
**BEFORE** [1] - 1:13
**beforehand** [1] - 82:13
**begin** [1] - 15:8
**behalf** [2] - 2:17, 2:25
**Belize** [147] - 5:12, 9:10, 10:11, 10:18, 15:15, 15:22, 16:1, 16:5, 16:10, 16:14, 16:18, 16:22, 16:25, 17:1, 17:2, 17:8, 17:12, 17:14, 17:18, 17:21, 17:23, 18:3, 18:8, 18:11, 18:13, 18:15, 18:16, 18:17, 18:24, 18:25, 19:12, 19:19, 20:16, 20:19, 20:22, 21:1, 21:9, 21:16, 22:10, 22:11, 22:13, 23:2, 23:4, 23:5, 23:10, 24:17, 25:15, 25:17, 26:13, 27:1, 27:6, 27:9, 27:13, 27:15, 29:2, 29:9, 29:12, 29:13, 30:3, 30:16, 30:17, 32:7, 32:14, 34:2, 34:13, 35:6, 35:16, 35:17, 36:23, 37:21, 38:4, 38:17, 38:20, 39:14, 39:16, 39:18, 40:1, 40:13, 40:14, 41:8, 42:17, 42:25, 46:25, 48:23, 49:2, 50:18, 56:2, 56:4, 57:12, 57:24, 60:11, 64:3, 64:4, 64:6, 64:8, 64:10, 65:14, 65:25, 66:15, 67:11, 68:2, 68:23, 71:18, 71:24, 72:12, 78:23, 79:1, 79:3, 81:14, 81:19, 81:25, 82:8, 82:23, 83:23, 87:8, 88:22, 93:18, 94:6, 94:7, 94:18, 95:7, 95:9, 96:23, 97:8, 97:19, 97:23, 98:15, 98:20, 99:16, 100:4, 100:10, 100:25, 102:5, 104:18, 105:3, 105:5, 105:19, 108:12, 109:5, 110:16, 110:24
**Belizean** [48] - 7:4, 17:16, 18:1, 18:18, 19:23, 20:3, 20:6, 21:19, 22:1, 25:4, 25:19, 28:20, 32:4, 34:9, 35:22, 38:7, 39:11, 51:9, 61:7, 75:2, 81:17, 81:18, 82:2, 84:5, 86:18, 87:25, 88:1, 88:5,

88:20, 88:23, 89:6, 95:2, 100:9, 100:22, 101:17, 101:25, 102:6, 102:12, 102:16, 102:19, 103:2, 104:11, 105:11, 106:15, 106:16, 106:22, 106:25, 111:22
**Belizeans** [2] - 9:12, 38:21
**Belmopan** [2] - 93:18, 94:6
**belong** [1] - 106:16
**below** [1] - 50:5
**Bergey** [2] - 29:18, 29:21
**best** [5] - 27:19, 31:22, 71:11, 72:11, 79:14
**better** [1] - 31:16
**between** [14] - 15:20, 18:7, 35:24, 49:23, 52:16, 53:18, 55:23, 72:9, 72:15, 80:9, 80:18, 82:7, 83:7, 100:4
**beyond** [3] - 57:9, 60:21, 89:8
**big** [3] - 54:23, 69:2, 79:17
**bilateral** [1] - 100:4
**binder** [10] - 6:8, 33:5, 33:14, 34:18, 44:6, 95:19, 96:13, 102:24, 109:12, 109:13
**biological** [1] - 59:4
**birthday** [1] - 18:10
**bit** [4] - 29:20, 38:19, 93:20, 103:18
**bits** [1] - 102:2
**black** [2] - 9:13, 108:17
**blocks** [1] - 16:13
**blue** [5] - 101:16, 102:5, 104:13, 104:14
**bodies** [1] - 24:11
**body** [1] - 69:24
**bonfire** [1] - 65:13
**booked** [1] - 64:7
**books** [1] - 79:18
**bottom** [8] - 50:10, 54:2, 69:22, 71:10, 96:15, 98:7, 98:8, 99:6
**bounced** [1] - 63:24
**box** [2] - 12:23, 58:2
**boxes** [10] - 23:16, 24:2, 26:10, 35:25, 56:15, 56:17, 58:8, 101:10, 101:12
**branch** [1] - 95:6
**Branch** [2] - 104:19, 104:21
**Branches** [1] - 104:23
**break** [3] - 18:7, 59:3, 59:6
**Brett** [3] - 40:10, 41:1, 41:2
**brief** [4] - 32:6, 89:16, 91:14, 91:15
**briefed** [1] - 41:23
**briefly** [4] - 14:1, 83:15, 94:17, 103:16
**bring** [2] - 75:11, 76:1
**broad** [4] - 26:19, 37:11, 57:23, 61:7
**broadly** [1] - 68:17
**brokerage** [2] - 16:7, 56:19
**Brooklyn** [3] - 1:7, 1:20, 2:2
**Building** [7] - 16:3, 16:4, 16:21, 54:18, 98:5, 100:17, 101:11
**building** [5] - 16:14, 58:3, 99:4, 108:21, 108:23
**buildings** [1] - 16:4
**bullet** [1] - 46:20

**burden** [1] - 6:1
**Bureau** [1] - 13:12
**bureaucratic** [1] - 63:17
**Burns** [1] - 24:8
**business** [10] - 3:2, 3:4, 4:21, 5:16, 15:21, 16:5, 95:7, 95:8, 96:3, 103:8
**businesses** [2] - 15:16, 15:19
**buy** [1] - 79:2
**BY** [13] - 1:18, 13:10, 23:1, 33:23, 44:1, 44:19, 62:24, 65:2, 77:1, 89:19, 92:22, 107:8, 110:12

## C

**cabin** [1] - 105:6
**Cadman** [2] - 1:20, 2:2
**caffeine** [1] - 93:21
**Calderon** [1] - 56:3
**Caldron** [10] - 6:25, 7:7, 69:24, 70:9, 71:6, 72:15, 112:15, 112:20, 112:23, 112:24
**Caldron's** [1] - 70:3
**calendar** [1] - 117:22
**cancelled** [1] - 64:10
**canine** [1] - 104:19
**cannot** [1] - 64:8
**capabilities** [3] - 28:7, 55:15, 71:19
**capable** [1] - 56:24
**capacity** [1] - 102:20
**CAPERS** [1] - 1:17
**captured** [1] - 107:21
**car** [1] - 108:9
**cargo** [1] - 21:23
**Carolyn** [1] - 98:13
**Carrano** [15] - 14:24, 24:15, 28:11, 39:6, 44:22, 65:13, 97:7, 97:10, 97:11, 97:22, 98:2, 98:3, 98:12, 99:15
**carrying** [1] - 101:12
**cars** [2] - 101:22, 102:19
**CART** [6] - 55:4, 55:7, 55:11, 64:2, 75:15, 80:20
**case** [46] - 3:12, 5:13, 14:12, 14:13, 14:15, 14:23, 15:1, 22:12, 24:15, 25:3, 44:22, 46:3, 47:7, 49:12, 52:2, 52:3, 52:16, 52:17, 52:18, 53:20, 54:23, 60:24, 61:14, 61:18, 61:19, 62:14, 66:9, 73:7, 74:18, 75:12, 76:17, 90:1, 97:1, 97:12, 111:25, 115:4, 115:10, 115:19, 115:23, 115:24, 115:25, 116:2, 118:10
**cases** [2] - 85:6, 116:15
**cc** [1] - 89:24
**Central** [2] - 25:5, 25:14
**ceremony** [1] - 10:17
**certain** [5] - 85:14, 96:12, 96:13, 100:9, 104:24
**certify** [1] - 10:19
**Cesar's** [1] - 10:6
**chain** [3] - 69:10, 77:22, 105:1
**chambers** [1] - 33:13

**chance** [3] - 54:5, 75:10, 117:17
**Chandler** [1] - 98:12
**change** [1] - 78:5
**changed** [1] - 78:12
**charge** [3] - 40:16, 67:13, 82:16
**check** [2] - 88:21, 117:9
**Chief** [1] - 97:18
**choice** [1] - 38:16
**choosing** [1] - 8:21
**CI** [2] - 42:16, 42:17
**CIB** [1] - 104:25
**circumstances** [1] - 49:5
**citizen** [1] - 32:14
**City** [11] - 15:15, 15:22, 16:14, 16:22, 17:23, 19:19, 21:7, 38:17, 38:20, 100:10, 105:6
**city** [1] - 38:17
**clarity** [1] - 73:14
**Clark** [1] - 98:13
**class** [1] - 104:1
**clear** [8] - 29:1, 52:5, 54:21, 72:13, 73:3, 78:21, 86:10, 115:8
**clearance** [7] - 95:1, 95:3, 95:4, 95:5, 95:15, 95:23, 96:22
**clearly** [1] - 30:2
**CLERK** [13] - 2:11, 12:25, 13:2, 92:15, 92:17, 114:7, 116:23, 117:2, 117:10, 117:12, 117:14, 117:18, 117:24
**client** [2] - 50:23, 92:5
**clients** [2] - 20:14, 92:6
**closer** [1] - 36:2
**co** [2] - 29:12, 90:1
**co-case** [1] - 90:1
**co-conspirator** [1] - 29:12
**Code** [1] - 11:11
**Cogan** [2] - 91:14, 115:4
**Cogan's** [1] - 114:25
**collar** [4] - 13:24, 24:12, 51:18, 71:20
**colleague** [1] - 83:21
**collect** [3] - 14:3, 14:6, 34:14
**collectively** [1] - 15:24
**colloquy** [1] - 10:4
**color** [1] - 104:8
**column** [5] - 96:16, 103:16, 103:20, 103:23, 104:5
**comfortable** [1] - 86:25
**command** [1] - 105:1
**commanded** [1] - 60:11
**comments** [2] - 10:24, 29:10
**Commission** [1] - 30:19
**commissioner** [11] - 82:8, 82:14, 82:22, 82:24, 82:25, 83:1, 90:16, 90:19, 90:21, 90:24, 91:4
**commitment** [1] - 64:9
**common** [2] - 29:17, 108:7
**common-law** [1] - 29:17
**communicate** [1] - 85:24
**communication** [4] - 25:11, 25:13, 25:14, 66:2

**communications** [3] - 70:19, 88:25, 111:24
**companies** [1] - 37:4
**comparing** [1] - 39:20
**competition** [1] - 90:25
**complaint** [1] - 88:18
**completed** [1] - 49:18
**complied** [2] - 12:7, 12:8
**component** [1] - 17:9
**computer** [7] - 2:5, 24:24, 26:13, 28:8, 64:2, 64:6, 80:20
**computer-aided** [1] - 2:5
**computers** [12] - 23:23, 24:3, 26:14, 26:15, 28:10, 36:1, 36:2, 55:15, 56:20, 84:17, 85:1, 86:20
**conceal** [1] - 76:20, 76:24
**conceive** [1] - 77:10
**concern** [7] - 30:23, 54:21, 63:17, 63:24, 65:21, 79:23, 118:3
**concerned** [5] - 5:14, 14:16, 21:14, 29:13, 36:12, 41:12, 65:9
**concerns** [3] - 29:6, 29:23, 30:21
**conclude** [2] - 77:8, 77:13
**conclusion** [1] - 112:4
**conduct** [11] - 11:22, 31:12, 34:10, 57:12, 58:12, 58:23, 61:10, 61:23, 84:8, 86:5
**conducted** [5] - 5:12, 18:13, 21:2, 21:4, 24:9, 58:9, 83:25, 84:11, 101:6
**conducting** [4] - 70:5, 70:11, 71:7, 89:6
**conducts** [1] - 11:25
**conference** [4] - 26:8, 91:14, 91:17, 117:4
**Conference** [1] - 116:24
**confirmation** [3] - 19:15, 20:21, 20:22
**confiscated** [1] - 88:6
**confusion** [1] - 37:19
**connected** [1] - 30:12
**connection** [3] - 17:3, 17:4, 29:22
**conscience** [1] - 5:13
**conscious** [1] - 11:5
**consider** [2] - 27:13, 55:12
**considered** [2] - 63:11, 118:7
**consistent** [2] - 54:8, 109:24
**conspirator** [1] - 29:12
**constituted** [1] - 84:22
**constitutional** [1] - 11:6
**consular** [1] - 94:22
**consuming** [1] - 62:19
**contact** [13] - 17:15, 17:25, 23:9, 23:14, 24:8, 39:13, 39:17, 55:23, 65:23, 68:2, 73:6, 100:21, 111:22
**contacted** [3] - 48:1, 52:23, 102:8
**contacts** [1] - 68:7
**contemplate** [2] - 116:2, 116:11
**contents** [1] - 60:25
**context** [3] - 85:18, 85:20, 91:4
**continue** [3] - 28:2, 59:9, 60:1

**Continued** [2] - 22:17, 118:13
**continued** [3] - 43:14, 64:15, 66:4
**CONTINUES** [1] - 65:1
**continuing** [1] - 81:8
**Continuing** [2] - 23:1, 77:1
**control** [5] - 19:21, 57:10, 58:12, 60:17, 61:12
**controlled** [1] - 60:10
**controlling** [1] - 20:6
**conversation** [8] - 40:22, 40:23, 52:19, 55:1, 55:16, 68:21, 72:7, 82:11
**conversations** [13] - 31:15, 40:4, 40:7, 41:5, 56:10, 66:6, 66:17, 67:23, 68:5, 72:14, 72:21, 72:22, 84:2
**convey** [2] - 47:3, 65:20
**conveyed** [1] - 68:11
**convinced** [1] - 71:1
**cooperating** [1] - 116:7
**cooperation** [9] - 5:19, 27:23, 28:18, 40:17, 47:5, 53:6, 63:12, 63:13, 90:20
**cooperative** [2] - 90:25, 119:18
**coordinate** [2] - 42:17, 63:8
**coordinated** [2] - 31:13, 87:8
**copies** [1] - 28:4
**copy** [11] - 4:11, 10:14, 22:16, 28:19, 33:11, 44:13, 63:23, 81:22, 106:3, 106:5, 110:6
**core** [3] - 77:12, 77:15, 95:2
**corporate** [2] - 25:20, 26:1
**Corporate** [1] - 15:20
**correct** [90] - 5:24, 12:18, 13:17, 13:18, 16:23, 19:6, 34:4, 34:16, 36:14, 36:17, 38:15, 38:25, 39:3, 42:14, 42:15, 42:19, 42:24, 44:4, 45:21, 46:1, 46:9, 46:15, 46:17, 48:11, 50:9, 51:1, 51:4, 51:6, 51:7, 51:9, 52:10, 54:4, 56:12, 57:3, 57:15, 60:8, 60:22, 65:7, 66:24, 70:21, 72:4, 72:17, 72:18, 73:1, 73:15, 73:16, 74:24, 75:19, 75:22, 79:9, 83:4, 83:23, 84:2, 84:3, 84:6, 84:11, 84:18, 84:19, 84:21, 85:4, 85:11, 85:12, 85:15, 85:16, 85:19, 85:20, 86:1, 86:3, 86:6, 86:7, 86:9, 86:13, 86:14, 86:16, 86:17, 86:21, 86:25, 87:5, 87:10, 87:25, 88:2, 90:5, 90:8, 90:22, 91:2, 99:20, 99:21, 99:23, 99:24, 112:8
**Correct** [1] - 27:7
**correspondence** [2] - 51:14, 109:24
**counsel** [4] - 2:14, 6:11, 15:4, 114:15
**counterpart** [1] - 27:25
**countries** [1] - 35:19
**country** [13] - 31:13, 35:16, 61:1, 61:14, 62:7, 84:17, 96:22, 97:14, 99:20, 99:23, 100:5, 102:20, 108:8
**Country** [6] - 95:1, 95:3, 95:4, 95:5, 95:14, 95:23
**couple** [4] - 7:23, 8:12, 44:5, 79:2
**course** [14] - 6:10, 6:23, 15:13, 16:24, 24:4, 24:23, 27:15, 28:6, 46:3, 55:1, 78:8, 96:3, 103:8, 112:1

**court** [8] - 10:4, 11:20, 27:2, 27:6, 51:9, 59:8, 109:5
**COURT** [164] - 1:1, 2:19, 2:23, 3:1, 3:10, 3:15, 3:17, 3:20, 3:22, 4:1, 4:4, 4:7, 4:9, 4:13, 4:15, 4:17, 4:19, 6:14, 7:20, 7:25, 10:25, 11:3, 11:15, 11:17, 12:14, 12:16, 12:20, 12:22, 13:7, 15:6, 26:25, 27:4, 32:23, 33:3, 33:6, 33:9, 33:14, 33:16, 33:18, 33:20, 35:2, 37:18, 45:2, 45:20, 45:22, 46:10, 50:3, 53:14, 53:15, 53:25, 57:2, 57:8, 57:17, 58:5, 58:16, 58:25, 59:5, 59:10, 59:13, 59:17, 59:21, 60:7, 60:14, 60:22, 62:8, 62:11, 62:13, 62:17, 62:23, 69:11, 69:14, 72:13, 72:20, 72:22, 73:13, 73:19, 73:22, 74:15, 76:13, 77:7, 78:2, 80:13, 80:24, 81:7, 82:4, 83:11, 83:14, 87:14, 87:16, 87:18, 88:9, 88:11, 88:13, 88:18, 89:12, 89:15, 90:10, 90:13, 91:9, 91:16, 91:19, 91:21, 92:2, 92:4, 92:6, 92:9, 92:12, 92:20, 93:19, 93:23, 96:8, 103:13, 106:12, 107:2, 107:5, 109:11, 109:16, 110:9, 111:6, 111:8, 111:12, 111:15, 111:19, 112:6, 112:9, 112:16, 112:18, 113:1, 113:5, 113:9, 113:15, 113:19, 113:21, 114:1, 114:3, 114:6, 114:10, 114:12, 114:14, 114:20, 114:23, 115:1, 115:4, 115:16, 115:20, 115:23, 115:25, 116:5, 116:9, 116:11, 116:17, 116:20, 116:22, 116:25, 117:4, 117:8, 117:11, 117:13, 118:2, 118:11, 119:1, 119:10, 119:17, 119:21
**Court** [15] - 2:1, 3:13, 5:14, 6:6, 6:12, 6:17, 7:18, 9:21, 33:12, 81:25, 84:20, 93:20, 98:17, 113:3, 115:14
**Court's** [1] - 9:1
**courtesy** [1] - 6:7
**Courthouse** [1] - 1:7
**courtroom** [5] - 8:9, 10:21, 11:19, 11:20, 12:17
**courts** [2] - 81:17, 81:18
**coverage** [1] - 110:23
**covered** [1] - 101:9
**covers** [2] - 24:18, 35:16
**CR** [1] - 1:4
**craft** [1] - 51:16
**crime** [1] - 13:24
**crimes** [2] - 71:20, 71:24
**criminal** [9] - 2:11, 14:4, 28:2, 29:11, 32:17, 43:1, 76:21, 84:23, 100:6
**Criminal** [2] - 104:18, 104:21, 104:23
**critical** [1] - 39:22
**CROSS** [2] - 33:22, 83:16, 107:7, 110:11, 120:7, 120:8, 120:14, 120:15
**cross** [4] - 6:12, 8:24, 77:13, 91:9
**CROSS-EXAMINATION** [6] - 33:22, 83:16, 107:7, 120:7, 120:8, 120:14
**cross-examination** [2] - 6:12, 77:13
**culling** [1] - 119:14
**cumbersome** [1] - 8:25

**current** [3] - 13:16, 93:17, 105:7
**Curtis** [3] - 40:10, 41:1, 41:2
**custody** [4] - 19:16, 29:4, 88:19, 88:20
**CYNK** [19] - 30:14, 30:15, 30:20, 30:22, 31:6, 41:10, 41:12, 41:21, 42:4, 42:21, 43:1, 43:13, 47:22, 47:24, 51:23, 52:23, 53:2, 54:22, 86:11

**D**

**danger** [1] - 119:12
**dangerous** [1] - 38:17
**dark** [2] - 101:16, 104:13
**database** [2] - 95:15, 104:2
**date** [10] - 72:8, 90:3, 100:19, 114:1, 114:3, 114:6, 114:16, 114:17, 115:9, 116:12
**dated** [3] - 74:11, 78:7, 83:8
**dates** [1] - 64:7
**daughter** [1] - 113:17
**Davis** [1] - 43:3
**days** [7] - 18:12, 30:6, 41:17, 52:24, 64:3, 79:2, 118:1
**deal** [1] - 11:15
**dealing** [1] - 36:14
**dealt** [1] - 74:21
**decal** [2] - 106:2, 106:6
**decals** [1] - 105:19
**decide** [1] - 47:8
**decided** [5] - 5:9, 47:13, 55:11, 64:11, 68:15
**decision** [6] - 5:2, 31:23, 68:25, 72:2, 72:5
**DEFENDANT** [10] - 3:19, 3:21, 3:25, 4:3, 4:6, 4:8, 4:12, 4:14, 4:16, 4:18
**Defendant's** [9] - 44:24, 45:7, 45:17, 46:11, 49:20, 49:25, 53:11, 53:22, 74:7
**Defendants** [2] - 1:10, 1:22
**defendants** [6] - 3:3, 20:13, 30:25, 32:13, 53:22, 92:11
**defense** [29] - 6:11, 7:15, 11:25, 12:4, 33:17, 34:18, 34:25, 44:16, 44:24, 45:17, 49:25, 57:18, 57:21, 69:5, 74:8, 74:12, 75:5, 77:25, 80:5, 80:11, 80:21, 83:9, 89:23, 109:13, 113:13, 116:13, 119:5
**Defense** [13] - 34:17, 34:25, 44:7, 44:13, 77:18, 77:25, 80:11, 80:21, 81:1, 81:2, 83:6, 83:9, 89:20
**definitely** [4] - 34:11, 50:16, 63:16, 76:23, 79:24, 113:12
**degree** [1] - 66:8
**delay** [1] - 69:2
**deliver** [2] - 63:22, 72:7
**delivered** [3] - 33:13, 82:14, 82:21
**denied** [2] - 76:14, 76:16
**deny** [1] - 77:2
**denying** [6] - 74:1, 75:1, 75:17, 76:7, 76:22, 77:5

**Department** [15] - 6:21, 18:14, 18:15, 18:22, 22:9, 31:13, 39:8, 93:1, 96:3, 96:21, 97:8, 98:14, 101:20, 103:8, 106:18

**dependent** [1] - 60:9

**Deputy** [1] - 6:25

**derailing** [1] - 72:2

**describe** [4] - 14:1, 56:14, 94:17, 103:16

**describing** [1] - 70:20

**description** [2] - 103:24, 104:1

**design** [1] - 76:23

**designatge** [1] - 95:7

**designed** [1] - 5:20

**desire** [1] - 10:6

**desk** [1] - 16:16

**desks** [2] - 84:16, 85:1

**destroy** [1] - 31:1

**destroyed** [7] - 21:15, 65:10, 65:19, 65:22, 69:3

**detail** [2] - 52:7, 58:24

**detailed** [1] - 36:22

**details** [4] - 43:5, 49:11, 70:23, 82:16

**detained** [1] - 20:15

**deter** [2] - 61:22, 62:2

**determination** [2] - 28:1, 31:16

**determine** [12] - 5:10, 5:17, 7:16, 35:11, 39:15, 49:3, 53:9, 57:4, 57:10, 67:18

**determines** [1] - 111:22

**determining** [1] - 60:15

**deterring** [1] - 61:24

**developing** [1] - 32:16

**development** [2] - 7:13, 7:18

**difference** [2] - 52:2, 52:16

**different** [11] - 28:6, 37:7, 48:11, 58:3, 61:4, 88:2, 101:13, 104:18, 105:16, 110:21, 111:3

**difficult** [1] - 32:15

**digits** [6] - 96:18, 97:4, 98:9, 98:17, 99:7, 99:12

**Diplomatic** [3] - 92:14, 93:2, 93:3

**diplomatic** [5] - 93:11, 93:12, 94:13, 111:1

**diplomats** [1] - 93:13

**DIRECT** [4] - 13:9, 92:21, 120:6, 120:13

**direct** [10] - 6:10, 12:9, 19:23, 31:6, 34:17, 58:13, 69:5, 69:21, 77:18, 83:5

**directed** [3] - 24:9, 60:10, 90:17

**directing** [3] - 20:6, 62:25, 98:7

**direction** [4] - 57:11, 59:15, 60:17, 66:9

**directive** [1] - 66:20

**directly** [3] - 16:20, 41:13, 62:5

**disagreeing** [1] - 59:23

**disagreement** [2] - 77:8, 77:11

**disagrees** [1] - 9:19

**disappointed** [1] - 31:22

**discharging** [1] - 12:1

**disclose** [4] - 42:1, 42:2, 46:6

**disclosed** [1] - 7:15

**disclosure** [2] - 8:21, 85:21

**disclosures** [1] - 7:6

**discovered** [4] - 111:18, 112:19, 112:21, 112:25

**discuss** [2] - 4:1, 90:6

**discussed** [16] - 4:13, 21:20, 25:20, 28:12, 28:16, 28:21, 32:15, 50:13, 55:17, 63:18, 67:2, 67:3, 70:10, 76:6, 83:21, 112:23

**discussing** [1] - 71:17

**discussion** [9] - 22:14, 58:6, 74:3, 74:25, 79:22, 81:20, 82:15, 82:18, 82:19

**discussions** [9] - 27:18, 28:10, 32:18, 66:4, 67:14, 67:20, 72:6, 72:14, 73:25

**disk** [1] - 107:21

**dispute** [1] - 61:13

**disregard** [1] - 54:25

**disregarding** [1] - 55:5

**distinctions** [1] - 52:5

**district** [1] - 16:5

**DISTRICT** [3] - 1:1, 1:1, 1:13

**DNU** [1] - 105:7

**document** [19] - 10:19, 34:20, 34:22, 45:7, 45:14, 49:22, 51:24, 52:12, 54:12, 77:21, 80:17, 96:11, 99:18, 99:22, 102:25, 103:4, 103:5, 103:16, 109:18

**documented** [1] - 51:22

**documents** [25] - 9:11, 9:16, 14:6, 21:24, 26:12, 26:20, 26:21, 26:22, 35:23, 36:22, 37:7, 37:15, 38:5, 44:5, 44:6, 45:11, 56:18, 80:4, 84:22, 86:20, 87:4, 119:15

**DOJ** [1] - 31:16

**donated** [11] - 101:17, 102:11, 102:20, 103:2, 104:3, 104:7, 104:8, 105:3, 106:4, 106:6, 106:14

**donation** [3] - 102:4, 102:6, 105:4

**donations** [1] - 102:3

**done** [7] - 34:12, 36:16, 37:1, 39:17, 57:13, 58:9, 60:17

**door** [1] - 61:25

**double** [1] - 105:6

**doubt** [1] - 70:25

**down** [18] - 4:20, 9:10, 35:6, 37:21, 38:4, 38:19, 42:16, 47:12, 58:1, 58:2, 61:10, 61:25, 62:7, 81:23, 93:19, 98:7, 98:16, 110:24

**downstairs** [1] - 91:20

**draft** [1] - 36:12

**drafted** [2] - 36:11, 86:24

**drafting** [1] - 34:7

**drafts** [1] - 81:10

**drive** [3] - 108:12, 108:16, 108:17

**drives** [1] - 56:20

**drug** [1] - 71:24

**Drug** [1] - 94:15

**DSS** [10] - 93:4, 93:6, 93:8, 93:10, 93:15, 93:16, 93:17, 94:5, 100:25, 101:1

**due** [2] - 77:11, 91:22

**duly** [2] - 13:1, 92:16

**dump** [1] - 30:15

**duplicate** [1] - 99:3

**duplicating** [1] - 98:4

**during** [14] - 6:10, 8:9, 9:15, 17:15, 17:25, 24:14, 56:4, 68:6, 88:20, 91:7, 97:23, 98:3, 98:4, 98:6

**duties** [1] - 94:17

**duty** [1] - 94:25

## E

**E-Country** [6] - 95:1, 95:3, 95:4, 95:5, 95:14, 95:23

**e-mail** [30] - 34:23, 35:4, 44:21, 45:15, 45:24, 46:1, 46:4, 47:6, 47:18, 49:23, 50:5, 50:6, 50:13, 50:15, 50:19, 52:9, 53:7, 53:10, 54:9, 77:22, 78:7, 78:12, 78:21, 80:9, 80:18, 83:7, 90:3, 90:6, 91:5

**e-mails** [4] - 46:5, 50:20, 53:18, 89:23

**early** [9] - 30:8, 36:9, 72:5, 79:24, 102:4, 104:10, 106:7, 117:1

**ease** [2] - 6:9, 96:13

**East** [2] - 1:20, 2:2

**EASTERN** [1] - 1:1

**effort** [2] - 35:13, 111:21

**eight** [1] - 37:25

**either** [3] - 11:7, 90:17, 101:10

**electronic** [1] - 56:21

**elements** [1] - 70:5

**eliminate** [2] - 75:16, 76:7

**email** [15] - 20:12, 69:10, 69:16, 69:17, 69:22, 69:24, 70:3, 72:19, 74:4, 74:5, 74:10, 74:22, 74:25, 75:4, 75:20

**emails** [5] - 9:4, 9:15, 9:23, 72:22, 73:2

**Embassy** [3] - 23:9, 38:24, 39:8

**embassy** [13] - 20:19, 20:22, 22:7, 39:4, 93:18, 94:1, 94:7, 94:10, 94:18, 94:22, 95:8, 95:11, 101:1

**employed** [5] - 13:11, 13:12, 13:14, 92:25, 93:1

**employee** [1] - 80:19

**encapsulating** [1] - 95:24

**encouraging** [1] - 62:20

**end** [6] - 68:24, 114:17, 114:18, 115:1, 115:5, 115:13

**endeavoring** [1] - 77:15

**ended** [1] - 115:11

**enforcement** [32] - 5:17, 5:18, 7:4, 9:9, 17:16, 18:1, 19:23, 20:1, 20:6, 20:16, 22:1, 23:22, 24:13, 26:5, 31:5, 31:12, 32:4, 55:14, 55:22, 55:23, 57:11, 60:11, 71:18, 71:20, 72:16, 72:24, 73:15, 82:19, 94:10, 94:24, 111:23

**Enforcement** [3] - 94:15, 101:18, 106:17

**engage** [2] - 75:20, 86:18

**entail** [1] - 27:24

**enter** [1] - 99:20

**entered** [1] - 81:18

**entire** [2] - 110:1, 110:4

**entirely** [1] - 60:19

**entities** [3] - 15:24, 37:8, 50:25

**entries** [3] - 96:12, 96:14, 97:21

**equipment** [2] - 56:24, 101:25

**Eric** [12] - 41:7, 41:16, 43:4, 45:16, 46:2, 50:11, 51:17, 51:24, 52:1, 52:6, 52:24, 53:18

**ERT** [1] - 75:16

**ESQ** [3] - 1:22, 1:22, 1:24

**essentially** [1] - 57:23

**establish** [2] - 60:21, 67:6

**EUGENE** [1] - 1:22

**Eusey** [5] - 69:25, 70:10, 71:9, 79:20, 79:23

**evade** [1] - 5:20

**evaluate** [1] - 7:15

**evening** [3] - 19:10, 20:18, 20:21

**event** [1] - 62:15

**eventually** [2] - 15:10, 78:21

**evidence** [59] - 5:11, 5:25, 14:3, 14:6, 18:16, 18:18, 18:21, 21:15, 21:18, 23:15, 23:18, 23:22, 24:25, 26:1, 26:5, 26:9, 26:11, 26:17, 27:20, 27:23, 27:25, 28:4, 28:8, 28:18, 31:1, 32:3, 32:7, 32:16, 34:15, 36:19, 37:3, 38:8, 38:9, 39:23, 46:24, 47:7, 48:23, 48:24, 48:25, 49:2, 49:13, 56:14, 63:25, 65:10, 65:18, 65:22, 67:7, 67:17, 69:3, 84:23, 85:6, 85:7, 86:20, 88:19, 88:23, 96:6, 98:4, 99:3

**evidentiary** [1] - 118:3

**EXAMINATION** [15] - 13:9, 33:22, 65:1, 83:16, 89:18, 92:21, 107:7, 110:11, 120:6, 120:7, 120:8, 120:10, 120:13, 120:14, 120:15

**examination** [4] - 6:10, 6:12, 77:9, 77:13

**examine** [4] - 112:10, 112:13, 112:16, 112:24

**examined** [1] - 112:10

**example** [5] - 40:9, 55:24, 63:21, 70:19, 79:15

**exception** [2] - 42:3, 105:20

**Exchange** [1] - 30:19

**exchange** [5] - 26:6, 45:15, 49:23, 80:9, 83:7

**exclusionary** [1] - 61:22

**excuse** [4] - 6:23, 44:12, 72:20, 73:19

**excused** [4] - 12:17, 91:10, 111:8, 111:11

**execute** [9] - 24:11, 29:14, 47:9, 49:16, 64:5, 70:18, 72:2, 73:12, 85:25

**executed** [16] - 19:1, 19:8, 20:3, 21:9, 21:16, 25:23, 26:23, 28:14, 30:7, 35:7, 53:6, 63:10, 64:1, 72:1, 78:5, 78:10

**executing** [4] - 20:20, 20:23, 82:16, 86:12

**execution** [2] - 87:9

**executive** [1] - 95:6

**exercise** [1] - 71:13

**exercises** [1] - 61:12

**exhaustive** [1] - 58:24

**exhibit** [3] - 10:11, 89:17, 109:13

**Exhibit** [51] - 34:17, 34:25, 44:7, 44:13, 44:25, 45:7, 45:18, 46:11, 49:20, 50:1, 53:11, 53:23, 69:6, 74:7, 74:8, 74:12, 75:5, 77:19, 77:25, 80:5, 80:7, 80:22, 81:1, 81:2, 89:20, 89:23, 95:17, 95:18, 95:22, 96:2, 96:6, 96:10, 96:15, 97:3, 99:6, 102:23, 103:7, 103:11, 103:15, 104:14, 105:2, 105:23, 105:24, 106:1, 106:5, 106:10, 108:3, 120:19, 120:20, 120:21, 120:22

**exhibits** [5] - 6:9, 33:12, 33:17, 34:18, 44:17

**Exhibits'** [1] - 44:14

**existed** [1] - 48:7

**exists** [1] - 111:23

**expect** [4] - 5:23, 10:12, 26:22, 56:19

**expedited** [4] - 34:4, 34:10, 62:4, 63:21

**experience** [2] - 24:12, 74:20

**expert** [1] - 80:20

**expertise** [1] - 71:21

**experts** [2] - 24:25, 116:8

**expired** [1] - 51:10

**explain** [3] - 85:22, 95:4, 105:13

**explained** [2] - 52:1, 58:22

**explore** [3] - 9:20, 9:22, 111:24

**explored** [1] - 85:14

**Explorer** [1] - 108:17

**exploring** [2] - 86:4, 86:13

**expressing** [2] - 8:19, 65:18

**extend** [2] - 43:8, 51:12

**extended** [1] - 51:13

**extent** [1] - 12:7

**extradition** [1] - 32:14

**extraordinarily** [1] - 57:23

**eyes** [1] - 81:23

**F**

**facilitate** [2] - 94:25, 95:1

**facilities** [1] - 93:12

**fact** [9] - 7:2, 10:14, 10:19, 20:22, 23:2, 34:13, 39:17, 84:21, 109:8

**facts** [3] - 9:20, 9:22, 36:15

**factual** [1] - 34:7

**fail** [1] - 60:1

**fair** [5] - 12:5, 51:15, 59:12, 65:6, 65:11

**fairly** [4] - 11:22, 32:6, 37:11, 42:6

**fairness** [3] - 10:6, 11:18, 12:3

**familiar** [8] - 10:13, 10:21, 51:17, 99:25, 109:19, 109:21, 109:22, 109:23

**family** [1] - 29:22

**far** [7] - 14:15, 36:12, 41:4, 56:7, 61:1, 62:19

**fast** [1] - 117:19

**faulty** [1] - 57:4

**favored** [7] - 27:21, 28:13, 40:17, 53:5, 63:15, 70:15

**FBI** [65] - 6:20, 13:13, 13:14, 13:16, 13:21, 14:12, 14:16, 14:17, 24:16, 25:3, 27:18, 27:22, 28:9, 28:13, 34:23, 35:15, 37:22, 37:23, 39:18, 40:5, 40:7, 40:10, 40:12, 40:17, 40:21, 40:23, 41:5, 42:5, 46:3, 46:21, 47:21, 48:5, 48:7, 48:8, 48:9, 48:14, 48:19, 49:4, 49:9, 53:5, 53:19, 55:3, 55:17, 56:1, 63:15, 63:22, 64:8, 66:7, 70:14, 74:10, 75:10, 75:11, 75:15, 76:2, 76:14, 76:15, 77:5, 78:13, 80:19, 90:1, 96:22, 96:25, 98:19, 99:3

**FBI's** [1] - 35:19

**fed** [1] - 73:7

**federal** [1] - 11:20

**Federal** [1] - 13:12

**Fedex** [1] - 63:24

**felt** [1] - 86:25

**few** [3] - 30:6, 52:24, 59:1

**field** [1] - 68:20

**fifth** [2] - 114:2, 114:5

**figure** [2] - 85:10, 85:13

**figuring** [1] - 85:17

**file** [1] - 50:17

**files** [1] - 56:18

**filled** [1] - 56:18

**final** [2] - 34:5, 81:12

**finally** [1] - 56:13

**financial** [1] - 14:6

**Financial** [2] - 23:19, 25:1

**fine** [5] - 52:5, 114:22, 116:10, 117:7, 117:20

**firm** [2] - 56:19, 64:9

**firms** [1] - 16:7

**first** [31] - 3:2, 4:24, 6:7, 11:3, 12:12, 17:6, 17:7, 18:4, 18:9, 20:9, 20:15, 23:8, 23:12, 23:15, 24:1, 24:21, 28:17, 31:21, 32:5, 34:18, 46:20, 51:25, 56:14, 57:19, 69:7, 73:9, 74:21, 78:7, 89:23, 107:19

**firsthand** [1] - 52:25

**fit** [1] - 70:6

**FIU** [135] - 23:19, 23:20, 23:22, 24:1, 24:5, 24:10, 24:12, 24:19, 24:22, 24:23, 24:24, 25:1, 25:8, 25:11, 27:25, 28:1, 28:5, 28:7, 28:23, 28:25, 29:14, 30:1, 30:2, 30:9, 30:17, 30:24, 31:2, 31:3, 31:6, 31:20, 32:5, 32:8, 32:15, 32:16, 39:21, 40:8, 40:11, 40:18, 40:19, 40:23, 41:5, 41:8, 41:13, 41:17, 41:20, 41:25, 42:3, 42:8, 42:20, 43:9, 46:6, 46:7,

46:9, 46:25, 47:3, 47:7, 47:8, 47:16, 47:20, 48:1, 48:3, 48:5, 48:7, 48:18, 48:24, 49:2, 49:5, 49:10, 50:15, 51:5, 51:11, 51:22, 52:3, 52:10, 52:14, 52:18, 52:20, 52:22, 52:24, 53:3, 53:8, 54:3, 54:17, 54:22, 55:1, 55:4, 55:11, 55:14, 55:18, 55:24, 56:6, 56:9, 63:23, 65:21, 65:23, 65:25, 66:17, 66:20, 67:2, 67:9, 67:14, 67:17, 67:21, 68:5, 68:10, 68:11, 69:25, 70:5, 70:10, 70:11, 70:16, 70:25, 71:7, 71:18, 71:19, 71:22, 73:2, 73:5, 73:14, 79:6, 79:11, 79:15, 82:12, 82:15, 82:22, 85:18, 85:24, 86:5, 86:10, 91:1, 112:21

**FIU's** [2] - 30:21, 41:12
**five** [2] - 59:6, 99:7
**five-minute** [1] - 59:6
**fix** [1] - 114:16
**fixing** [1] - 114:15
**flag** [2] - 105:20, 105:21
**Flatley** [1] - 80:18
**flurry** [1] - 9:8
**fly** [1] - 8:24
**focus** [3] - 32:6, 43:11, 99:8
**follow** [5] - 20:21, 32:8, 50:6, 62:1, 112:2
**follow-up** [4] - 20:21, 32:8, 50:6, 112:2
**followed** [1] - 31:24
**following** [4] - 22:6, 25:17, 48:22, 52:8
**footage** [4] - 101:6, 101:8, 107:11, 107:25
**force** [1] - 104:25
**Ford** [6] - 102:5, 104:14, 105:6, 108:7, 108:17, 110:25
**foreground** [1] - 101:13
**foreign** [9] - 5:17, 31:12, 35:19, 35:20, 43:10, 61:1, 66:8, 93:12, 101:21
**forensic** [4] - 26:13, 26:15, 28:9, 35:12
**forgetting** [1] - 112:14
**forgive** [1] - 93:21
**form** [4] - 53:3, 66:2, 70:23, 105:5
**formal** [1] - 28:19
**formalized** [1] - 95:5
**formally** [2] - 22:10, 64:12
**format** [2] - 109:22, 109:23
**forth** [2] - 54:7, 85:19
**forthcoming** [1] - 67:1
**forward** [2] - 53:19, 73:3
**forwarded** [1] - 69:16
**foundation** [2] - 29:18, 29:20
**four** [2] - 17:4, 75:4
**Fourth** [4] - 5:21, 57:5, 57:14, 58:19
**fourth** [2] - 114:2, 114:5
**frankly** [2] - 102:18, 115:15
**Franks** [1] - 5:6
**fraud** [5] - 38:3, 46:24, 71:21, 93:13, 94:21
**freeze** [4] - 43:8, 51:8, 51:12, 51:13
**freezing** [1] - 43:7

**Friday** [4] - 9:3, 71:11, 79:22, 79:23
**front** [4] - 53:15, 101:10, 101:13, 109:13
**froze** [1] - 42:21
**full** [2] - 13:3, 92:18
**fully** [1] - 11:5
**furnished** [1] - 110:1
**future** [2] - 67:1, 116:12

## G

**game** [1] - 72:3
**gang** [1] - 41:18
**gather** [1] - 39:21
**gathering** [1] - 113:6
**Gene** [2] - 2:1, 2:21
**general** [4] - 23:16, 39:14, 39:24, 49:12, 55:14, 83:20
**general's** [12] - 23:13, 23:17, 23:18, 23:25, 24:4, 24:9, 24:14, 24:20, 24:22, 25:5, 26:6, 63:23
**generally** [2] - 43:9, 119:18
**given** [6] - 6:13, 50:7, 57:11, 96:22, 102:2, 112:7
**glanced** [1] - 72:23
**GLASSER** [1] - 1:13
**Glenna** [2] - 29:17, 29:21
**Global** [2] - 16:8, 16:15
**Godfrey** [3] - 29:9, 32:14, 32:17
**Gordon** [1] - 16:13
**government** [56] - 5:25, 6:17, 6:19, 6:24, 7:5, 7:10, 7:16, 9:19, 9:23, 10:1, 10:6, 10:17, 11:4, 11:7, 11:9, 11:10, 18:24, 33:11, 52:17, 52:20, 57:22, 60:10, 61:13, 65:25, 66:6, 66:8, 68:23, 84:5, 92:13, 95:2, 96:5, 96:13, 101:25, 102:7, 102:12, 102:17, 103:10, 104:11, 105:11, 106:9, 106:15, 106:16, 106:22, 106:25, 111:15, 112:14, 113:25, 114:8, 114:19, 117:6, 119:2, 119:4, 119:17
**Government** [28] - 1:17, 10:3, 20:5, 34:11, 44:14, 86:23, 95:17, 95:18, 95:22, 96:2, 96:6, 96:10, 96:15, 97:3, 99:5, 102:23, 103:7, 103:11, 103:15, 104:15, 105:2, 105:23, 105:24, 106:1, 106:5, 106:10, 106:21, 108:3
**government's** [2] - 6:1, 118:8
**Government's** [1] - 65:21
**governmental** [1] - 95:12
**graduating** [1] - 113:17
**granted** [3] - 97:18, 98:14, 98:20
**grave** [1] - 29:6
**great** [2] - 6:4, 76:18
**GREGG** [1] - 1:8
**Gregg** [2] - 2:12, 2:25
**grown** [1] - 9:25
**guess** [4] - 8:12, 10:23, 46:19, 73:25
**guilty** [2] - 4:8, 4:18
**guy** [1] - 64:6

**guys** [2] - 58:4, 117:19

## H

**half** [2] - 76:6, 90:24
**hand** [8] - 6:19, 12:25, 29:8, 41:14, 44:16, 51:25, 72:7, 92:15
**handful** [1] - 44:6
**hands** [2] - 84:21, 86:19
**happy** [1] - 12:19
**hard** [2] - 9:1, 56:20
**header** [1] - 109:24
**hear** [5] - 8:23, 45:12, 59:10, 68:9, 77:14
**heard** [6] - 5:23, 51:23, 51:25, 61:5, 107:20, 108:19
**hearing** [12] - 2:11, 5:25, 6:24, 7:14, 7:19, 11:18, 15:23, 65:15, 73:20, 77:10, 111:18, 113:4
**HEARING** [1] - 1:12
**heed** [1] - 119:8
**held** [2] - 13:19, 93:24
**help** [4] - 64:5, 64:6, 64:7, 99:3
**helpful** [1] - 28:9
**helping** [1] - 101:21
**helps** [1] - 85:6
**highlight** [1] - 51:19
**highlighted** [4] - 52:6, 96:12, 96:13
**Hilux** [1] - 105:6
**himself** [1] - 35:16
**hit** [1] - 41:10
**hold** [1] - 119:13
**holiday** [1] - 117:24
**holsters** [1] - 101:22
**Homeland** [2] - 14:19, 38:2
**Honor** [42] - 2:18, 2:24, 3:8, 3:11, 6:4, 10:5, 11:2, 12:18, 12:21, 13:8, 15:3, 32:22, 33:10, 33:19, 44:12, 57:1, 59:14, 69:13, 76:11, 82:3, 89:11, 89:16, 91:13, 92:3, 92:13, 96:5, 103:10, 106:9, 107:1, 107:4, 109:10, 111:7, 111:13, 111:16, 112:19, 113:7, 113:16, 114:9, 114:19, 116:4, 116:8, 119:20
**HONORABLE** [1] - 1:13
**hope** [2] - 10:17, 10:22
**hoped** [1] - 79:1
**hopefully** [1] - 11:19
**hoping** [1] - 30:4
**hotel** [4] - 26:8, 26:10, 26:14, 38:18
**hotels** [1] - 38:21
**hour** [2] - 20:17, 90:24
**House** [1] - 16:14
**HSI** [2] - 14:20, 14:25
**human** [1] - 118:10
**hundreds** [1] - 56:15
**hung** [1] - 115:11
**hypothetical** [7] - 49:12, 53:3, 54:16, 66:2, 70:24, 71:4, 71:14

## I

**i.e** [1] - 101:22
**IBC** [5] - 26:2, 26:17, 26:21, 27:15, 84:12
**IBM** [2] - 37:14, 37:15
**idea** [4] - 71:1, 76:10, 79:13, 79:25
**identification** [4] - 81:2, 95:17, 102:23, 105:23
**identified** [2] - 111:25, 112:14
**identifies** [1] - 85:7
**identify** [1] - 112:2
**identifying** [1] - 86:2
**ILG** [1] - 1:4
**illegal** [3] - 43:12, 49:1, 84:11
**images** [1] - 26:15
**immediate** [1] - 43:7, 43:13
**immediately** [5] - 7:7, 7:10, 16:12, 29:25, 63:19
**imperfect** [1] - 79:14
**implicate** [1] - 58:18
**implicit** [1] - 11:6
**important** [6] - 48:21, 51:20, 51:21, 52:1, 52:13, 75:25
**impression** [3] - 21:12, 26:16, 26:19
**inappropriate** [1] - 73:5
**inartfully** [1] - 49:4
**inclination** [1] - 8:5
**including** [1] - 16:7
**incorporated** [1] - 81:11
**incredibly** [1] - 91:14
**independently** [1] - 30:18
**indicate** [5] - 97:13, 97:17, 98:11, 99:14, 99:22
**indicates** [5] - 96:20, 96:21, 97:6, 98:18, 99:19
**indication** [2] - 20:15, 61:2
**indictment** [7] - 3:3, 3:23, 4:5, 4:11, 63:8, 78:18
**indirectly** [2] - 20:18, 29:21
**individual** [1] - 99:19
**individuals** [4] - 14:9, 83:22, 99:1, 99:2
**indulgence** [2] - 9:1, 59:2
**influence** [1] - 31:21
**inform** [3] - 3:13, 7:18, 8:2
**informally** [1] - 28:18
**information** [71] - 6:18, 7:15, 18:14, 20:18, 21:22, 22:7, 28:22, 28:25, 29:2, 29:25, 30:1, 30:2, 30:19, 31:20, 32:2, 32:9, 38:10, 39:21, 39:24, 40:2, 41:21, 41:25, 42:8, 42:25, 46:2, 46:5, 46:12, 46:22, 47:1, 47:12, 47:19, 47:24, 48:19, 52:4, 52:25, 53:4, 53:8, 53:19, 55:8, 56:24, 66:15, 66:18, 66:20, 67:11, 67:16, 67:19, 67:22, 68:11, 68:22, 69:1, 70:15, 70:16, 70:17, 73:7, 73:9, 79:24, 80:2, 82:24, 82:25, 86:1, 86:2, 86:19, 87:3, 89:5, 89:7, 111:18, 112:1, 112:22,

113:3, 113:7, 113:13
**informed** [2] - 29:3, 108:19
**INGOGLIA** [74] - 1:22, 2:20, 7:23, 8:1, 11:14, 11:16, 33:4, 33:7, 33:23, 34:25, 44:1, 44:14, 44:19, 44:24, 45:17, 45:21, 46:11, 49:25, 53:22, 57:7, 57:16, 57:18, 58:15, 58:20, 59:1, 59:9, 59:12, 59:14, 59:18, 60:6, 60:12, 60:19, 60:23, 62:10, 62:12, 62:16, 62:22, 62:24, 65:2, 69:12, 73:17, 73:20, 74:12, 77:1, 77:14, 77:25, 80:11, 80:21, 81:8, 82:5, 83:9, 83:13, 92:5, 92:8, 96:7, 103:12, 106:11, 107:6, 107:8, 109:10, 109:17, 110:8, 111:20, 112:8, 112:12, 112:17, 113:23, 114:11, 114:22, 116:10, 116:21, 117:7, 117:21, 117:25
**Ingoglia** [22] - 2:21, 4:2, 6:16, 7:11, 7:12, 12:16, 33:3, 37:19, 57:2, 58:5, 58:25, 59:13, 59:21, 59:23, 62:8, 77:7, 92:4, 107:5, 111:19, 112:22, 112:23, 114:21
**initial** [2] - 7:5, 61:3
**initiate** [1] - 32:11
**initiated** [2] - 10:3, 51:23
**initiating** [1] - 52:19
**INL** [10] - 101:18, 101:19, 101:20, 101:24, 102:8, 102:9, 102:10, 103:1, 103:5, 106:17
**inquire** [2] - 9:14, 83:14
**inquiry** [3] - 57:19, 77:16, 112:5
**inside** [2] - 108:21, 108:23
**insofar** [3] - 5:14, 11:12, 19:2
**instead** [1] - 79:7
**instructions** [2] - 31:24, 55:6
**integrity** [1] - 11:23
**Intelligence** [2] - 23:19, 25:2
**intend** [2] - 7:1, 117:22
**intended** [3] - 5:20, 8:8, 31:2
**intends** [1] - 6:19
**intention** [2] - 86:11, 118:8
**interact** [1] - 66:7
**interaction** [3] - 42:10, 45:5, 61:6
**interdiction** [1] - 104:20
**interest** [3] - 32:11, 35:19, 56:4
**interested** [6] - 40:18, 41:14, 47:1, 48:18, 68:9, 111:20
**internal** [5] - 22:14, 27:18, 72:15, 72:24, 82:15
**Internal** [1] - 14:19
**internally** [2] - 63:19, 71:17
**International** [11] - 16:7, 16:8, 16:11, 16:12, 18:23, 21:4, 30:20, 31:14, 43:2, 101:18, 106:17
**international** [1] - 61:24
**internationally** [1] - 61:24
**Internet** [1] - 107:13
**interviews** [2] - 14:5, 30:25
**inventory** [4] - 88:7, 88:15, 88:25, 89:2
**inventorying** [1] - 89:8
**investigate** [4] - 14:4, 16:6, 88:13,

94:20
**investigated** [1] - 89:7
**investigates** [1] - 13:24
**investigating** [7] - 6:23, 42:4, 71:1, 85:2, 86:11, 93:12, 97:12
**Investigation** [4] - 13:12, 104:19, 104:21, 104:23
**investigation** [107] - 5:14, 14:8, 14:11, 14:12, 14:14, 14:18, 14:21, 14:22, 14:25, 15:7, 15:11, 15:13, 16:6, 16:24, 17:3, 17:9, 17:10, 17:13, 17:19, 25:4, 27:16, 27:25, 28:2, 28:22, 29:2, 29:6, 29:8, 29:16, 30:11, 30:12, 30:17, 30:22, 31:2, 31:4, 31:7, 32:3, 32:4, 32:9, 32:10, 32:11, 32:17, 36:19, 38:6, 40:1, 40:20, 41:12, 41:15, 41:19, 41:21, 41:23, 41:24, 42:2, 42:13, 42:21, 42:23, 43:1, 43:6, 43:11, 43:13, 47:22, 47:25, 48:3, 48:24, 49:11, 50:21, 51:3, 51:5, 51:17, 51:23, 52:11, 52:14, 52:15, 52:23, 53:2, 54:24, 55:19, 63:9, 66:13, 66:22, 67:25, 70:23, 70:24, 70:25, 74:22, 74:23, 76:17, 76:19, 76:21, 76:24, 78:15, 78:22, 79:3, 79:17, 79:19, 82:9, 83:22, 83:25, 84:5, 84:9, 84:18, 85:3, 85:18, 86:6, 86:21, 90:2, 91:4, 91:7
**investigations** [7] - 17:4, 24:12, 30:10, 51:18, 55:20, 78:20, 94:6
**Investigations** [2] - 14:20, 38:2
**investigative** [1] - 43:7
**invite** [1] - 61:10
**involve** [1] - 84:4
**involved** [8] - 14:8, 29:11, 40:25, 61:3, 66:12, 71:23, 76:17, 83:22
**involvement** [13] - 27:8, 31:17, 74:1, 75:1, 75:17, 76:8, 76:14, 76:15, 76:20, 76:24, 77:4, 77:5
**involves** [1] - 5:13
**IPC** [14] - 15:19, 15:20, 15:21, 15:24, 16:1, 17:11, 19:1, 19:2, 19:18, 21:2, 37:3, 37:7, 37:8, 100:9
**IPC's** [5] - 16:3, 16:12, 16:16, 16:17, 16:21
**irrelevant** [2] - 62:18, 77:9
**IRS** [20] - 6:25, 14:19, 14:22, 14:23, 24:15, 37:24, 40:5, 51:3, 55:24, 56:1, 56:6, 66:16, 66:17, 66:21, 69:24, 90:20, 97:8, 97:11, 98:14
**IRS's** [1] - 56:4
**issue** [7] - 6:2, 6:15, 28:15, 77:10, 77:12, 77:15, 113:14
**issued** [4] - 27:1, 27:5, 52:22, 109:4
**issues** [5] - 6:5, 6:19, 9:17, 118:3, 118:7
**item** [2] - 75:4, 103:20
**items** [3] - 35:9, 56:21, 103:2
**iteration** [2] - 64:1, 71:15
**itinerary** [7] - 96:17, 97:3, 98:8, 98:16, 98:23, 99:7

**itself** [3] - 11:25, 103:24, 107:17

## J

**jackets** [2] - 75:11, 76:2
**Jackie** [1] - 20:12
**JACQUELYN** [1] - 1:18
**Jacquelyn** [3] - 2:16, 36:12, 44:22
**JAMES** [1] - 1:24
**James** [1] - 2:25
**Jason** [13] - 35:14, 40:11, 40:24, 44:23, 73:23, 74:11, 74:17, 80:9, 83:7, 89:24, 90:18, 90:23, 91:3
**job** [3] - 35:18, 66:7, 94:23
**John** [12] - 14:24, 24:15, 28:11, 39:6, 44:22, 97:7, 97:10, 97:11, 98:3, 98:12, 99:15
**join** [2] - 3:14, 11:2
**joined** [1] - 15:4
**Jonathan** [2] - 89:24, 89:25
**judge** [11] - 30:3, 37:15, 51:13, 57:16, 59:1, 59:9, 60:6, 62:16, 73:17, 116:23, 117:21
**Judge** [16] - 2:20, 33:4, 33:8, 77:14, 82:5, 83:13, 91:14, 107:6, 110:8, 110:10, 111:5, 112:17, 114:22, 114:25, 115:4
**JUDGE** [1] - 1:13
**Judicial** [1] - 116:24
**judicial** [1] - 117:4
**July** [5] - 42:11, 42:12, 44:21, 45:6, 49:24
**June** [4] - 30:13, 41:10, 42:12, 114:17
**jury** [2] - 115:11, 116:18
**Justice** [6] - 18:14, 18:15, 18:22, 22:10, 31:14, 96:22
**justice** [3] - 11:21, 29:9, 100:6
**Justin** [1] - 15:2

## K

**Kaplan** [17] - 34:24, 35:14, 40:11, 40:24, 44:23, 73:23, 74:11, 74:17, 75:1, 75:4, 77:3, 80:10, 83:8, 89:24, 90:18, 90:23, 91:3
**Kasulis** [12] - 2:16, 6:3, 7:21, 8:2, 9:5, 13:7, 20:12, 36:12, 44:22, 89:12, 89:13, 112:18
**KASULIS** [59] - 1:18, 2:16, 3:8, 3:11, 3:16, 6:4, 6:15, 12:13, 12:15, 12:18, 13:8, 13:10, 15:3, 23:1, 32:22, 33:1, 33:10, 33:15, 33:17, 33:19, 33:21, 35:1, 44:12, 44:18, 45:1, 45:12, 45:19, 50:2, 53:24, 57:1, 69:13, 74:14, 76:11, 78:1, 80:12, 80:23, 82:3, 83:10, 88:17, 89:16, 89:19, 91:8, 92:3, 111:13, 111:16, 112:15, 112:19, 113:2, 113:6, 113:11, 113:22, 113:24, 114:4, 114:8, 114:18, 116:3, 116:7, 117:6, 119:20

**Keilty** [1] - 2:16
**KEILTY** [9] - 1:19, 92:13, 92:22, 96:5, 103:10, 106:9, 107:1, 107:4, 111:7
**kept** [2] - 96:2, 103:7
**Kessler** [1] - 114:6
**key** [1] - 41:20
**keyboards** [1] - 56:25
**kind** [7] - 40:7, 60:12, 68:10, 70:19, 108:11, 108:16, 109:18
**Kittelstad** [1] - 15:2
**knock** [1] - 61:25
**knowledge** [6] - 8:3, 86:10, 86:11, 87:23, 88:5, 99:1
**knowledgeable** [1] - 46:4
**Knowles** [1] - 20:13
**known** [2] - 13:13, 63:6
**KOUSOUROS** [37] - 1:24, 2:24, 11:2, 83:15, 83:17, 88:10, 88:12, 88:14, 89:11, 89:13, 91:13, 91:18, 91:20, 92:10, 110:10, 110:12, 111:5, 113:16, 113:20, 114:2, 114:13, 114:24, 115:3, 115:8, 115:18, 115:21, 115:24, 116:16, 116:19, 117:19, 118:1, 118:6, 118:12, 119:7, 119:14, 119:19, 120:9
**Kousouros** [11] - 2:25, 4:13, 7:11, 10:25, 59:10, 83:14, 92:9, 110:9, 114:5, 116:15, 119:1
**Kueber** [3] - 30:20, 42:4, 43:1

## L

**labeled** [1] - 105:18
**large** [10] - 21:23, 21:24, 30:15, 35:25, 100:16, 102:3, 104:13, 105:21
**largest** [1] - 102:3
**last** [20] - 4:24, 8:1, 9:10, 10:4, 11:18, 53:10, 63:25, 65:20, 71:15, 78:14, 79:5, 96:16, 96:17, 97:4, 98:9, 98:16, 98:17, 99:7, 99:12, 112:7
**late** [5] - 20:21, 72:3, 104:9, 106:7, 107:16
**latter** [1] - 61:12
**laundering** [4] - 13:25, 37:5, 38:3, 46:24
**Law** [2] - 101:18, 106:17
**law** [34] - 5:17, 7:4, 9:9, 11:22, 17:16, 18:1, 19:23, 20:1, 20:5, 20:16, 22:1, 23:22, 24:13, 26:5, 29:17, 31:5, 31:12, 32:4, 55:14, 55:22, 57:11, 60:11, 71:18, 71:19, 72:16, 72:24, 73:14, 82:2, 82:19, 94:9, 94:24, 111:22
**lay** [1] - 81:22
**Leach** [1] - 20:13
**lead** [6] - 14:15, 21:14, 25:3, 29:7, 30:25, 52:9
**leading** [7] - 9:8, 27:17, 30:8, 35:8, 39:18, 66:1, 112:21
**leaf** [1] - 109:19
**learn** [8] - 15:13, 15:16, 20:9, 24:5,

40:3, 61:4, 100:12, 100:15
**learned** [23] - 6:24, 7:3, 7:12, 8:2, 21:16, 22:4, 30:17, 30:23, 34:1, 34:13, 35:24, 35:25, 36:1, 40:4, 41:16, 43:6, 43:12, 44:2, 48:3, 52:23, 82:20, 90:8, 100:18
**least** [6] - 36:9, 48:13, 79:14, 79:18, 116:7, 117:21
**leave** [2] - 8:9, 58:3
**led** [1] - 70:10
**leeway** [1] - 9:21
**left** [2] - 5:7, 61:9
**Legacy** [5] - 16:8, 16:15, 16:17, 19:2, 37:3, 50:24, 100:10
**Legacy's** [2] - 19:18, 21:2
**legal** [27] - 8:18, 12:8, 24:16, 24:17, 34:23, 35:15, 35:18, 39:7, 40:4, 40:5, 40:9, 40:10, 40:14, 40:24, 40:25, 41:2, 53:19, 56:1, 56:2, 63:22, 66:7, 66:21, 73:3, 73:6, 74:10, 77:24, 82:22
**Legal** [1] - 18:24, 100:3
**lengths** [1] - 76:18
**LEO** [1] - 1:13
**liaison** [2] - 35:20, 94:24
**license** [1] - 103:22
**lighting** [2] - 105:15, 105:18
**likelihood** [1] - 90:19
**likely** [1] - 46:16
**limine** [1] - 118:3
**limitation** [1] - 57:6
**limitations** [1] - 12:4
**limited** [2] - 102:19, 105:20
**line** [2] - 50:5, 60:2
**lines** [1] - 52:8
**list** [1] - 104:6
**listed** [6] - 97:14, 97:15, 98:22, 104:6, 104:17, 105:4
**listen** [1] - 87:14
**lists** [1] - 96:16
**literal** [1] - 57:25
**literally** [1] - 61:8
**litigated** [1] - 60:25
**live** [1] - 63:13
**loathe** [1] - 11:8
**local** [1] - 7:4
**locate** [1] - 98:16
**located** [7] - 10:10, 16:1, 19:2, 24:17, 46:25, 103:21, 108:21
**location** [11] - 26:9, 30:5, 46:25, 66:23, 67:4, 68:13, 68:14, 87:5, 88:2, 103:20, 108:24
**locations** [3] - 54:14, 54:17, 84:16
**locked** [1] - 23:23
**locker** [1] - 23:22
**logical** [2] - 61:20, 61:21
**logistics** [1] - 26:7
**look** [19] - 8:4, 9:12, 23:15, 24:1, 32:7, 36:13, 44:5, 44:10, 50:10, 53:12, 71:5, 80:4, 80:15, 81:1, 87:6, 96:10, 99:6,

109:21, 109:23
  **looked** [4] - 26:20, 56:15, 72:23, 97:21
  **looking** [11] - 42:5, 53:13, 58:17, 80:7, 81:9, 84:25, 97:2, 98:22, 103:15, 105:2, 110:5
  **looks** [4] - 90:23, 109:19, 109:22, 111:3
  **loop** [1] - 68:3
  **looped** [1] - 31:14
  **loss** [1] - 58:7
  **loud** [1] - 57:24
  **low** [1] - 41:20
  **low-key** [1] - 41:20
  **luck** [1] - 41:16
  **lunch** [1] - 91:12
  **luncheon** [1] - 91:24

# M

  **machine** [2] - 56:22, 56:23
  **mail** [30] - 34:23, 35:4, 44:21, 45:15, 45:24, 46:1, 46:4, 47:6, 47:18, 49:23, 50:5, 50:6, 50:13, 50:15, 50:19, 52:9, 53:7, 53:10, 54:9, 77:22, 78:7, 78:12, 78:21, 80:9, 80:18, 83:7, 90:3, 90:6, 91:5
  **mails** [4] - 46:5, 50:20, 53:18, 89:23
  **maintained** [3] - 23:19, 23:20, 103:1
  **majority** [2] - 102:5, 104:10
  **man** [1] - 29:9
  **management** [1] - 64:8
  **Management** [1] - 15:20, 15:21
  **March** [1] - 17:20
  **marked** [24] - 10:11, 35:3, 45:3, 45:23, 49:20, 50:4, 53:11, 54:1, 69:5, 69:15, 74:16, 78:3, 80:14, 80:25, 81:2, 83:5, 83:12, 95:16, 96:9, 102:22, 103:14, 105:22, 106:13, 110:22
  **Market** [2] - 16:8, 16:15
  **Matalon** [8] - 16:3, 16:4, 16:21, 54:18, 98:5, 99:4, 100:17, 101:11
  **material** [14] - 6:9, 6:17, 7:2, 8:1, 8:5, 12:2, 33:11, 58:17, 101:22, 102:2, 112:7, 112:10, 118:9, 119:5
  **materials** [11] - 35:23, 57:13, 60:16, 84:16, 84:21, 85:3, 86:5, 87:23, 88:6, 88:12, 89:8
  **matter** [16] - 3:13, 3:14, 7:14, 11:21, 30:10, 38:10, 41:9, 41:18, 45:24, 48:11, 76:14, 78:11, 100:5, 118:10, 119:14, 119:22
  **mattered** [1] - 67:12
  **McCurdy** [7] - 24:16, 39:7, 41:3, 77:24, 79:4, 89:24, 90:18
  **McGuire** [38] - 6:20, 8:14, 9:11, 9:15, 10:12, 10:13, 12:11, 12:20, 13:5, 13:11, 19:17, 20:9, 27:8, 29:5, 32:25, 33:24, 34:20, 35:4, 44:20, 45:24, 62:25, 73:14, 77:18, 78:4, 81:1, 82:7, 87:14, 89:21,

96:21, 96:24, 96:25, 97:22, 98:2, 98:5, 98:19, 98:23, 120:5
  **McGuire's** [8] - 8:11
  **mean** [7] - 8:24, 14:13, 37:9, 58:2, 81:16, 85:6, 88:13
  **means** [3] - 14:15, 71:12, 73:17
  **meant** [1] - 69:2
  **measures** [1] - 76:20
  **mechanical** [1] - 2:5
  **media** [3] - 21:1, 30:13, 30:16
  **meet** [11] - 9:11, 17:12, 41:8, 42:17, 47:6, 56:9, 71:11, 78:25, 79:16, 79:22, 116:14
  **meeting** [33] - 17:10, 17:21, 24:4, 24:14, 24:19, 24:21, 27:24, 32:5, 41:1, 41:9, 41:17, 48:10, 50:8, 50:15, 53:1, 54:3, 54:12, 55:13, 64:9, 66:10, 71:8, 79:15, 79:18, 79:21, 79:23, 80:1, 82:12, 82:13, 82:17, 83:3, 98:6
  **meetings** [9] - 7:4, 7:8, 32:8, 42:16, 57:20, 82:7, 94:25, 98:2, 112:20
  **member** [8] - 18:1, 20:1, 20:5, 22:1, 24:22, 25:11, 29:18, 31:5
  **members** [8] - 17:16, 24:19, 24:24, 25:1, 28:22, 31:6, 55:24, 72:16
  **memo** [1] - 50:17
  **memory** [1] - 35:5
  **mention** [1] - 52:15
  **mentioned** [12] - 9:5, 23:3, 30:6, 41:9, 47:6, 51:6, 70:14, 71:15, 81:10, 95:3, 104:21, 104:22
  **message** [1] - 50:11
  **met** [23] - 23:8, 23:10, 23:12, 23:14, 24:23, 24:24, 25:1, 25:4, 25:8, 38:24, 40:11, 43:4, 48:9, 52:24, 55:18, 70:5, 90:18, 90:21, 90:24, 91:4, 91:6, 98:3, 98:5
  **Miami** [5] - 15:12, 19:9, 63:6, 72:9, 78:15
  **Michael** [1] - 2:16
  **MICHAEL** [1] - 1:19
  **middle** [1] - 75:5
  **might** [16] - 7:24, 28:8, 28:11, 32:14, 47:5, 51:20, 54:22, 59:10, 63:18, 63:25, 65:19, 67:1, 67:3, 67:17, 72:25, 117:13
  **millions** [1] - 119:15
  **Minister's** [2] - 29:19, 29:22
  **minute** [3] - 3:7, 59:3, 59:6
  **miss** [1] - 113:18
  **misstated** [1] - 68:18
  **MLAT** [65] - 10:1, 10:11, 10:13, 10:19, 18:23, 18:25, 19:11, 21:12, 23:14, 25:22, 27:22, 28:15, 28:19, 31:17, 31:18, 34:3, 34:5, 34:7, 34:8, 34:9, 36:10, 36:11, 36:20, 36:21, 37:2, 39:21, 57:22, 62:3, 62:4, 63:17, 63:20, 63:21, 64:5, 67:24, 71:16, 71:17, 72:6, 72:8, 78:24, 78:25, 79:6, 79:12, 81:11, 81:12, 82:14, 82:16, 82:21, 86:15, 86:24, 87:3, 87:6, 87:10, 87:11, 87:20, 88:7, 90:7,

90:9, 90:14, 99:25, 100:3, 100:7, 109:7, 110:1, 110:2, 110:4
  **mobile** [1] - 104:20
  **model** [2] - 104:6, 104:10
  **moment** [7] - 32:22, 45:25, 70:20, 82:5, 107:1, 109:10, 109:19
  **moments** [1] - 59:2
  **Monday** [6] - 23:8, 39:2, 117:11, 117:12, 117:14, 117:24
  **money** [4] - 13:24, 37:4, 38:3, 46:24
  **month** [2] - 67:10, 115:11
  **months** [6] - 21:14, 27:17, 30:8, 46:17, 63:18, 112:21
  **morning** [20] - 2:18, 2:19, 2:20, 2:23, 2:24, 3:1, 3:2, 3:5, 3:18, 3:19, 3:20, 3:21, 4:21, 4:23, 5:10, 5:16, 33:24, 33:25, 79:16, 117:16
  **most** [2] - 38:19, 101:9
  **mostly** [3] - 9:4, 16:15, 110:21
  **motion** [6] - 5:2, 5:6, 5:11, 6:1, 67:5, 67:7
  **motions** [2] - 5:1, 118:2
  **move** [18] - 3:4, 30:4, 31:1, 37:20, 53:10, 58:1, 58:2, 58:25, 59:2, 61:8, 61:9, 62:15, 62:19, 62:23, 68:14, 68:24, 72:12, 73:13
  **moved** [6] - 21:15, 60:25, 69:3, 88:2, 88:3
  **moves** [3] - 96:5, 103:10, 106:9
  **movie** [1] - 9:6
  **moving** [3] - 62:16, 73:17, 73:21
  **MR** [119] - 2:20, 2:24, 7:23, 8:1, 11:2, 11:14, 11:16, 33:4, 33:7, 33:23, 34:25, 44:1, 44:14, 44:19, 44:24, 45:17, 45:21, 46:11, 49:25, 53:22, 57:7, 57:16, 57:18, 58:15, 58:20, 59:1, 59:9, 59:12, 59:14, 59:18, 60:6, 60:12, 60:19, 60:23, 62:10, 62:12, 62:16, 62:22, 62:24, 65:2, 69:12, 73:17, 73:20, 74:12, 77:1, 77:14, 77:25, 80:11, 80:21, 81:8, 82:5, 83:9, 83:13, 83:15, 83:17, 88:10, 88:12, 88:14, 89:11, 89:13, 91:13, 91:18, 91:20, 92:5, 92:8, 92:10, 92:13, 92:22, 96:5, 96:7, 103:10, 103:12, 106:9, 106:11, 107:1, 107:4, 107:6, 107:8, 109:10, 109:17, 110:8, 110:10, 110:12, 111:5, 111:7, 111:20, 112:8, 112:12, 112:17, 113:16, 113:20, 113:23, 114:2, 114:11, 114:13, 114:22, 114:24, 115:3, 115:8, 115:18, 115:21, 115:24, 116:10, 116:16, 116:19, 116:21, 117:7, 117:16, 117:19, 117:21, 117:25, 118:1, 118:6, 118:12, 119:7, 119:9, 119:14, 119:19, 120:9
  **MS** [58] - 2:16, 3:8, 3:11, 3:16, 6:4, 6:15, 12:13, 12:15, 12:18, 13:8, 13:10, 15:3, 23:1, 32:22, 33:1, 33:10, 33:15, 33:17, 33:19, 33:21, 35:1, 44:12, 44:18, 45:1, 45:12, 45:19, 50:2, 53:24, 57:1, 69:13, 74:14, 76:11, 78:1, 80:12, 80:23, 82:3, 83:10, 88:17, 89:16, 89:19, 91:8,

92:3, 111:13, 111:16, 112:15, 112:19, 113:2, 113:6, 113:11, 113:22, 113:24, 114:4, 114:8, 114:18, 116:3, 116:7, 117:6, 119:20
**MULHOLLAND** [6] - 1:8, 3:21, 4:12, 4:14, 4:16, 4:18
**Mulholland** [7] - 1:24, 2:13, 2:25, 3:6, 3:20, 4:9, 5:4
**multiple** [1] - 112:20
**murders** [1] - 71:25
**must** [1] - 66:12
**Mutual** [2] - 18:23, 100:3

# N

**name** [7] - 13:3, 13:5, 92:18, 95:14, 105:7, 112:13, 112:15
**named** [1] - 15:21
**names** [1] - 68:13
**Narcotic** [1] - 106:17
**Narcotics** [1] - 101:18
**national** [2] - 104:25, 105:1
**near** [1] - 67:1
**necessarily** [3] - 10:7, 12:6, 97:20
**necessary** [4] - 7:13, 7:17, 75:15, 76:2
**need** [13] - 22:15, 35:11, 35:12, 39:23, 60:21, 62:8, 64:5, 84:4, 102:18, 111:17, 115:5
**needed** [7] - 24:10, 84:21, 84:25, 85:2, 85:5, 85:6, 85:10
**needs** [2] - 59:4, 113:2
**never** [6] - 10:8, 27:10, 28:13, 28:14, 63:10, 81:24
**NEW** [1] - 1:1
**new** [2] - 7:13, 85:7
**New** [8] - 1:7, 1:20, 2:2, 13:23, 14:2, 18:9, 21:7, 38:3
**newer** [1] - 16:4
**newly** [1] - 8:2
**news** [10] - 10:10, 20:25, 21:3, 41:10, 42:5, 101:5, 107:11, 107:14, 107:25, 110:23
**newspaper** [2] - 21:23, 42:24
**next** [13] - 18:3, 22:17, 31:3, 43:14, 45:7, 46:16, 53:2, 64:15, 104:5, 113:10, 113:12, 113:17, 118:13
**nice** [1] - 3:10
**night** [3] - 8:1, 9:3, 112:7
**ninety** [1] - 56:3
**ninety-day** [1] - 56:3
**nobody** [3] - 65:24, 109:2, 112:3
**non** [2] - 38:6, 38:8
**non-pertinent** [2] - 38:6, 38:8
**nondisclosure** [1] - 85:19
**none** [1] - 100:23
**nonetheless** [1] - 10:8
**nonprofit** [1] - 29:18
**noon** [1] - 117:18
**note** [3] - 15:4, 33:10, 59:16

**notes** [3] - 7:8, 8:15, 8:22
**nothing** [3] - 52:15, 89:11, 119:16
**noticed** [2] - 84:9, 117:21
**noticing** [1] - 75:23
**notification** [1] - 84:7
**noting** [2] - 8:12, 59:20
**November** [4] - 15:9, 17:7, 17:8, 17:11
**number** [19] - 20:25, 21:24, 36:1, 38:5, 44:15, 68:25, 69:22, 96:17, 97:3, 98:9, 98:17, 99:7, 99:11, 103:22, 104:5, 104:13, 109:16
**numbers** [1] - 98:23
**numerous** [1] - 15:1

# O

**o'clock** [6] - 1:10, 91:12, 91:15, 91:22, 91:23, 115:16
**object** [2] - 8:22, 59:18
**objection** [22] - 35:1, 37:18, 45:1, 45:19, 50:2, 53:24, 57:1, 57:20, 59:16, 59:20, 69:13, 74:14, 76:11, 78:1, 80:12, 80:23, 82:3, 83:10, 88:17, 96:7, 103:12, 106:11
**objections** [2] - 5:4, 8:13
**objective** [1] - 31:1
**objectives** [1] - 53:1
**obligated** [2] - 12:5, 119:4
**obligations** [7] - 8:18, 8:21, 10:8, 11:6, 12:1, 12:7, 12:8
**obliged** [1] - 11:10
**observations** [1] - 10:5
**observe** [3] - 62:13, 101:8, 108:25
**observing** [1] - 108:6
**obtain** [28] - 22:6, 27:22, 28:3, 28:17, 28:19, 30:3, 30:5, 30:19, 40:19, 41:25, 46:6, 46:13, 47:1, 47:13, 47:14, 47:19, 47:24, 48:22, 49:3, 51:11, 53:4, 58:13, 66:20, 67:15, 68:22, 70:17, 85:10
**obtained** [9] - 18:25, 25:19, 25:22, 26:17, 28:3, 32:3, 39:24, 42:25, 43:4
**obtaining** [6] - 14:5, 27:9, 40:15, 58:18, 67:21, 81:20
**obvious** [1] - 42:6
**obviously** [1] - 7:14
**occasions** [1] - 74:17
**occur** [2] - 19:4, 87:1
**occurred** [1] - 19:10
**October** [1] - 96:1
**OF** [3] - 1:1, 1:4, 1:12
**offer** [2] - 55:7, 61:11
**offered** [1] - 69:11
**offers** [10] - 34:25, 44:24, 45:17, 49:25, 53:22, 74:12, 77:25, 80:11, 80:21, 83:9
**offhand** [1] - 116:6
**Office** [9] - 9:25, 10:20, 14:7, 18:22, 20:14, 27:19, 31:14, 51:2, 68:1
**office** [40] - 15:22, 16:3, 16:4, 16:11,

16:12, 16:13, 16:14, 16:16, 16:17, 16:21, 19:3, 19:18, 21:2, 21:24, 23:13, 23:15, 23:17, 23:18, 23:25, 24:1, 24:5, 24:7, 24:9, 24:14, 24:17, 24:20, 24:22, 24:23, 25:5, 26:6, 35:15, 56:19, 58:1, 60:25, 63:23, 68:20, 94:14, 94:16, 94:23, 101:20
**Office's** [1] - 112:5
**officer** [5] - 29:13, 29:15, 29:16, 94:5, 94:18
**Officer** [1] - 6:21
**officers** [2] - 71:24, 101:11
**offices** [7] - 16:10, 19:1, 21:19, 25:20, 26:1, 26:18, 27:14, 84:10, 84:12, 84:16, 100:10
**official** [4] - 23:13, 34:8, 95:7, 95:8
**officials** [9] - 35:20, 38:16, 38:19, 39:9, 39:11, 39:14, 48:9, 66:8, 74:1
**offshore** [1] - 37:4
**OIA** [9] - 22:10, 27:19, 31:16, 38:7, 40:12, 68:1, 73:6, 82:21, 87:11
**OIA's** [1] - 31:24
**once** [3] - 67:16, 67:18, 106:14
**one** [48] - 6:25, 10:2, 16:4, 16:16, 17:9, 18:12, 21:22, 24:24, 26:14, 27:21, 28:12, 29:12, 32:13, 32:22, 33:7, 37:6, 37:8, 38:18, 41:1, 44:7, 51:8, 51:11, 51:21, 53:1, 56:7, 63:17, 64:2, 65:13, 66:5, 66:16, 67:16, 67:20, 68:25, 69:21, 71:19, 73:2, 73:7, 73:10, 73:11, 73:12, 80:8, 82:5, 85:17, 89:16, 89:17, 110:10, 110:25
**ones** [1] - 111:3
**online** [1] - 107:14
**open** [2] - 28:2, 59:8
**opened** [4] - 30:17, 43:1, 43:5, 52:11
**opening** [1] - 52:16
**openness** [1] - 8:3
**operated** [5] - 15:17, 15:19, 15:22, 16:1, 16:15
**operation** [2] - 75:2, 100:17
**operations** [2] - 84:2, 106:19
**operatives** [2] - 84:10, 84:14
**opinion** [1] - 85:2
**opportunity** [10] - 4:1, 9:20, 25:25, 36:21, 41:20, 52:25, 63:7, 63:19, 101:5, 113:7
**option** [4] - 74:1, 75:17, 76:7, 85:21
**options** [5] - 28:6, 28:12, 39:20, 72:10, 79:14
**order** [5] - 3:2, 85:10, 86:19, 116:22, 118:4
**organizational** [1] - 73:4
**original** [1] - 69:17
**originally** [1] - 41:8
**otherwise** [1] - 8:25
**our'** [1] - 47:22
**outfitted** [1] - 105:10
**outlet** [1] - 107:14
**outline** [1] - 59:2

**outstanding** [1] - 5:2
**overcome** [1] - 6:1
**overseas** [2] - 93:12, 93:14
**overseeing** [1] - 40:25
**overt** [1] - 43:13
**overview** [1] - 24:25
**own** [13] - 28:1, 30:22, 31:3, 31:18, 32:11, 42:25, 51:11, 52:4, 52:22, 55:3, 55:10, 104:2, 110:15
**owner** [1] - 43:2

**P**

**p.m** [1] - 90:4
**packages** [1] - 105:15
**Paes** [3] - 3:12, 3:15, 15:4
**PAES** [3] - 1:18, 117:16, 119:9
**page** [21] - 4:22, 22:17, 43:14, 46:8, 46:10, 46:11, 46:12, 64:15, 69:21, 71:5, 71:9, 71:10, 75:5, 96:15, 97:2, 98:8, 99:5, 99:7, 118:13
**Panama** [1] - 16:15
**panels** [1] - 105:21
**paper** [3] - 26:12, 44:16, 56:18
**papers** [1] - 61:15
**paragraphs** [1] - 51:14
**part** [26] - 15:10, 16:6, 17:12, 17:18, 33:16, 35:9, 36:20, 50:10, 51:3, 57:19, 67:25, 71:19, 71:25, 76:17, 78:16, 79:10, 82:20, 83:25, 85:13, 94:23, 94:24, 99:2, 102:20, 114:25
**participate** [4] - 14:17, 19:17, 27:12, 31:20
**participated** [4] - 14:20, 14:22, 14:25, 20:2
**participating** [1] - 27:14
**participation** [2] - 7:3, 24:6
**particular** [4] - 13:21, 54:14, 86:24, 108:11
**particulars** [1] - 83:21
**parties** [2] - 5:15, 11:22
**partners** [1] - 101:21
**parts** [1] - 34:6
**passport** [2] - 93:13, 94:20
**past** [4] - 73:21, 74:20, 101:25, 110:2
**pause** [1] - 109:20
**Pause** [7] - 32:24, 78:9, 80:6, 80:16, 81:6, 82:6, 107:3
**peace** [1] - 29:9
**pending** [1] - 81:7
**penny** [1] - 30:14
**people** [7] - 10:20, 22:15, 51:6, 68:9, 72:24, 94:21, 97:19
**people's** [1] - 59:4
**perceive** [1] - 58:19
**perfect** [1] - 85:8
**period** [9] - 7:9, 34:1, 59:19, 66:11, 67:10, 68:6, 97:15, 97:24, 98:3
**permission** [4] - 6:13, 97:18, 98:14,

98:20
**permitted** [1] - 98:19
**person** [3] - 99:22, 112:2, 112:3
**personally** [3] - 8:8, 27:21, 63:22
**personnel** [9] - 39:10, 82:8, 94:10, 94:25, 97:14, 98:22, 100:25, 108:11, 108:24
**persons** [1] - 29:12
**pertinent** [2] - 38:6, 38:8
**Philip** [3] - 30:20, 42:4, 43:1
**phone** [3] - 7:8, 54:8, 55:10
**photocopy** [2] - 56:22, 56:23
**physical** [3] - 16:16, 16:18, 86:20
**physically** [1] - 35:17
**picked** [2] - 26:9, 26:13
**picking** [1] - 116:18
**picks** [1] - 61:15
**pictures** [2] - 101:9, 101:11
**pieces** [1] - 36:20
**place** [10] - 6:8, 9:7, 34:2, 38:18, 45:5, 50:6, 100:13, 100:19, 106:21, 108:10
**placed** [4] - 105:16, 106:2, 106:3, 106:6
**plan** [34] - 28:13, 28:14, 28:15, 28:16, 28:17, 28:21, 29:1, 29:23, 30:4, 30:6, 31:9, 31:10, 31:11, 31:22, 39:19, 53:5, 53:6, 53:9, 63:10, 64:1, 68:24, 70:14, 71:11, 71:15, 72:1, 72:2, 72:3, 73:8, 73:10, 78:4, 78:5, 79:1, 86:9, 87:20
**planned** [1] - 64:3
**planning** [7] - 28:6, 43:6, 43:12, 70:20, 72:10, 79:25, 82:20
**plans** [2] - 3:14, 63:3
**plate** [1] - 103:22
**plates** [2] - 107:24, 111:1
**play** [2] - 9:17, 31:18
**Plaza** [2] - 1:20, 2:2
**plead** [2] - 4:7, 4:17
**pm** [4] - 19:9, 20:18, 21:3, 117:15
**pocket** [1] - 44:6
**point** [23] - 10:18, 11:9, 23:13, 24:8, 32:1, 42:20, 46:20, 58:6, 58:11, 60:2, 61:12, 61:13, 61:17, 61:18, 62:17, 63:3, 65:13, 65:16, 75:20, 90:14, 102:4, 119:18
**points** [1] - 51:20
**police** [41] - 27:23, 28:18, 29:13, 29:15, 40:17, 47:5, 53:5, 53:6, 55:14, 63:11, 64:4, 64:12, 70:15, 71:24, 82:8, 82:14, 82:21, 82:23, 82:24, 83:1, 87:25, 90:16, 90:18, 101:10, 101:16, 101:17, 101:21, 101:22, 102:19, 102:21, 103:3, 104:25, 108:7, 108:9
**Police** [1] - 105:19
**police-to-police** [3] - 27:23, 28:18, 40:17
**portion** [1] - 81:12
**portions** [2] - 34:7, 36:13
**posed** [1] - 101:13
**position** [6] - 13:16, 13:19, 72:12,

93:17, 93:24, 94:4
**possibility** [10] - 27:14, 39:12, 55:3, 63:13, 65:10, 65:22, 66:25, 75:1, 90:6, 111:24
**possible** [6] - 19:14, 47:11, 54:15, 59:25, 91:13
**possibly** [2] - 6:18, 22:16
**post** [1] - 95:25
**potential** [3] - 7:19, 85:3, 111:17
**precinct** [1] - 105:1
**precincts** [3] - 104:19, 104:22, 104:24
**precise** [2] - 67:4, 68:13
**predominantly** [1] - 104:14
**prefaced** [1] - 89:15
**preference** [2] - 71:22, 71:25
**preliminary** [1] - 10:23
**premises** [1] - 67:1
**preparation** [1] - 66:10
**prepare** [4] - 50:14, 50:16, 66:10, 118:1
**prepared** [1] - 10:3
**preparing** [1] - 6:24
**presence** [5] - 16:16, 16:18, 30:16, 64:12, 99:16
**present** [9] - 14:6, 24:22, 28:10, 28:11, 48:22, 48:23, 56:8, 68:7, 92:11
**preserve** [1] - 67:7
**press** [1] - 78:16
**pretrial** [2] - 116:22, 118:4
**pretty** [4] - 5:9, 93:20, 105:21, 108:7
**previous** [1] - 116:23
**previously** [5] - 23:3, 66:13, 78:17, 91:7, 105:8
**primarily** [1] - 40:18
**primary** [1] - 108:9
**Prime** [2] - 29:19, 29:22
**principally** [1] - 94:21
**priority** [2] - 68:25, 69:4
**problem** [3] - 75:16, 115:14, 115:15
**problems** [2] - 11:12, 11:13
**procedural** [1] - 7:23
**procedure** [1] - 29:11
**procedures** [2] - 40:19, 62:1
**proceed** [5] - 3:11, 4:20, 6:3, 6:6, 7:21, 12:10, 58:6, 70:4, 70:11, 71:7
**proceeding** [4] - 5:6, 7:9, 60:3, 60:5
**Proceedings** [1] - 2:5
**proceeds** [1] - 43:11
**process** [18] - 20:23, 21:12, 26:4, 28:8, 31:18, 40:15, 49:14, 53:8, 55:9, 55:15, 63:18, 66:19, 67:11, 67:24, 95:1, 100:6, 113:11
**processes** [2] - 29:11, 94:22
**produce** [3] - 9:23, 10:1, 113:13
**produced** [1] - 2:5
**production** [2] - 9:3, 9:4
**professionally** [1] - 11:23
**program** [1] - 56:1
**prohibit** [1] - 59:25

**prohibited** [1] - 59:21, 62:20
**prominent** [1] - 29:18
**prompted** [2] - 10:2, 18:20
**promptly** [4] - 18:16, 34:12, 34:14, 38:9
**proper** [1] - 62:1
**property** [2] - 106:15, 106:25
**proposal** [5] - 7:19, 27:21, 47:11, 49:10, 49:18
**propose** [1] - 113:3
**proposed** [2] - 7:13, 78:10
**prosecution** [1] - 85:4
**prosecutors** [3] - 8:16, 8:17, 34:7
**protecting** [2] - 93:13, 94:23
**provide** [6] - 7:7, 7:10, 11:21, 33:11, 46:21, 52:4
**provided** [9] - 42:7, 46:2, 101:24, 102:16, 103:5, 104:11, 104:16, 104:17, 105:10
**provision** [1] - 118:8
**public** [5] - 72:11, 76:19, 78:16, 78:22, 79:3
**pull** [1] - 103:18
**pulled** [1] - 21:23
**pump** [1] - 30:15
**pump-and-dump** [1] - 30:15
**purpose** [7] - 5:24, 60:2, 60:4, 60:15, 61:22, 86:18, 102:13
**purposes** [4] - 15:23, 16:19, 28:20, 70:20
**pursuant** [4] - 11:10, 25:23, 87:24, 88:6
**pursue** [1] - 55:9
**pursued** [2] - 86:8, 86:23
**put** [4] - 7:13, 58:2, 89:3, 106:24

## Q

**quantity** [1] - 35:22
**quarter** [1] - 105:20
**questions** [18] - 4:10, 5:3, 33:1, 46:9, 47:4, 47:15, 48:14, 52:20, 54:22, 57:21, 59:19, 68:19, 77:9, 83:13, 83:20, 91:8, 107:4, 110:8
**quickly** [15] - 30:5, 36:4, 39:16, 66:3, 67:6, 67:7, 67:12, 67:14, 67:24, 68:14, 68:23, 72:12, 116:19, 119:11
**quite** [2] - 29:20, 115:15

## R

**radio** [1] - 105:15
**radios** [1] - 105:17
**Radisson** [2] - 38:13, 38:18
**raise** [4] - 6:5, 6:16, 12:25, 92:15
**raised** [2] - 6:15, 111:17
**rather** [2] - 27:22, 78:18
**reach** [4] - 48:5, 48:13, 60:2, 73:5

**reached** [7] - 20:13, 30:18, 41:13, 47:20, 47:23, 82:22
**reaction** [2] - 11:16, 21:8
**read** [9] - 4:4, 4:15, 54:5, 71:6, 75:25, 78:7, 110:1, 110:2, 110:4
**reading** [1] - 35:4
**ready** [9] - 6:2, 6:3, 7:21, 12:10, 12:14, 64:7, 92:2, 92:4, 92:7
**realize** [1] - 41:16
**really** [9] - 9:20, 11:23, 38:18, 57:9, 58:7, 67:25, 79:2, 91:15, 119:14
**reason** [6] - 61:21, 61:23, 77:2, 115:21, 115:22, 119:13
**reasons** [3] - 29:8, 37:5, 66:13
**reassigned** [1] - 41:3
**receive** [7] - 5:25, 74:5, 87:4, 88:24, 89:2, 89:5, 89:7
**received** [27] - 3:22, 4:11, 9:3, 9:4, 18:13, 19:15, 20:11, 20:18, 20:21, 35:2, 45:2, 45:22, 50:3, 53:25, 66:18, 67:16, 69:14, 74:4, 74:10, 74:15, 78:2, 80:13, 80:24, 83:11, 96:8, 103:13, 106:12
**receiving** [2] - 25:22, 48:14
**recently** [4] - 7:15, 107:18, 111:18, 111:25
**recess** [3] - 59:7, 91:11, 91:24
**recognize** [20] - 34:22, 44:11, 44:20, 45:10, 45:14, 49:22, 53:12, 69:7, 74:8, 77:21, 80:5, 80:8, 80:17, 83:6, 95:18, 101:15, 103:4, 105:24, 106:1, 108:9
**recollection** [1] - 45:4
**record** [6] - 2:15, 13:4, 15:3, 92:18, 96:2, 103:7
**recorded** [1] - 2:5
**records** [1] - 22:16
**recovered** [1] - 98:4
**red** [1] - 111:1
**redirect** [2] - 89:12, 111:6
**REDIRECT** [2] - 89:18, 120:10
**refer** [2] - 15:23, 89:20
**reference** [4] - 6:10, 31:10, 50:13, 118:4
**referenced** [1] - 74:5
**referred** [2] - 65:13, 93:3
**referring** [5] - 27:1, 27:5, 74:4, 76:10, 110:19
**reflect** [1] - 9:17
**reflected** [1] - 54:12
**refresh** [2] - 35:4, 45:4
**regard** [1] - 106:18
**regarding** [5] - 6:2, 8:11, 28:16, 30:14, 100:22
**regardless** [1] - 8:22
**region** [1] - 24:18
**regional** [4] - 94:5, 94:14, 94:18, 94:22
**Regional** [1] - 6:21
**regular** [3] - 96:3, 102:9, 103:8
**regulatory** [1] - 16:18
**Reid** [36] - 6:22, 39:7, 92:14, 92:19,

92:23, 92:25, 93:15, 93:19, 93:25, 94:3, 94:9, 94:17, 95:3, 95:16, 96:10, 97:2, 97:13, 98:22, 99:5, 99:18, 99:25, 100:7, 100:21, 100:24, 101:5, 101:24, 102:13, 102:22, 103:15, 104:9, 104:15, 105:9, 105:22, 106:14, 107:9, 120:12
**related** [10] - 6:19, 26:21, 37:3, 37:7, 37:15, 41:19, 47:24, 82:9, 84:18, 109:5
**relates** [3] - 45:24, 100:5, 102:10
**relating** [3] - 9:4, 55:19, 100:6
**relation** [3] - 19:7, 19:12, 19:24
**relationship** [4] - 48:8, 60:13, 60:14, 83:1
**release** [2] - 69:1, 78:17
**relevance** [4] - 37:19, 58:7, 59:22, 60:1
**relevant** [3] - 7:9, 58:23, 62:5
**remedy** [1] - 8:3
**remember** [12] - 37:6, 37:8, 39:4, 41:4, 65:15, 65:17, 75:23, 82:11, 82:18, 82:20, 107:13, 107:21
**removed** [1] - 21:25
**rented** [1] - 26:8
**repeated** [1] - 10:1
**rephrase** [1] - 102:15
**reply** [1] - 77:23
**report** [3] - 95:23, 102:11
**reported** [2] - 21:1, 109:2
**Reporter** [1] - 2:1
**reporter** [1] - 93:20
**reports** [1] - 21:8
**represent** [1] - 35:19
**representative** [1] - 24:7
**representatives** [1] - 23:25
**represented** [1] - 56:4
**represents** [3] - 98:11, 103:16, 103:20
**request** [32] - 10:2, 10:11, 10:13, 10:19, 11:2, 18:23, 18:25, 19:11, 23:14, 25:22, 28:19, 34:3, 36:10, 36:21, 36:22, 37:11, 37:12, 48:2, 57:23, 62:3, 66:25, 86:15, 86:24, 87:3, 87:6, 87:10, 87:20, 88:7, 95:5, 95:6, 103:6, 109:7
**Request** [1] - 18:24
**requested** [7] - 12:16, 24:10, 34:4, 37:3, 64:12, 87:11, 95:24
**requesting** [3] - 22:11, 36:22, 100:8
**requests** [5] - 10:23, 37:6, 37:8, 95:12, 95:25
**require** [1] - 38:21
**required** [3] - 12:2, 16:18, 84:7
**requirement** [1] - 106:21
**requirements** [1] - 39:15
**reread** [1] - 4:24
**resided** [2] - 15:14, 15:15
**resolved** [2] - 65:4, 65:5
**resolves** [1] - 3:14
**respect** [15] - 6:11, 11:17, 11:18, 12:3, 12:4, 28:15, 31:6, 57:12, 66:16, 77:7, 77:11, 106:22, 111:16, 112:1, 118:4
**respond** [2] - 11:4, 39:17

**responded** [1] - 34:14
**responding** [1] - 75:7
**responds** [1] - 90:23
**response** [4] - 75:18, 75:20, 76:7, 116:13
**responsibilities** [3] - 14:1, 35:10, 73:8
**responsibility** [4] - 58:10, 94:20, 94:24, 105:1
**responsible** [3] - 39:16, 93:11, 101:20
**restate** [1] - 27:3
**resting** [1] - 111:15
**restrictions** [2] - 5:21, 106:24
**resume** [2] - 91:12, 91:23
**retrial** [1] - 115:11
**returned** [2] - 18:9, 38:9
**reveal** [9] - 39:25, 49:10, 66:11, 66:12, 66:21, 70:22, 78:19, 79:19, 79:24
**revealed** [3] - 54:17, 66:14, 70:23
**revealing** [1] - 31:3
**Revenue** [1] - 14:19
**review** [17] - 14:5, 18:16, 22:16, 25:25, 36:20, 36:21, 38:8, 47:8, 48:24, 49:2, 67:17, 70:17, 88:22, 88:23, 113:2, 113:8, 118:10
**reviewed** [3] - 26:11, 36:11, 47:13
**reviewing** [4] - 26:4, 47:1, 62:8, 81:12
**right-hand** [1] - 29:8
**rigid** [1] - 10:7
**ROBERT** [2] - 1:8, 1:17
**Robert** [7] - 2:12, 14:8, 15:7, 15:10, 15:14, 19:4, 19:7
**role** [2] - 14:11, 58:18
**room** [1] - 26:8
**rooms** [1] - 26:14
**route** [5] - 27:22, 39:21, 55:9, 70:16, 86:23
**routed** [2] - 90:7, 90:15
**row** [5] - 96:16, 96:20, 96:21, 97:6, 97:7
**Rudolph** [1] - 2:1
**rule** [1] - 61:22
**Rule** [2] - 5:2, 12:1
**ruled** [2] - 4:25, 81:25
**rumors** [1] - 20:19
**run** [4] - 29:19, 38:19, 91:18, 102:10
**running** [1] - 102:19

**S**

**S-2** [1] - 1:4
**safe** [1] - 38:18
**safeguarded** [1] - 26:11
**safer** [1] - 117:13
**Salvador** [1] - 35:15
**San** [1] - 35:15
**Savannah** [1] - 2:21
**SAVANNAH** [1] - 1:22
**saw** [13] - 20:25, 23:16, 24:1, 24:2, 34:8, 35:6, 54:8, 88:4, 101:4, 107:24,

108:2, 110:2, 110:23
**scale** [2] - 56:25, 100:17
**scanned** [2] - 26:12
**scenario** [1] - 48:23
**scene** [1] - 9:10
**schedule** [3] - 79:15, 82:13, 115:12
**scheduled** [2] - 41:17, 115:14
**scheme** [1] - 30:15
**scope** [9] - 22:7, 26:16, 31:2, 31:3, 32:10, 35:5, 35:9, 57:9, 78:19
**screen** [4] - 9:13, 95:20, 95:21, 96:11
**search** [119] - 9:7, 10:2, 10:3, 14:5, 18:25, 19:1, 20:7, 20:20, 20:24, 21:14, 21:17, 22:8, 24:8, 24:11, 25:19, 25:22, 25:23, 26:23, 26:25, 27:1, 27:4, 27:5, 27:9, 27:10, 27:17, 28:3, 28:4, 28:12, 29:10, 29:14, 29:15, 30:3, 30:5, 30:8, 30:24, 32:19, 34:2, 34:4, 34:10, 35:5, 35:7, 35:24, 36:16, 36:23, 37:1, 37:13, 37:14, 37:17, 39:11, 39:12, 39:15, 39:22, 40:15, 40:16, 40:19, 41:6, 47:2, 47:9, 47:13, 47:14, 48:18, 49:3, 49:5, 49:16, 52:18, 52:20, 53:4, 54:15, 57:5, 57:13, 58:9, 58:12, 58:14, 60:5, 60:9, 60:16, 61:3, 61:7, 61:8, 61:11, 61:15, 61:16, 63:1, 66:1, 66:3, 67:15, 67:18, 67:19, 67:21, 70:5, 70:11, 70:17, 70:18, 71:7, 77:5, 81:16, 81:17, 81:21, 81:24, 85:25, 86:12, 87:9, 87:24, 88:7, 88:9, 88:10, 88:11, 89:6, 100:17, 100:22, 107:17, 107:19, 108:18, 108:19, 109:4, 112:21
**searched** [1] - 107:22
**searches** [29] - 5:12, 18:12, 19:4, 19:8, 19:10, 19:18, 19:21, 19:24, 20:2, 20:10, 21:1, 21:3, 21:8, 22:4, 24:6, 25:18, 27:12, 27:14, 31:9, 31:20, 31:21, 55:25, 74:2, 82:1, 86:5, 98:5, 100:12, 101:6, 109:5
**seated** [2] - 13:2, 92:17
**SEC** [5] - 47:23, 47:24, 47:25, 52:23
**second** [17] - 3:22, 6:15, 7:14, 7:19, 8:8, 17:18, 46:12, 51:14, 70:3, 71:5, 76:6, 96:16, 103:23, 111:17, 113:4, 114:4
**secret** [1] - 119:16
**secretary** [1] - 95:24
**section** [7] - 36:21, 46:20, 70:1, 71:6, 102:8, 102:9, 103:1
**secure** [6] - 26:9, 27:19, 30:5, 67:1, 68:15, 68:16
**secured** [3] - 26:14, 62:4, 65:11
**securing** [1] - 93:11
**securities** [3] - 37:4, 38:3, 71:21
**Securities** [8] - 16:7, 16:8, 16:11, 16:13, 21:5, 30:18, 30:20, 43:2
**Security** [7] - 6:21, 14:20, 38:2, 92:14, 93:2, 93:3, 93:11
**security** [6] - 46:24, 94:5, 94:13, 94:14, 94:18, 94:23

**see** [34] - 9:7, 9:10, 34:20, 43:10, 44:7, 46:14, 46:20, 53:12, 56:13, 56:19, 60:1, 70:1, 70:3, 70:6, 70:7, 71:10, 75:4, 77:12, 79:4, 79:8, 80:4, 81:14, 85:25, 91:16, 96:17, 97:3, 98:8, 98:24, 107:24, 109:4, 109:7, 109:19, 114:16
**seeing** [1] - 65:15
**seek** [1] - 47:8
**seeking** [1] - 36:19
**seem** [4] - 9:5, 57:8, 57:14, 75:25
**seize** [2] - 18:18, 61:9
**seized** [17] - 5:11, 18:17, 21:19, 23:23, 24:25, 26:1, 26:23, 28:5, 35:9, 35:22, 35:25, 38:5, 58:8, 60:16, 87:24, 88:16, 99:3
**seizing** [1] - 43:11
**seizure** [4] - 18:21, 57:13, 60:5, 60:9
**send** [1] - 36:13
**sending** [2] - 28:19, 34:14
**SENIOR** [1] - 1:13
**sense** [8] - 28:24, 35:5, 35:21, 40:6
**sent** [9] - 34:3, 34:23, 44:21, 50:18, 50:20, 69:17, 77:22, 90:9, 95:25
**sentence** [3] - 46:21, 70:3, 79:5
**September** [105] - 9:6, 9:8, 15:12, 18:4, 18:5, 18:6, 18:7, 18:8, 18:11, 18:12, 18:19, 19:18, 20:2, 20:7, 20:10, 20:11, 21:6, 21:18, 22:2, 22:6, 22:8, 22:9, 23:3, 23:6, 23:7, 24:6, 24:20, 25:6, 25:9, 25:12, 25:15, 26:18, 27:13, 30:9, 32:6, 32:19, 34:2, 34:4, 35:8, 39:1, 39:2, 39:12, 40:8, 55:18, 56:9, 56:13, 59:15, 62:25, 63:1, 63:4, 63:5, 63:6, 63:7, 63:10, 63:14, 64:3, 64:11, 64:13, 65:4, 65:23, 69:16, 69:17, 72:8, 72:9, 77:4, 77:16, 77:17, 78:4, 78:6, 78:7, 78:14, 78:22, 78:23, 78:24, 79:16, 80:10, 83:8, 88:19, 90:3, 94:3, 94:9, 96:23, 97:9, 97:22, 97:23, 98:15, 98:20, 98:21, 99:16, 99:17, 100:8, 100:20, 100:25, 101:2, 101:6, 111:23
**sequence** [1] - 53:10
**serial** [1] - 104:5
**serve** [2] - 31:17, 71:16
**served** [6] - 28:20, 63:20, 78:25, 87:11, 90:7
**service** [1] - 94:13
**Service** [5] - 14:19, 92:14, 93:2, 93:3, 93:11
**Services** [3] - 15:20, 15:21
**set** [6] - 17:21, 41:9, 54:7, 67:5, 67:6, 79:21
**setting** [2] - 37:4, 80:1
**seven** [2] - 6:18, 9:5
**several** [10] - 14:23, 17:1, 20:24, 21:13, 27:17, 29:8, 29:10, 101:9, 101:11, 110:21
**share** [12] - 29:1, 29:25, 31:19, 32:2, 32:8, 32:15, 41:21, 47:7, 48:19, 53:3, 70:15, 70:16

**shared** [2] - 47:12, 67:21
**sharing** [4] - 27:25, 28:22, 28:24, 80:1
**Shawn** [1] - 98:12
**shipping** [1] - 63:21
**shocking** [1] - 5:13
**short** [1] - 18:7
**showing** [3] - 95:16, 102:22, 105:22
**shows** [7] - 46:1, 97:7, 98:12, 98:19, 99:15, 104:2, 105:6
**sign** [1] - 37:15
**significant** [1] - 60:15
**silence** [2] - 73:17, 73:20
**similar** [8] - 36:18, 37:2, 37:12, 56:1, 66:19, 78:11, 82:12
**similarly** [2] - 17:21, 26:13
**simple** [1] - 89:3
**simply** [2] - 62:13, 97:18
**single** [1] - 61:14
**sirens** [1] - 105:18
**sit** [3] - 4:20, 43:10, 64:10
**site** [1] - 107:22
**sites** [1] - 34:14
**sitting** [1] - 41:4
**six** [3] - 37:25, 61:9, 67:10
**six-month** [1] - 67:10
**sixth** [2] - 114:2, 114:5
**slash** [1] - 75:16
**slow** [2] - 21:13, 93:19
**small** [4] - 16:16, 26:8, 51:5, 102:2
**solved** [1] - 114:16
**someone** [2] - 10:18, 108:22
**sometimes** [1] - 93:3
**somewhat** [2] - 8:24, 30:12
**somewhere** [2] - 107:21, 115:12
**son's** [1] - 18:9
**soon** [5] - 3:14, 7:12, 19:14, 22:14, 72:11
**sorry** [8] - 45:12, 53:13, 57:17, 59:17, 81:17, 87:13, 115:8, 117:16
**sort** [23] - 8:19, 24:1, 26:7, 39:18, 40:17, 41:10, 41:13, 41:20, 41:23, 43:10, 43:13, 47:5, 49:9, 49:11, 49:12, 51:23, 56:17, 63:16, 70:23, 71:20, 72:11, 116:20, 119:13
**sound** [1] - 71:14
**source** [2] - 40:2, 107:13
**space** [1] - 23:21
**Special** [31] - 6:20, 6:21, 12:20, 13:11, 13:16, 14:2, 14:3, 14:23, 15:2, 19:17, 20:9, 24:15, 27:8, 28:11, 29:5, 32:25, 39:6, 41:7, 41:16, 41:22, 45:15, 47:10, 49:24, 85:2, 89:21, 92:14, 93:9, 96:25, 97:7, 97:11, 99:15
**specialist** [2] - 102:10, 103:6
**specialists** [1] - 104:18
**specialized** [1] - 64:2
**specific** [4] - 46:21, 46:25, 54:16, 108:2
**specifically** [7] - 16:1, 31:19, 40:11,

40:12, 96:22, 98:23, 102:9
**speculation** [2] - 76:12, 88:17
**speech** [1] - 58:22
**spell** [2] - 13:3, 92:18
**spent** [1] - 57:19
**spreadsheet** [2] - 97:13, 103:1
**squad** [5] - 13:21, 13:23, 13:24, 14:2, 38:2
**stack** [1] - 44:16
**staff** [3] - 100:16, 108:18, 108:21
**stand** [1] - 10:17
**standing** [1] - 101:10
**starred** [1] - 46:19
**start** [7] - 7:24, 34:1, 40:6, 54:22, 115:1, 115:5, 117:22
**starting** [1] - 35:21
**starts** [1] - 117:4
**state** [4] - 2:14, 13:3, 62:10, 92:17
**State** [7] - 6:21, 39:8, 93:1, 96:3, 101:21, 103:8, 106:18
**statements** [2] - 8:15, 11:17
**STATES** [3] - 1:1, 1:4, 1:13
**States** [19] - 1:7, 1:17, 1:19, 2:12, 2:17, 5:18, 11:11, 57:11, 58:4, 58:11, 60:10, 60:18, 62:2, 72:16, 72:25, 86:23, 100:4, 100:8, 110:15
**status** [1] - 53:2
**statute** [2] - 95:2, 119:4
**statutes** [1] - 40:14
**stay** [3] - 38:13, 38:19, 38:21
**stenography** [1] - 2:5
**step** [2] - 12:22, 53:2
**Stephen** [1] - 80:18
**steps** [4] - 30:24, 31:3, 43:7, 61:9
**STEVENSON** [1] - 1:22
**Stevenson** [1] - 2:21
**sticker** [1] - 106:2
**stickers** [1] - 111:4
**still** [5] - 5:1, 9:17, 25:21, 63:13, 109:12, 113:6, 113:11, 113:12
**stock** [1] - 30:14
**stop** [1] - 9:6
**stopped** [2] - 9:15, 88:21
**stops** [1] - 44:13
**storage** [1] - 23:21
**stored** [1] - 23:17
**storing** [1] - 56:24
**story** [2] - 9:7, 41:10
**straight** [1] - 52:22
**street** [2] - 58:1, 58:2
**strict** [1] - 10:7
**structure** [1] - 73:4
**structured** [1] - 76:15
**stuff** [3] - 9:18, 57:22, 57:25
**subclass** [1] - 104:4
**subject** [8] - 30:10, 30:15, 41:6, 42:2, 45:24, 50:5, 55:24, 66:13
**subjects** [8] - 17:22, 29:7, 29:24, 54:24, 76:18, 85:7, 85:19, 86:3

**submitted** [2] - 18:23, 19:14
**subsequent** [5] - 9:15, 46:5, 58:23, 78:12, 81:20
**subsequently** [1] - 51:9
**substance** [2] - 48:20, 54:7
**substantial** [2] - 35:22, 48:25
**substantive** [1] - 80:1
**sufficient** [2] - 30:2, 47:13
**suggested** [2] - 8:3, 78:13
**suggesting** [1] - 48:17
**suggestion** [2] - 119:8, 119:19
**suite** [3] - 16:3, 16:11, 16:20
**summary** [8] - 50:13, 50:15, 50:16, 50:19, 51:16, 51:19, 54:2, 95:23
**summer** [1] - 56:4
**Sunday** [2] - 23:4, 78:23
**superseding** [2] - 3:3, 3:23
**supervisor** [3] - 34:24, 53:20, 77:23
**support** [5] - 17:14, 17:24, 35:13, 94:22, 101:22
**supported** [2] - 27:22, 62:14
**supposed** [1] - 103:21
**suppress** [2] - 5:11, 6:2
**suppression** [1] - 2:11
**Supreme** [1] - 81:25
**surely** [1] - 33:6
**surplusage** [1] - 5:8
**surprised** [5] - 21:10, 21:15, 36:3, 36:6, 66:14
**sustain** [1] - 37:18
**sustained** [2] - 76:13, 82:4
**swore** [1] - 36:14
**sworn/affirmed** [2] - 13:1, 92:16
**synonymous** [1] - 12:6
**system** [1] - 95:14

## T

**tab** [2] - 34:19, 109:15
**tabbed** [2] - 34:18, 44:7
**table** [1] - 15:5
**tag** [1] - 103:22
**tailgate** [1] - 105:21
**tailored** [1] - 105:14
**takedown** [1] - 73:8
**tampering** [1] - 119:12
**target** [4] - 66:22, 68:13, 95:2
**targeted** [1] - 87:3
**targeting** [2] - 86:5, 94:21
**targets** [5] - 30:10, 32:2, 32:12, 39:25, 46:3, 66:1
**task** [2] - 14:3, 22:12
**team** [7] - 26:13, 38:24, 39:5, 75:11, 80:20, 99:3, 104:20
**teams** [1] - 34:14
**telephonic** [1] - 54:9
**ten** [2] - 37:23, 116:8
**terms** [8] - 36:18, 39:14, 39:24, 49:12, 80:1, 85:1, 85:18, 118:8

**testified** [7] - 42:20, 68:4, 73:23, 85:14, 85:24, 99:18, 107:11
**testifies** [1] - 119:6
**testimony** [6] - 8:10, 8:11, 8:17, 8:23, 45:25, 69:19
**Texas** [1] - 112:24
**texts** [1] - 81:11
**THE** [201] - 1:13, 2:11, 2:19, 2:23, 3:1, 3:10, 3:15, 3:17, 3:19, 3:20, 3:21, 3:22, 3:25, 4:1, 4:3, 4:4, 4:6, 4:7, 4:8, 4:9, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 6:14, 7:20, 7:25, 10:25, 11:3, 11:15, 11:17, 12:14, 12:16, 12:20, 12:21, 12:22, 12:24, 12:25, 13:2, 13:5, 13:7, 15:6, 26:25, 27:3, 27:4, 27:7, 32:23, 33:3, 33:6, 33:9, 33:14, 33:16, 33:18, 33:20, 35:2, 37:18, 45:2, 45:20, 45:22, 46:10, 50:3, 53:14, 53:15, 53:16, 53:17, 53:25, 57:2, 57:8, 57:17, 58:5, 58:16, 58:25, 59:5, 59:10, 59:13, 59:17, 59:21, 60:7, 60:14, 60:22, 62:8, 62:11, 62:13, 62:17, 62:23, 69:11, 69:14, 72:13, 72:18, 72:20, 72:22, 73:1, 73:13, 73:19, 73:22, 74:15, 76:13, 77:7, 78:2, 80:13, 80:24, 81:7, 82:4, 83:11, 83:14, 87:14, 87:15, 87:16, 87:17, 87:18, 88:9, 88:11, 88:13, 88:18, 89:12, 89:15, 90:10, 90:13, 91:9, 91:16, 91:19, 91:21, 92:2, 92:4, 92:6, 92:9, 92:12, 92:15, 92:17, 92:19, 92:20, 93:19, 93:21, 93:23, 96:8, 103:13, 106:12, 107:2, 107:5, 109:11, 109:16, 110:9, 111:6, 111:8, 111:10, 111:12, 111:15, 111:19, 112:6, 112:9, 112:16, 112:18, 113:1, 113:5, 113:9, 113:15, 113:19, 113:21, 114:1, 114:3, 114:6, 114:7, 114:10, 114:12, 114:14, 114:20, 114:23, 115:1, 115:4, 115:16, 115:20, 115:23, 115:25, 116:5, 116:9, 116:11, 116:17, 116:20, 116:22, 116:23, 116:25, 117:2, 117:4, 117:8, 117:10, 117:11, 117:12, 117:13, 117:14, 117:18, 117:24, 118:2, 118:11, 119:1, 119:10, 119:17, 119:21
**themselves** [2] - 11:22, 106:4
**theory** [3] - 57:18, 57:22, 62:10
**thereafter** [4] - 29:25, 57:8, 57:13, 58:17
**third** [4] - 46:19, 69:21, 98:8
**Thomas** [7] - 6:20, 13:5, 96:21, 96:24, 96:25, 98:19, 120:5
**three** [15] - 15:19, 15:21, 16:10, 94:15, 96:18, 97:2, 97:4, 98:8, 98:9, 98:17, 99:7, 99:12, 115:17, 116:3, 118:1
**throughout** [3] - 66:11, 67:10, 108:8
**Thursday** [1] - 117:1
**ticket** [2] - 64:7, 64:11
**tie** [1] - 108:2
**tied** [1] - 3:13
**timed** [3] - 79:6, 86:24, 87:1
**timeframe** [1] - 107:15

**timing** [1] - 28:24
**Timothy** [5] - 6:22, 39:7, 92:14, 92:19, 120:12
**tipped** [1] - 41:13
**tired** [1] - 9:25
**Titan** [15] - 16:7, 16:10, 16:20, 19:1, 19:18, 21:2, 26:2, 26:17, 26:21, 27:15, 30:20, 43:2, 50:24, 51:5, 82:1, 84:13, 97:1, 97:12, 100:9
**Titan's** [1] - 43:2
**Titan-Bandfield** [1] - 97:12
**title** [1] - 93:8
**Title** [1] - 11:11
**today** [12] - 6:19, 7:1, 8:11, 15:23, 21:20, 25:20, 41:4, 54:5, 69:19, 73:23, 93:6, 115:10
**together** [4] - 4:25, 23:4, 23:24, 39:9
**tomorrow** [1] - 119:10
**took** [6] - 17:18, 36:6, 45:5, 88:19, 100:13, 100:19
**top** [3] - 44:7, 79:4, 97:2
**tossed** [2] - 51:9, 51:10
**total** [1] - 17:2
**totally** [1] - 73:4
**towards** [2] - 98:7, 99:6
**town** [1] - 113:18
**Toyota** [1] - 105:6
**tracker** [1] - 97:20
**tracking** [1] - 104:1
**tracks** [1] - 95:11
**traditional** [2] - 101:16, 102:21
**trained** [1] - 28:9
**training** [1] - 101:23
**transcript** [2] - 2:5, 4:24
**TRANSCRIPT** [1] - 1:12
**transcription** [1] - 2:5
**transmitted** [2] - 19:12, 100:7
**transpired** [1] - 100:20
**transported** [1] - 26:10
**travel** [20] - 16:24, 17:8, 18:11, 18:16, 22:11, 22:12, 22:13, 23:2, 23:7, 35:8, 35:11, 35:24, 38:20, 64:3, 64:8, 64:13, 78:23, 87:18, 87:20, 89:1
**traveled** [7] - 17:12, 17:13, 17:20, 17:22, 17:23, 23:4, 23:5, 23:25, 41:8, 64:13, 84:1
**traveling** [1] - 50:18
**travelled** [1] - 48:23
**travels** [1] - 87:8
**Treasury** [2] - 97:8, 98:14
**Treaty** [1] - 100:3
**trial** [9] - 28:20, 114:16, 114:17, 115:1, 115:5, 115:9, 115:11, 115:12, 116:24
**tried** [5] - 22:6, 32:9, 39:21, 85:13, 116:15
**trip** [7] - 17:6, 17:7, 17:15, 17:18, 17:25, 18:3, 18:4
**trips** [4] - 17:1, 17:2, 17:5, 18:4
**Troy** [8] - 6:25, 56:3, 56:7, 56:10,

69:24, 70:9, 71:6, 112:15
**truck** [1] - 21:23
**trucks** [1] - 104:20
**true** [1] - 106:5
**try** [3] - 9:20, 10:18, 87:16
**trying** [9] - 9:22, 43:8, 49:4, 53:7, 58:21, 58:22, 62:10, 67:5, 67:10
**Tuesday** [6] - 79:7, 117:2, 117:10, 117:22, 117:23, 117:25
**turn** [11] - 7:2, 11:10, 12:1, 34:19, 45:7, 46:8, 49:19, 74:7, 96:15, 109:15, 119:5
**turned** [5] - 6:17, 7:10, 11:9, 86:15, 112:22
**turning** [1] - 99:5
**turns** [1] - 79:20
**two** [38] - 5:20, 6:5, 6:20, 11:3, 12:5, 16:13, 18:4, 18:12, 21:22, 32:7, 33:12, 37:25, 39:20, 41:17, 46:8, 46:10, 46:11, 46:17, 51:14, 51:20, 53:1, 59:3, 61:16, 64:3, 69:21, 71:12, 73:10, 80:4, 94:1, 94:13, 96:16, 97:21, 99:5, 110:10, 110:20, 111:13, 116:7
**two-minute** [1] - 59:3
**Tyler** [6] - 24:16, 39:7, 41:3, 77:24, 89:24, 90:18
**type** [11] - 20:15, 26:22, 39:23, 56:18, 103:25, 104:4, 104:10, 104:15, 108:5, 110:18, 110:24
**types** [2] - 36:19, 110:21
**typical** [1] - 71:24
**typically** [2] - 50:17, 67:19
**typo** [1] - 78:24

## U

**U.S** [40] - 23:8, 23:9, 24:13, 26:5, 26:23, 27:19, 28:22, 30:11, 30:18, 31:5, 32:4, 34:11, 36:16, 36:22, 37:14, 38:16, 38:19, 39:9, 39:10, 39:13, 49:1, 51:2, 52:17, 52:19, 55:22, 61:3, 61:6, 61:10, 61:12, 61:14, 61:23, 62:3, 62:6, 77:4, 82:7, 82:19, 84:23, 88:20
**ubiquitous** [1] - 108:7
**ultimately** [2] - 78:5, 86:16
**unavailable** [1] - 113:16
**unconstitutional** [1] - 82:1
**under** [9] - 21:12, 46:12, 46:20, 49:5, 60:17, 70:15, 73:4, 82:2
**undercover** [11] - 17:9, 17:10, 17:11, 17:14, 17:20, 17:22, 17:24, 29:20, 76:17, 84:2, 84:12
**understood** [4] - 32:13, 63:16, 65:3, 70:25
**undertaken** [1] - 60:16
**undertaking** [1] - 111:21
**underway** [2] - 42:14, 108:19
**unfortunately** [1] - 8:5
**Unicorn** [11] - 16:8, 16:12, 19:2, 21:4,

26:2, 26:22, 27:15, 37:3, 82:1, 84:13, 100:9

**Unicorn's** [1] - 26:17
**uniform** [2] - 75:15, 101:12
**unindicted** [1] - 29:12
**Unit** [3] - 23:19, 25:2, 105:5
**unit** [3] - 105:7, 105:14, 105:17
**UNITED** [3] - 1:1, 1:4, 1:13
**United** [19] - 1:7, 1:17, 1:19, 2:12, 2:17, 5:18, 11:11, 57:11, 58:4, 58:11, 60:10, 60:18, 62:2, 72:16, 72:24, 86:23, 100:4, 100:8, 110:15
**units** [4] - 104:16, 104:18, 104:19, 105:3
**universe** [1] - 68:9
**unless** [2] - 64:8, 119:11
**unnecessarily** [1] - 62:19
**unrelated** [2] - 41:9, 41:18, 91:7
**unsealed** [1] - 78:19
**up** [32] - 3:6, 3:13, 6:8, 9:8, 12:22, 17:21, 20:21, 21:23, 23:23, 26:9, 26:13, 27:17, 30:8, 32:8, 35:8, 37:4, 39:18, 41:9, 50:6, 52:7, 52:12, 58:4, 58:11, 62:17, 66:1, 79:21, 80:1, 88:21, 112:2, 112:21, 115:17, 119:18
**update** [2] - 50:7, 54:9
**updates** [1] - 66:18
**upstairs** [1] - 91:18
**urgent** [2] - 50:18, 66:25
**US** [41] - 9:9, 9:25, 10:3, 10:20, 14:7, 18:16, 20:1, 20:5, 20:19, 20:22, 22:7, 22:9, 22:11, 65:21, 65:24, 66:6, 68:1, 68:11, 73:14, 73:25, 74:1, 75:1, 93:1, 93:12, 93:13, 93:18, 94:1, 94:21, 94:24, 95:6, 101:1, 105:20, 106:21, 108:11, 108:24, 109:7, 110:22, 111:21, 112:4
**useful** [1] - 55:12
**usual** [1] - 116:12

**V**

**vacation** [1] - 79:20
**validity** [2] - 60:5, 60:8
**value** [1] - 61:24
**variation** [1] - 63:16
**varies** [1] - 108:14
**variety** [1] - 104:20
**various** [3] - 95:12, 104:19, 105:19
**vehicle** [15] - 102:3, 103:2, 103:24, 103:25, 104:2, 104:4, 104:8, 105:4, 105:6, 105:14, 105:19, 108:8, 108:11, 108:16
**vehicles** [30] - 101:12, 101:15, 101:16, 101:17, 101:25, 102:10, 102:11, 102:14, 102:16, 102:21, 104:10, 104:16, 105:2, 105:10, 105:16, 106:4, 106:6, 106:14, 106:18, 106:23, 106:25, 107:24, 108:2, 108:5, 110:15, 110:18, 110:21, 110:22, 110:23, 110:24

**version** [3] - 34:5, 34:8, 81:13
**versions** [2] - 36:9, 37:7
**versus** [1] - 2:12
**video** [1] - 108:3
**view** [2] - 62:14, 101:5
**VIN** [1] - 104:5
**violation** [1] - 57:5
**visa** [2] - 93:13, 94:21
**visit** [1] - 47:20
**visited** [2] - 84:9, 84:10
**voluminous** [1] - 118:9
**volunteer** [1] - 55:3
**volunteered** [1] - 55:5

**W**

**wait** [3] - 11:13, 64:10, 64:11
**waited** [1] - 87:11
**waiting** [2] - 5:2, 112:4
**Walters** [1] - 89:25
**wants** [3] - 6:11, 75:16, 112:23
**warrant** [61] - 18:25, 19:1, 20:20, 21:17, 25:19, 25:22, 25:23, 26:23, 26:25, 27:1, 27:4, 27:5, 27:9, 27:11, 28:3, 28:4, 29:14, 29:14, 30:3, 30:6, 30:24, 37:13, 37:14, 37:17, 39:22, 40:15, 40:16, 40:19, 47:2, 47:9, 47:14, 48:18, 49:3, 49:6, 49:16, 52:18, 52:21, 53:4, 58:14, 62:1, 66:3, 67:15, 67:18, 67:20, 67:21, 70:5, 70:12, 70:17, 70:18, 71:7, 81:15, 81:16, 81:17, 81:21, 85:25, 86:12, 87:9, 87:24, 109:4
**warrants** [7] - 14:5, 20:24, 25:24, 29:10, 36:16, 37:1, 81:24
**Warren** [1] - 43:3
**watch** [1] - 107:12
**watched** [2] - 107:11, 107:15
**watching** [1] - 9:6
**wear** [2] - 75:8, 75:11
**Wednesday** [2] - 116:25, 117:5
**week** [21] - 42:22, 48:10, 51:8, 51:11, 63:1, 65:8, 65:20, 67:17, 79:21, 113:10, 113:12, 113:17, 113:19, 113:24, 114:4, 116:14, 116:23, 116:24, 117:1, 117:9
**weeks** [5] - 21:13, 32:7, 61:16, 63:18, 116:3
**whereabouts** [1] - 100:24
**white** [4] - 13:24, 24:12, 51:18, 71:20
**whole** [4] - 32:17, 66:11, 78:19, 110:3
**wife** [3] - 10:6, 29:17, 29:19
**William** [1] - 98:12
**Williams** [33] - 41:7, 41:16, 41:22, 42:10, 43:4, 44:3, 45:5, 45:16, 46:2, 47:2, 47:10, 48:10, 48:17, 48:22, 49:24, 50:7, 50:14, 51:15, 51:17, 51:21, 51:24, 52:1, 52:6, 52:24, 53:18, 54:7, 54:11, 54:14, 54:20, 54:25, 55:16, 72:15
**Williams'** [2] - 47:20, 54:2
**window** [2] - 63:7, 65:20

**Winston** [2] - 3:12, 15:4
**WINSTON** [1] - 1:18
**wiretap** [1] - 5:4
**wish** [2] - 11:4, 83:14
**Witness** [1] - 91:10
**witness** [20] - 6:7, 7:1, 7:22, 8:8, 12:12, 12:17, 12:23, 13:1, 33:5, 56:10, 92:12, 92:16, 111:11, 111:12, 112:11, 112:13, 112:16, 119:5, 119:12
**WITNESS** [14] - 12:21, 12:24, 13:5, 27:3, 27:7, 53:15, 53:17, 72:18, 73:1, 87:15, 87:17, 92:19, 93:21, 111:10
**witnesses** [12] - 6:9, 6:18, 6:20, 6:25, 7:17, 9:5, 61:2, 111:14, 116:5, 116:7, 116:8, 116:12
**wonderful** [1] - 115:20
**wondering** [1] - 54:22
**word** [3] - 12:3, 77:2, 77:3
**words** [2] - 48:20, 77:14
**works** [7] - 39:8, 40:13, 53:8, 84:24, 113:23, 114:8, 117:6
**write** [3] - 51:19, 52:12, 90:20
**writes** [2] - 52:7, 71:9
**writing** [2] - 52:8, 79:4
**written** [3] - 50:17, 65:15, 75:23
**wrote** [2] - 55:10, 91:5

**Y**

**year** [1] - 104:7
**years** [4] - 13:15, 13:20, 93:16, 94:1
**yesterday** [7] - 6:16, 6:24, 7:3, 7:11, 112:14, 112:20, 112:25
**YORK** [1] - 1:1
**York** [8] - 1:7, 1:20, 2:2, 13:23, 14:2, 18:9, 21:7, 38:3
**yourself** [2] - 33:7, 35:6