**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------------------

**UNITED STATES OF AMERICA,**


**-against-**


**GREGG MULHOLLAND**

*Defendant*.

**SENTENCING MEMORANDUM**

**14-CR-00476-002 (ILG)**
-------------------------------------------------------------------------------------------



By:  James Kousouros, Esq.
     Law Offices of James Kousouros
     260 Madison Avenue, Floor 22
     New York, New York 10016
     Tel: (212) 532-1934
     Fax: (212) 532-1939
     James@kousouroslaw.com

# TABLE OF CONTENTS

TABLE OF EXHIBITS .................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

*The Offense Conduct and Mr. Mulholland's Role Therein* ............................................ 3

*The United States Sentencing Guidelines/Pre-Sentence Report* .................................... 4

*The Advisory Sentencing Guidelines and the Court's Authority to Render a Non-Guidelines Sentence* .................................................................................................................... 9

*History, Characteristics Personal and Family Circumstances of Gregg Mulholland* ................ 12

*The 28-Level Increase in the Offense Level Overstates Mr. Mulholland's Offense.* ................... 22

*Restitution* ............................................................................................................... 27

*Treaty Transfer* ......................................................................................................... 27

*Designation* .............................................................................................................. 28

CONCLUSION ........................................................................................................... 28

# TABLE OF EXHIBITS

Exhibit A - Superseding Indictment

Exhibit B – Plea Agreement

Exhibit C – Addendum to Pre-Sentence Report

Exhibit D - Consent of Defendant Gregg R. Mulholland

Exhibit E – Letters of Support

Exhibit F - Letter of Gregg Mulholland

# TABLE OF AUTHORITIES

**Cases**

Gall v. United States, 128 S. Ct. 588 (2007)..................................................................... 9

Kimbrough v. United States, 128 S. Ct. 558 (2007) ........................................................... 9

Koon v. United States, 518 U.S. 81, 131 (1996) .............................................................. 23

Pepper v. United States, 572 U.S. 476, 131 S.Ct. 1229, 1240 (2011) ........................... 23

Rita v. United States, 127 S. Ct. 2465 (2007)............................................................... 2, 9

Spears v. United States, 129 S. Ct. 840, 843 (2009)....................................................... 26

United States v Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) aff'd 301 Fed. Appx. 93 at
   **1 (2d Cir. 2008) .......................................................................................................... 24

United States v Donaghy, 570 F. Sup. 2d 411, 425 (E.D.N.Y. 2008) ........................... 27

United States v Emmenegger, 329 F. Supp. 2d 416 (S. D. N. Y. 2004)........................... 24

United States v Jones, 531 F. 3d 163 ............................................................................... 11

United States v Kumar, 617 F. 3d 612 (2d Cir. 2010) ............................................... 10, 24

United States v Pepper, 131 S. Ct. 1229, 1240 (2011) ............................................. 11, 12

United States v Thurston, 456 F.3d 211 (1st. Cir. 2006).......................................... 23, 24

United States v. Booker, 543 U.S. 220 (2005)................................................... 2, 8, 9, 10

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008)..................................................... 10

United States v. Cooper, 437 F.3d 324, 330 (3rd Cir. 2006) ............................................ 2

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)....................................................... 9

United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006) .......................................... 10

United States v. Jones, 531 F.3d 163, 168 n.5 (2d Cir. 2008) .......................................... 9

United States v. McBride, 434 F.3d 470, 477 (6th Cir. 2006)......................................... 24

United States v. Oakford Corp., 79 F. Supp. 2d 357 at  368 (S.D.N.Y 1999)............... 26

United States v. Ravelo, 370 F. 3d 266, 275 (2d Cir. 2004).......................................... 24

United States v. Vonner, 516 F.3d 382, 392 (6th Cir. 2008)(en banc)......................... 10

**Statutes**

15 U.S.C. §§78j(b) and 78ff.............................................................................................. 1

18 U.S.C. §1956(h) ....................................................................................................... 1, 4

18 U.S.C. §3553............................................................................................................ passim

18 U.S.C. §3661 ............................................................................................................. 10

18 U.S.C. §371 ................................................................................................................. 1

**Other Authorities**

Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 Fed.
   Sent. R. 167, 169 (2008 WL 2201039, 12 at *4 (February, 2008) ........................... 25

Kate, Stith & Jose A. Carbranes, Fear of Judging: Sentencing Guidelines in the Federal Courts
   69 (1998) ...................................................................................................................... 25

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------
**UNITED STATES OF AMERICA**


         **-against-**                              **14-CR-00476-002 (ILG)**


**GREGG MULHOLLAND**
-------------------------------------------------------

### SENTENCING MEMORANDUM

### PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of Gregg Mulholland, who is scheduled to be sentenced by the Honorable I. Leo Glasser, United States District Court Judge for the Eastern District of New York, on January 19, 2017.  Gregg Mulholland was arrested on June 23, 2015 in Phoenix Sky Harbor International Airport, in Phoenix, Arizona. He was charged with one count of Conspiracy to Commit Securities Fraud in violation of 18 U.S.C. §371, one count of Money Laundering Conspiracy in violation of 18 U.S.C. §1956(h), and two counts of Securities Fraud in violation of 15 U.S.C. §§78j(b) and 78ff. (Please see Superseding Indictment, attached as **Exhibit A.**) Mr. Mulholland pleaded guilty to Count Three, the Money Laundering Conspiracy, pursuant to a plea agreement. (Please see Plea Agreement, attached as **Exhibit B**.)

Mr. Mulholland has been incarcerated since his arrest. He has maintained an unblemished disciplinary record in custody and has availed himself of every opportunity at the Metropolitan Detention Center (MDC) towards rehabilitation and a successful and law-abiding re-acclamation into society.

1

This memorandum will address:

A.  The offense conduct and Mr. Mulholland's role therein;

B.  The Advisory Guidelines and this Court's authority to render a non-guidelines sentence in this matter;

C.  Mr. Mulholland's family circumstances;

D.  The effect of the plea agreement;

E.  The overstatement of Mr. Mulholland's culpability in assessing a 28-level increase based on the gain of the entire conspiracy;

F.  Mr. Mulholland's financial proffer and SEC settlement; and

G.  Conclusion.

It is respectfully requested that the Court first determine the applicable sentencing range, then consider Mr. Mulholland's history and family circumstances and the relevant sentencing factors enumerated in §3553 and based thereon determine the appropriate sentence to be imposed herein (Rita v. United States, 551 U.S. 338, 351 (2007) [directing that a district court begin all sentencing proceedings by correctly calculating the appropriate guidelines range]; See, United States v. Cooper, 437 F.3d 324, 330 (3rd Cir. 2006)[describing a three step sentencing process now required in the wake of the Supreme Court decision in United States v. Booker, 543 U.S. 220 (2005), to wit; (a) calculate the applicable guideline range; (b) consider viability of departure motions and; (c) consider statutory sentencing factors enumerated in 18 U.S.C. §3553].

We ask that the Court consider the imposition of a non-guidelines sentence in this matter as there exist mitigating factors pursuant to 18 U.S.C. §3553 (a) which support such a sentence.

2

## _The Offense Conduct and Mr. Mulholland's Role Therein_

Gregg Mulholland has pleaded guilty to laundering funds derived from a conspiracy to manipulate the price of penny stocks. In this case it was alleged that Robert Bandfield founded IPC Corp. which opened offshore accounts for individuals who wanted to shield their identities and trading from regulatory agencies. Mr. Mulholland was introduced to Brian DeWitt, a broker for Legacy Global Markets [hereinafter referred to as LGM] in late 2010 by an existing client of LGM and agreed to refer clients to LGM for a commission and finder's fee. DeWitt in turn introduced Mulholland to Terry Turner, who was at the time the beneficial owner, counsel of record and compliance officer for LGM.  Mr. Mulholland explained that he had clients to refer to LGM to establish accounts for trading and Turner became the conduit to IPC in Belize to have the accounts opened and managed overseas. While IPC was run by Mr. Bandfield, Mr. Mulholland had never met or spoke with him until after he was arrested. Mr. Mulholland was instructed to refer the clients to Turner, who had their accounts established in Belize through IPC. Mr. Mulholland thus became a client of IPC Corp., established accounts with it and then engaged in the manipulation of stock prices for their benefit. The funds used to transact the trades were then transferred through escrow accounts controlled by Terry Turner.

While the amount of funds transferred through the various accounts was approximately $250 million, the profits were substantially lower. As will be discussed, _infra_, Mr. Mulholland, prior to the plea in this case participated in a lengthy financial proffer in which he set forth the movement of the funds and the fact that his gain from the scheme was approximately $19 million. Of this $19 million, Mr. Mulholland received approximately $9.2 million as the remaining funds were commissions never distributed to him. The government has accepted this proffer as accurate. As part of the financial proffer, Mr. Mulholland disclosed his every asset, some of which were not

3

known by the government and he has voluntarily agreed to forfeit these assets, one of which is the home in Canada in which his wife and children reside. In addition, Mr. Mulholland has agreed to settle a pending SEC lawsuit in which he will be forever barred from any and all involvement in the trading of securities. While this bar may have been inevitable, in agreeing to settle the matter expeditiously, Mr. Mulholland has thus saved the government the expense of otherwise lengthy litigation.[1]

### *The United States Sentencing Guidelines/Pre-Sentence Report*

Mr. Mulholland entered his plea pursuant to a plea agreement with the Government. (Please see **Exhibit B**.) The resultant calculations from the Department of Probation were different from those contemplated in the plea agreement and, as set forth below, this has precipitated issues concerning the appropriate enhancement for the funds involved in this matter and the guidelines calculations originally contemplated when the plea agreement and recommended sentence was entered into.

Pursuant to this agreement, Mr. Mulholland agreed to plead guilty to one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. §1956(h). The plea agreement contained an estimated offense level of 40. This calculation used *§2S1.1(a)(2)* as the applicable guideline. This carries a base offense level of eight and directs that the number of levels corresponding to the "value of the laundered funds" be added. This resulted in a 28-level enhancement for the value of the funds laundered ($250 million), a two-level enhancement for more than ten victims and a further two level enhancement for conducting a substantial part of the

---

[1] In 2006 Mr. Mulholland was ordered to disgorge $1.8 million dollars related to a company named Rudy Beverage. Mr. Mulholland brokered a printing deal in which he was paid in stock to promote Rudy Beverage. The disclosure attendant to this deal misstated his stock compensation and not illegal trading activity.

4

fraudulent scheme outside the United States. Given Mr. Mulholland's timely acceptance of responsibility, a three level downward adjustment was applied resulting in an adjusted offense level of 37 and a sentencing range of 210-240 months. This agreement contained a non-binding joint recommendation to the Court of a twelve-year sentence pursuant to Fed. R. Crim. Pro. 11(c)(1)(B). This recommendation of a 144-month sentence was in light of the guidelines range originally contemplated and the government's agreement that given this range, a non-guidelines sentence was appropriately recommended to the Court.

After further reviewing these calculations, the parties agree that the enhancements for more than ten victims pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i) and for committing the scheme from outside the United States pursuant to §2B1.1(b)(10)(B) should not have been included using §2S1.1(a)(2) as only the loss table, and not the other enhancements contained §2B1.1 are incorporated into §2S1.1(a)(2). This would have resulted in an adjusted offense level of 33 and a resultant sentencing range of 135-168 months.

The Department of Probation has reached the same adjusted offense level of 40 in the PSR however using a different series of calculations (See, PSR, attached hereto and labeled Exhibit C). The calculation in the PSR starts with §2S1.1*(a)(1)* as Mr. Mulholland is responsible for the underlying conduct – stock manipulation - that generated the laundered funds. This section refers to the base offense level for the underlying offense, in this case stock fraud, and directs that adjustments be applied pursuant to §2B1.1. Because Mr. Mulholland was not convicted of an offense referenced to §2B1.1, the base offense level is 6 (§2B1.1(a)(2)). While the same 28 level increase was applied pursuant to (§2B1.1(b)(1)(O)), this figure was again based on the value of laundered funds. A two-level enhancement for more than ten victims (§2B1.1(2)(A)(i)) was applied as well as a two level enhancement for conducting a substantial part of the fraudulent

scheme outside the United States(§2B1.1(10)(B)). Finally, this is subject to a two-level enhancement under §2S1.1(b)(2)(B) as Mr. Mulholland was convicted under 18 U.S.C. §1956. Applying the three level downward adjustment for acceptance of responsibility yielded the adjusted offense level of 37. Given the information revealed after the entry of the plea and set forth below, we submit that the 28 level upward adjustment is inappropriate as the estimable gain from the offense is dramatically lower than $250 million.

The use of §2S1.1(a)(1) requires a closer look at the $250 million dollar figure and the resultant 28 level upward adjustment. The application of 2S1.1(a)(1) requires an estimation of the actual gain or loss from the offense if this can be accomplished. It was our understanding that the amount of gain/loss could not be determined given the complexity of the market and the number of trades involved. Any such estimation was not readily discernable from the terabytes of discovery in this case and, as noted by the Department of Probation, none of the victims have come forward to provide information concerning losses.

While we understand that the total amount of funds which passed through the subject accounts was approximately $250 million, information contained in the pre-sentence report as well as settlement documents received from the SEC in the past months reveal that in fact, the gain or loss, or an estimation thereof, is attainable and the that the actual loss or gain from the conduct in this case is appreciably less than $250 million.

In documents provided by the government to the Department of Probation after the plea was entered concerning the issue of whether restitution should be ordered (See, Addendum to the Pre-Sentence Report, attached hereto as **Exhibit C**), the government provided Probation with documented information reflecting a total loss of approximately $53 million for the two largest stock schemes in this case, VLNX and CYNK. The documents and accompanying figures provided

by the government, as far as we can discern, reflected the total amount of trades in the stocks. These did not all result in the total losses to the investors or gains to the brokers. In even more revelatory documents provided by the SEC this past month, the SEC analyzed Mr. Mulholland's ownership interest in VLNX and concluded that as an 87% beneficial owner of the stock, the total proceeds of the sales of VLNX was approximately $21 million (Attached hereto and labeled **Exhibit D** is the Consent of Defendant Gregg R. Mulholland; Please see page 2).[2] Based upon this information, we submit that a reasonable estimate of the total gain in this case for guidelines purposes would be closer to $65 million but certainly less than $150 million as required in §2B1.1(b)(1)(O). This figure would result in a 24 level enhancement pursuant to §2B1.1(b)(1)(M) and an adjusted offense level of 33 and a sentencing range of 135-168 months. If the loss were less than $65 million, it would result in an upward adjustment of 22 levels and an adjusted offense level of 31 and a sentencing range of 108-135 months. Given the information provided by both the government and the SEC, we submit that these are the upward adjustments that should be considered by the Court.

A fair reading of §2S1.1(a)(2) is that the amount of the laundered funds is a default figure to be used when the amount of the loss or gain cannot be ascertained using §2S1.1(a)(1).[3] It was

---

[2] The stock was sold by the custodian of record (Scottsdale Capital) and the figures were arrived at by internal audit. There is therefore no indication that they are inaccurate. This $53 million dollar figure provided by the government represents the total amount of transactions for the stock as opposed to the actual profits from the illegal trading.

[3] §2S1.1(a)(1) provides that the Base Offense Level is:
  (1) The offense for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct); and (B) the offense level for that offense can be determined; or
  (2) 8 plus the number of offense levels from the table in §2B1.1...corresponding to the value of the laundered funds, otherwise.
The Application Notes to §2S1.1, in defining the "Value of Laundered Funds" provides that "Subsection (a)(2) sets the offense level at the value of the laundered funds if the offense level for the underlying offense cannot be determined".

upon this premise that the recommendation of 12 years was reasonable to us as it represented a significant downward variance from the guidelines. We only seek to establish a more accurate starting point from which this Court can determine the appropriate sentence. We ask that the Court consider these facts and circumstances in determining the appropriate sentence in this case.

Mr. Mulholland has fully accepted responsibility for his actions, meriting a two-level reduction under §3E1.1(a). This is clearly reflected in his plea, his full financial proffer prior to the entry of the plea and his voluntary forfeiture of his every asset. The Government has indicated that it will make a motion under §3E1.1(b), indicating that Mr. Mulholland pleaded guilty in a timely manner and merits a further one-level reduction.

Mr. Mulholland has never been arrested previously and is therefore in criminal history category I. With a total offense level of 37 in CHC I, Mr. Mulholland has a guidelines range of 210-240 months. With a total offense level of 33, the guidelines range is 135-168 months and with a total offense level of 31 the guidelines range is 108-135 months. For the reasons set forth below, we respectfully submit that the Court impose a non-guidelines sentence based upon the lower guidelines as they are fact based and as there do exist mitigating circumstances warranting a non-guidelines sentence in this case.

While we fully recognize the gravity of the offenses, we respectfully submit that the Court should consider a sentence which will recognize the difference in the guidelines using the actual estimate of the gain/loss from this offense, the fact that Mr. Mulholland's total profit was $19 million of which he received approximately $9 million, the substantial value to the government of avoiding the need for a trial in this case along with Mr. Mulholland's personal history and family circumstances. In the aftermath of United States v. Booker, 543 U.S. 220 (2005) and its progeny, such a sentence is clearly within this Court's discretion.

### *The Advisory Sentencing Guidelines and the Court's Authority to Render a Non-Guidelines Sentence*

In <u>Booker</u>, the United States Supreme Court held that the United States Sentencing Guidelines were unconstitutional as then applied and thus rendered the guidelines advisory. While a sentencing court is nevertheless duty bound to consider the guidelines in fashioning an appropriate sentence, they are now but one factor in the overall analysis (<u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005)). As the Supreme Court made clear in <u>Rita v. United States</u>, 127 S. Ct. 2465 (2007), a non-guidelines sentence can now be predicated upon traditional departure grounds, because the Guidelines do not adequately reflect statutory considerations, or because a particular case warrants a non-guidelines sentence. See also, <u>Kimbrough v. United States</u>, 128 S. Ct. 558 (2007) [guidelines now serve as one factor among several courts must consider in determining an appropriate sentence]; <u>Gall v. United States,</u> 128 S. Ct. 588 (2007)).

This Court now has "considerable discretion in identifying the grounds that can justify a non-Guidelines sentence" (<u>United States v. Jones</u>, 531 F.3d 163, 168 n.5 (2d Cir. 2008) [Raggi, J.]). As Judge Raggi explained in <u>Jones</u>, "the district court 'may not presume' the reasonableness of the Commission's Guidelines sentencing range," and extraordinary circumstances are not required for the court to impose a non-guidelines sentence (<u>id.</u> at 166). The sentencing court, after first identifying the applicable guideline range, can impose a non-Guidelines sentence upon a finding of "sufficient justification" for the sentence imposed (See, <u>Gall v. United States</u>, *supra*, [upholding district court's sentence of probation in a case involving distribution of 10,000 pills of ecstasy with a guideline range of 30-37 months]; <u>Kimbrough v. United States</u>, *supra*, [upholding district court's decision to sentence defendant below the guideline range based upon court's disagreement with the then extant difference in treatment of crack and powder cocaine]; <u>United</u>

9

States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006) [defendant's good faith efforts to cooperate can be considered in support of a non-guidelines sentence].

In United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) the Court held that "[a] sentencing judge has a very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. No limitation is placed upon the information concerning a defendant's background and the conduct in issue that can be considered by the court in making its sentencing determination (Id.; See also, 18 U.S.C. §3661). And, as stated by the Sixth Circuit in United States v. Vonner, 516 F.3d 382, 392 (6th Cir. 2008)(*en banc*), "Booker breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the §3553 factors to the criminal defendants that come before them".

Judge Rakoff, in sentencing Rajat Gupta (11 Cr. 907 (JSR)) on a conviction after trial for securities violations justified a non-guidelines sentence thusly: "[h]uman beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results".

While white collar cases have, for good reason, proliferated in recent years, the guidelines in these cases as well have been found, by this Court and others, to vastly overstate the criminal propensities and culpability of some of those accused of these crimes. While this issue is discussed at length, *infra*, this Court's observations in United States v Kumar, 617 F.3d 612 (2d Cir. 2010), a case involving a $400 million dollar fraud in Computer Associates, reflect the need for stern punishment while acknowledging that the number of years arrived at using the mathematical rigidity of the guidelines can often "shock the conscience of the Court, [and] the conscience of the reasonable person". It is in instances such as these that Courts are empowered to reject the advisory guidelines in giving meaning to the factors delineated in 18 U.S.C. § 3553.

These decisions universally applaud the discretion now afforded to district court judges who have "access to, and greater familiarity with, the individual case and the individual defendant" to be sentenced to make the "individualized assessment[s]" so often constrained by the once mandatory guidelines. With this discretion we can trust that "every convicted person be considered as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue" (United States v Jones, 531 F.3d 163, *supra*; United States v Pepper, 131 S. Ct. 1229, 1240 (2011)). Thus, while consideration of the guidelines is in order, the Court must now be guided, in the final analysis, by the all of the factors set forth in 18 U.S.C. §3553.

In this particular case, we ask that the Court consider the factors set forth in §3553 (a) to determine the appropriate sentence to be imposed and to consider as well Mr. Mulholland's acceptance of responsibility and personal circumstances.

These factors include:

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed—

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

11

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category

of defendant as set forth in the guidelines—…

(5) the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct;

In fashioning an appropriate sentence, the overarching mandate of the sentencing court is the "parsimony principle" - to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" Section 3553 (United States v. Pepper, *supra*, at 1243).

Based upon the *stare decisis* generated in the wake of the Booker decision, this Court's authority to render a non-guidelines sentence in this case is clear. We are grateful for the Court's consideration of the facts and circumstances herein, including Mr. Mulholland's personal and family circumstances, the effect (if appropriate) of the 28 level adjustment on his guidelines, and Mr. Mulholland's financial proffer, voluntary restitution and SEC settlement as set forth below.

### *History, Characteristics Personal and Family Circumstances of Gregg Mulholland*

Gregg Roy Mulholland was born to George Mulholland and Patricia nee Roy Mulholland on June 27, 1969. Mr. Mulholland was born in Stanton, California, but moved to Calgary, Alberta, Canada soon after his birth. George Mulholland (72) is a retired sheet-metal worker. Patricia Mulholland (71) is a retired marketer. Patricia Mulholland has suffered several recent strokes and has limited mobility. Neither parent has been able to visit Mr. Mulholland and will not likely be able to during his impending period of incarceration in the United States. Patricia and George Mulholland raised Gregg and his brother, William Campbell Mulholland, in a loving, lower-middle-income home in Calgary.

12

Mr. Mulholland moved from Calgary to Orange County California in 1990 to attend school. While living in California, he met his future wife, Delia Vargas, in approximately 2001. They married on June 3, 2006 in Huntington Beach, California. Mrs. Mulholland was a housewife prior to Mr. Mulholland's arrest. Since his arrest she has worked as a designer, a realtor's assistant and an E-bay seller. Mr. Mulholland has two children, ████ aged 7, and ████ aged 6. ████ Mulholland is in good health. ███ Mulholland suffers from atypical neurological development. Gregg and Delia Mulholland have avoided getting a formal diagnosis for ███ so that she is able to attend regular schools, however, doctors have indicated that she likely has some form of autism disorder. ███ Mulholland underwent 25-30 hours per week of speech, occupational and physical therapy. As ███ progresses with age with her condition unabated, the family will have to seek alternatives for her education and treatment. Given Mr. Mulholland's incarceration in the United States, his absence from the family has greatly impacted both ████ and her sister.

Mr. Mulholland graduated John G. Diefenbaker High School in Calgary, Alberta in 1987. He then attended Mount Royal College in Calgary for approximately one year and Orange Coast Community College in Costa Mesa, California from August 1990 until December 1992. While still in school, Mr. Mulholland began working for Stuart Jones in Irvine California. This was a brokerage firm for which he worked as a salesman. From approximately 1992 through 1994 he worked for Arpaja in Newport Beach, California in business development. He then worked in sales for Giant Advertising in Orange County, California from approximately 1994 through 1996. Mr. Mulholland was self-employed from that point until his arrest in the instant case.

As stated, *supra*, Mr. Mulholland's absence has adversely affected his wife, Delia and their two young daughters. Mr. Mulholland and Delia have enjoyed a loving relationship from the moment they met. Mr. Mulholland has always been a loving and involved father and misses his

13

family tremendously. Delia Mulholland has submitted a letter for the Court's consideration in which she expresses her sincere love for her husband, his commitment to his family and how his absence has devastated both Mr. Mulholland and their two young daughters.

After a lengthy courtship, the two married and Mr. Mulholland embraced Delia's eight year old son as his own. After their daughter, ██ began exhibiting developmental delays, the parents embarked on an emotionally taxing journey during which they attempted to diagnose and treat their child's condition. Mr. Mulholland's commitment and strength was indispensable to the emotional stability of his family during these difficult times. The bond that was forged between Mr. Mulholland and these three children, as loving and supportive as it was then, has now widened the void created by his absence. Delia Mulholland writes:

> Gregg immediately took control of the situation with a calming strength that pulled our entire family closer than ever. Together we researched, and sought out doctors and specialists, who eventually and unfortunately confirmed our worst fears. Again my husband's gentle and unyielding strength and dedication to our family led the way to the courage to work through our obstacles as a family. I remember countless times being at what I thought was my wits end, only to be rescued by Gregg's strength and selfless love that never seemed to end. This love and dedication to our family propelled us through as much as 30 hours of therapy per week making all the difference in ██ development. Through out this time Gregg never once neglected or wasn't there for anyone else in our family that ever needed him. He also found a way to make if fun for our sweet little girl and her sister ██ instead of the horror it could have been for both our baby girls.  Unfortunately this has built a necessary bond with both of our little girls that tears at them every single day that their Daddy is not here.  Even though ██ has come so so far from where she started, I can see the catastrophic effects of her Daddy's absence. ██ is no stranger either to the pain of missing her Daddy; having been 4yrs old when he was taken from her. ██ is still very confused and hurt driven by her intense love for her Daddy that was so involved in every single aspect of her little life. To say that Gregg is the love of my life, my best friend, and the glue that holds our family together doesn't come close to describing what Gregg is and what he means to our little girls, Derald and the rest of the family.

While Mr. Mulholland certainly accepts responsibility for this tragedy, this entire family is suffering and his guilt and remorse from causing this is excruciating. There is little question but that Mr. Mulholland's absence will be prolonged and his two young girls will be without their father in these most important years. We only ask that the Court consider Mr. Mulholland's commitment to his family, how much they truly need him and render a sentence that will allow him to re-enter their lives within a reasonable period of time.

Many of Mr. Mulholland's friends and family members have written to the Court to express what he means to them. (Please see Letters of Support, **Exhibit E**.)

While living in California, Mr. Mulholland was an active member of the Back Bay Rugby Club. Several different friends have written of essentially the same experience with Gregg Mulholland. Each of them came to the club, met Mr. Mulholland, and found one of the great friends of their lives. Patrick Linden writes, "[o]ver the years our friendship has grown to more than just being good friends, and to this day I look at Gregg as being more like my brother instead of just a friend." This same sentiment is echoed over and over by this group of friends. Jon Luca Del Fante recalls of his first meeting with the team, "[w]ithout being asked Greg took me under his wing and made me feel at home amongst the senior players. From that day forward our relationship has grown and I look up to Greg as an older brother." As do all of the letters in support of Mr. Mulholland, these letters reflect his deep commitment to his family. Andrew Vanos, provides these observations:

> My friend Gregg is a giving, kind and openhearted person who loves his friends and most of all his family. Gregg is generous and caring and has always been the type of person to lend a helping hand to those who need it.

15

I first met Gregg playing rugby and knew him as a teammate. He was loyal, a team player and embodied the true meaning of a teammate. As I got to know Gregg, I have had the opportunity to see how he has grown as a person and how he has positively impacted people's lives. The biggest growth and testament to his character is having seen him develop as a husband and father. His commitment and dedication to his family is a model that every husband and father should try and replicate. Every time I reflect on our friendship, I am thankful that Gregg happened to come into my life, and I am proud to call him my friend.

Yet another friend, Cameron Frater, personally observed Mr. Mulholland with his family, and describes for Your Honor Mr. Mulholland's relationship with his daughters thusly:

His true calling though came when he became a Husband and Father to his wife Delia and beautiful girls ██ and ██████ It was here where his biggest growth came. He is the true embodiment of a loving and dotting Father and Husband whose love is unwavering and devoted to his family. It is a trait that every man should try and emulate. He is a hands on father who loves every second with his girls who absolutely adore him and look at him as their hero. Nothing is out of the question, whether it is dressing up, having his nails painted, doing crafts, reading to them or just hanging out and being goofy.

Cameron Frater's wife, Kathy Frater relates how she came to consider Mr. Mulholland as practically a member of her own family. She makes similar observations about Mr. Mulholland and his daughters:

When I met Gregg, he and his wife Delia were expecting their first child. He was an incredibly attentive and doting husband and his adoration and affection for Delia was apparent in his every interaction. Gregg always made it very clear, his wife and family came first in his life and his love and affection is an example of how all men should respect and love their wives.

When I met Gregg in that first meeting, I was struck by the intensity of his excitement at becoming a first time father and can truly say, his love for his children has only intensified as time has progressed. I am continually impressed with his level of engagement with his daughters; from diapers, to illness, to their first steps and dance lessons and first day of school, Gregg was always present. He is a

16

patient, involved, calm and affectionate Dad who has cultivated an incredible bond with his girls.

Katharine Johnston, a personal and professional friend of Mr. Mulholland's asks "Your Honor to please consider that Gregg is young with a whole life ahead of him. He has run successful legitimate businesses in the past and he will again. He has young daughters that need their father to be responsible for them both financially and emotionally. He and Delia love each other and will rebuild their lives in a positive and contributory way."

Mr. Mulholland's family members have also written on his behalf. His sister-in-law, Ana Cervantes describes his role in the family:

> I've seen how dedicated he is to his two beautiful girls, he goes way beyond being a responsible and caring dad, he's everything to the girls, he would read to them, he would encourage them to imbibe good habits, listen to them, play, dance, oh my gosh I could write a big list to describe everything he did for my nieces and my nephew which is his stepson, he's been there for him, also. I've seen how he goes out of his way to make my sister Delia happy, and all the love he has for her and his family. I've never seen an unhappy moment in their household, he's the one that made sure everyone was happy and had what they needed. I know my nieces miss their dad so much.

Mr. Mulholland's extended family has also written about his commitment to family. His sister-in-law Hilda Kent writes, "I have not known him long, only by family gatherings and reunions, and all the times I have gone with my family, we have always been treated like family. He has always welcomed us like we have known each other for many, many years." His wife's brother, Hugo Vargas, recalls, "I have come over to visit and catch him in his work out routine carrying each child on his shoulders up and down the stairs and involving the girls in his regimen. As a husband to Delia he has always treated her with the greatest respect as if she is the only flower left on this planet." His brother's wife, Mary Mulholland, has expressed the sorrow and dislocation

that the entire family feels due to his arrest and how Mr. Mulholland's incarceration in the United

States has so dramatically exacerbated the effects of this separation from his family:

> I know Gregg to be a devoted family man, as a husband to Delia
> Mulholland and a loving and doting father to his two daughters, ███
> (7) and ███████ (5). He is also my eldest daughter's godfather. Gregg
> cares deeply about his family and shares a wonderful relationship
> with his parents. Prior to his detention he would call his mother
> almost daily. She would in turn pass along his family news and it
> would help bring us all closer together despite our geographical
> distance. Unfortunately, Gregg has not been able to call his mother
> from prison and I know this has caused her a lot of stress, heartache
> and pain. We are a tight knit family, of which Gregg is an integral
> part.
>
> Gregg's daughters, ███ and ██████ miss him dearly. The past eleven
> months have taken a toll on the entire family but most especially on
> his young daughters. Despite talking to him for a few brief minutes
> daily, they desperately miss him. As far back as Christmas, when
> Delia and the girls came to Calgary for the holidays, it was clear that
> ██████ was already pulling away from her father and didn't want to
> talk to him on the phone. She couldn't understand why he wasn't
> with them for Christmas and it was truly heartbreaking to witness. I
> can only imagine their relationship has further deteriorated since
> then. Both girls are too young to fully understand why their father
> isn't there to read them bedtime stories and tuck them in at night.
> Furthermore, Gregg has been incarcerated at The Metropolitan
> Detention Center in Brooklyn New York for over 11 months and it
> is located on the opposite coast from where his immediate family
> live in Vancouver, Canada.

Mr. Mulholland's parents as well have submitted letters describing their love for their son

and how he developed from a responsible and hardworking child to an exemplary son, grandson,

father and husband. Mr. Mulholland's mother writes of the care he gave to his grandmother after

her stroke and his unyielding commitment to her in the aftermath. His father recalls a lifetime of

hard work by Gregg Mulholland, starting with his first job cleaning a fire extinguisher

distributorship to earn money for a hockey glove through years of working multiple jobs and going

to school at the same time. He also speaks of his son's kindness, from volunteering at a program

for children with Down's syndrome during his teenage summers to just being someone who "has always put others first." He pleads, "if ever there was a man who deserved a second chance, this is a man who spent a life earning it in advance." Both of his parents speak of his love for his children. His father observes that he "would have bet that there was no possible way to have impressed me or made me even more proud until I saw the type of father my son had become… fatherhood was obviously his true calling." These words say nothing of material wealth – they speak of the qualities that really matter. While the allure of financial gain lured Mr. Mulholland astray, he never wavered in his commitment to his family and the virtues his parents instilled in him.

Finally Mr. Mulholland has submitted a letter for Your Honor's consideration. (Please see, Letter of Gregg Mulholland, **Exhibit F**.) In this letter, Mr. Mulholland expresses a poignant and heartfelt apology and true reflection of remorse for his conduct. Mr. Mulholland recalls how he became involved in this matter and how that fateful decision has caused both he and his family utter devastation.

> I remember the actual day in 2010 that I was introduced to Legacy Global Markets, and its legal compliance officer, Terry Turner. Ironically it was right about that same time that I was offered a great job, just after the birth of my first daughter; with one of the world's largest toy manufacturers. Choosing, instead to work with Legacy Global Markets, and represent foreign clients was a horrific decision, I will never forgive myself for. No matter how hard I try; the guilt and remorse I feel for everything I have done and the mistakes I have made consumes my every thought. Dejected, shattered, and heart-sick barely describes how sorry I am, and how much I regret my choices.

Mr. Mulholland describes how he strayed from the tenets he was raised by his parents to abide by and states:

For this my conscience causes me to relive the enormity of my senseless stupidity without reprieve leaving me disgusted and disappointed with myself. Though to know that I am the one who let down these kind, honest, loving people - that struggled just to put food on the table while my brother and I were oblivious to their selfless sacrifice, is a dagger of guilt that twists deeper and deeper without relenting.

As he moves on to the immediate and long-lasting devastation he has caused his wife and children

it is clear that in this regard, Mr. Mulholland is overwhelmed with remorse and self-loathing:

Though even this is exceeded by the guilt and regret I bear for what I have done to the most wonderful woman I know and our two little girls. After 16 years of a love story that could have come from the pages of a sappy romance novel and 10 amazingly happy years of marriage, I am continually reminded of the pain I am responsible for causing and continue to cause because of my actions. I took my vows and the honor of being a good husband more serious than anything ever in my life, yet when my wife; Delia blessed me with two beautiful babies - I took that gift with an even greater conviction - degree of purpose, and poured my heart and soul into it.

Being a Daddy to those two little angels became my everything. The full magnitude of this is explained by knowing, that when ▇ was just 14 months old, my wife and I noticed significant developmental delays that caused us to take her to a host of specialists who eventually confirmed our worst fears. Though believing that discipline and courage, along with our faith was the bridge between goals and achievements my wife and I banded together and resolved that we would do everything that we could to avoid a clinical diagnosis. This was to ensure that ▇ had every opportunity to life a normal life, and that is exactly what we did. After hundreds of hours of research and visits to specialists that had no exact answers about Autism or Asperger's Syndrome we began: We started, Physical therapy, occupational therapy, and speech therapy, often exceeding 30 hours per week. My wife nor I ever missed a session and soon included ▇▇▇ so it became a normal family event instead of the intense work it was. We have come a light year since then, but it requires a lifetime of love, patience, understanding, and complete family effort to see it through.

Knowing that I have left, ▇▇ her sister ▇▇▇ and my wife alone with the full weight of the world crashing around them while I am left to watch and do nothing - brutally aware it's my fault; is a gut

20

wrenching torture beyond what I could have imagined in my worst nightmares.

The guilt, remorse, and regret I feel for what I have done, consumes every minute of every day, and haunts my nights. Unable to afford, to travel from Western Canada in the wake of my financial proffer, it's been 541 excruciating days since I've seen either ▇ or ▇▇▇ or held them in my arms. Prior to this there was rarely day in either one of their lives that I didn't start with soft kisses, or a night that my wife and I didn't end with a bedtime story, and more of those soft kisses.

We readily concede that Mr. Mulholland was unfortunately driven by financial gain in his business. However, from a rehabilitative perspective he is a man who has always been a devoted husband, father, son and friend to many. He is a man who has succeeded in legitimate business, and can do so again. This is a man who is truly remorseful and will not re-offend as he now realizes that there is no amount of money worth the separation from his family. The punishment he will receive and serve isolated from his loved ones will be brutal for him and his family.

In addition to the personal impact of this case and Mr. Mulholland's unwavering acceptance of responsibility for his conduct, we ask the Court to note that Mr. Mulholland has exhibited this acceptance in other ways as well. The government in this case properly sought forfeiture. Mr. Mulholland, prior to entering his plea agreed to submit to a proffer in which he detailed, in excruciating detail, the offense, his role in it, the roles of others and he set forth his every asset, some of which were not known to the government. He did so knowing that while he was always willing to cooperate, the government was not amenable to his cooperation. He came clean in every respect despite this. After detailing his assets, he agreed to complete forfeiture and explained how these assets could be attached. One of the assets was the house in Canada in which his wife and children reside. The house and one other property have been the subject of litigation with the SEC in Canada. Mr. Mulholland has done his utmost to secure an agreement in which the

21

litigation would be terminated and the house forfeited with his wife being able to retain enough funds to relocate to far more modest accommodations. There is also an SEC matter in the United States. This matter was stayed pending the outcome of this criminal case. Mr. Mulholland has agreed to settle this matter as well with a complete and lifetime bar from the securities field. While we recognize that this outcome was inevitable, Mr. Mulholland chose not to litigate this matter. As for the forfeiture of the properties in Canada, his wife has been advised that she could tie the matter up in litigation for years. They have chosen not to do so. Mr. Mulholland is determined to leave all remnants of this conduct far behind him. He wants nothing more than to start anew and legally. While this will cause his family significant financial hardship in the years to come, it is Mr. and Ms. Mulholland's hope that they can persevere until his return.

      While we realize that the conduct in this case calls for significant punishment, these guidelines are staggering as they are propelled into the stratosphere by amounts that can be illusory in terms of the actual gain or loss and simply be far more than is necessary to achieve the goals of punishment. We only ask that the Court consider this and Mr. Mulholland's better half in formulating a sentence which is sufficient but not greater than necessary to punish him just enough while also facilitating an opportunity for him to return to his family and live a law abiding life.

### The 28-Level Increase in the Offense Level Overstates Mr. Mulholland's Offense.

      As reflected in the pre-sentence report in this case, the offense level of 37 (or 33) is driven almost entirely by the total amount of funds transferred in this case or the estimated proceeds from the illegal activity. While we understand the mechanics of the guidelines in financial fraud cases, they often result in an overstatement of a particular defendant's criminal behavior. We respectfully submit that the increases in the offense levels based upon the value of laundered funds and

alternatively the gain from the charged conduct as well as the other adjustments stacked thereon present such a case.

In some instances, the guidelines increase attributable to a particular defendant may overstate the defendant's criminal propensity and yield a sentence far in excess than that required to satisfy the goals of punishment. In such instances, consideration of a non-guidelines sentence is appropriate for several reasons.  Stated simply, while perhaps in a case such as this the punishment fits within the numerically fixed guideline, it may not befit the individual to whom it is affixed. As the Supreme Court has stated, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue" (Koon v. United States, 518 U.S. 81, 131 (1996). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime"; (Pepper v. United States, 572 U.S. 476, 131 S.Ct. 1229, 1240 (2011))[internal quotations and citation omitted].

Application Note 19 (c) to Section 2B1.1 provides that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense."  Indeed, the excessive increases for loss provided for in the Guidelines have been resoundingly found to be unreasonable and penologically counterproductive. In United States v. Thurston, 544 F. 3d 22 (1st. Cir. 2008) a jury convicted the defendant of conspiring to defraud the Medicare program of more than five million dollars. The defendant's guidelines were 63-78 months, however the statutory maximum was five years. The district court departed downward and sentenced the defendant to three months incarceration and 24 months supervised release. The First Circuit affirmed the departure having previously observed that "a sentencing court could

23

plausibly conclude that a $5,000,000 intended loss finding, with its resulting 14-level increase in the offense level, leads to a modest overstatement of the seriousness of [the defendant's] crime."[4] (Id.; See also, United States v. Ravelo, 370 F. 3d 266, 275 (2d Cir. 2004); United States v. McBride, 434 F.3d 470, 477 (6th Cir. 2006).

United States v Kumar, 617 F. 3d 612 (2d Cir. 2010) involved a $400 million fraud committed on a publicly traded company, Computer Associates. This Court imposed non-guidelines sentences of 84 and 144 months, disregarding fraud guidelines which provided for life sentences. Your Honor stated at sentencing that "to impose the sentences recommended by the Guidelines in this case would shock the conscience of this Court, [and] the conscience of the reasonable person". This case involves conduct which yielded substantially less than that in Kumar and yet the guidelines provide advisory sentences akin to those imposed in Kumar (See also, United States v Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) aff'd 301 Fed. Appx. 93 at **1 (2d Cir. 2008) [describing the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human being if not cabined by common sense"]).

This issue was crystallized by Judge Lynch in United States v. Emmenegger, 329 F. Supp. 2d 416 (S. D. N. Y. 2004).[5]  On the one hand, the Court recognized that securities fraud by employees of broker dealers is a crime that warrants particular deterrent attention and requires a

---

[4] United States v Thurston, 456 F.3d 211 (1st. Cir. 2006).  Thurston was originally sentenced in a pre-Booker landscape. While the First Circuit originally found the departure unwarranted and remanded the case, after the Booker decision was handed down, the First Circuit reviewed the case within the ambit of Booker and United States v Gall, 128 S. Ct. 586 (2007) and affirmed the sentence as procedurally sound and substantively reasonable (See, Gall, 128 S. Ct. at 597).

[5] While this case was decided pre-Booker, Judge Lynch grappled with the issues presented in Blakely v. Washington, 124 S. Ct. 2531 (2004) which precipitated the Booker decision. Judge Lynch determined that the defendant in the case would be sentenced pursuant to the guidelines, but he also conducted the analysis of what sentence he would impose in the event the guidelines were no longer mandatory.

prison sentence accordingly.  On the issue presented, however, Judge Lynch made the following

observations:

> Other aspects of the guidelines scheme, however, are more
> questionable. The Guidelines place undue weight on the amount of
> loss involved in the fraud. This is certainly a relevant sentencing
> factor: All else being equal, large thefts damage society more than
> small ones, create a greater temptation for potential offenders, and
> thus generally require greater deterrence and more serious
> punishment. But the guidelines provisions for theft and fraud place
> excessive weight on this single factor, attempting-no doubt in an
> effort to fit the infinite variations on the theme of greed into a limited
> set of narrow sentencing boxes-to assign precise weights to the theft
> of different dollar amounts… The rough magnitude of the theft is
> relevant to sentencing, but the particular amount stolen is not as
> significant… Were less emphasis placed on the overly-rigid loss
> table, the identification of different types of fraud or theft offenses
> of greater or lesser moral culpability or danger to society would
> perhaps assume greater significance in assessing the seriousness of
> different frauds.

(Id. at 427-428; See also, Kate, Stith & Jose A. Carbranes, *Fear of Judging: Sentencing Guidelines*

*in the Federal Courts 69 (1998)*["Because of their arithmetic approach and also in an effort to

appear 'objective', [the Guidelines] tend to place great weight on putatively measurable quantities,

such as…[the] amount of financial loss in fraud cases, without, however explaining why it is

appropriate to accord such huge weight to such factors"]; Frank O. Bowman III, *Sentencing High-*

*Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169 (2008 WL 2201039, 12 at

*4 (February, 2008)[reflecting on the Sentencing Commission's systematic increase from the

former Section 2F1.1 fraud guidelines to the dramatically higher guidelines contained in 2B1.1

without the support of any empirical data demonstrating the penological value of such a radical

upward shift. Given this failure by the Sentencing Commission to fulfill its institutional role,

district courts can vary from the guidelines "based upon *policy* disagreement with them, and not

simply based on an individualized determination that they yield an excessive sentence in a particular case" (Spears v. United States, 129 S. Ct. 840, 843 (2009))].

We respectfully submit that this is a case in which the accountability inherent in the 24-28 level increases pursuant to §2B1.1 overstate Mr. Mulholland's criminal propensity and results in a sentence which is simply years greater than necessary in light of all the factors embodied in 18 U.S.C. §3553(a). As set forth, *supra*, we believe that the actual loss can be estimated in this case and that it is, at most, in the $65 million range warranting a 24 level increase, again, at most.

The IPC business operated by Mr. Bandfield in Belize was operating for decades prior to Mr. Mulholland's involvement in this case. While Mr. Mulholland was clearly a significant participant in this conspiracy, he was still one cog in a wheel that was guided by counsel Terry Turner, who profited at least as much if not more than Mr. Mulholland. In Mr. Mulholland's financial proffer to the government, he outlined his profits in this case. He made $19 million dollars of which he received approximately $9.2 million. The balanced was due in commissions that he never received. We recognize that this is a large sum of money but it pales in significance to the total amount of funds which passed through the accounts (approximately $250 million) or the actual losses in this case both of which alternatively drive the guidelines. In asserting this position, it is of utmost importance that the Court rest assured that we do not, in any way detract from the seriousness of this offense or Mr. Mulholland's complete acceptance of responsibility for his conduct. We only ask that the Court consider the actual gain to Mr. Mulholland be a consideration (See, e.g.,  United States v. Oakford Corp., 79 F. Supp. 2d 357 at  368 (S.D.N.Y 1999), a case in which Judge Rakoff noted that one of the reasons that a downward departure was appropriate in the case was that "each of the defendants personally realized only a small portion of the overall gain or profits").

Based upon the foregoing, we respectfully submit that the 28-level enhancement in this case dramatically overstates Mr. Mulholland's culpability and that this supports consideration of a non-guidelines sentence in this case.

### *Restitution*

With regard to the issue of forfeiture, the government has asserted that restitution is warranted in this case pursuant to United States v Donaghy, 570 F. Sup. 2d 411, 425 (E.D.N.Y. 2008). The Department of Probation has concluded that while the government has identified victims in two of the stock manipulation schemes (VLNX and CYNK), "it is not clear that they were victims of the convicted conduct, money laundering, wherein the 'victim' is society at large" (See, Addendum to the Pre-Sentence Report, **Exhibit C**). We agree with probation as a legal matter, however, we also submit that given the forfeiture by Mr. Mulholland of his every asset which would otherwise be used to effectuate any restitution order, such an order should not be entered in this case.

### *Treaty Transfer*

At this time, there exists a procedure pursuant to which those sentenced to serve terms of imprisonment in the United States can apply for a transfer to serve the balance of their sentence in their country of origin. Mr. Mulholland qualifies for this treaty transfer. We understand that this process is lengthy and will require several levels of governmental applications and approval. I have discussed this with the Government and the government has no objection to his request. We would respectfully request that the Court consider a judicial recommendation supporting the transfer if Mr. Mulholland is found to be eligible therefor.

*Designation*

Given Mr. Mulholland's family being located in western Canada, we would respectfully request a judicial recommendation that Mr. Mulholland serve his sentence in a facility located in the Pacific Northwest. Mr. Mulholland has not seen his wife for several months and his children since his arrest. They cannot afford to travel to this area to see him given their financial condition which will continue to deteriorate as the restitution order is executed.

## CONCLUSION

In the final analysis, we ask that the Court consider a sentence that will address the goals of sentencing and yet acknowledge Mr. Mulholland's acceptance of responsibility, as well as his otherwise law-abiding life. In terms of the traditional 3553 factors, the offense is a financial manipulation that resulted in substantial improper gains. We have never contested this fact.  And yet, while retribution and general deterrence are factors to be considered and goals to be implemented, a sentence far less than that called for by the advisory guidelines will suffice to achieve them. Specific deterrence has already been achieved in this case. Mr. Mulholland's life and that of his wife and children will be forever affected and as reflected in his letter to the Court, nothing could have been or ever will be worth the personal pain he has caused. He has been detained a continent away from his loved ones and will remain so in the immediate future. He has not seen his young daughters, ███ and █████ since his arrest and detention as the family cannot afford to travel to the United States to see him. Even if he is ultimately placed at a facility in the Northwest, he will still be in a different country from his family barring a treaty transfer. He has lost his ability to provide for his family and has forfeited all of his assets which will eventually

28

leave his wife and children financially destitute. Most importantly, he will miss the formative years of his daughters' lives and not be there as his daughter struggles with her developmental disabilities. Mr. Mulholland will continue to endure the guilt and shame precipitated by his actions irrespective of the sentence imposed and yet, he is a man who can be rehabilitated and emerge from prison as a productive member of society. More than anything else, however, he desperately wants the chance to be reunited with his young family and make up for the devastation he has caused.

For the reasons set forth herein, we respectfully request that the Court consider a non-guidelines sentence in this matter.

Thank you for your courtesy and consideration.


Respectfully Submitted,


_____/s/_____

James Kousouros, Esq.


CC:    Clerk of the Court

Jacqueline Kasulis, Winston Paes, and Michael Keilty
*Assistant United States Attorneys*

Roberta Houlton
*United States Probation Officer*

Gregg Mulholland