

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

WMP/JMK
F. #2013R00505

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 23, 2017

**By Hand and ECF**

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Gregg Mulholland
                Criminal Docket No. 14-476 (S-2) (ILG)

Dear Judge Glasser:

      The government respectfully submits this letter in response to the defendant Gregg Mulholland's sentencing memorandum, dated January 10, 2017 ("Def. Mem."). In that submission, the defendant argues that a sentence far below his advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of imprisonment is appropriate in this case. The defendant's request is based primarily on: (i) his role in the offense; (ii) his personal history and characteristics; and (iii) the Guidelines' alleged overstatement of his criminal conduct. For the reasons set forth below, the government recommends that a 12-year term of imprisonment, as both the government and the defendant agreed in the plea agreement to recommend to the Court, is warranted here.[1] The defendant is scheduled to be sentenced before the Court on January 27, 2017.

I.    The Offense Conduct

      A.    The Defendants and Other Relevant Entities

      Mulholland's co-defendant, Robert Bandfield, a U.S. citizen who lived and worked in Belize City, Belize, founded and controlled IPC Management Services LLC, IPC Corporate Services Inc. and IPC Corporate Services LLC (collectively, "IPC Corp"). (Docket Entry No. 96, Superseding Indictment "SI" ¶¶ 1, 5). Bandfield marketed IPC Corp as offshore

---

[1] As set forth in the defendant's plea agreement, which is attached to the defendant's January 10, 2017 sentencing submission as Exhibit B, the government and the defendant agreed to recommend to the Court that the defendant be sentenced to a term of imprisonment of 12 years or 144 months, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B). See Def. Mem., Ex. B, ¶ 2.

Hon. I. Leo Glasser
January 23, 2017
Page 2

management companies that provided, <u>inter alia</u>, the following services: (a) offshore company formation; (b) nominee services; (c) trust formation; (d) licensed trustee services; (e) full banking services; (f) offshore credit cards; and (g) offshore brokerage (securities) accounts.  (<u>Id.</u>).  Bandfield also claimed to have created three offshore brokerage firms: Legacy Global Markets S.A. ("Legacy"), Titan International Securities Inc. ("Titan") and Unicorn International Securities LLC ("Unicorn").  (SI ¶¶ 2-5).

Mulholland, also known as "Stamps" and "Charlie Wolf," a dual citizen of the U.S. and Canada and a resident of California during the relevant period, was one of IPC Corp's largest clients.  (SI ¶ 6).  In approximately late 2010/early 2011, Mulholland began moving his cash and a substantial amount of his securities to Legacy from Gibraltar Global Securities, Inc. ("Gibraltar"), a Bahamas-based broker-dealer that was under regulatory scrutiny by Bahamian authorities, regulators in British Columbia, and the U.S. Securities and Exchange Commission ("SEC").  Mulholland began using IPC Corp's services when he migrated his money and securities to Legacy.  In early 2012, Mulholland purchased Legacy for approximately $1 million through a trust that Bandfield had created for him to conceal his ownership interest in the brokerage firm. From approximately February 2012 through September 2014, Mulholland secretly owned and controlled Legacy.  (<u>Id.</u>).

B.      <u>Overview of the Fraudulent Schemes</u>

Mulholland, together with Bandfield and others, devised and engaged in three inter-related conspiracies: (a) securities fraud – defrauding investors and potential investors in various U.S. publicly traded companies through, <u>inter alia</u>, the fraudulent concealment of the true beneficial ownership interests in the various U.S. publicly-traded companies, and the engineering of artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies; (b) tax fraud – defrauding the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment and collection of revenue, specifically federal income taxes; and (c) money laundering – laundering money by facilitating financial transactions to and from the United States, which transactions involved proceeds of fraud in the sale of securities.  (SI ¶ 20).  Specifically, Mulholland and his group of stock manipulators (the "Mulholland Group") fraudulently manipulated the stock of more than forty U.S. publicly-traded companies through the use of Bandfield's shell structures and offshore brokerage firms, and then transferred, through attorney escrow accounts associated with five offshore law firms established by a cooperating witness ("CW-1"), the fraudulent proceeds into, <u>inter alia</u>, accounts controlled by the Mulholland Group in the U.S. and Canada.  (SI ¶¶ 21-22).

Evidence obtained through, <u>inter alia</u>, five judicially-authorized wiretaps of telephone lines for IPC Corp, Titan and Legacy and search warrants revealed that Bandfield, through IPC Corp, was engaged in a scheme with more than 100 clients, including the Mulholland Group, to evade U.S. securities and tax laws and conceal their fraudulent activity and illegal proceeds through IPC Corp's fraudulent international business corporation ("IBC") and limited liability company ("LLC") structure.  (SI ¶¶ 34-36).  IPC Corp's structure enabled its clients to

Hon. I. Leo Glasser
January 23, 2017
Page 3

conceal their fraudulent trading activities at brokerage firms, such as Legacy and Titan, through the use of nominees, and then transfer the proceeds of their fraudulent trading activity through attorney escrow accounts and unmarked debit cards. (SI ¶¶ 35-36). The use of the nominee accounts at the brokerage firms provided U.S. clients with the additional benefit of evading the payment of taxes on their fraudulent trading proceeds. (Id.).

        C.        The Mulholland Group's Stock Manipulation Schemes

Beginning in 2011, the Mulholland Group utilized IPC Corp's fraudulent shell company structure to open brokerage accounts in the names of the IBCs at offshore brokerage firms such as Legacy, Titan and Unicorn. Through those brokerage accounts, the Mulholland Group fraudulently manipulated the stock of more than forty U.S. publicly-traded companies. Mulholland was the leader of the Mulholland Group, and coordinated the co-conspirators' efforts on each stock deal. The Mulholland Group was comprised of individuals who worked in concert on each deal to identify the stock to manipulate; gain control of the company's shares; transfer the shares to various IBCs to hide the Mulholland Group's ownership interest and control; promote the stock to U.S. investors through fraudulent promotional emails and mailings; and then manipulate the price of the stock through coordinated trading using various offshore brokerage firms. Once the Mulholland Group successfully "pumped and dumped" a company's stock, Mulholland directed CW-1, an attorney, to transfer the fraudulent proceeds to accounts in the U.S., Canada and overseas through escrow accounts of five offshore law firms that CW-1 controlled. Notably, CW-1 created four of the five offshore law firms at Mulholland's request. In order to further conceal the Mulholland Group's stock manipulation schemes, in addition to purchasing Legacy, Mulholland created and utilized two additional offshore brokerage firms – Clearwater Securities and IntraWorld Securities. The Mulholland Group also routinely utilized burner phones, aliases and Skype to avoid detection by law enforcement. From approximately 2011 to 2014, the Mulholland Group laundered more than $250 million through CW-1's attorney escrow accounts.

Two of the more than forty stocks fraudulently manipulated by the Mulholland Group – Vision Plasma Systems, Inc. ("Vision Plasma" or "VLNX") and Cynk Technology Corp. ("CYNK" or "Introbuzz") – are set forth in the superseding indictment.[2] (SI ¶¶ 38, 40-46). Specifically, in June 2011, approximately 84 million shares of Vision Plasma were issued to nine IBCs created by IPC Corp for Mulholland. Thus, the Mulholland Group beneficially owned and controlled at least 84 percent of the free trading shares of VLNX, which was concealed from the investing public in violation of SEC rules and regulations. (SI ¶ 41). A year later, in August 2012, a promotional campaign was orchestrated to manipulate VLNX stock. (SI ¶ 42). Prior to August 16, 2012, there was no trading activity in VLNX. (Id.). On August 16, 2012, the daily trading volume was 308 million shares and the stock price, which opened at $0.14, increased to an intraday high of $0.39 before closing at $0.30. (Id.). That same day, the nine IBCs beneficially owned and controlled by the Mulholland Group sold more than 83 million shares of VLNX, primarily through

---

[2] Contrary to Mulholland's assertion in his sentencing submission, VLNX and CYNK were not the "two largest stock schemes in this case." Def. Mem. at 6.

Hon. I. Leo Glasser
January 23, 2017
Page 4

Legacy, which was secretly owned by Mulholland, resulting in approximately $21 million in proceeds. (Id.).

Additionally, the Mulholland Group also fraudulently manipulated the price and volume of CYNK's stock. Between April 2012 and September 2012, the Mulholland Group wire transferred $1,524,000 from an account controlled by the Mulholland Group to Introbuzz's account at Bank of America. (SI ¶ 44). In June 2012, approximately 75 percent of Introbuzz's initial public offering of stock was purchased by associates of the Mulholland Group. (Id.). Throughout 2013, the associates of the Mulholland Group who had purchased shares through the initial public offering of CYNK stock sold their CYNK shares to three IBCs controlled by the Mulholland Group. (SI ¶ 45). Mulholland had paid IPC Corp for the three IBCs that ended up owning the vast majority of CYNK's free trading shares. (Id.). By May 2014, the Mulholland Group was ready to commence the manipulation of CYNK's stock. (SI ¶ 46). On or about May 15, 2014, after no trading for 24 days, the stock closed at $0.06 per share following trading of 1,900 shares. (Id.). From approximately June 17, 2014 through July 10, 2014, despite CYNK having no revenue or assets, more than 2 million of its shares were traded, its share price increased from a closing price of $2.25 per share to a closing price of $13.90 per share, and CYNK was valued at more than $4 billion as a result of the fraudulent manipulation by the Mulholland Group. (Id.). A number of offshore brokerage firms, including Legacy and Titan, traded in CYNK stock. (Id.).

II.   Relevant Procedural History

   A.   Initial Indictment and Bandfield's Arrest

On September 5, 2014, a grand jury sitting in the Eastern District of New York returned an indictment that charged the defendant Robert Bandfield and others with conspiracy to commit securities fraud (Count One); conspiracy to defraud the United States – tax fraud (Count Two); and money laundering conspiracy (Count Three). (Docket Entry No. 1). On September 9, 2014, Bandfield was arrested at the airport in Miami, Florida. In the months following Bandfield's arrest and the unsealing of the indictment, Mulholland sold his primary residence in San Juan Capistrano, California – which he had purchased with the proceeds of his various stock manipulation schemes – for approximately $8 million and moved his family, including his wife and two small daughters, to Vancouver, British Columbia.

   B.   Mulholland's Arrest and the Superseding Indictments

On June 23, 2015, Mulholland was arrested pursuant to a complaint at an airport in Phoenix, Arizona.[3] On July 31, 2015, a grand jury sitting in the Eastern District of New York

---

[3]   Mulholland had traveled from Vancouver, Canada to Phoenix, where he was waiting to board a plane bound for Mexico.

returned a superseding indictment that charged Bandfield and Mulholland (and others) with conspiracy to commit securities fraud (Count One); money laundering conspiracy (Count Three); securities fraud as to VLNX (Count Four); and securities fraud as to CYNK (Count Five). (Docket Entry No. 32). Additionally, Bandfield was charged with conspiracy to defraud the United States – tax fraud (Count Two). On February 26, 2016, the grand jury returned a second superseding indictment against the defendants, which included minor changes to the initial superseding indictment. (Docket Entry No. 96).

      C.      Bandfield and Mulholland's Guilty Pleas

On May 9, 2016, Mulholland pleaded guilty to Count Three (money laundering conspiracy) of the superseding indictment. (Docket Entry No. 113). In his plea agreement, Mulholland agreed, inter alia, to stipulate to the government's Guidelines calculation as set forth in the plea agreement, and recommend a 12-year term of imprisonment. Def. Mem., Ex. B, ¶ 2. As part of his guilty plea, Mulholland also agreed to forfeit a property in Whistler, British Columbia, a property in Vancouver, British Columbia, the proceeds of the sale of his San Juan Capistrano, California home, a Range Rover vehicle and an aircraft. On May 24, 2016, approximately two weeks prior to the start of trial, Bandfield pleaded guilty to Count Three (money laundering conspiracy) of the superseding indictment. Bandfield is scheduled to be sentenced on January 31, 2017.

III.      The Sentencing Guidelines and Restitution

      A.      The Sentencing Guidelines

On August 26, 2016, the Probation Department ("Probation") issued its Pre-Sentence Investigation Report ("PSR") for Mulholland. On September 29, 2016, Probation issued an addendum to the PSR ("PSR Add."). In its January 16, 2017 letter to Probation, the government objected to Probation's calculation of the applicable Guidelines range of imprisonment. In the plea agreement, the government calculated the offense level under the Guidelines as follows:

| | | |
|---|---|---:|
| | Base Offense Level (§ 2S1.1(a)(2)) | 8 |
| Plus: | Gain of More than $250,000,000 (§ 2B1.1(b)(1)(O)) | +28 |
| Plus: | Involved 10 or More Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Substantial Part of Scheme was Outside the U.S. (§ 2B1.1(b)(10)(B)) | +2 |
| | Minus: Acceptance of Responsibility (§ 3E1.1) | -3 |
| | Total: | 37 |

Hon. I. Leo Glasser
January 23, 2017
Page 6

An offense level of 37, when applied to Criminal History Category I, carries a range of imprisonment of 210-240 months due to the applicable mandatory maximum sentence. The defendant stipulated to the above Guidelines estimate.

In the PSR and PSR Addendum, Probation calculated the total offense level under the Guidelines as follows:

| | | |
|---|---|---:|
| Base Offense Level (§§ 2S1.1(a)(**1**); 2B1.1(a)(2)) (emphasis added) | | 6 |
| Plus: | Gain of More than $250,000,000 (§ 2B1.1(b)(1)(O)) | +28 |
| Plus: | Involved 10 or More Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Substantial Part of Scheme was Outside the U.S. (§ 2B1.1(b)(10)(B)) | +2 |
| Plus: | Defendant was Convicted under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Minus: Acceptance of Responsibility (§ 3E1.1) | | <u>-3</u> |
| Total: | | <u>37</u> |

Although using slightly different Guidelines provisions, the government and Probation arrived at the same offense level and advisory Guidelines range of imprisonment, i.e., 210-240 months due to the applicable mandatory maximum sentence.

For the reasons set forth herein and as contained in the government's January 16, 2017 PSR objections letter, Probation's use of U.S.S.G. § 2S1.1(a)(1) as the starting point for the base offense level is wrong. In determining the base offense level, U.S.S.G. § 2S1.1(a) provides that the following sub-sections are appropriate:

> (1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) **the offense level for that offense can be determined** (emphasis added); or
>
> (2) 8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

Probation determined that U.S.S.G. § 2S1.1(a)(1) was an appropriate starting point, whereas the government elected to use U.S.S.G. § 2S1.1(a)(2) in the plea agreement.

The government submits that Probation incorrectly used U.S.S.G. § 2S1.1(a)(1) as the starting point. Under the two-prong approach of U.S.S.G. § 2S1.1(a)(1), although there is no

Hon. I. Leo Glasser
January 23, 2017
Page 7

doubt that the defendant committed fraud in the sale of securities, which is the underlying offense or specified unlawful activity of money laundering conspiracy (the count of conviction), the second prong – the offense level for that offense can be determined – has never been provided or determined by the government.  The underlying securities fraud committed by the defendant and his co-conspirators involved more than 40 publicly-traded companies and determining the actual or intended loss associated with each of these companies would involve an immense amount of resources, that is, put simply, not practicable.  Although the application notes provide that the "court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined," the government submits that, under the circumstances of this case, the second prong of U.S.S.G. § 2S1.1(a)(1) was not satisfied, which then directs the court to apply U.S.S.G. § 2S1.1(a)(2) to determine the base offense level.  Accordingly, the appropriate Guidelines calculation should begin with determining the base offense level pursuant to U.S.S.G. § 2S1.1(a)(2).

Unfortunately, it does not follow that the Guidelines calculation provided in the plea agreement is correct.  Although the government contends it used the appropriate starting point in calculating the base offense level, it improperly relied on enhancements in U.S.S.G. § 2B1.1, rather than U.S.S.G. § 2S1.1, in arriving at the total offense level.  The government submits that the following is the correct Guidelines calculation:

| | | |
|---|---|---:|
| | Base Offense Level (§ 2S1.1(a)(2)) | 8 |
| Plus: | Value of Laundered Funds Exceeds $250,000,000 (§ 2B1.1(b)(1)(O)) | +28 |
| Plus: | Defendant was Convicted under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Plus: | Offense involved Sophisticated Laundering (§ 2S1.1(b)(3)) | +2 |
| Minus: | Acceptance of Responsibility (§ 3E1.1) | <u>-3</u> |
| Total: | | <u>37</u> |

Based on the foregoing, the total offense level is 37, which is the same offense level set forth in the plea agreement and PSR, but uses the correct methodology.  Accordingly, with a Criminal History Category I, the applicable Guidelines range is 210-240 months' imprisonment.

B.  <u>Restitution</u>

The PSR Addendum referenced the government's identification of over 5,000 victims in relation to VLNX and CYNK – two of the over forty stock manipulation schemes perpetrated by the defendant and his co-conspirators.  In the PSR Addendum, Probation acknowledged the government's position that restitution is mandatory in this case because the identified victims suffered actual pecuniary harm as a result of the defendant's fraudulent manipulation schemes.  PSR Add.  While also acknowledging that 18 U.S.C. § 1956 contemplates the imposition of restitution for money laundering offenses, Probation determined that the victim

Hon. I. Leo Glasser
January 23, 2017
Page 8

of the money laundering conspiracy to which Bandfield and Mulholland pleaded guilty was "society at large," and declined to recommend restitution here. PSR Add. In his sentencing submission, Mulholland agreed with Probation's determination regarding restitution. Def. Mem. at 27.

As discussed above, on January 16, 2017, the government submitted objections to the PSR and the PSR Addendum, including Probation's recommendations regarding restitution. As set forth in that letter, the government maintains that restitution is mandatory under the Mandatory Victims Restitution Act ("MVRA"), appropriate under the Victim Witness Restitution Act ("VWPA"), and should be ordered as to the victim investors who were defrauded by Mulholland and his co-conspirators' manipulation of VLNX and CYNK. In support of its position, the government explained that the money laundering count does not mandate that its victim is per se "society at large." The government further explained that, if that were the case, restitution could never be ordered for money laundering offenses. The government also noted that the specified unlawful activity for the money laundering count of conviction in this case is fraud in the sale of securities, which here involves the more than forty publicly-traded companies manipulated by the defendant and his co-conspirators. Because it would require a herculean, if not impracticable, effort to identify the actual pecuniary harm suffered by specific victims for the more than forty fraudulent manipulation schemes, the government selected the two stocks that were also charged in the indictment as substantive securities fraud and presented Probation with its best efforts to make whole a percentage of victims who suffered loss as a direct result of the defendant's fraudulent scheme. Accordingly, the government submits that restitution is appropriate here.[4]

IV.     The Jointly-Recommended 12-Year Term of Imprisonment is Appropriate

    A.     Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] ... to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

---

[4] As of the filing of this letter, Probation had not filed an addendum in response to the government's objections concerning the Guidelines calculation and restitution.

Hon. I. Leo Glasser
January 23, 2017
Page 9

Later, in <u>Gall v. United States</u>, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." <u>Id.</u> at 49-50 (citation and footnote omitted).

    B.    <u>Application of Law</u>

As explained in greater detail below, the government respectfully submits that the Court should impose a sentence of 12 years' imprisonment because such a sentence is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." (18 U.S.C. § 3553(a)(2)(A)). A 144-month sentence will also further the aims of specific and general deterrence, and will avoid unwarranted sentencing disparities among the defendant and his co-defendants. (<u>See</u> <u>id</u>. §§ 3553(a)(2)(B), (a)(2)(C), (a)(6)).

    1.    <u>Nature and Circumstances of the Offense</u>

As set forth above, the defendant was the leader of a group of individuals who systematically manipulated the shares of more than forty publicly-traded companies over a four-year time period through a sophisticated offshore operation and brokerage firm network designed to maximize both profits and anonymity. In doing so, Mulholland and his co-conspirators made hundreds of millions of dollars from countless unwitting investors. Indeed, the Mulholland Group made more than $21 million from one stock deal alone – VLNX. By being the leader of such a sophisticated group of stock fraudsters, utilizing offshore shell companies and nominees, and owning and/or controlling three offshore brokerage firms, the extent and seriousness of Mulholland's criminality is beyond question. Put simply, Mulholland and his co-conspirators are responsible for one of the largest market manipulation schemes ever charged in this district. In light of the seriousness of the offenses perpetrated by Mulholland, a 12-year term of imprisonment is warranted. <u>See</u> 18 U.S.C. §§ 3553(a)(1), (2)(A).

    2.    <u>History and Characteristics of the Defendant</u>

The defendant next argues that he deserves a term of imprisonment significantly below the advisory Guidelines range because he contends that (1) he is a man of good character and is devoted to his family and friends; and (2) he has fully accepted responsibility for his actions. Def. Mem. at 12-22. The defendant submitted almost 20 letters of support that primarily state that he is a committed husband and father, a good athlete and someone who has positively impacted the lives of his family and friends. Notably, all of these letters reveal a lack of understanding of the nature and extent of Mulholland's crimes, particularly those letters that highlight the

defendant's "honesty" and "kindness." The defendant's actions in this scheme, as set forth in detail above, demonstrate an individual who lacks character, not the honest, caring man portrayed in his letters of support. Indeed, Mulholland and his co-conspirators made more than $250 million from countless victims based entirely on lies and deceit. The massive fraud perpetrated by Mulholland was ingenious and calculating, without any regard to its effect on investors and to the integrity of the financial markets. Indeed, Mulholland and his co-conspirators stole money from investors in more than forty publicly-traded companies and also used attorneys, who typically embody a position of trust, to conceal and transfer the hundreds of millions of dollars of fraudulent proceeds.

As evidenced by his sentencing submission and letter to the Court, Mulholland appears to be very remorseful that he has harmed his parents, wife and daughters through his extensive criminal conduct, but notably, <u>makes what appears to be merely a passing reference to the actual victims of his crimes, to whom he refers as "everyone and anyone I may have hurt or affected</u>." Instead, he attempts to downplay his culpability by blaming his initial involvement in stock manipulation schemes and the Mulholland Group on CW-1, the attorney who was one of Mulholland's initial contacts at Legacy and later transferred Mulholland's stock fraud proceeds through various escrow accounts at Mulholland's request. In writing that he made a fateful choice in 2010 to "work with Legacy" and "represent foreign clients" instead of working for a "one of the world's largest toy manufacturers," Mulholland ignores that he was charged by the SEC for participating as a stock promoter in a market manipulation scheme that occurred <u>in 2008</u> involving Rudy Nutrition, a company that was purportedly established to compete with Gatorade in the sports drink market. <u>SEC v. Ruettiger, et al.</u>, No 2:11-CV-02011 (D. Nev. Dec. 16, 2011); Litigation Rel. No. 22198 (December 16, 2011). Instead, Mulholland and his co-conspirators used Rudy Nutrition as a vehicle for a pump-and-dump scheme in 2008 that generated approximately $11 million in profits. On January 19, 2012, Mulholland entered into a consent injunction in federal court with the SEC in which he was prohibited from committing any future violations of the antifraud and registration provisions of the federal securities laws, and prohibited from participating in any offering of a penny stock. Mulholland was clearly in violation of that injunction for a significant portion of the time in which he acted as the leader of the Mulholland Group. Additionally, on September 24, 2013, the SEC obtained a final money judgment totaling $5.3 million against Mulholland. Although Mulholland clearly had the means to pay the money judgment, he did not make any payments to the SEC. The SEC's Office of Collections then had to pursue Mulholland for the entire sum, and has succeeded in locating and encumbering millions of dollars in assets in the U.S. and Canada.[5] The government also has obtained evidence from

---

[5] In his sentencing submission, Mulholland states that he submitted to a "proffer in which he detailed, in excruciating detail, the offense, his role in it, the role of others and he set forth his every asset, some of which were not known to the government." Def. Mem. at 21. While Mulholland did participate in a proffer with the government and readily agreed to forfeiture, he exaggerates the scope and level of detail provided to the government in that proffer. As Mulholland notes in his submission, the government was not amenable to his efforts to become a cooperating witness. <u>Id.</u> The government's position was based largely on its conclusion, formed

Hon. I. Leo Glasser
January 23, 2017
Page 11

another cooperating witness who had worked with Mulholland as part of the Mulholland Group ("CW-2"), who has been corroborated through other sources of evidence, that Mulholland had participated in pump-and-dump schemes prior to meeting CW-1.

In sum, the defendant's history and characteristics weigh heavily in favor of a 12-year term of imprisonment.

       3.      Seriousness of the Offense and Deterrence

There can be no doubt that Mulholland committed a serious offense, and one that is unfortunately too common in our society and in our financial markets. Not only is market manipulation too common, but Mulholland took it to a level that is very rarely seen. The defendant, together with his co-conspirators, stole more than $250 million from more victims than the government can realistically count.

The Court's sentence should further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C). Here, both are at issue. The defendant has a long history of participating in stock manipulation schemes, and directed the manipulation of the stock of more than forty publicly-traded companies in this case alone. As detailed above, the defendant ignored an SEC injunction and a money judgment regarding prior, similar conduct. Thus, the need for specific deterrence cannot be overstated. Additionally, the need for general deterrence in this case is incredibly high. Given that sophisticated market manipulation schemes are difficult to detect and prosecute, particularly those schemes that function largely offshore, there is greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan,

---

through its review of extensive evidence it obtained in this case, that Mulholland is one of the most culpable individuals who participated in the charged crimes. The government agreed to a proffer with Mulholland, however, solely to determine Mulholland's assets for forfeiture purposes only. Contrary to Mulholland's assertions, the government did not extensively proffer Mulholland on the charged offenses, his role in the scheme and the role of others. While Mulholland disclosed his properties and assets, such as an aircraft and Range Rover vehicle, to the government during that proffer, the government was aware of most, if not all, of the assets he disclosed. Additionally, because the Mulholland Group's operations were international in scope and involved the transfer of money through overseas bank accounts, the government cannot verify that Mulholland has disclosed all of his criminal gains to the government.

43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

A 12-year sentence, which represents a strong but fair sentence by the Court, would send a strong deterrent message to those who engage in similar conduct as the defendant that participation in such crimes are serious offenses that come with appropriate consequences.

    4.  Need to Avoid Unwarranted Sentencing Disparities

The defendant also argues for a sentence below the advisory Guidelines range because the applicable Guidelines range of 210-240 months purportedly overstates his "criminal propensity" and results in a sentence that is "years greater than necessary in light of all the factors embodied in 18 U.S.C. § 3553(a)." Def. Mem. 22-27. As an initial matter, considering the nature of Mulholland's criminal activity, and the fact that the value of the funds laundered in this case is so high and is comprised of money stolen from countless victims, the applicable Guidelines range in this case does not shock the conscience. The government agreed to recommend a 12-year sentence in the plea agreement, however, due to the complexity of the charges in this case; the volume and complexity of the evidence, including evidence obtained from offshore sources; and the significant resources that would have been expended by the government during a trial. A 12-year sentence, while significant, does not create an unwarranted sentencing disparity in light of the sheer number of stock manipulation schemes in which the defendant participated and the magnitude of the proceeds laundered. Additionally, there is minimal risk that a 12-year sentence for Mulholland will create an unwarranted sentencing disparity as compared to the sentence the Court imposes on Bandfield, who was the architect of the entire scheme and was just as – if not more – culpable than Mulholland.

Hon. I. Leo Glasser
January 23, 2017
Page 13

V. Conclusion

   Based on the foregoing, the government respectfully submits that the Court impose a 12-year term of imprisonment.

              Respectfully submitted,

              ROBERT L. CAPERS
              United States Attorney
              Eastern District of New York

By: /s/

              Jacquelyn M. Kasulis
              Winston M. Paes
              Michael T. Keilty
              Assistant U.S. Attorneys
              (718) 254-6103 (Kasulis)

Cc: Clerk of the Court (ILG) (By ECF)
   James Kousouros, Esq. (By ECF and Email)
   Roberta Houlton, U.S.P.O. (By Email)